## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEBRASKA

CARSON P., by his next friend Crystal Foreman;  )
PAULETTE V., by her next friend, Sherri Wheeler;  )
DANIELLE D., by her next friend, Jodell Bruns;  ) Case No. _____
CHERYL H., by her next friend, Susan Nowak; and  )
JACOB P., by his next friend, Sara Jensen, on their  )
own and on behalf of all others similarly situated,  )
                                                     )
                                                     )
                Plaintiffs,                          ) **CLASS ACTION COMPLAINT**
                                                     )
v.                                                   )
                                                     )
DAVE HEINEMAN, as Governor of the State of           )
Nebraska; NANCY MONTANEZ, as Director of             )
Services, Nebraska Department of Health and          )
Human Services; JOANN SCHAEFER, as the               )
Director of Regulation and Licensure, Nebraska       )
Department of Health and Human Services;             )
RICHARD NELSON, as the Director of Finance           )
and Support, Nebraska Department of Health and       )
Human Services; DENNIS LOOSE, as the Chief           )
Deputy Director, Nebraska Department of Health       )
and Human Services; and TODD RECKLING, as            )
the Administrator of the Department of Health and    )
Human Services' Office of Protection and Safety,     )
                                                     )
                                                     )
                Defendants.                          )
_____      )

1.    This is a civil rights class action brought pursuant to 42 U.S.C. § 1983 on

behalf of all foster children who are or will be in the legal custody of the Nebraska Department

of Health and Human Services ("HHS"). The defendants in this action are Dave Heineman, as

-1-

Governor of the State of Nebraska; Nancy Montanez, as the Director of Services, Nebraska HHS; Dr. Joann Schaefer, as the Director of Regulation and Licensure, Nebraska HHS; Richard Nelson, as the Director of Finance and Support, Nebraska HHS; Dennis Loose, as the Chief Deputy Director of Services, Nebraska HHS; and Todd Reckling, Administrator of HHS' Office of Protection and Safety (collectively, the "Defendants"). All Defendants are sued in their official capacities, as the administrators of Nebraska's child welfare system.

2.    Defendants' failure to protect Nebraska's foster children and provide them with legally-required services subjects these children to significant and ongoing harm, deprives them of a chance for a safe and stable childhood, and violates their rights under the United States Constitution and various federal statutes. This action seeks declaratory and injunctive relief against Defendants to stop continuing violations of the legal rights of Nebraska's foster children and to prevent Defendants, by their actions and inactions, from continuing to harm the very children that rely on the State for their care and protection.

## INTRODUCTION

3.    There are more than 6,000 abused, neglected or otherwise deprived children in the custody of HHS. Instead of providing these traumatized and vulnerable children with a safe and temporary home, Nebraska's mismanaged, overburdened and under-funded foster care system routinely further harms them and allows them to deteriorate, without the basic care, services, protection and opportunities for a permanent home that are necessary for their physical, emotional and psychological development and well-being.

4.    As a result of serious systemic deficiencies that have been known to Defendants for many years, the Nebraska foster care system operated by HHS inflicts numerous harms on abused and neglected children while they are in state custody, including:

a. ***Frequent moves among multiple inappropriate placements.*** Subjecting foster children, especially those who have undergone the trauma of being removed from an abusive or neglectful home, to repeated changes in their primary caregivers causes serious harm to their development and psychological health. Yet data collected by HHS and reported to the federal government shows that, of the children in Defendants' custody during fiscal year 2004, nearly 32% had experienced four or more placements during their current stay in foster care. In another example, the annual report issued by the Nebraska Foster Care Review Board in 2004 (the "FCRB 2004 Report") found that 50% of all children in "out-of-home" foster care as of the last day of 2003 had experienced four or more placements during their time in foster care, and over 30% of those children had been moved six or more times.

b. ***Excessive stays in emergency shelters and other temporary facilities.*** Nebraskan children first entering foster care and those already in state custody who have their foster homes or other placements "disrupt" are routinely left for extended periods of time, sometimes many months, in inappropriate emergency shelters and other temporary facilities intended for very limited stays (no more than 30 days), often for the simple reason that the State has nowhere else to place them. Treatment services are frequently lacking in the shelters, and these facilities often randomly mix youth who have been adjudicated delinquent with non-offenders, and children with aggressive physical or sexual behaviors with young and vulnerable children.

c. ***The placement of infant and other very young foster children in emergency shelters and other temporary facilities.*** In addition to the harmful extended use of emergency shelters for children generally, group-care facilities designed for very short stays are being regularly used as placements for infants, toddlers and other young children, sometimes for extended periods of time, again often because appropriate placements are unavailable. The care of young children forming critical bonds and developmental skills through shifts of caretakers in group facilities is damaging to these children.

d. ***Overcrowded foster homes.*** As a result of the lack of homes and other placements for foster children, foster homes are regularly overcrowded, sometimes housing more than six children at a time (many of them with special needs). Such overcrowding prevents adequate parental supervision and places children at risk of harm.

e. ***Maltreatment of foster children while in State custody.*** Far too often children brought into Nebraska's foster care custody because of abuse or neglect at the hands of their own biological parents or other caregivers are subject to further maltreatment *while in the custody of the State.* This maltreatment occurs because of the State's failure to (i) appropriately

-3-

screen and oversee foster homes, (ii) segregate sexually reactive children (often themselves the victim of prior sexual abuse) or physically aggressive children from other foster children, and (iii) adequately monitor and supervise visits between foster children and their biological family members when problems that have not been addressed place children at risk of harm.

f.      *Overuse of institutional placements for children.* Due to a lack of foster homes, Nebraskan foster children are inappropriately placed in institutions and other congregate facilities when they could be appropriately placed with foster families. The State also continues to place young children (including children under eight years of age) in institutions and group facilities, denying them individualized treatment and important one-on-one relationships with consistent caregivers.

g.      *Excessive lengths of stay in State custody.* Nebraskan foster children are unnecessarily spending large portions of their lives – and sometimes their entire childhoods – in foster care. Defendants fail to provide foster children with appropriate case management, case plans and the services, including adoption-related services, required to prevent children from growing up in state custody. Nebraskan foster children are routinely denied opportunities to be adopted, and many are discharged from the foster care system at or around the State's age of majority without the life skills necessary for them to live independently.

5.      These continuing harms to children are caused by a number of severe and

long-standing systemic deficiencies that plague Nebraska's foster care system, including:

a.      *A severe shortage of foster homes.* HHS fails to maintain an adequate number and kind of foster homes and other appropriate placements for foster children. Foster children are placed wherever a bed or "slot" is available and not according to their individual needs.

b.      *High caseloads and turnover.* HHS caseworkers responsible for overseeing the care and protection of children in the State's custody often have dangerously high caseloads that are frequently multiples of the national standard of 12-15 foster children per caseworker. High caseloads and an unsupportive environment for many caseworkers have led to very high turnover rates. In urban areas, caseworkers frequently leave after working with HHS for one or two years and many leave well before that time, often before they have even completed their training. As a result, frontline staff members are frequently inexperienced.

c.      *Poor monitoring of child safety.* Nebraska's foster homes are often inadequately screened for safety. For example, the FCRB 2004 Report found that, in over 25% of the "out-of-home" foster care cases reviewed

-4-

by the Board during calendar year 2003, children were placed in homes that were unsafe, inappropriate or had never undergone a documented safety assessment. Additionally, high caseloads interfere with the ability of caseworkers to adequately monitor the safety of foster children assigned to them. Recent state data shows that, for January 2005, at least 36% of foster children statewide did not receive a required monthly contact from their caseworker.

d. *A lack of basic health services for foster children.* Nebraska's foster children are routinely denied services necessary to address acute mental health problems on the basis of cost. These children are left in foster homes that are unable to meet their needs and in which their mental health further deteriorates. Foster children are also denied timely basic medical examinations and dental health services.

e. *Poor planning and services to quickly move children out of foster care and into permanent homes.* HHS routinely fails to provide foster children with appropriate case management, case plans and services, especially adoption-related services, that are required to ensure that children do not grow up languishing in State custody. In a 2002 audit of HHS, the federal government identified the failure to establish goals for children's permanent placement and the failure to achieve adoptions in a timely manner as "critical problems." These same "critical problems" continue today.

f. *Grossly inadequate payments to foster care providers.* Nebraska fails to provide payments to those caring for foster children that even approach the actual cost of care. For example, HHS pays foster parents as little as $222 per month – less than $8 per day – to raise a two-year-old foster child, when the federal government estimates that the average monthly cost of raising a child in the rural United States is $755 and even more in the urban Midwest.

g. *Fiscal waste.* Nebraska regularly fails to collect available federal funds for foster children in State custody, foregoing many millions of dollars that could be used to provide desperately needed homes and services for children.

6. The harms routinely inflicted on children in Nebraska's foster care custody, and the systemic deficiencies and pattern and practice of conduct from which they arise, cause the overall physical, emotional and psychological deterioration of foster children while in State custody.

7.     Defendants have long been aware of HHS' ongoing and systemic failure to provide for the safety and well-being of Nebraska's foster children, as all of these deficiencies have been repeatedly documented in governmental reports, audits and in the media. Yet Defendants have been unable or unwilling to address them. The serial reform plans Defendants have issued over the years have failed to ameliorate the ongoing systemic deficiencies and harms to Nebraska's foster children detailed in this Complaint.

8.     These and other actions and inactions of Defendants subject Nebraska's foster children to significant and ongoing harms, deprive them of a chance for a safe and stable childhood, and violate their rights under the United States Constitution and federal statutes. This lawsuit seeks declaratory and injunctive relief to stop these ongoing legal violations and the serious harms that flow from them and ensure that Defendants adequately care for and protect children in state custody, as required by law.

## JURSIDICTION AND VENUE

9.     This is an action brought pursuant to 42 U.S.C. § 1983, alleging violations of the United States Constitution and federal statutes. This court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 & 1343.

10.    Venue in this district is proper, pursuant to 28 U.S.C. § 1391(b), because the claims arise in the district.

## PARTIES

### Named Plaintiffs

11.    Named Plaintiff Carson P.[1] is an eight-year-old boy who has been in HHS custody for approximately two years.

---

[1] Pursuant to Rule 5.3 of the Local Civil Rules of the United States District Court for the District of Nebraska, the minor Named Plaintiffs are identified only by their initials and a pseudonym.

12.    Carson P. appears in this action through his next friend, Crystal Foreman, Bellevue, Nebraska.

13.    Named Plaintiff Paulette V. is an 18-year-old girl who has been in HHS custody for most of the last 12 years.

14.    Paulette V. appears in this action through her next friend, Sherri Wheeler, Imperial, Nebraska.

15.    Named Plaintiff Danielle D. is a seven-year-old girl who has been in HHS custody for approximately two years.

16.    Danielle D. appears in this action through her next friend, Jodell Bruns, Lincoln, Nebraska.

17.    Named Plaintiff Cheryl H. is an 18-year-old girl who has been in HHS custody for approximately 10 years.

18.    Cheryl H. appears in this action through her next friend, Susan Nowak, Poughkeepsie, New York.

19.    Named Plaintiff Jacob P. is a 13-year-old boy who has been in HHS custody continuously for 18 months.

20.    Jacob P. appears in this action through his next friend, Sara Jensen, Neola, Iowa.

## Defendants

21.    Defendant Dave Heineman is the Governor of Nebraska and is sued in his official capacity. His business address is the Office of the Governor, P.O. Box 94848, Lincoln, Nebraska 68509-4848. Pursuant to Article IV, § 6 of the Nebraska State Constitution, Governor

-7-

Heineman is directly responsible for ensuring that all Nebraska agencies, including HHS, comply with applicable federal and state laws.

22.    Pursuant to the Nebraska Partnership for Health and Human Services Act of 1996, the HHS "System" is comprised of three interrelated HHS agencies:    Services, Regulation and Licensure, and Finance and Support. The three directors of the HHS agencies are members of the HHS "Policy Cabinet."

23.    HHS Services operates Nebraska's public child welfare program. Within HHS Services is the Office of Protection and Safety, which is charged with drafting child welfare policy and otherwise developing the State's child welfare program, including its foster care and adoption programs.

24.    The State is divided into five HHS service areas. In each service area there is an HHS Office of Protection and Safety Service Area Administrator charged with implementing the child welfare program developed by the central HHS Office of Protection and Safety.

25.    Defendant Nancy Montanez is the Director of HHS Services and is sued in her official capacity. Her business address is P.O. Box 95044, Lincoln, Nebraska 68509-5044. In her role as Director of HHS Services, Director Montanez is directly responsible for managing HHS Services, including HHS Service's Office of Protection and Safety, and for supervising all public child welfare services in the State of Nebraska. Pursuant to Neb. Rev. Code § 68-1207 and other provisions, Ms. Montanez is responsible for supervising the State's public child welfare services as described by federal and Nebraska law. Ms. Montanez is a trained social worker, having received her degree in that field from the University of Nebraska at Kearney in 1984.

-8-

26. Defendant Dr. Joann Schaefer is the Director of HHS Regulation and Licensure and is sued in her official capacity. Dr. Schaefer is also Nebraska's Chief Medical Officer. Her business address is P.O. Box 95007, Lincoln, Nebraska 68509-5007. In her role as Director of Regulation and Licensure, Dr. Schaefer is responsible for developing and disseminating regulations governing the operation of the Office of Protection and Safety, through which Nebraska operates its public child welfare program, and for licensing facilities and services used by HHS. Dr. Schaefer is a trained physician, having received a graduate degree in medicine from Creighton University Medical School in 1995.

27. Defendant Richard Nelson is the Director of Finance and Support of HHS and is sued in his official capacity. His business address is P.O. Box 95026, Lincoln, Nebraska 68509-5036. In his role as Director of Finance and Support, Mr. Nelson is responsible for aligning human resources, financial resources, and information needs for HHS. From 1999 to 2004, Mr. Nelson served as the Director of HHS Regulation and Licensure.

28. Defendant Dennis Loose is the Chief Deputy Director for HHS Services. His business address is P.O. Box 95044, Lincoln, Nebraska 68509. In his role as Chief Deputy Director, Mr. Loose directly oversees HHS Services' Office of Protection and Safety, the organization charged with developing the State's child welfare program. Mr. Loose also directly oversees the five HHS Service Area Administrators charged with the "on the ground" implementation of Nebraska's child welfare program.

29. Defendant Todd Reckling is the Administrator of HHS Services' Office of Protection and Safety. His business address is P.O. Box 95044, Lincoln, Nebraska 68509. In his role as Administrator, Mr. Reckling is charged with management of HHS' Office of Protection and Safety.

## CLASS ACTION ALLEGATIONS

30.    This action is properly maintained as a class action pursuant to Fed. R. Civ. P. 23 (a) and (b)(2).

31.    The class is defined as: "All foster children who are or will be in the legal custody of HHS, including those alleged or adjudicated to be abused, neglected or abandoned by their parent, guardian or custodian, and those alleged or adjudicated to be wayward, uncontrollable or habitually truant."

32.    The plaintiff class is sufficiently numerous. As of March 9, 2005, there were approximately 6,674 foster children in the legal foster care custody of HHS, making joinder of all members impracticable.

33.    The questions of law and fact raised by the identified Named Plaintiffs are common to and typical of those raised by the putative class members. Each Named Plaintiff and each putative class member is in need of foster care services, must rely on Defendants for those services, and is subject to HHS' harmful systemic deficiencies.

34.    Questions of fact shared by the Named Plaintiffs and the putative class members (together, the "Plaintiffs" or the "Plaintiff children") include:

> a.    whether Defendants fail to provide foster children in their custody with safe, stable and appropriate foster care placements, as required by law and reasonable professional standards;
>
> b.    whether Defendants fail to provide foster children in their custody with legally required safety, protection and services necessary to prevent them from deteriorating physically, psychologically, emotionally, or otherwise, while in state custody;
>
> c.    whether Defendants fail to provide appropriate and timely permanency planning and services for children in foster care to assure that they are properly cared for and either safely reunited with their families or freed for adoption and promptly placed in another permanent home, consistent with applicable law and reasonable professional standards; and

-10-

4:05-cv-03241-RGK-DLP   Doc # 1   Filed: 09/19/05   Page 11 of 57 - Page ID # 12

d. whether Defendants fail to provide foster children in their custody with the opportunity to maintain critical family relationships, including through visitation with their siblings.

35. Common questions of law include:

a. whether Defendants' actions and inactions violate Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to be safe from harm while in state custody;

b. whether Defendants' actions and inactions violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, and relevant federal regulations, to mandated foster care and adoption services and foster care maintenance payments;

c. whether Defendants' actions and inactions violate Plaintiffs' rights under the Early and Periodic Screening, Diagnosis and Treatment program of the Medicaid Act, and relevant federal regulations;

d. whether Defendants' actions and inactions violate Plaintiffs' rights to familial association under the First, Ninth and Fourteenth Amendments to the United States Constitution; and

e. whether Defendants' actions and inactions breach contractual rights enjoyed by Plaintiffs as third-party beneficiaries to Nebraska's State Plan contracts with the federal government pursuant to Titles IV-B and IV-E of the Social Security Act.

36. The legal violations alleged by the Named Plaintiffs are typical of those raised by each member of the putative class. The harms suffered by the Named Plaintiffs are typical of the harms suffered by all children in the putative class.

37. Each Named Plaintiff appears by a next friend pursuant to Fed. R. Civ. P. 17(c), and each next friend is sufficiently familiar with the child's situation to fairly and adequately represent the child's best interest in this litigation.

38. The Named Plaintiffs will fairly and adequately protect the interests of the members of the putative class.

-11-

39.     The Named Plaintiffs and the putative class are represented by attorneys employed by Children's Rights, a national non-profit legal organization based in New York, New York, with experience in complex child welfare class actions; attorneys employed by Nebraska Appleseed Center for Law in the Public Interest, a non-profit, non-partisan law project based in Lincoln, Nebraska, with experience in complex welfare and Medicaid class actions; and attorneys from Ogborn, Summerlin & Ogborn, P.C., a private law firm with offices in Lincoln, Nebraska and Denver, Colorado, with experience in complex federal court class actions; DLA Piper Rudnick Gray Cary US LLP, an international private law firm with offices in cities throughout the country, with experience in complex federal court class actions; and Cline, Williams, Wright, Johnson & Oldfather, L.L.P., a private firm with offices in Lincoln, Omaha, Aurora and Scottsbluff, Nebraska, and Fort Collins, Colorado; Woods & Aitken LLP, a private firm with offices in Lincoln and Omaha; and Gross & Welch, P.C., L.L.O., a private law firm with offices in Omaha, all with experience in complex federal court litigation.

40.     Counsel for the Plaintiffs know of no conflicts among members of the putative class.

41.     Defendants have acted or refused to act in a manner generally applicable to the putative class, making class-wide declaratory and injunctive relief appropriate and necessary.

## FACTUAL ALLEGATIONS REGARDING NAMED PLAINTIFFS

### Carson P.

42.     Carson, now eight years old, has been in HHS custody for approximately two years. A victim of sexual abuse and fetal alcohol syndrome, Carson has serious mental and behavioral health needs. Throughout his term in foster care Carson has routinely been, and is

-12-

now being, denied access to treatment and services appropriate to these significant needs, to his great detriment.

43.    Carson came into HHS custody in September 2003 as a six-year-old. When police officers arrived at Carson's house, they found him carrying around an axe and determined that he had access to other weapons, including a knife, and drug paraphernalia. Carson had been encouraged to drink alcohol and smoke in the home and at the time of removal his teeth were severely decayed.

44.    Carson was placed into a foster home that was provided almost no information about his medical, emotional and mental health needs and the circumstances under which he came into care.

45.    After several months in foster care, Carson reported being repeatedly sexually abused prior to removal.    Carson was taken to be interviewed at Project Harmony, Omaha's Child Advocacy Center, but he became frightened and was unable to complete the interview process.

46.    Though Carson talks openly of his desire to harm and even kill people, hears voices, and describes dreams in which he molests other children, he was not assessed in any formal manner at or around the time he came into care and HHS has consistently impeded any and all efforts to obtain appropriate treatment for Carson's various mental health and behavioral problems.

47.    During his first eight months in foster care, Carson's HHS caseworker failed to visit him even a single time. For much of this period he was provided with no therapy whatsoever, despite repeated requests by those charged with his care who were witnessing his troubling symptoms and behaviors first-hand. When Carson's caseworker finally approved basic

therapy by a counselor, not a psychologist, it was insufficient to even begin to match Carson's needs, because, among other reasons, he received only a single 30-minute session every two weeks.

48.    In the months following Carson's first outcry about his sexual abuse, he began speaking about the abuse in more explicit detail with his foster parents and, eventually, with his therapist. These allegations were referred to Carson's HHS case manager. The case manager, however, refused to report the allegations, and they were not investigated, despite the fact that one of the alleged perpetrators was Carson's biological mother's boyfriend and Carson's permanency plan was then, as it still is today, reunification with Carson's biological mother.

49.    Though Carson has remained in care far longer than 15 of the most recent 22 months, Carson's permanency goal remains reunification and a petition seeking termination of his parental rights has not yet been filed. HHS has also not yet even begun the process of locating Carson's biological father.

50.    Throughout most of his nearly two-year stay in foster care, Carson has been denied any visits with siblings, cousins, and other family members.

51.    The foster care maintenance payments made to Carson's foster parents on his behalf have consistently failed to cover the actual costs of caring for him.

52.    HHS recently placed Carson with a relative who has not been adequately trained or otherwise prepared to address Carson's substantial needs, a problem made worse by the grossly inadequate therapy being provided him.

53.    Defendants' actions and inactions are part of a systemic pattern of conduct that has caused Carson, and continues to cause Carson, irreparable harm. Defendants have violated, and acted in deliberate indifference to and beyond the bounds of reasonable

-14-

professional judgment regarding, Carson's constitutional and statutory rights by failing to provide necessary services and an appropriate placement for him; by failing to make periodic comprehensive assessments of his needs, including his mental health needs, and providing services consistent with those needs; by failing to make timely and meaningful casework contacts and monitor his progress in foster care in order to ensure his safety and well-being; by failing to provide him with monitoring and services necessary to prevent him from deteriorating physically, psychologically, emotionally, educationally or otherwise while in state custody; by failing to pay foster care maintenance payments on his behalf that cover the reasonable costs of caring for him; by failing to support his family relationships, in particular by not providing child-sibling visits; by failing to provide appropriate management and supervision while he has been in HHS custody in accordance with his individual needs, best interests, and reasonable professional standards; by failing to provide case management and planning in accordance with his individual needs, best interests, and reasonable professional standards; and by failing to develop and implement a viable permanent plan that will allow him to leave foster care and secure a safe and appropriate permanent home in accordance with his individual needs, best interests, and reasonable professional standards.

### Paulette V.

54.     Paulette V. has been languishing in the State's foster care custody for most of the last twelve years, during which time she has been physically or sexually abused on three separate occasions and has been subjected to at least 17 different foster placements, a number of them dangerous and clearly inappropriate to meet her needs. Paulette, who will be turning 19 years old in less than a year, has not been provided a legally mandated written transitional living plan and other services necessary to adequately prepare her for adulthood.

-15-

55. Paulette was removed from her biological mother's care into the legal custody of HHS when she was five years old. Upon entering the system, HHS separated Paulette from her younger brother and sister who were also taken into foster care, and she was denied visitation with them for more than 10 years.

56. HHS originally placed Paulette in a relative foster home in the Omaha area, more than 350 miles from where she was living at the time she came into care. During the course of Paulette's approximately five-year stay at this home, the relative with whom she was placed was incarcerated for a drug offense. HHS did not seek to remove Paulette from the home at the time or otherwise appropriately monitor her safety and the adequacy of supervision in the home. To the contrary, she was only rarely visited by her HHS caseworker. At age 10, as HHS continued in its failure to monitor Paulette's safety and well-being, Paulette was repeatedly sexually abused by an older boy living in the home.

57. Paulette was then sent by HHS to live with a more distant relative. Notwithstanding her prior sexual abuse, HHS arranged for Paulette to receive only minimal counseling. Given her past experiences, Paulette found the stress of living with a number of older boys in the home intolerable and she was moved by HHS to yet another relative placement, her fourth foster home since entering care.

58. Paulette lived in this home, which eventually took legal guardianship of her, for about three years. In this home, Paulette was physically abused by her relative foster parent. She reported the abuse. However, despite extensive bruising, no action was taken either by the police or by HHS. Paulette came back into HHS legal custody when, at the age of 13, she was again sexually abused, this time by a boyfriend of her relative foster parent and then guardian.

-16-

59.    Paulette was next shuffled through a string of group homes. The repeated and serious psychological and physical traumas she had suffered during her years in HHS custody manifested themselves in increasingly difficult to control behaviors. She was eventually transferred by HHS to a highly restrictive residential treatment center, where she lived for approximately six months. Though Paulette attended an in-house school in the facility, none of the credits she earned while in this school were accepted once she returned to mainstream public school, and, as a result, she was forced to repeat the 8th Grade.

60.    HHS then sent Paulette to yet another relative foster home, where she lived for nearly two years. The pattern of scarce visitation by HHS and inadequate counseling continued. This placement was also eventually formalized into a guardianship, but only three months later Paulette came back into foster care when she attempted suicide and HHS had her placed in a psychiatric hospital for several months.

61.    Upon discharge from this psychiatric hospital, HHS placed Paulette in a privately run Omaha emergency shelter to await yet another foster placement. She remained in this inappropriate facility for approximately three months while HHS purportedly sought to find her an appropriate home. The shelter, intended for extremely short stays of up to 30 days, was populated by a mix of delinquent, neglected and abused teens and some younger children, including children less than five years of age. HHS next placed Paulette in a different shelter in Omaha where she resided for over a month before running away after a dispute with another resident. She was then kept for a number of days in a locked facility.

62.    Paulette was then placed by HHS for nearly two years in a series of restrictive group placements, including a residential treatment center, operated by a private provider. She continued to be visited by HHS only sporadically during this time. She repeatedly

-17-

asked her HHS caseworker to be transferred to a family home but was told that no such homes were available.

63.    In late 2004, as a 17-year-old, Paulette was at last placed by HHS into a family foster home, at least her 17th foster care placement. Paulette – now 18 years of age – has not been involved in the required process of developing and implementing a Written Transitional Living Plan and is not otherwise being adequately prepared for her transition to adulthood at age 19, a transition that will surely be harder for Paulette given the many harms inflicted upon her during her years in HHS custody.

64.    Defendants' actions and inactions are part of a systemic pattern of conduct that has caused Paulette, and continues to cause Paulette, irreparable harm. Defendants have violated, and acted in deliberate indifference to and beyond the bounds of reasonable professional judgment regarding, Paulette's constitutional and statutory rights by failing to protect her from harm; by failing to provide necessary services and an appropriate permanent placement for her; by failing to make periodic comprehensive assessments of her needs; by placing her in inadequately screened and monitored foster homes; by placing her into circumstances while in HHS custody which Defendants knew or should have known would have and did render her vulnerable to danger, placed her at risk of harm and which in fact resulted in severe harm to her; by failing to make timely and meaningful casework contacts and monitor her progress in foster care in order to ensure her safety and well-being; by placing her in emergency shelters for more than thirty days and contrary to her individual needs and best interests; by failing to provide her with monitoring and services necessary to prevent her from deteriorating physically, psychologically, emotionally, educationally or otherwise while in state custody; by failing to support her family relationships by not providing child-sibling visits; by failing to

-18-

provide appropriate management and supervision while she has been in HHS custody in accordance with her individual needs, best interests, and reasonable professional standards; by failing to provide case management and planning in accordance with her individual needs, best interests, and reasonable professional standards; by failing to develop and implement a viable permanent plan that will allow her to leave foster care and secure a safe and appropriate permanent home in accordance with her individual needs, best interests, and reasonable professional standards; and by failing to provide her with legally mandated independent living and transitional services to enable her to live on her own once she is discharged from HHS custody at age 19.

## Danielle D.

65.    Danielle is a seven-year-old child who has spent the majority of her life in state custody and is now more than two years into her second extended stay in foster care. HHS has failed to provide Danielle with the case planning and services needed to move her on to a permanent home. In fact, for much of the last calendar year, Danielle's permanency goal has been "long term foster care," a manifestly inappropriate goal for an eminently adoptable child such as Danielle.

66.    Danielle originally entered the foster care system as a toddler following the drowning of her younger brother. After approximately a year and a half in HHS custody, Danielle was returned home. In 2003, Danielle re-entered the foster care system as a four-year-old after one of her teachers reported signs of physical abuse.

67.    Danielle is hearing impaired and significantly developmentally delayed. At the time of her re-entry into foster care, Danielle had a hearing aide but had not been taught

how to use it. The foster care maintenance payments made to her foster parents on her behalf have consistently failed to cover the actual costs of caring for her.

68.    HHS failed to take necessary steps to provide Danielle's biological mother with the services necessary to further the purported goal of reunification or to determine that reunification was inappropriate and implement another permanency plan.

69.    More than a year into Danielle's second foster care stay, it was determined that Danielle's mother could not safely and appropriately care for Danielle. Notwithstanding this determination and the fact that Danielle's foster mother had indicated that she was ready, willing and able to adopt Danielle, instead of promptly seeking to terminate parental rights so that Danielle could be adopted, HHS recommended that Danielle's permanency goal be changed from reunification to "long term foster care," clearly an inappropriate goal for a child as young as Danielle for whom a potential stable and permanent adoptive home had already been identified.

70.    Although a petition seeking termination of Danielle's mothers parental rights has recently been filed, HHS continues to fail to take reasonable steps to seek and secure a permanent and stable home for Danielle. For example, HHS has not yet begun the process of finding and terminating the rights of Danielle's biological father or timely or appropriately followed-up on Danielle's mother's claim of a tribal affiliation for Danielle, both necessary precursors to Danielle actually achieving permanency.

71.    During her time in foster care, HHS has failed to arrange for even a single visit between Danielle and either of her sisters, both of whom have been in foster care for a number of years. Moreover, HHS has failed to appropriately monitor the visits between Danielle and her mother, delegating responsibilities for such monitoring (and transportation to and from

the visits) to a constantly changing corps of under-trained and inexperienced staff employed by a private subcontractor.

72.     Defendants' actions and inactions are part of a systemic pattern of conduct that has caused Danielle, and continues to cause Danielle, irreparable harm. Defendants have violated, and acted in deliberate indifference to and beyond the bounds of reasonable professional judgment regarding, Danielle's constitutional and statutory rights by failing to provide necessary services and an appropriate permanent placement for her; by failing to make periodic comprehensive assessments of her needs; by failing to make timely and meaningful casework contacts and monitor her progress in foster care in order to ensure her safety and well-being; by failing to provide her with monitoring and services necessary to prevent her from deteriorating physically, psychologically, emotionally, educationally or otherwise while in state custody; by failing to support her family relationships by not providing child-sibling visits; by failing to pay foster care maintenance payments on her behalf that cover the costs of caring for her; by failing to provide appropriate management and supervision while she has been in HHS custody in accordance with her individual needs, best interests, and reasonable professional standards; by failing to provide case management and planning in accordance with her individual needs, best interests, and reasonable professional standards; and by failing to develop and implement a viable permanent plan that will allow her to leave foster care and secure a safe and appropriate permanent home in accordance with her individual needs, best interests, and reasonable professional standards.

## Cheryl H.

73.     Cheryl H. has been in foster care for nine years. Because of HHS' failure to appropriately assess Cheryl's needs and place her in accordance with them and HHS' failure

to develop, train and support foster parents capable of meeting the needs of children like her, Cheryl has unnecessarily suffered through more than a dozen placement changes and has spent significant periods of her life in institutional settings. As a result of HHS' failure to provide Cheryl with appropriate treatment and case planning services, Cheryl has also been denied the opportunity for a stable home through adoption or guardianship. Instead, she has been permitted to steadily deteriorate while in state custody.

74.    Within a short time of coming into care, Cheryl – then only nine years old – was placed for an extended stay in a large group home, far from the biological mother with whom the state's plan was for her to be reunified. When this placement disrupted, she was placed with a pair of first-time foster parents who struggled for a little under a year to meet her very significant mental health and behavioral needs with almost no caseworker supervision, support (including respite services) or training from HHS. On several occasions during her placement in the home, Cheryl's condition deteriorated to the point that she required hospitalization in the children's ward of a psychiatric hospital, but each time she was returned to the foster home without significant additional supports or services. Ultimately that placement also disrupted and Cheryl then spent more than a year living in an emergency children's shelter with children of various ages and emotional, mental health and behavioral needs, a manifestly inappropriate placement for a troubled girl who was then only 11 years old.

75.    Cheryl's placement when she was at last moved from the shelter was with another set of first-time foster parents, again with no special training in the provision of anything but basic non-therapeutic foster care. This placement was also punctuated by a number of psychiatric hospitalizations but, as before, no alternative placement or stabilization and support services to the foster home were offered or tried.

76.    When this placement also disrupted, Cheryl was placed for a period of time with a residential treatment center, and then moved through a number of group placements operated by the same provider that ran the treatment center. At approximately the age of 16, Cheryl was again placed in an unsupported "traditional" foster home that was ultimately unable to handle her. When that placement disrupted, she was returned to a children's shelter for approximately a month, and is currently living with yet another foster parent, awaiting emancipation when she turns 19 in January 2006. There is minimal planning being done for Cheryl's future transition to adulthood, a future that looks uncertain at best in view of her many behavioral, developmental and mental health problems – problems that have either been caused or exacerbated by her many years in foster care.

77.    Defendants' actions and inactions are part of a systemic pattern of conduct that has caused Cheryl, and continues to cause Cheryl, irreparable harm. Defendants have violated, and acted in deliberate indifference to and beyond the bounds of reasonable professional judgment regarding, Cheryl's constitutional and statutory rights by failing to protect her from harm; by failing to provide necessary services and an appropriate permanent placement for her; by failing to make periodic comprehensive assessments of her needs; by placing her in inadequately trained and supported foster homes; by failing to make timely and meaningful casework contacts and monitor her progress in foster care in order to ensure her safety and well-being; by placing her in emergency shelters for more than thirty days and contrary to her individual needs and best interests; by failing to provide her with monitoring and services necessary to prevent her from deteriorating physically, psychologically, emotionally, educationally or otherwise while in state custody; by failing to provide appropriate management and supervision while she has been in HHS custody in accordance with her individual needs, best

-23-

interests, and reasonable professional standards; by failing to provide case management and planning in accordance with her individual needs, best interests, and reasonable professional standards; by failing to develop and implement a viable permanent plan that will allow her to leave foster care and secure a safe and appropriate permanent home in accordance with her individual needs, best interests, and reasonable professional standards; and by failing to provide her with legally mandated independent living and transitional services to enable her to live on her own once she is discharged from HHS custody at age 19.

## Jacob P.

78.     Jacob is a 13-year-old boy who has been HHS custody nearly half of his life. Jacob is developmentally delayed with an extensive history of behavioral problems, many caused or exacerbated by his experiences in state custody. During his time in foster care, Jacob has been shuffled amongst at least 11 different foster care placements, including five different placements in the past year and a half, many of which were wholly inappropriate to, and failed to meet, his extensive needs.

79.     Jacob first came into HHS custody in December 1996, at age four. Jacob was neglected medically and had been given alcohol by family members in order to control his behaviors.

80.     After stays in a number of placements, including various institutional settings, Jacob was placed in a potentially adoptive home in August 1999, into which he was adopted in November 2000.

81.     Throughout Jacob's adoption, he reported being slapped and otherwise verbally and emotionally abused by his adoptive parents. In November 2002, HHS investigated abuse allegations against his adoptive parents, but offered no additional services to the family. While

-24-

in the home, another foster child, who had also been adopted by Jacob's adoptive parents, threatened to kill Jacob. In addition, Jacob allegedly acted out sexually towards this adoptive brother.

82.     As a result of these and other behaviors, Jacob's adoptive parents repeatedly requested that HHS provide services in order to help them successfully deal with Jacob's needs and behaviors, including inpatient treatment for Jacob's adoptive brother that would separate the boys. HHS' contractor, Magellan, denied services to Jacob and his adoptive parents without reason. Instead of offering services to keep the family intact, HHS offered the parents an information packet and threatened the adoptive parents with prosecution if they abandoned Jacob's adopted brother.

83.     Jacob's adoption disrupted and his adoptive parents relinquished custody back to HHS in February 2004. Since that time, Jacob has had at least four placement changes and currently resides in a group home. Although Jacob had been in care for many years prior to his disrupted adoption, he was only recently tested for Fetal Alcohol Syndrome even though he exhibited facial features consistent with the diagnosis. In addition, Jacob was not given a neuropsychological evaluation until December 2004.

84.     As a result of his extensive time in State custody and multiple placement moves, Jacob suffers from severe attachment problems.    Though Jacob desperately needs the permanency that only a properly supported adoptive home can provide, his primary permanency goal is not adoption, but rather guardianship. Although Jacob now has a concurrent goal of adoption, HHS has taken no steps towards that goal and Jacob is not currently listed on the HHS adoption website.

85.        Defendants' actions and inactions are part of a systemic pattern of conduct that has caused Jacob, and continues to cause Jacob, irreparable harm. Defendants have violated, and acted in deliberate indifference to and beyond the bounds of reasonable professional judgment regarding, Jacob's constitutional and statutory rights by failing to provide necessary services and an appropriate permanent placement for him; by failing to make periodic comprehensive assessments of his needs; by failing to provide him with monitoring and services necessary to prevent him from deteriorating physically, psychologically, emotionally, educationally or otherwise while in state custody; by failing to provide appropriate management and supervision while he has been in HHS custody in accordance with his individual needs, best interests, and reasonable professional standards; by failing to provide case management and planning in accordance with his individual needs, best interests, and reasonable professional standards; and by failing to develop and implement a viable permanent plan that will allow him to leave foster care and secure a safe and appropriate permanent home in accordance with his individual needs, best interests, and reasonable professional standards.

## FACTUAL ALLEGATIONS REGARDING SYSTEMIC DEFICIENCIES AND THE RESULTING HARMS TO FOSTER CHILDREN IN STATE CUSTODY

86.        The described experiences of the Named Plaintiffs are not atypical, but instead are all too common illustrations of Defendants' pattern and practice of deliberate indifference towards, and widespread and systemic failure to exercise and implement reasonable professional judgment regarding, the health, safety and welfare of the abused and neglected foster children they are legally obligated to care for and protect.

87.        Defendants have the authority and the legal responsibility to ensure that foster children in state custody receive the services, care and protection to which they are legally entitled, yet past attempts to address the many pronounced deficiencies in Nebraska's child

-26-

welfare system, and in particular its foster care and adoption programs, have been largely ineffective and in any event not targeted at the problems delineated in this Complaint. Defendants have long known of the injuries and harms suffered by Plaintiff children (and their predecessors in the State's foster care system) as a result of Defendants' pattern and practice of action and inaction. Their failure to take the steps necessary to ameliorate these ongoing, systemic harms reflects a clear departure from any reasonable exercise of their professional judgment, and is also in deliberate indifference to Plaintiff's health, safety and well-being.

## Dangerous and Inappropriate Foster Care Placements and Placement Processes

88.     Plaintiff children who have been traumatized by abuse and neglect and removal from their homes are subject to further harm while in the State's foster care system because of a grave shortage of appropriate numbers and types of foster homes and other placements, which results in the predictable cycling of children through numerous inappropriate and too often dangerous foster care placements.

89.     Because of a severe shortage of foster care placements, an overburdened and insufficiently supported staff, and the absence of an appropriate and timely administered process for assessing the needs of foster children, Plaintiff children who enter foster care in Nebraska are routinely placed without regard to their specific needs or the training and capacity of the foster parents or other caretakers with whom they are placed. Instead, Plaintiffs are regularly placed wherever a bed or "slot" is available.

90.     HHS often fails to collect or maintain the information necessary to properly match Plaintiff children with foster care homes or other placements. For example, as of March 2004, only 18% of the foster parent records contained information regarding the

-27-

characteristics of a child that the foster parents would accept into their home, and only 16% of the foster children's records contained information about the children's characteristics.

91.     HHS caseworkers routinely place Plaintiff children in foster homes without providing the foster parents with adequate information concerning the children's medical and mental health history and needs, and without preparing the foster parents to deal with the predictable behaviors and treatment needs of the children placed in their homes. As a result, foster parents are frequently unaware of and unequipped to meet Plaintiff children's needs. HHS caseworkers are also often unresponsive to foster parents' requests for additional support or information about foster children placed with them.

92.     For foster children with needs that require intensive services or, in rare cases, placement in group or institutional settings that can provide an even higher level of treatment and care, HHS consistently does not provide such services or placements unless and until the children "fail" in the less-supported (and less expensive) placements, those placements disrupt, and those children suffer unnecessary and damaging additional placement moves. This de facto requirement of "failure" before needed services and placements are provided is severely damaging to Plaintiff children.

93.     HHS' pattern and practice of placing children wherever a bed is available instead of based on their individual needs, failing to develop and maintain appropriate foster homes and other placements, failing to provide foster parents with sufficient preparation or information, and failing to provide children with expensive services and placement absent prior placement disruptions or other failures, results in a high rate of psychologically damaging placement disruptions, with Plaintiff children being repeatedly and unnecessarily shuffled from one placement to another. For example, HHS reported to the federal government that from

-28-

October 2003 to September 2004, approximately 47% of the children in foster care had experienced three or more placements and approximately 32% of Nebraska's foster children had experienced four or more placements. In the 2004 FCRB[2] Report, the Board stated that, of the files reviewed of children who were in "out-of-home" foster care placement at the end of 2003, close to 50% experienced four or more placement disruptions, and 33% had experienced six or more placement disruptions while in foster care. The Board expressed special concern about the number of placements experienced by pre-school age children, who can be particularly damaged by multiple broken attachments with care givers. Of the files reviewed of pre-school age children who were in "out-of-home" foster placement at the end of 2003, about 38% had lived in three or more different homes, and about 12% had lived in five or more homes.

94.    Compounding the harm done to Plaintiff children from being shuffled from one placement to another, it is commonplace for HHS to move a child from a foster home abruptly without attempting to provide supportive services to either prevent the placement from disrupting or at least minimize the trauma of yet another change in a child's primary caregiver.

95.    Each placement move by a foster child forces that child to seek to form new attachments with adult caregivers. Plaintiff children who suffer multiple placement moves frequently become increasingly reluctant to love and trust their caretakers, suffer behavioral problems, and become more difficult to place in permanent homes. Additionally, the frequent placement moves experienced by Plaintiff children directly interfere with their education, as

---

[2] The Nebraska Foster Care Review Board was created in 1982 pursuant to the Foster Care Review Act. Neb. Rev. Stat. § 43-1301 *et seq.* Among other statutory duties, the board is charged with (i) establishing and training local foster care review boards for the conduct of six-month permanency review hearings for children in out-of-home state custody, and (ii) accumulating data and making reports on children in out-of-home placements to HHS and the juvenile courts. The FCRB is also authorized to visit and observe foster care facilities in order to ascertain whether the individual physical, psychological, and sociological needs of each foster child are being met. *See* Neb. Rev. Stat. §§ 1303-1308.

many of these unnecessary placement moves result in school changes, delays in the transfer of school records, and delays in enrollment and unnecessary absences from school.

96.     Because of an insufficient number and array of available foster homes, Defendants often rely on unsafe and inappropriate placements for the care of Plaintiff children, including inadequately screened and monitored public (or "traditional") foster homes directly administered by HHS; relative foster homes, also under the direct supervision of HHS; homes recruited by agencies that contract with HHS; and homes and group or institutional placements recruited and overseen by private providers.

97.     There is an acute shortage in Nebraska of the therapeutic foster homes needed to accommodate children with emotional or behavioral problems. Because HHS has failed to develop, train and support a sufficient number of therapeutic foster homes, Plaintiff children are routinely placed in settings that are unable to meet their needs and where they endanger their own development and safety as well as the safety of the other children with whom they are placed (including other foster children and foster parents' biological and adoptive children).

98.     In addition to the harm directly inflicted upon Plaintiff children by the emotional trauma caused by each placement move, HHS' failure to match these children with homes appropriate to their needs results in even longer stays in foster care for these children, and further harm, as the emotional and behavioral effects of the placement moves significantly decreases their chances of ever being placed in a permanent home.

99.     The severe lack of foster homes also results in HHS placing Plaintiff children for extended periods of time in emergency shelters that are intended only for very short stays. In addition to failing to provide stability, these shelter placements often fail to provide

-30-

children with adequate treatment services and fail to provide even rudimentary safety, as they often house together children of diverse ages and maturity levels, including youth who have been adjudicated to be delinquent with non-offenders and children with aggressive physical or sexual behaviors with very young and vulnerable children. Although these emergency shelter placements are intended to be temporary and to last no more than 30 days, Plaintiff children frequently remain for far longer periods – sometimes for four months or more – because the State has nowhere else to place them and also, in some cases, because staff are too overwhelmed to even determine what placements are available for them.

100.    In addition to the inappropriate use of shelters for all children, very young foster children (including infants and toddlers) are regularly placed in emergency shelters and other temporary facilities, again because appropriate foster care placements are unavailable or in some cases because staff are too overwhelmed to locate them. The State's data indicates that in the month of April 2005 alone, more than 300 separate foster children spent time in emergency shelters in Nebraska. The average age of children residing in shelters was 13.45 years, reflecting the fact that a number of children staying in these facilities were in fact significantly younger. In the Northern Service Area the average age of children that spent time in shelters was 11.19 years, a product of that region's regular placement of infants and other very young children in sheltercare. HHS' care of young children forming critical bonds and developmental skills through shifts of caretakers in group facilities such as shelters or crisis nurseries is severely damaging to these children.

101.    As a result of the lack of homes and other placements for foster children, foster homes are regularly overcrowded and may include six or even more Plaintiff children,

-31-

exclusive of biological and adoptive children living in the home. Such overcrowding often prevents adequate parental supervision and places children at risk of harm.

102. Another result of HHS' failure to develop and retain a sufficient number and array of foster homes is that Plaintiff children are often regularly placed in institutions and other congregate facilities when they could be appropriately placed with appropriately trained and supported foster families. HHS also continues to place young Plaintiff children (including children under eight years of age) in non-family settings. Such children are denied individualized treatment and one-on-one relationships with a consistent caregiver by virtue of their institutionalization. As the most common source of adoptive parents is foster parents, the State's placement of Plaintiff children in institutions decreases the likelihood that they will be adopted.

103. Defendants devote few resources to recruiting and retaining foster homes for Plaintiff children and pay foster parents caring for Plaintiff children only a fraction of what it costs to actually raise those children.

104. As it is legally obligated to do, Nebraska provides foster care maintenance payments for the direct and intended benefit of most foster children in the state's custody. However, these foster care maintenance payments are not set based on the actual and reasonable costs and individual needs of the children themselves and are insufficient to provide essential and appropriate care and services to Plaintiff children. For instance, HHS pays many foster parents only $222 a month – less than $8 a day – to raise a newborn to two-year-old child, when the federal government estimates that it costs an average family $755 a month to raise a child of that age in the rural United States and $761 a month for the urban Midwestern United States. Nebraska's $222 basic rate is the lowest foster maintenance payment in the country. The

-32-

exceedingly low rates paid to foster parents taking care of the State's most vulnerable children interfere with HHS' ability to recruit and retain foster and adoptive families for Plaintiff children.

105. Similarly, the rates paid on behalf of Plaintiff children placed with private providers – including some of the state's most damaged and vulnerable children – are not established based on the actual needs of children and the reasonable cost of caring for them. The foster care maintenance payments provided for children placed with private providers, including those in non-family settings, are insufficient to provide appropriate care and services to Plaintiff children.

106. Plaintiff children are regularly placed with foster parents to whom HHS denies basic supportive services, such as appropriate respite care. Additionally, HHS often fails to respond to foster parents' requests for assistance with services and instead often simply moves Plaintiff children rather than providing services and supports to prevent impending placement disruptions.

107. In addition to the Plaintiff children that HHS places in "out-of-home" care, there are approximately 1,500 children in the legal custody of HHS who reside with their biological parents or other caretakers, most of them on trial reunifications following stays in non-relative foster homes or other placements. As with the children in "out-of-home" care, these children are insufficiently monitored and visited by HHS and are denied needed services, including mental health services.

108. Far too often Plaintiff children brought into Nebraska's foster care custody because of abuse or neglect at the hands of their own biological parents or other caregivers are subject to further abuse, neglect and other maltreatment and harmful conditions while in the

custody of the State. This maltreatment occurs because of HHS' failure to appropriately screen and oversee foster homes, segregate sexually reactive children (often themselves the victims of prior sexual abuse) or physically aggressive children from other foster children, and adequately monitor and supervise visits between foster children and their biological family members when problems that have not been addressed place children at risk of harm.

109.   Through the pattern and practice of subjecting Plaintiffs to placement practices that are emotionally, psychologically and even physically injurious to them, Defendants have acted and continue to act with deliberate indifference to their welfare and in clear departure from any reasonable exercise of professional judgment. This pattern and practice of conduct has caused, and is causing, direct and severe harm to Plaintiff children.

**High Caseloads, Turnover and Inadequate Training**

110.   Defendants routinely fail to hire and retain a sufficient number of caseworkers necessary to ensure Plaintiff children are provided the care and services to which they are legally entitled.

111.   National standards provide that foster care caseworkers be responsible for no more than 12 to 15 foster children. HHS caseworkers responsible for Plaintiff children routinely carry caseloads dangerously in excess of those standards. In some regions, child welfare caseworker caseloads are routinely several times the national standard and sometimes require caseworkers to be responsible for – and attempt to ensure the safety of – more than 50 Plaintiff children at one time.

112.   High caseloads and a lack of support have led to a high caseworker and supervisor attrition rate. Especially in urban areas, caseworkers frequently leave after working for HHS for only one or two years, and many leave well before that time. Among children

-34-

reviewed in the 2004 FCRB Report, nearly 60% had four or more caseworkers while in foster care. Frontline staff, who are charged with making critical decisions about a child including where the child will live, are frequently young and inexperienced and, as a result, often unequipped to make decisions that comport with any reasonable professional judgment. As a result of high attrition in the supervisor ranks, supervisory staff responsible for overseeing caseworkers are often themselves inexperienced, having been prematurely promoted to cover vacant positions. Supervisors are also often distracted from their supervisory duties by the need for them to carry caseloads of foster children pending the replacement and training of departed caseworkers.

113.   The high turnover rate denies Plaintiff children the appropriate and consistent services, stable placements and case planning that are essential to their safety and well-being and to preventing them from languishing in state custody without permanent homes. Essential information about Plaintiff children and their cases – including such things as how well particular children are adjusting to new foster homes, whether parent-child visits are helpful or harmful to particular children, or even what efforts the biological parents have made towards reunification – is lost because of caseworker turnover, attendant rebalancing of caseloads within HHS units, and the lack of effective communication between incoming and departing or otherwise transitioning workers.

114.   These problems unduly prolong the time Plaintiff children stay in state custody, as was recognized in a statewide "self-assessment" which HHS submitted to the federal government in 2002 as part of its federal audit, which listed caseworker turnover as one of the barriers towards timely moving children towards adoption. This self-assessment also identified

turnover and high caseloads as impacting HHS' ability to complete case plans in a timely fashion. These deficiencies persist today.

115.    Compounding the problems of turnover and high caseloads, the training provided by HHS to child welfare caseworkers fails to adequately prepare the workers for the job critical functions of overseeing the safety, well-being and permanency of Plaintiff children.

116.    Through the pattern and practice of failing to hire, retain, train and support front-line staff sufficient to meet the needs of Plaintiffs, Defendants have acted and continue to act with deliberate indifference to their welfare and in clear departure from any reasonable exercise of professional judgment. This pattern and practice of conduct has caused, and is causing, direct and severe harm to Plaintiff children.

**Poor Monitoring of Child Safety**

117.    Defendants often fail to take basic screening precautions before Plaintiff children are placed in foster homes and other placements and fail to monitor Plaintiff children's safety and well-being once in their placements.

118.    HHS routinely fails to conduct documented assessments of the safety of a home in which it has placed a foster child, or to consistently conduct criminal and child abuse background checks on the people it relies upon to care for foster children. For example, the 2004 FCRB Report found that in over 25% of the cases reviewed, children were placed in homes that were unsafe, inappropriate, or had never undergone a documented safety assessment. In 19% of the cases reviewed by the Board, there was no clear indication that a complete assessment was conducted of the foster child's safety in the child's current placement.

119.    HHS also fails to adequately license and otherwise oversee private providers with whom it contracts for the provision of group and institutional foster care to

-36-

Plaintiff children. Licensing inspections of such facilities are typically performed only once every other year, usually on an announced basis, and fail to identify staff and conditions that put Plaintiff children at risk of harm. Such procedures are not in accord with national standards regarding the licensing of such facilities.

120. Compounding the danger to children, HHS caseworkers responsible for Plaintiff children often fail to consistently visit the children assigned to them for long periods of time, placing these children at serious risk of harm.

121. Regular visitation is essential to determining, among other things, foster children's safety, their treatment and service needs, their progress in moving toward a permanent home and the continued appropriateness of their current placements. HHS itself has determined that foster care caseworkers are required to visit each of the children on their caseload every thirty days.

122. Nevertheless, Plaintiff children go long periods without seeing their caseworkers. One of the findings made by the United States Department of Health and Human Services Administration for Children and Families during a 2002 audit of Nebraska's child welfare system was that "the frequency and quality of face-to-face contact between caseworkers and the children and parents in their caseloads was often insufficient to monitor children's safety or promote attainment of case goals." These deficiencies remain today. For example, state data reports show that, for the month of March 2005, approximately 30% of foster children statewide did not receive a required monthly contact from their caseworker. In the Eastern Service Area (which includes Omaha), approximately 45% of children did not receive required monthly visits during March 2005. In the 2004 FCRB Report, the Board found that 526 foster children in "out-

-37-

of-home" placement had no documentation in their case record to indicate that they had been seen by their caseworker even once in the previous 60 days.

123.   Defendants inappropriately "contract out" essential casework duties such as monitoring visitation between Plaintiff children and their biological parents and conducting home visits. These vitally important caseworker tasks are not adequately monitored by HHS and the actual supervision is often undertaken by cycling workers with minimal training and only limited knowledge of the children and parents whose visits they are supervising. Essential information about Plaintiff children, such as how well particular children are adjusting to new foster homes or whether parent-child visits are helpful or harmful to particular children, is often lost because the contract workers supervising visitation did not have the training to properly assess the situation or because of a lack of communication and coordination between and among the foster care caseworker and the contract worker or workers.

124.   In its 2004 Report, the Foster Care Review Board documented some of the problems created by Defendants' reliance on substandard and unmonitored contract agents. For example, in some cases, foster children were transported by a contract provider for supervised parent-child visits for weeks before the caseworker or the foster parents were informed that the parents were not even attending the visits. At least one contract agency upon which Defendants rely to transport and supervise parent-child visits prohibited its employees from disclosing to HHS caseworkers any negative interactions that occurred during those visits.

125.   Far too often private agency staff contracted to transport Plaintiff children to visitations fail to ensure that children are properly restrained in car seats, putting such children at risk of severe injury.

-38-

126.    Defendants continue the pattern and practice of failing to appropriately screen foster homes and failing to supervise the Plaintiff children in their custody despite the risk it poses for and harm it inflicts upon the children they are charged with protecting. Defendants' failure to adequately monitor Plaintiff children is a departure from any reasonable exercise of professional judgment and is in deliberate indifference to Plaintiffs' safety and well-being. This pattern and practice of conduct has caused, and is causing, direct and severe harm to Plaintiff children.

### A Lack of Basic Health Services for Foster Children

127.    Defendants often fail to ensure that Plaintiff children in HHS custody receive adequate health care services, including mental health, medical and dental care.

128.    Adequate health services are critical to ensuring that foster children do not deteriorate while in state custody. Health services are particularly important to foster children, as abused and neglected children who enter foster care frequently have more serious health care needs, stemming from the circumstances that resulted in their placement into state custody and the trauma of being removed from what is often the only home they have ever known.

129.    For those Plaintiff children who need higher levels of medical and mental health services, Defendants have elected to contract with Magellan Health Services, a private behavioral health organization, to provide intensive care management services. Personnel from Magellan rarely, if ever, visit with children, typically making their determinations as to the needs of Plaintiff children solely on the basis of superficial paper reviews. Magellan frequently denies requests that foster children be provided higher-level treatment (and placement in the facilities in which such treatment can be provided) based on cost and without regard for diagnoses of need for such treatment and placements.    Magellan also terminates mental health services and

-39-

placements prematurely based on cost and regardless of the child's actual continuing need. HHS usually simply accepts such decisions by Magellan, and does not challenge them through the administrative appeals process. As a result of the denial or premature termination of critical mental health services, the mental health of Plaintiff children further deteriorates and their placements disrupt more frequently, decreasing the likelihood that the children will ever be placed in stable and permanent homes.

130. Plaintiff children, especially in the western and northern areas of the State, are regularly denied access to medical and mental health services in proximity to their homes, often because relevant service providers are located across state lines. Plaintiff children are either denied any access to health professionals or are required to spend hours traveling across the State to receive services, including regularly needed services such as weekly counseling.

131. In addition to receiving deficient mental health services, Nebraska foster children are often denied required periodic medical and dental screening examinations and treatment. Plaintiff children are also frequently denied timely and adequate dental care. This is due, at least in part, to a severe shortage of dental care providers willing to accept Medicaid in Nebraska, coupled with Defendants' failure to make alternative funding arrangements for dental services.

132. In addition to deficiencies in the delivery of health care services, critical medical and mental health information about individual Plaintiff children is often not passed on to foster parents and other caretakers, thereby placing the health of those children in jeopardy.

133. Defendants' pattern and practice of denying Plaintiff children needed mental health services and other medical and dental care subjects them to unnecessary harm and continued risk of harm, and amounts to a departure from any reasonable exercise of professional

-40-

judgment and deliberate indifference to Plaintiffs' health, safety and well-being. This pattern and practice of conduct has caused, and is causing, direct and severe harm to Plaintiff children.

## Planning and Services Inadequate to Move Children
## Out of Foster Care and Into Permanent Homes

134.    Reasonable professional judgment and applicable law dictate that the placement of a child in foster care must be temporary. Foster children and their families must be provided with planning and services necessary for the children to be promptly returned to the custody of their parents or other caretakers, when it is safe to do so. When it is not safe or appropriate for children to be "reunified" with their own families, foster children must receive prompt efforts to find them an alternative permanent home, typically through adoption.

135.    In Nebraska, foster children do not receive this mandated "permanency planning" and related services. Instead, Plaintiff children are spending significant portions of their lives growing up in state custody. In its 2002 review of the Nebraska foster care system, the federal government identified HHS' failure to establish appropriate permanency goals and achieve adoptions in a timely manner as "critical problems." Because Defendants have failed to address these problems, children continue to linger in state custody unnecessarily, at significant cost to their health and well-being.

136.    Plaintiff children remain in foster care for unnecessarily long periods of time because HHS fails to take even the most rudimentary steps to plan for how a child is to achieve a permanent home. A child's case plan is key to a child achieving such permanency, as it sets forth the plan for either reunifying the child with his or her biological parents or, when that is not possible, for moving the child to a safe and permanent alternative home, and designates the services necessary for the child to attain that goal. Despite the clear importance of case plans,

-41-

and the statutory obligation to create and implement them, HHS frequently fails to either prepare or implement case plans in an adequate or timely manner.

137. The federal government, in its 2002 audit, expressed concern over HHS' many failures in developing case plans and in involving parents in the case planning process. The failure to develop timely and adequate case plans remains a critical problem. In its most recent report, the Foster Care Review Board found that in 30% of the cases reviewed, the foster child either had no current case plan, or the existing plan was incomplete. The State's own data reflect that in the month of March 2005, more than 30% of the children in custody did not have a current case plan. And data submitted by HHS to the federal government in 2004 reflects that 1,062 children (13.27%) in state custody had no established permanency goal.

138. In the absence of a permanency goal and case plan for achieving that goal, Plaintiff children's stays in foster care are unnecessarily prolonged. Often, biological parents do not know or do not understand what they must do to secure their child's return home or are not provided services necessary for them to attain those goals. In cases in which parents are not making efforts to be reunified with their children, there is often no documentation upon which to build a case for the termination of their parental rights, a required step before a child can be adopted.

139. In those cases in which case plans are completed, they often contain "boiler-plate" language and are devoid of individualized assessments regarding the needs and circumstances of children. Thus, HHS' policy is to initially assign a goal of return home to every child who enters foster care, regardless of the child's family history. Despite the heavy reliance on reunification as a permanency goal, critical services for biological parents, such as

substance abuse counseling, often are not available, even though HHS identified them as necessary for the safe return of a child to his or her biological parents.

140.    Caseworkers fail to regularly and consistently meet with biological parents, as they are required to do in order to assist and assess the parents' progress in achieving the goal of reunification. In March 2005, caseworkers of Plaintiff children made required visits with the biological families of the children on their caseload less than half of the time, and only a third of the time in the Eastern Service Area. HHS' failure to adequately and consistently work with biological parents toward reunification and to provide access to services to assist in reunification, often unnecessarily prolongs Plaintiff children's stays in foster care and deprives them of family relationships and the opportunity to be reunified.

141.    In many cases, HHS makes no effort to have Plaintiff children's initial goal of reunification changed to adoption (or in select cases, to another appropriate permanency option) until long after it is clear that a child will never be able to return home safely and well beyond the statutory timeframes mandating that the child's goal be changed. According to 2004 statistics, only 9.87% of Nebraska's foster care population had a permanency goal of adoption, when the national rate is approximately 20%. While children get older waiting for their goal to be changed to adoption, many develop behavioral problems associated with multiple moves, years of uncertainty about their future, and other harms experienced while in foster care, and many are no longer good candidates for adoption.

142.    HHS also regularly recommends the return of Plaintiff children to their biological families, often on trial reunifications, without ensuring their safety, without having provided needed services to such families, and without having assessed whether the problems that led to the entry of such children into foster care have been addressed. As a result, too many

-43-

Plaintiff children who are reunified with their biological families return to foster care after experiencing further maltreatment. For example, the FCRB 2004 Report indicates that just under 40% of the foster children who were in "out-of-home" care at the end 2003 had returned to State custody due to abuse or neglect after one or more failed reunification attempts.

143.    HHS routinely recommends that Plaintiff children attend biological parent-child visits even when such visits are clearly emotionally injurious to a child because the parent's attendance at the visits is erratic, or because the parent fails to engage with the child in an appropriate manner. Too often HHS caseworkers are unaware of what transpires at these visits because the supervision of the visits has been contracted out to private agency workers, and critical information is not passed on to the HHS workers with principal responsibility for the case.

144.    In those cases in which it is determined that reunification is no longer an appropriate goal for a Plaintiff child, HHS frequently fails to begin the process necessary to permit termination of the parental rights of the biological parents in accordance with federal statutory timeframes. In its review of Nebraska's child welfare system, the federal government noted as a "key concern" that the State was failing to free children for adoption in accordance with the time frames established by federal law. Nebraska stakeholders involved with the federal review noted that it was "rare" for HHS to seek to free a child for adoption. This deficiency continues today.

145.    Even on those occasions when HHS decides to free a Plaintiff child for adoption, the process is often unnecessarily prolonged because HHS first seeks to terminate the rights of the biological mother. Only after that is accomplished does HHS begin the process of terminating the rights of the father. In many instances, it is only when HHS is preparing to

-44-

terminate the rights of a biological mother that HHS begins the search for missing biological fathers. If the father is located, HHS may start the lengthy process of attempting to reunify the foster child and missing father, regardless of how long the child has been in foster care. Only after this process has been exhausted does HHS seek to move a child to adoption.

146.    By failing to locate and involve missing fathers at the outset of a case, and by later not seeking to terminate the rights of both parents simultaneously, months, and frequently years go by, during which time opportunities for a permanent home are lost and Plaintiff children are left in limbo, not knowing if they will ever find a permanent home.

147.    HHS also regularly fails to identify in a timely fashion relatives who are willing and able to provide appropriate care for Plaintiff children at the time they enter the foster care system. Instead, HHS frequently waits until a child has been in the foster care system for months and sometimes years before it looks to identify relatives who may be available to care for their kin in foster care. In some instances a search for relatives does not even begin until the child has been in custody so long that he or she is in the process of being freed for adoption. If a relative is located for a child at that late juncture, HHS often removes the child from a foster home and places the child with the relative, regardless of how long the child has lived in the foster home or if the foster parents are ready, willing and able to adopt the child, and irrespective of whether the child has ever had any contact with the relative prior to entering foster care. The frequent practice of uprooting children from stable foster families that have bonded with and are willing to adopt particular children and placing those children into the homes of relatives who are virtual strangers to them, is often psychologically damaging.

148.    In those cases in which HHS seeks to change a child's goal to adoption and the child's parental rights are terminated in order for the child to be adopted, it takes well

-45-

over three years, on average, from the child's entry into care for an adoption to be finalized, an enormous portion of any child's life. In fiscal year 2004, only 15% of those children who exited foster care to a finalized adoption did so within 24 months of coming into foster care. The national standard on this measure is 32%, more than double HHS' performance on this critical benchmark.

149. The routine delays in accomplishing adoptions of foster children in Nebraska are harmful and unnecessary because, as the federal government noted in its audit of Nebraska's foster care system, they are principally attributable to ineffective casework practice, rather than any external factors. Poor casework includes the unnecessary delays described above and the failure to transfer cases in a timely manner to the adoption unit responsible for placing children in permanent homes (in the few areas that have such specialized adoption units) or to private agencies with whom HHS contracts for adoption services, and the failure to list children available for adoption on either the state or national adoption exchanges that allow prospective adoptive parents to identify children whom they might be interested in adopting. Although, in September 2004, HHS reported to the federal government that there were over 700 children in state custody with the goal of adoption, as of March 2005 only 161 were residing in what HHS identified as pre-adoptive homes. Though there are many hundreds of children with the goal of adoption for whom HHS has not identified an adoptive home, as of September 2005, only 45 foster children were listed on the State's public adoption exchange website.

150. There are a number of Plaintiff children in foster care for whom Nebraska simply has given up trying to find a permanent home. In 2004, the State reported that over 130 foster children had a permanency goal of "long term foster care" and 488 had a goal of "emancipation from foster care." This means that HHS has no plan for these children other than

-46-

that they will grow up in foster care and, at or around age 19, be left to fend for themselves without ever having had the opportunity to grow up in a permanent and loving home. Of particular concern is HHS' inappropriate practice of attaching goals such as "long term foster care" even to very young children under six years old.

151.    Plaintiff children are also frequently denied relationships with siblings. Children who enter State custody with siblings are often separated from them and placed in different foster homes. HHS also routinely fails to ensure that foster children who are separated from their siblings have regular opportunities to visit them. As a result, HHS interferes with and damages these critical family relationships.

152.    Defendants are legally obligated to provide independent living services to those foster youth ages 16 and older who cannot be returned home or adopted in order to prepare them to live on their own upon discharge from foster care. HHS has failed to adequately develop or make accessible an adequate array of such independent living services. As a result, every year Plaintiff children are emancipated from the foster care system without the life skills necessary to function in society. Many of these foster care "graduates" go on to enter the ranks of the unemployed, the incarcerated and the homeless.

153.    Defendants' pattern and practice of allowing children to languish for long periods of time in foster care, failing to provide adequate planning and services for children's placement into permanent homes, separating foster children from their siblings and denying them opportunities to maintain family relationships, and failing to provide adequate services to allow children to live independently when they are discharged from state custody, despite the knowledge that such practices subject children to psychological harm and make them more likely to develop behavioral problems, is in deliberate indifference to Plaintiff children's welfare, and

is well outside the bounds of any reasonable exercise of professional judgment. This pattern and practice of conduct has caused, and is causing, direct and severe harm to Plaintiff children.

## Fiscal Waste

154. Nebraska regularly fails to collect available federal funds for foster children in State custody, foregoing millions of dollars that could be used to provide desperately needed homes and services for Plaintiff children.

155. Nebraska has entered into a State Plan contract with the federal government pursuant to Title IV-E of the Social Security Act, under which the State is entitled to receive certain federal monies in exchange for the State's compliance with various federal requirements pertaining to foster care and adoption assistance. Yet Nebraska routinely fails to collect available federal funds for the care of foster children and, in fact, collects Title IV-E federal funds for only between 20 and 30% of the foster children in "out-of-home" care in the State, about half the national average.

156. HHS also fails to spend all of the monies appropriated to it by the legislature for maintenance of the State's child welfare system.

157. Defendants' pattern and practice of failure to obtain and expend available monies on behalf of Plaintiff children in desperate need of appropriate placements and services is inconsistent with the reasonable exercise of professional judgment and in deliberate indifference to Plaintiffs' safety and well-being. This pattern and practice of conduct has caused, and is causing, direct and severe harm to Plaintiff children.

## Poor Information Management Systems

158. Defendants have failed to develop an information management system that is capable of meeting the needs of HHS caseworkers and the Plaintiff children they serve. The

-48-

data in the State's primary child welfare database, N-FOCUS, is often outdated or incorrect, impeding the ability of caseworkers, supervisors and management staff to make informed decisions for Plaintiff children.

## Breach of State Plan Contracts

159.    The federal government has approved the State Plans submitted by Nebraska in order to receive federal financial assistance under Titles IV-B and IV-E of the Social Security Act to help fund the State's child welfare, foster care and adoption programs. These State Plans are contracts into which the State of Nebraska enters for the express and direct benefit of Plaintiff children, who are third-party beneficiaries of these contracts. Defendants are directly responsible for fulfilling the obligations undertaken by Nebraska when it entered into these State Plan contracts, including but not limited to the obligation to administer the programs in accordance with specific relevant state statutes, regulations, policies and all applicable federal statutes, regulations and other official issuances of the United States Department of Health and Human Services.

160.    Defendants have breached their obligations to Plaintiffs under these State Plan contracts.

## CAUSES OF ACTION BROUGHT PURSUANT TO 42 U.S.C. § 1983

### First Cause of Action – Substantive Due Process

161.    Each and every allegation of the Complaint is incorporated as if fully set forth herein.

162.    The foregoing actions and inactions of the Defendants amount to a pattern, practice, or custom of failure to exercise reasonable professional judgment and of deliberate indifference to Plaintiffs' constitutional rights, and are the cause of the violation of such rights.

-49-

As a result of Defendants' conduct, Plaintiffs have been and are being severely harmed and deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution. These rights include, but are not limited to, Plaintiffs' right to protection from harm; their right not to deteriorate or be harmed – physically, emotionally or developmentally – while in state custody; their right not to remain in state custody unnecessarily; their right to be housed in the least restrictive, most appropriate and family-like placement while in state custody; their right to treatment and services related to the cause of their confinement; and their right to receive care, treatment and services consistent with reasonable professional judgment.

## Second Cause of Action – Adoption Assistance and Child Welfare Act

163.     Each and every allegation of the Complaint is incorporated as if fully set forth herein.

164.     Under the Adoption Assistance and Child Welfare Act of 1980 as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. §§ 620-29(i), 670-679b (the "Act"), states receive certain federal reimbursements so long as they enter into a plan approved by the federal Department of Health and Human Services and comply with its terms. Nebraska receives federal funding under the Act and has submitted and entered into such a plan, which is a legal contract between the federal government and the State, thereby agreeing to provide child welfare services in accordance with the Act.

165.     As a result of the foregoing actions and inactions of the Defendants, the Defendants are engaging in a policy, pattern, practice or custom of depriving Plaintiffs the rights individually conferred upon them by the Act and the regulations promulgated thereunder (45 C.F.R. Parts 1355-1357). These rights include, but are not limited to: the right of each Plaintiff

child to a timely written case plan containing mandated elements, and to the implementation of this plan; the right of each Plaintiff child to have a petition to terminate parental rights filed, or have a compelling reason documented why such a petition has not been filed, in accordance with specified, statutory standards and time frames; the right of each Plaintiff child whose permanency goal is adoption to planning and services to obtain a permanent placement, including documentation of the steps taken to secure permanency; the right of each Plaintiff child to services to facilitate that child's return to his family home or the permanent placement of the child in an alternative permanent home; the right of each Plaintiff child to placement in a family foster home or institutional placement that is licensed, re-licensed and operated in conformity with national standards; the right of each Plaintiff child to services that protect the child's safety and health; the right of each Plaintiff child to have health records reviewed, updated, and supplied to foster parents or other foster care providers with whom the child is placed at the time of placement; the right of each Plaintiff child to foster care maintenance payments paid to the foster parents or foster care providers with whom the child is placed that cover the actual cost (and the cost of providing) the Plaintiff child's food, clothing, shelter, daily supervision, school supplies, reasonable travel to visitation with family, and other expenses; and in the case of a Plaintiff child who has reached 16 years of age, the right to services needed to help the child prepare for the transition from foster care to independent living. *See* 42 U.S.C. §§ 622(b)(10)(B), 627(b)(2), 671(a)(1), 671(a)(10), 671(a)(11), 671(a)(15), 671(a)(16), 671(a)(19), 671(a)(22), 672, 675(1), 675(4), 675(5)(B), 675(5)(D), 675(5)(E); 45 C.F.R. Parts 1355-1357.

## Third Cause of Action – EPSDT

166. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

167.    As a result of the foregoing actions and inactions, the Defendants are engaging in a policy, pattern, practice or custom of depriving Plaintiffs the rights individually conferred upon them by the Early and Periodic Screening, Diagnosis and Treatment program of the federal Medicaid Act. These rights include, but are not limited to: the right of each Plaintiff child to receive periodic general physical health screenings and examinations administered by competent medical professionals at age-appropriate intervals determined by a panel of independent health care experts; the right of each Plaintiff child to receive periodic hearing and eye screenings and examinations, mental health screenings and examinations, dental screenings and examinations and lead blood tests, administered by competent medical professionals at age-appropriate intervals; the right of each Plaintiff child to receive all necessary inter-periodic screenings and examinations; the right of each Plaintiff child to receive all necessary childhood vaccinations and boosters at appropriate times; the right of each Plaintiff child to receive any and all treatments deemed necessary to correct or ameliorate defects and physical and mental illnesses and conditions discovered by qualified medical professionals conducting any of the above-mentioned screenings and examinations; and the right of each Plaintiff child to other diagnostic, screening, preventive, and rehabilitative services, including any medical or remedial services recommended by a qualified medical professional for the maximum reduction of physical and mental disability and restoration of an individual to the best possible functional level. *See* 42 U.S.C. §§ 1396, 1396a, 1396d(a), 1396d(r), 1396n(c); and 42 C.F.R. Parts 420-421.

## Fourth Cause of Action - First, Ninth, and Fourteenth
## Amendments to the United States Constitution

168.    Each and every allegation of the Complaint is incorporated as if fully set forth herein.

-52-

169. The foregoing actions and inactions of the Defendants amount to a pattern, practice, or custom of failure to exercise reasonable professional judgment and of deliberate indifference to Plaintiffs' constitutional rights, and are the cause of the violation of such rights. As a result of Defendants' conduct, the Plaintiff children have been and are being severely harmed and deprived of the liberty interests, privacy interests and associational rights conferred on them by the First, Ninth, and Fourteenth Amendments to the United States Constitution not to be deprived of a child-parent or a child-sibling family relationship absent compelling reasons.

### Fifth Cause of Action – Procedural Due Process

170. Each and every allegation of the Complaint is incorporated as if fully set forth herein.

171. The foregoing actions and inactions of the Defendants amount to a pattern, practice, and custom of failure to exercise reasonable professional judgment and of deliberate indifference to the constitutional rights of Plaintiffs, and are the cause of the violation of such rights. As a result of Defendants' conduct, Plaintiffs have been and are being harmed and deprived of both federal and state-created liberty or property rights without due process of law in violation of their constitutional rights.

172. Defendants' actions and inactions have resulted and are continuing to result in deprivations of the following federal-law entitlements to which Plaintiff children have a constitutionally protected interest:

a. the entitlements arising from the Act and regulations promulgated thereunder; and

b. the entitlements arising from the Early and Periodic Screening, Diagnosis and Treatment program of the federal Medicaid Act.

-53-

173.    Defendants' actions and inactions have resulted and are continuing to result in deprivations of the following state-law entitlements to which each Plaintiff child has a constitutionally protected interest:

a.    the entitlements arising from Neb. Rev. Stat. § 43-1311, requiring HHS, *inter alia*, to provide each child with a medical examination within two weeks of the child's removal from his or her home;

b.    the entitlements arising from Neb. Rev. Stat. § 43-1312, requiring HHS, *inter alia*, to provide each child with a safe and appropriate plan; and

c.    the entitlements arising from Neb. Rev. Stat. § 43-292.02, requiring HHS, *inter alia*, to file or join in the filing of a petition to terminate the parental rights of each child in foster care for 15 of the most recent 22 months absent certain narrow exceptions.

## Sixth Cause of Action – Breach of State Plans

174.    Each and every allegation of the Complaint is incorporated as if fully set forth herein.

175.    Under Titles IV-B and IV-E of the Social Security Act, states receive certain federal monies so long as they enter into plans approved by the United States Department of Health and Human Services and comply with their terms. Nebraska receives federal funding under Titles IV-B and IV-E of the Social Security Act and has submitted such State Plans, which are legal contracts between the federal government and the State, and such plans have been approved. In these State Plan contracts, the State agrees to provide child welfare, foster care and adoption services to Plaintiffs in accordance with specific statutes, regulations and policies and all applicable federal regulations and other official issuances of the United States Department of Health and Human Services.

176. As a result of their foregoing actions and inactions, Defendants have breached and continue to breach their obligations under Nebraska's State Plan contracts, and all Plaintiffs, as the intended direct third-party beneficiaries to these State Plan contracts, are (i) being denied their rights under law to the services and benefits that the State of Nebraska is obligated to provide to them under such contracts, and (ii) being harmed thereby.

## PRAYER FOR RELIEF

177. WHEREFORE, the Plaintiff children respectfully request that this Court:

a. Assert jurisdiction over this action;

b. Order that all Plaintiffs may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

c. Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure: (i) Defendants' violation of the Plaintiffs' substantive due process rights under the due process clause of the Fourteenth Amendment to the United States Constitution; (ii) Defendants' violation of Plaintiffs' statutory rights under the federal Adoption Assistance and Child Welfare Act, as amended by the Adoption and Safe Families Act of 1997, and regulations promulgated thereunder; (iii) Defendants' violation of Plaintiffs' statutory rights under the federal Early and Periodic Screening, Diagnosis and Treatment program of the Medicaid Act; (iv) Defendants' violation of Plaintiffs' rights under the First, Ninth and Fourteenth Amendments to the United States Constitution; (v) Defendants' violation of Plaintiffs' procedural due process rights under the due process clause of the Fourteenth Amendment to the United States Constitution; and (vi) Defendants' breach of all Plaintiffs' rights under the State Plan contracts;

-55-

d.    Permanently enjoin Defendants from subjecting Plaintiffs to practices that violate their rights;

e.    Order appropriate remedial relief to ensure Defendants' future compliance with legally mandated care, treatment and services to Plaintiffs;

f.    Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988 & 1920 and Fed. R. Civ. P. 23(e) & (h); and

g.    Grant such other and further equitable relief as the Court deems just, necessary and proper to protect Plaintiffs from further harm by Defendants.

Dated: September 19, 2005

Respectfully submitted,

By:  _____

MARCIA ROBINSON LOWRY (pro hac vice pending)
IRA P. LUSTBADER (pro hac vice pending)
DOUGLAS C. GRAY (pro hac vice pending)
TARA S. CREAN (pro hac vice pending)
CHILDREN'S RIGHTS
404 Park Avenue South, Eleventh Floor
New York, New York 10016
Phone: (212) 683-2210
Facsimile: (212) 683-4015

By:  _____

D. MILO MUMGAARD (Bar No. 19919)
JENNIFER A. CARTER (Bar No. 22819)
NEBRASKA APPLESEED CENTER FOR LAW
IN THE PUBLIC INTEREST
941 'O' Street, Suite 105
Lincoln, NE 68508-3626
Phone: (402) 438-8853
Facsimile: (402) 438-0263

By:

V. GENE SUMMERLIN (Bar No. 19611)
MARNIE A. JENSEN (Bar No. 22380)
OGBORN, SUMMERLIN & OGBORN, P.C.
210 Windsor Place
330 South Tenth Street
Lincoln, NE 68508
Phone: (402) 434-8040
Facsimile: (402) 434-8044

By:

STANLEY J. ADELMAN (pro hac vice pending)
ANNE C. AUTEN (pro hac vice pending)
DLA PIPER RUDNICK GRAY CARY US LLP
203 North LaSalle Street
Chicago, Illinois 60601
Phone: (312) 368-4095
Facsimile: (312) 236-7516

## OF COUNSEL:

KEVIN COLLERAN (Bar No. 10740)
CLINE, WILLIAMS, WRIGHT, JOHNSON & OLDFATHER, L.L.P.
1900 U. S. Bank Building
233 S. 13th Street
Lincoln, NE 68508
Phone: (402) 474-6900

EDWARD H. TRICKER (Bar No. 15504)
WOODS & AITKEN LLP
301 South 13th Street, Suite 500
Lincoln, Nebraska 68508
Phone: (402) 437-8500

THOMAS A. GRENNAN (Bar No. 15675)
GROSS & WELCH, P.C., L.L.O.
1500 Omaha Tower
2120 South 72nd Street
Omaha, Nebraska 68124-2342
Phone: (402) 392-1500

-57-