IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CRYSTAL FOREMAN, CARSON P.,      )
SHERRI WHEELER, PAULETTE         )
V., JODELL BRUNS, DANIELLE       )
D., SUSAN NOWAK, CHERYL H.,      )          4:05CV3241
SARA JENSEN, JACOB P.,           )
MICHELINE CREAGER, BOBBI         )
W., VANESSA NKWOCHA, and         )
HANNAH A.,                       )       REPORT AND RECOMMENDATION
                                 )
          Plaintiffs,            )
                                 )
          v.                     )
                                 )
DAVE HEINEMAN, NANCY             )
MONTANEZ, JOANN SCHAEFER,        )
RICHARD NELSON, DENNIS           )
LOOSE,  and TODD RECKLING,       )
                                 )
          Defendants.            )
_____

CONTENTS OF OPINION

INTRODUCTION.  . . . . . . . . . . . . . . . . . . . . . .    1

THE PLAINTIFFS' CLAIMS . . . . . . . . . . . . . . . . . .    2

THE PENDING MOTIONS  . . . . . . . . . . . . . . . . . . .    5

SUMMARY OF RECOMMENDATIONS . . . . . . . . . . . . . . . .    7

THE RECORD . . . . . . . . . . . . . . . . . . . . . . . .    8

        I.    The Named Defendants:  The Office of Protection
              and Safety of the Nebraska Health and Human
              Services Department  . . . . . . . . . . . . .    9

              A.    Entering HHS Legal Custody   . . . . . . .    9

                    1.    Voluntary Placement Agreement. . . . .   10

                    2.    Police Hold/HHS Temporary Custody. . .   11

                    3.    Court Intervention . . . . . . . . .   13

                          a.    Juveniles Needing State
                                Protection: "3(a) Juveniles." . .  13

            b.     Juveniles Needing State
                   Supervision: "3(b) Juveniles.". .     17

            c.     Juveniles Needing Mental Health
                   Care:  "3(c) Juveniles.". . . . .      19

            d.     Juveniles Needing Rehabilitation:
                   "Juvenile Offenders." . . . . . .      20

            e.     "Dually Adjudicated" Juveniles. .      24

      4.    Voluntary Relinquishment . . . . . . .        24

   B.    Placement Considerations. . . . . . . . .         25

      1.    Location . . . . . . . . . . . . . . .         25

      2.    Native American Placements . . . . . .         26

   C.    Oversight by the Nebraska Foster Care
         Review Board. . . . . . . . . . . . . . .         27

II.  The Named Plaintiffs . . . . . . . . . . . . .        28

   A.    Carson P. . . . . . . . . . . . . . . . .         30

   B.    Paulette V. . . . . . . . . . . . . . . .         35

   C.    Danielle D. . . . . . . . . . . . . . . .         39

   D.    Cheryl H. . . . . . . . . . . . . . . . .         43

   E.    Jacob P. . . . . . . . . . . . . . . . .          46

   F.    Bobbi W. . . . . . . . . . . . . . . . .          49

   G.    Hannah A. . . . . . . . . . . . . . . . .         53

III. System Reform and Oversight. . . . . . . . . .        57

   A.    Nebraska Oversight and Reform Efforts . . .       57

   B.    Federal Oversight Through Funding
         Requirements. . . . . . . . . . . . . . .         59

   C.    Current Status and Continuing Reform
         Efforts . . . . . . . . . . . . . . . . .         61

LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . .       64

I.   Motion for Class Certification. . . . . . . . .       64

   A.    The Class Definition. . . . . . . . . . .         68

1.  Proposed Class Definition--Ambiguous
    and Inconsistent with the Plaintiffs'
    Stated Intent. . . . . . . . . . . .      69

    a.  Ambiguity of the Term, "Foster
        Children." . . . . . . . . . .        70

    b.  Ambiguity of the "Including"
        Clause of the Proposed Class
        Definition. . . . . . . . . . .       74

2.  Crafting a Class Definition. . . . . .     78

3.  Potential Subclasses Within the
    Plaintiffs' Intended Class Definition.    81

    a.  "Alleged" 3(a) and 3(b)
        Juveniles . . . . . . . . . . .       82

    b.  Native American 3(a) and 3(b)
        Juveniles. . . . . . . . . . .        86

    c.  "Dually Adjudicated" Juveniles. .     89

    d.  Juveniles Placed Out-of-State . .     90

4.  The Re-Drafted Class Definition. . . .     91

B.  Rule 23(a) Requirements . . . . . . . . .     92

1.  Numerosity . . . . . . . . . . . . .     92

2.  Commonality. . . . . . . . . . . . .     92

3.  Typicality . . . . . . . . . . . . .    107

4.  Adequacy of Representation /Dismissal
    for Lack of Standing . . . . . . . .    109

    a.  Adequacy of Representation/Lack
        of Article III Standing--the
        Named Plaintiffs. . . . . . . .      112

        i.   Adequacy of Representation
             /Mootness:  Cheryl H. and
             Paulette V . . . . . . . .      112

        ii.  Lack of Article III
             Standing:  Carson P.,
             Danielle D., Jacob P., Bobbi
             W., and Hannah A . . . . . .    116

iii. Adequacy of Representation:
     Carson P., Danielle D.,
     Jacob P., Bobbi W., and
     Hannah A . . . . . . . . . .   119

     b.  Adequacy of Representation/Lack
         of Prudential Standing--the Next
         Friends . . . . . . . . . . . .   120

II.  Motion to Dismiss--Abstention. . . . . . . . .   139

     A.  The Rooker-Feldman Doctrine . . . . . . .   140

     B.  Younger Abstention. . . . . . . . . . . .   142

         1.  Ongoing State Proceedings. . . . . .   143

         2.  State Proceedings Implicate Important
             State Interests. . . . . . . . . . .   144

         3.  Federal Litigation Will Interfere with
             the State Proceeding . . . . . . . .   146

         4.  The State Proceedings Provide an
             Adequate Opportunity to Raise the
             Federal Claims . . . . . . . . . . .   159

III. Rule 12(b)(6) Motion to Dismiss--No Private
     Right of Action . . . . . . . . . . . . . .   165

     A.  The AACWA. . . . . . . . . . . . . . . .   171

         1.  42 U.S.C. § 671(a)(15) . . . . . . .   172

         2.  42 U.S.C. §§ 671(a)(1), 672, and
             675(4) . . . . . . . . . . . . . . .   180

         3.  42 U.S.C. § 671(a)(10) and (11). . .   184

         4.  42 U.S.C. § 671(a)(22) . . . . . . .   186

         5.  42 U.S.C. §§  622(b)(10)(B),
             671(a)(16), 675(1), and  675(5)(B,
             (D), and (E) . . . . . . . . . . . .   187

         6.  42 U.S.C. § 671(a)(19) . . . . . . .   193

     B.  EPSDT . . . . . . . . . . . . . . . . . .   193

RECOMMENDATION . . . . . . . . . . . . . . . . . .   194

iv

INTRODUCTION

The plaintiffs' complaint requests declaratory and injunctive relief under 42 U.S.C. § 1983 against Dave Heineman, Governor of the State of Nebraska, and Nebraska Department of Health and Human Services ("HHS") employees Nancy Montanez, Joann Schaefer, Richard Nelson, Dennis Loose, and Todd Reckling in their official capacities (collectively referred to as the "State").  The complaint alleges that named plaintiffs, Carson P., Paulette V., Danielle D., Cheryl H., Jacob P., Bobbi W., and Hannah A., are each foster children in the legal custody of the HHS.  Filing 64 (Amended Complaint), ¶¶ 11-24.  The HHS Office of Protection and Safety drafts child welfare policy, and develops and operates Nebraska's public child welfare programs, including its foster care and adoption programs.  Filing 64 (Amended Complaint), ¶ 27.

The named plaintiffs seek "declaratory and injunctive relief against Defendants to stop continuing violations of the legal rights of Nebraska's foster children and to prevent Defendants, by their actions and inactions, from continuing to harm the very children that rely on the State for their care and protection."  Filing 64 (Amended Complaint), ¶ 2.  They further seek leave to pursue a class action on behalf of "[a]ll foster children who are or will be in the legal custody of [the Nebraska Department of Health and Human Services], including those alleged or adjudicated to be abused, neglected or abandoned by their parent, guardian or custodian, and those alleged or adjudicated to be wayward, uncontrollable or habitually truant."  Filing 64 (Amended Complaint), ¶ 35.

1

THE PLAINTIFFS' CLAIMS

The named plaintiffs claim the State's actions or inactions in implementing its child welfare system violate the United States Constitution, federal statutes, and contracts between the State and the United States. See filing 42 (Report of Parties' Planning Conference), pp. 5-11. They allege the State has and continues to deprive them of procedural and substantive due process rights in violation of the Fourteenth Amendment to the United States Constitution, (see filing 42 (Report of Parties' Planning Conference), pp. 5, 9-10 (Claims I & V)), and their right to familial association secured under the First, Ninth and Fourteenth Amendments. See filing 42 (Report of Parties' Planning Conference), pp. 8-9 (Claim IV).

The named plaintiffs allege that HHS' actions or inactions violate their substantive due process rights by:

- failing to protect foster children in HHS custody from physical, emotional, and developmental harm;

- allowing their condition to deteriorate;

- requiring them to remain in state custody unnecessarily;

- failing to house them in the least restrictive, and most appropriate and family-like placement warranted under the circumstances; and

- failing to provide treatment and services related to the cause of their confinement and in accordance with reasonable professional judgment.

Filing 42 (Report of Parties' Planning Conference), pp. 5-6 (Claim I). See also filing 64 (Amended Complaint), ¶¶ 182-83.

2

The plaintiffs allege the State violates certain provisions of the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997 ("AACWA/ASFA") and its regulations; specifically 42 U.S.C. §§ 622(b)(10)(B), 627(b)(2), 671(a)(1), 671(a)(10), 671(a)(11), 671(a)(15), 671(a)(16), 671(a)(19), 671(a)(22), 672, 675(1), 675(4), 675(5)(B), 675(5)(D), 675(5)(E), and 45 C.F.R. Parts 1355-1357.  The plaintiffs claim the defendants violate these statutes and regulations by:

- failing to formulate and implement a timely written case plan containing mandated elements;

- failing to timely file petitions to terminate parental rights, or having a documented and compelling reason for failing to do so;

- failing to provide planning and services for permanent placement of children whose permanency goal is adoption;

- failing to facilitate the child's return to the family home or the permanent placement of the child in an alternative permanent home;

- placing children in family foster homes or institutions that are not licensed, re-licensed and operated in conformity with national standards;

- failing to provide services to protect the child's safety and health;

- failing to have health records reviewed, updated, and supplied to foster parents or other foster care providers with whom the child is placed at the time of placement;

- failing to pay maintenance payments to foster parents in an amount that covers the actual cost of the child's needs; and

3

- failing to provide services to help children who have reached the age of 16 in the transition from foster care to independent living.

Filing 42 (Report of Parties' Planning Conference), pp. 6-7 (Claim II).  See also filing 64 (Amended Complaint), ¶¶ 184-86.

The plaintiffs further allege the State violate certain provisions and regulations of the Early and Periodic Screening, Diagnosis and Treatment program of the federal Medicaid Act ("EPSDT"); specifically, 42 U.S.C. §§ 1396, 1396a, 1396d(a), 1396d(r), 1396n(c), and 42 C.F.R. Parts 420-421.  The plaintiffs claim the defendants violate these statutes and regulations by:

- failing to assure each child receives periodic, timely, and appropriate vaccinations and boosters, lead blood tests, and physical, mental, dental, and eye examinations, screenings, and treatments; and

- failing to provide each child with diagnostic, screening, preventive, and rehabilitative services for maximum reduction of physical and mental disabilities and restoration to the best possible functional level.

Filing 42 (Report of Parties' Planning Conference), pp. 7-8 (Claim III).  See also filing 64 (Amended Complaint), ¶¶ 187-88.

The plaintiffs allege the State deprives them of their rights to familial association in violation of the First, Ninth and Fourteenth Amendments to the United States Constitution. See filing 42 (Report of Parties' Planning Conference), pp. 8-9 (Claim IV).  See also filing 64 (Amended Complaint), ¶¶ 189-90.

The plaintiffs claim the State deprives them of constitutionally protected property and liberty interests in

4

federal and state entitlements guaranteed by the AACWA/ASFA, the EPSDT, and Neb. Rev. Stat. §§ 43-1311, 43-1312, and 43-292.02 without affording them the procedural due process required under the Constitution.  See filing 42 (Report of Parties' Planning Conference), pp. 9-10 (Claim V).  See also filing 64 (Amended Complaint), ¶¶ 191-94.

Finally, the plaintiffs claim they are the intended third-party beneficiaries of Title IV-E and Title IV-B State Plan Contracts entered into between the State and the United States Government, and they have been deprived of rights and benefits owed to them under the terms of those contracts. Filing 42 (Report of Parties' Planning Conference) at p. 10 (Claim VI).  See also filing 64 (Amended Complaint), ¶¶ 195-97.

## THE PENDING MOTIONS

The following motions are currently pending:

- The plaintiffs' Motion for Class Certification and Appointment of Class Counsel, (filing 11); and

- The defendants' Motion to Dismiss pursuant to Rule 12(b)(1) or, in alternative, Rule 12(b)(6) of the Federal Rules of Civil Procedure, (filing 70).

The pending motions have been extensively briefed and raise a myriad of issues.  The named plaintiffs move for certification of a class defined to include:

> All foster children who are or will be in the legal custody of [the Nebraska Department of Health and Human Services], including those alleged or adjudicated to be abused, neglected or abandoned by their parent, guardian or custodian, and those alleged or adjudicated to be wayward, uncontrollable or habitually truant.

5

Filing 11 (Motion to Certify Class).  See also filing 64
(Amended Complaint), ¶ 35.  The named plaintiffs claim over 6000
children are currently subjected to deficient custodial care
provided by the State, the State's conduct (or lack thereof)
toward the named plaintiffs while in foster care is typical of
that experienced by all members of the proposed class, and they
are willing and able to adequately represent the proposed class.
Filing 11 (Motion to Certify Class).

     The defendants have moved to dismiss the plaintiffs'
complaint under Rule 12(b)(1) for lack of standing and on the
basis of Younger and Rooker-Feldman abstention.  The defendants
also argue that the claims of named plaintiffs who are no longer
in HHS legal custody because they have reached the age of
majority are moot.  The defendants have also moved to dismiss
claims II and III of the complaint under Rule 12(b)(6), and
assert that plaintiffs cannot state a claim for relief under
either the AACWA or the EPSDT because these federal statutes do
not create a private right of action.

     These parties' motions raise interrelated arguments.  Many
of the facts submitted on the class certification motion are
also argued in support of or in opposition to the defendants'
Rule 12(b)(1) motion to dismiss for lack of standing.  The
indexes of evidence filed by the defendants were offered to both
oppose the motion to certify the class and support the motion to
dismiss.  See filings 73 (Defendants' Index of Evidence) and 74
(Defendants' Index of Evidence Filed under Seal).  The
plaintiffs have, in turn, argued that defendants' evidence
supports the class certification motion and undermines the
defendants' motion to dismiss.  They have also filed a
supplemental index of evidence in support of their motion for

6

class certification, and have cited this evidence to not only
request class certification, but also oppose the motion to
dismiss.  See filing 82 (Plaintiffs' Reply Brief--Class
Certification), pp. 30-31, 34-36, 39, 44-52; filing 88
(Plaintiffs' Brief--Motion to Dismiss), pp. 42-47.  Finally, the
defendants' brief opposing class certification "incorporate[s]
the facts, arguments and authorities contained in Defendants'
Motion to Dismiss and Brief in Support of Defendant's Motion to
Dismiss. . . ," (filing 71 (Defendants' Brief--Class
Certification), pp. 3-4), and the plaintiffs have briefed the
issues accordingly.  See filing 82 (Plaintiffs' Reply Brief--
Class Certification), p. 36 n. 34.

    The court's determination of class certification therefore
encompasses review of the extensive record submitted for both
the motion to certify a class and the motion to dismiss.  To
facilitate efficient use of the court's limited resources, this
report and recommendation addresses the issues raised in the
plaintiffs' motion for class certification, filing 11, and the
defendants' motion to dismiss, filing 70.

SUMMARY OF RECOMMENDATIONS

    For the reasons discussed herein, I shall recommend that:

--   The plaintiffs' motion for class certification be
     denied;

--   The claims of Cheryl H. and Paulette V. be dismissed
     as moot;

--   The defendants' motion to dismiss for lack of standing
     because named plaintiffs, Carson P., Danielle D.,
     Jacob P., Bobbi W., and Hannah A. face no real threat
     of imminent harm be denied.

7

-- The defendants' motion to dismiss for lack of standing
because Crystal Foreman, Jodell Bruns, Sara Jensen,
Micheline Creager, and Vanessa Nkwocha, (the self-
appointed next friends of Carson P., Danielle D.,
Jacob P., Bobbi W., and Hannah A., respectively), are
not capable and appropriate next friends, and
unauthorized to litigate the legal rights of the named
plaintiffs, be held in abeyance pending a ruling on
the remainder of defendants' motion to dismiss;

-- The defendants' motion to dismiss on the basis of
Rooker-Feldman abstention be denied;

-- The defendants' motion to dismiss on the basis of
Younger abstention be granted;

-- The defendants' Rule 12(b)(6) motion to dismiss the
plaintiffs' claim based on the federal Adoption
Assistance and Child Welfare Act ("AACWA") be granted;

-- The defendants' Rule 12(b)(6) motion to dismiss the
plaintiffs' claim based on the Early and Periodic
Screening, Diagnosis and Treatment program of the
federal Medicaid Act ("EPSDT") be denied.

## THE RECORD

The court cannot adequately or appropriately determine the
issues raised herein without analyzing the voluminous factual
record in the context of Nebraska law.  Therefore, the summary
of evidence provided hereafter addresses not only the evidence
filed of record, but also relevant Nebraska statutes and
judicial opinions.  "[T]he law of any state of the Union,
whether depending upon statutes or upon judicial opinions, is a
matter of which the courts of the United States are bound to
take judicial notice, without plea or proof."  McIndoo v.
Burnett, 494 F.2d 1311, 1313 (8th Cir. 1974)(citing Lamar v.
Micou, 114 U.S. 218, 223 (1885); Old Hickory Products Co., Ltd.
v. Hickory Specialties, Inc., 366 F.Supp. 913, 916 (D.Ga.
1973)).

8

I.   <u>The Named Defendants:   The Office of Protection and
Safety of the Nebraska Health and Human Services
Department</u>.

The Protection and Safety department of HHS is tasked with
providing "family-centered services to protect children from
abuse and neglect, to improve conditions in families that place
children at risk, and assisting youth to be productive and law-
abiding citizens." Filing 73, ex. 7 (Nebraska Administrative
Code-HHS), § 1-001 (HHS-003483).   The Protection and Safety
System is, in turn, divided into two areas:   child welfare and
protective services (with services provided by "Protective
Services Workers"), and the Juvenile Services System (the
"Office of Juvenile Services" with services provided by
"Juvenile Services Officers."). See filing 73, ex. 7 (Nebraska
Administrative Code-HHS), §§ 1-001 through 1-004.01
(HHS-003484-3488).

A.   <u>Entering HHS Legal Custody</u>.

As of December 31, 2005, there were a total of 7636
children in the legal custody of HHS.[1]   Filing 73, ex. 17
(Derived Placement Data), p. HHS-011294.   These children entered
HHS legal custody through one of four ways:

1)   Voluntary placement agreement.[2]

---

[1]Of these 7636 children, 135 are runaways and 80 are in
independent living.   Filing 73, ex. 17 (Derived Placement Data),
p. HHS-011293.

[2]The plaintiffs' briefs on class certification clarify that
children voluntarily placed in HHS legal custody are not intended
class members.

9

2)   Law enforcement pickup for temporary custody (also
     known as a "Police Hold");[3]

3)   Court adjudications under Neb. Rev. Stat. § 43-247;[4]
     and,

4)   Voluntary relinquishment of parental rights.[5]

Filing 73, ex. 7 (Nebraska Administrative Code–HHS), § 8-001
(HHS-003612).  Each method for placement in HHS legal custody
will be discussed in turn.

    1.   <u>Voluntary Placement Agreement</u>.

     A child can be voluntarily and temporarily placed in HHS
custody when a parent has no other option for the child's care,
and placement is not expected to exceed six months; for example,
when short-term hospitalization is required, the parent must
complete a short-term jail sentence, or short-term respite care
is needed while in-home services are being arranged.  The parent
must agree to participate in specific case plan activities and
services and assume financial responsibility for the placement

---

[3]To the extent that children entered HHS temporary legal
custody due to alleged abuse and neglect, these children are
described in the "including" clause of the plaintiffs' proposed
class definition.  The plaintiffs' briefs on class certification
clarify that children adjudicated under Neb. Rev. Stat. § 43-
247(1), (2), and (4) are not intended class members.

[4]Based on the plaintiffs' briefs on class certification, to
the extent that children entered HHS legal custody pursuant to an
adjudication under Neb. Rev. Stat. § 43-247(3)(a) and 3(b), these
children are included in the plaintiffs' intended class.

[5]The plaintiffs' reply brief on class certification argues
that a voluntarily relinquished child should be included in the
putative class even if the child was not also adjudicated under
Neb. Rev. Stat. § 43-247(3)(a) and/or 3(b).

10

costs, but can terminate the agreement at any time.  If placement lasts for more than six months, the case is referred to the county attorney for filing a petition.[6]  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 7.003.01-7.003.01A (HHS-003599).

There were 22 children in HHS custody pursuant to voluntary placement agreements on December 31, 2005.  Filing 83, ex. 8 (Defendants' Answers to Interrogatories), pp. 29-30. See also filing 73, ex. 17 (Derived Placement Data), column "03-Vol Placement Agreement," (HHS-011293).

2.   Police Hold/HHS Temporary Custody.

A law enforcement officer may place a child in the temporary custody of HHS, without a court order, if the officer believes the child is seriously endangered by his or her surroundings and needs to be immediately removed, or when the officer believes the juvenile is mentally ill and dangerous. Filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 7-003.02, 8-001.01 (HHS-003600, 3612).  See also Neb. Rev. Stat. §§ 43-248(3), 43-250(4)&(5)(LEXIS 2005).[7]  Law enforcement may

---

[6]Voluntary placement is not available for "juvenile offenders" or "status offenders."  See discussion infra.

[7]Under Neb. Rev. Stat. § 43-248, if a law enforcement officer believes a juvenile "is seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection," there are reasonable grounds to believe he or she is a runaway, or the officer "believes the juvenile to be mentally ill and dangerous as defined in section 71-908 and that the harm described in that section is likely to occur before proceedings may be instituted before the juvenile court," the juvenile may be taken into temporary custody. Juveniles needing protection are delivered to the temporary custody of HHS; juveniles believed to be mentally ill and

initiate a "police hold" for the protection of a child based on information it has directly received, upon notice from HHS personnel that an immediate risk of harm exists, or based upon facts elicited through a law enforcement/HHS joint investigation.  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), § 4-002.01 (HHS-003515); ex. 20 (NCPC Model Protocol for the Investigation of Child Abuse and Neglect Cases), p. HHS-011412-19).  After the child is in HHS temporary custody, the HHS regulations require caseworkers to secure a placement in the least restrictive setting consistent with the child's best interest, supervise that placement, consent to any necessary emergency medical or mental health treatment, refer the case to intake for processing, and contact the county attorney, law enforcement, or the court to determine if a court order for temporary custody will be issued.  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), § 8-001.02 (HHS-003612).

Law enforcement placement with HHS can extend for no longer than forty-eight hours.  In the absence of a court order authorizing continued placement, HHS temporary custody terminates at forty-eight hours and the child must be returned to the custody of his or her parent.  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), § 8-001.02 (HHS-003612-13).

There were 24 children in HHS temporary custody pending adjudication on December 31, 2005.  Filing 73, ex. 17 (Derived Placement Data), column "04-Police Hold," (HHS-011293).

---

dangerous are placed in a mental health facility or delivered to the temporary custody of HHS.  Neb. Rev. Stat. § 43-250(4)&(5) (LEXIS 2005).

3.   Court Intervention.

The Nebraska juvenile court has exclusive or original concurrent jurisdiction over juveniles as described in Neb. Rev. Stat. § 43-247.  Under the Nebraska Juvenile Code, a "juvenile" is "any person under 18 years of age," (Neb. Rev. Stat. § 43-245(4)(LEXIS 2005)), and therefore no Nebraska juvenile court case may be filed regarding a child who has reached the age of eighteen.  However, if the child was subject to the juvenile court's jurisdiction at the age of eighteen, the court's jurisdiction continues until the child turns nineteen or is married.  Neb. Rev. Stat. § 43-245(1)(LEXIS 2005)("Age of majority means nineteen years of age"); Neb. Rev. Stat. § 43-412(1)(LEXIS 2005)(Office of Juvenile Services commitment ends on child's nineteenth birthday);  In re Interest of Steven K., 11 Neb. App. 828, 829, 661 N.W.2d 320, 322 (Neb. 2003)("[M]arriage terminates the minority of a juvenile and, therefore, also ends the jurisdiction of the juvenile court.").

The Nebraska courts may place juveniles in HHS custody when the child needs:  1) state protection and/or care; 2) state supervision; 3) mental health treatment; or 4) state rehabilitation.

a.  Juveniles Needing State Protection:  "3(a) Juveniles."

Pursuant to Neb. Rev. Stat. § 43-247(3)(a), the juvenile court has exclusive original jurisdiction over "abused or neglected," or "dependent" juveniles--commonly referred to as "3(a) juveniles."

"Dependent juveniles" are children who are homeless or destitute, or without proper support through no fault of their

13

parents, guardians, or custodians; for example, where the parent
is incapacitated or unavoidably absent from home, or where
parents cannot provide for the exceptional needs of their child.
Neb. Rev. Stat. § 43-247(3)(a)(LEXIS 2005).  A family has a
dependent child if no mistreatment has been identified and
information indicates state assistance is required to address the
child's needs.  Filing 73, ex. 7 (Nebraska Administrative
Code-HHS), §§ 3-006.03 & 3-005.02 (HHS-003492, 003511).

    "Abused or neglected" juveniles need state protection from
the behavior of their parents, guardians, or custodians.
Juveniles characterized as "abused or neglected" are:

    --    abandoned children;

    --    those lacking proper parental care by reason of the
          fault or habits of their parents, guardians, or
          custodians;

    --    those lacking proper or necessary subsistence,
          education, or other care necessary for their health,
          morals, or well-being because of neglect or refusal to
          provide such care, or neglect or refusal to provide
          special care required for their mental condition; and

    --    those in a situation or engaging in an occupation
          dangerous to life or limb or injurious to their health
          or morals.

Neb. Rev. Stat. § 43-247(3)(a)(LEXIS 2005).

    In child abuse or neglect cases, HHS regulations require
that Protective Services Workers perform an initial assessment by
gathering information to validate maltreatment or the allegations
of a court petition, and when necessary, formulate and implement
a plan to secure child safety while working with the family to
preserve the family unity whenever possible.  § 4-002.01 at HHS-
003515.  When HHS has determined that a risk of child abuse or

neglect exists, and voluntary services will not provide for the child's safety,[8] HHS may initiate proceedings for court intervention by:  1) requesting temporary custody (e.g., requesting the court to authorize continuing HHS custody of a child initially placed in HHS temporary custody by law enforcement), or 2) requesting that a petition be filed (presented to the juvenile court by the county attorney and outlining factual circumstances justifying court intervention on the child's behalf).[9]  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 1-004.01, 8-001.03 through 8-001.05 (HHS-003487, 003613-14).  If the court enters an order requiring an adjudication hearing for an abused or neglected child, HHS Protective Service Workers prepare a written case plan and court report outlining HHS's recommendations for the juvenile court's consideration, and attend the court hearing to provide testimony as requested or oral recommendations as necessary.  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 8-001.08, 8-001.10 (HHS-003487, 003615).  See also Neb. Rev. Stat. § 43-1311(1) (LEXIS 2005)(HHS shall "[c]onduct or cause to be conducted an investigation of the child's circumstances designed to establish a safe and appropriate plan for the rehabilitation of the foster child and family unit or permanent placement of the child.").

---

[8]HHS may arrange for services to be provided on a voluntary basis and then monitor the family's progress in ameliorating the conditions which led to the abuse or neglect.  Filing 73, ex. 20 (NCPC Model Protocol for the Investigation of Child Abuse and Neglect Cases), p. HHS-011420).

[9]Law enforcement may decide to arrest the suspected perpetrator of child abuse or neglect.  In such cases, the county attorney may also initiate criminal proceedings, or may decline to prosecute when other measures are deemed more appropriate, such as pretrial diversion or the filing of a juvenile court petition.  Filing 73, Ex. 20 (NCPC Model Protocol for the Investigation of Child Abuse and Neglect Cases) at HHS-011419).

15

The court determines whether the HHS placement recommendations should be adopted.  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 8-001.08 through 8-001.10 (HHS-003487, 003614-15).  The court may permit a 3(a) "abused and neglected" juvenile to remain in his or her home subject to supervision, or it may commit the juvenile to (1) institutional care, (2) inpatient or outpatient mental health treatment, (3) the care of a reputable citizen of good moral character, (4) the care of an accredited association dedicated to caring for and obtaining homes for juveniles and willing to receive the juvenile, (5) the care of a suitable family, or (6) the care and custody of the Department of Health and Human Services.  Neb. Rev. Stat. § 43-284(LEXIS 2005).  If the juvenile court judge does not accept the HHS placement recommendation, HHS may file a request for expedited review by the Juvenile Review Panel.  Neb. Rev. Stat. § 43-287.04(LEXIS 2005).

Though the care options described in § 43-284 are also available for 3(a) "dependent" children as ordered by the court, since no maltreatment has been identified in such cases, state regulations require HHS to focus first on helping the dependent families stay together through the use of parent, family, and community resources.  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 3-006.03 (HHS-003512).  "Only when family resources and community resources are inappropriate or unavailable to meet the family need will Child Protective Services intervention be considered."  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 3-006.03 (HHS-003512).

In child abuse, neglect, and dependency situations, the efforts of HHS Protective Service Workers are directed at working with the children and their families to reduce risk to the child

16

in the present and future and help the family become self-sufficient.  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 1-001, 1-004.01 (HHS-003484, 003487).  For children adjudicated under 43-247(3)(a), HHS is required to provide ongoing services to the child and family, and an updated case plan evaluation and report to the presiding juvenile court every six months.  The juvenile court must review dispositional orders for each foster child every six months.  Neb. Rev. Stat. § 43-1313(LEXIS 2005); filing 73, ex. 7 (Nebraska Administrative Code-HHS), § 5-004.02 (HHS-003537).

As of December 12, 2005, there were over 2500 children in HHS legal custody who were adjudicated as 3(a) juveniles solely on the basis of suspected child abuse and/or neglect, and over 250 children adjudicated as 3(a) juveniles solely on the basis of dependency.  Filing 83, ex. 8 (Defendants' Answers to Interrogatories), pp. 5, 20.  See also filing 73, ex. 15 (Adjudication Listing).

b.  Juveniles Needing State Supervision:  "3(b) Juveniles."

Pursuant to Neb. Rev. Stat. § 43-247(3)(b), the juvenile court has <u>exclusive</u> jurisdiction over actions involving juveniles who are:

--   uncontrolled by their parent, guardian, or custodian because they are wayward or habitually disobedient;

--   act in a manner that injures or endangers seriously the morals or health of themselves or others; or

--   are habitually truant from home or school.

17

Neb. Rev. Stat. § 43-247(3)(b)(LEXIS 2005).  Such juveniles are often referred to as "3(b) juveniles" or "status offenders."[10] Filing 73, ex. 7 (Nebraska Administrative Code-HHS), § 1.006.05 (HHS-003493).  Status offenses are acts that are problematic for the juvenile and family, but not illegal if performed by an adult.

In status offender situations, the court may place the juvenile in HHS legal custody.  Neb. Rev. Stat. 43-286(2)(LEXIS 2005).  However, parents are expected to exhaust all other reasonable community or family resources before asking HHS to become involved, and they must agree to be actively involved in HHS' plan for services once the child becomes a state ward.  HHS provides services to status offenders only when the court has determined that a child is a status offender and has ordered the department's involvement.  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§  1.006.05, 3-006.04 (HHS-003493, 003513).

As with dependent juveniles, the juvenile court may order that status offenders be placed in any of the care options described in § 43-284.  However, unless maltreatment has been identified, out-of-home placement of status offenders is unusual; HHS' focus in status offender cases is to assist parents in

---

[10]Under the Nebraska Juvenile Code, the term "status offender" means "a juvenile who has been charged with or adjudicated for conduct which would not be a crime if committed by an adult, including, but not limited to, juveniles charged under subdivision (3)(b) of section 43-247," and those who have violated Neb. Rev. Stat. § 53-180.01 (unlawful for minors to attempt to buy alcohol), and § 53-180.02 (unlawful for minors to sell, consume, or possess alcohol outside their home).  Neb. Rev. Stat. § 43-245(15)(LEXIS 2005).

properly parenting the child.[11]  Filing 73, ex. 7 (Nebraska
Administrative Code-HHS), §§ 1.006.05 (HHS-003493).  See also
filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 4.009-
4.009.05 (HHS-003523-3525).

There were nearly 500 children in HHS custody who were
adjudicated solely as 3(b) juveniles as of December 12, 2005.
Filing 83, ex. 8 (Defendants' Answers to Interrogatories), pp.
12-13.  See also filing 73, ex. 15 (Adjudication Listing).

c.  Juveniles Needing Mental Health Care:  "3(c) Juveniles."

The juvenile court has <u>exclusive</u> jurisdiction over actions
involving juveniles who are "mentally ill and dangerous as
defined in section 71-908."  Neb. Rev. Stat. § 43-247(3)(c)(LEXIS
2005).  Neb. Rev. Stat. § 71-908 states:

> Mentally ill and dangerous person means a person who is
> mentally ill or substance dependent and because of such
> mental illness or substance dependence presents:
>
> (1)  A substantial risk of serious harm to another
>      person or persons within the near future as
>      manifested by evidence of recent violent acts or
>      threats of violence or by placing others in
>      reasonable fear of such harm; or
>
> (2)  A substantial risk of serious harm to himself or
>      herself within the near future as manifested by
>      evidence of recent attempts at, or threats of,
>      suicide or serious bodily harm or evidence of
>      inability to provide for his or her basic human
>      needs, including food, clothing, shelter,
>      essential medical care, or personal safety.

---

[11]HHS Juvenile Service Officers work with status offenders
and their families.  Filing 73, ex. 7 (Nebraska Administrative
Code-HHS), § 1-004.01(b) (HHS-003487).

Neb. Rev. Stat. § 71-908(LEXIS 2005).  As previously discussed,
such juveniles are often originally placed in HHS temporary
custody by law enforcement officers.  As with 3(a) and 3(b)
juveniles, if the court determines that a juvenile is mentally
ill and the juvenile is adjudicated to be a ward of the state,
the juvenile's care and custody is subject to the provisions of
Neb. Rev. Stat. § 43-284(LEXIS 2005).

   Thirteen children were in HHS custody on December 12, 2005
solely on the basis of a 3(c) adjudication.  Filing 83, ex. 8
(Defendants' Answers to Interrogatories), p. 32.  See also filing
73, ex. 15 (Adjudication Listing).

   d.  Juveniles Needing Rehabilitation:  "Juvenile Offenders."

   The Nebraska juvenile court has exclusive jurisdiction over
juveniles under the age of sixteen who have either committed a
misdemeanor or infraction under Nebraska law, or have violated a
city or village ordinance (other than traffic offenses).  Neb.
Rev. Stat. § 43-247(1)(LEXIS 2005).  The juvenile court has
concurrent original jurisdiction with the district court over
juveniles who have committed a felony under Nebraska law, (Neb.
Rev. Stat. § 43-247(2)(LEXIS 2005)), and it has concurrent
original jurisdiction with both the district and county courts
over juveniles who are sixteen or seventeen years of age who have
either committed a misdemeanor or infraction under Nebraska law,
have violated a city or village ordinance, (Neb. Rev. Stat. § 43-
247(1)(LEXIS 2005)), or have committed a traffic offense.  Neb.
Rev. Stat. § 43-247(4)(LEXIS 2005).  Such juveniles are also
known as "juvenile offenders," (see filing 73, ex. 7 (Nebraska
Administrative Code-HHS), §§ 1-006.08, 8-001.10 (HHS-003494, HHS-

20

003614-15)), or "delinquent juveniles." Neb. Rev. Stat. §
28-709(2)(a)(LEXIS 2005)("Delinquent child shall mean any child
under the age of eighteen years who has violated any law of the
state or any city or village ordinance.").

The HHS Office of Juvenile Services (HHS-OJS), and its
Juvenile Service Officers, provide services for juvenile
offenders and their families.  Neb. Rev. Stat. § 43-401(LEXIS
2005); filing 73, ex. 7 (Nebraska Administrative Code-HHS), § 1-
004.01(b) (HHS-003487).  Unlike "3a" and "3b" juvenile cases,
adjudication of juvenile offenders is subject to the provisions
of the Juvenile Service Act.  Neb. Rev. Stat. § 43-401 et seq,
(LEXIS 2005).

A Nebraska court may commit juveniles adjudicated under Neb.
Rev. Stat. § 247 (1),(2) and (4) to the legal custody of HHS-OJS.
Neb. Rev. Stat. § 43-408(1)(LEXIS 2005).  The court orders the
initial "level of treatment" required for juveniles committed to
the Office of Juvenile Services; that is, the type of
supervision, care, confinement, and rehabilitation services that
must be afforded to the juvenile offender.[12]  Neb. Rev. Stat. §
43-408(2)(LEXIS 2005); filing 73, ex. 7 (Nebraska Administrative
Code-HHS), §§ 8-001.10 (HHS-003487, 003614-15).  The court may
request a recommendation from the Office of Juvenile Services
before determining the level of treatment needed.  Neb. Rev.
Stat. § 43-408(2)(LEXIS 2005).  The court does not, however,
order a specific placement for the juvenile.  Neb. Rev. Stat. §
43-408(2)(LEXIS 2005).

---

[12]Unlike child welfare cases, the initial assessment of
juvenile offenders is performed by community or Youth Residential
Treatment Centers.  Filing 73, ex. 7 (Nebraska Administrative
Code-HHS), p. HHS-003515.

21

The "level of treatment" ordered by the court determines the "level of placement" made by HHS.  Neb. Rev. Stat. § 43-408(3)(LEXIS 2005).  There are three levels of placement identified by HHS for juvenile offenders:  1) home care; 2) out-of-home placement with a relative, foster family, agency-based foster care, group home, emergency shelter, residential treatment center, treatment group home, or in-patient treatment facility; and 3) placement in a self-contained, staff-secure residential facility (a Youth Rehabilitation Treatment Center such as those located in Geneva and Kearney, Nebraska).  Neb. Rev. Stat. § 43-286(1)(b)(LEXIS 2005); filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 7-004.01B, 8.001.01 (HHS-003602, HHS-003615-16).  HHS must advise the court of where the juvenile has been placed within thirty days after placement.  Neb. Rev. Stat. § 43-408(2)(LEXIS 2005).

The court maintains jurisdiction over the juvenile until he or she is discharged from the Office of Juvenile Services.  While in the custody of the Office of Juvenile Services, HHS must provide reports to the court, and the court must conduct review hearings every six months to re-evaluate the juvenile's placement and level of treatment.  Neb. Rev. Stat. § 43-408(2)&(3)(LEXIS 2005).  The juvenile court determines when the juvenile should be discharged from HHS-OJS custody.

> [I]t is clear under the language of § 43-408 that the committing court maintains jurisdiction over a juvenile committed to OJS, conducts review hearings every 6 months, and is to receive written notification of the placement and treatment status of juveniles committed to OJS at least every 6 months.  See § 43-408(2) and (3).  Thus, although the statute speaks of committed 'juveniles' being "discharged from [OJS]," § 43-408(2), the statute does not explicitly say that OJS discharges the juveniles, and, on the contrary, the Legislature has explicitly mandated that the committing court

22

"continue[s] to maintain jurisdiction" over a juvenile
committed to OJS. Id. Therefore, while OJS may make
an initial determination with regard to the
advisability of the discharge of a juvenile committed
to OJS, the committing court, as a result of its
statutorily imposed continuing jurisdiction, must
approve the discharge of the juvenile.

In re Tamantha S., 267 Neb. 78, 82, 672 N.W.2d 24, 27-28 (Neb.
2003)(interpreting amendments to Neb. Rev. Stat. § 43-408 and
distinguishing In re Interest of David C., 6 Neb. App. 198, 572
N.W.2d 392 (1997), which was issued prior to those amendments).

       The ongoing efforts of HHS Juvenile Services Officers are
directed at holding the offenders accountable for their behavior,
teaching them to become responsible citizens, addressing their
risks and needs, and maintaining public safety.  Juvenile
Services Officers supervise and monitor the juvenile offender's
behavior, determine if the level of restriction imposed is
serving to modify the juvenile's behavior, assist the juvenile in
making arrangements for making restitution or performing
community service, provide notice to the juvenile of all liberty
(parole) violations, and attend all hearings.  Filing 73, ex. 7
(Nebraska Administrative Code-HHS), §§ 1-001, 5-001.01
(HHS-003484, 3532-33).

       There were 1,375 children exclusively in the custody of HHS'
Office of Juvenile Services as of December 12, 2005:  493 with an
unspecified adjudication; 741 adjudicated under § 43-247(1) only;
38 adjudicated under both § 43-247(1) and (2); and 103
adjudicated under § 43-247(2) only.  Filing 83, ex. 8
(Defendants' Answers to Interrogatories), at p. 27.  See also
filing 73, ex. 15 (Adjudication Listing).

      e.   "Dually Adjudicated" Juveniles.

      Juveniles can be adjudicated as under more than one category of § 43-247.  HHS defines juveniles as "dually adjudicated" if they were adjudicated in more than one of the following categories:  abused and/or neglected (§ 43-247(3)(a)); dependent (§ 43-247(3)(a)); status offenders (§ 43-247(3)(b)); or juvenile offenders (§ 43-247(1)(2), and/or (4)).  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), § 3-005.05 (HHS-003511).  The child welfare and protective services and the Office of Juvenile Services divisions of HHS may share responsibility for a juvenile adjudicated under § 43-247(3) and as a juvenile offender.  As of December 12, 2005, there were 512 dually adjudicated juveniles.  See filing 71 (Defendants' Brief Opposing Class Certification) at p. 25.

      4.  <u>Voluntary Relinquishment</u>.

      The juvenile court has <u>exclusive</u> jurisdiction over juveniles whose parents have voluntarily relinquished their parental rights in writing to the Department of Health and Human Services or any child placement agency licensed by the Department of Health and Human Services.  Neb. Rev. Stat. § 43-247(8)(LEXIS 2005).  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), § 1-006.04 (HHS-003492-93).  Voluntary relinquishments can be precipitated by 3(a) adjudications; that is, where a juvenile court has determined that a child was abused or neglected, and the child is placed in HHS legal custody, the parent may thereafter decide to voluntarily relinquish parental rights rather than work toward reunification.  In such cases, the permanency plan for the child becomes adoption, and the child remains in HHS legal custody

following the § 43-247(8) adjudication that parental rights have been relinquished.

However, for children that are not already HHS wards, HHS does not provide adoption services to parents seeking to relinquish parental rights unless the family has contacted and been turned down by private social services agencies.  Filing 73, ex. 7 (Nebraska Administrative Code-HHS), § 3-006.07 (HHS-003513).

As of December 31, 2005 there were no children in HHS solely due to a voluntary relinquishment of parental rights.  Filing 73, ex. 17 (Derived Placement Data), column "05-Direct Relinquishment," (HHS-011293).

    B.   <u>Placement Considerations</u>.

    1.   <u>Location</u>.

Many children in HHS legal custody remain in the physical custody of a parent and are placed in their own homes.  This is commonly referred to as an "in-home placement."  As of December 31, 2005, of the 7636 children in the legal custody of HHS, 2361 (or 23.5%) were placed with their parent or caretaker, and 724 of these children had never been placed outside of their home.  Filing 73, ex. 17 (Derived Placement Data), p. HHS-011293.

In contrast, a child in HHS legal custody may also be placed in another state.  Under the Interstate Compact on the Placement of Children ("ICPC"), Neb. Rev. Stat. § 43-1101 et seq, children can be placed in out-of-state locations in order to secure the maximum opportunity for a child to be placed in a suitable

25

environment.  HHS retains the legal responsibility to ensure that
the child's needs are met, with the receiving state's social
services agency providing case assessment and management services
under Nebraska HHS supervision.  As of January 23, 2006, 357
juveniles in Nebraska HHS legal custody were in placements
outside Nebraska pursuant to ICPC authority.  Filing 74, ex. 36
(Reckling Affidavit), ¶ 6.

   2.   <u>Native American Placements</u>.

   Special placement considerations must be implemented when
Native American children are adjudicated under Neb. Rev. Stat. §
43-247(3)(a) and/or (b) and § 43-247(8).  Under the Indian Child
Welfare Act of 1978 ("ICWA"), 25 U.S.C. 1901 *et seq*, and the
Nebraska Indian Child Welfare Act ("NICWA"), Neb. Rev. Stat. §
43-1501 et seq, when the juvenile at issue is an "abused and
neglected," "dependent," "status offender," or voluntarily
relinquished Native American, HHS must use tribal social services
whenever possible, with case-planning and services provided based
on the social and cultural standards of the tribe.  HHS must make
"active efforts," considered a higher standard than "reasonable
efforts," to provide culturally relevant remedial and
rehabilitative services to prevent the breakup of the family.
Where out-of-home placement is required, the child must be placed
in Native American homes or care facilities authorized or
approved by tribal authorities unless the biological parents or
the child (if over 12 years of age) requests otherwise, or
adherence to the established placement order is not possible
because placement locations are unavailable or the approved
criteria will not address the child's extraordinary needs.  Neb.
Rev. Stat. § 43-1508(LEXIS 2005); filing 73, ex. 7 (Nebraska

26

Administrative Code–HHS), §§ 5-004.02D, 7.004.07 (HHS-003539, 003610); ex. 8 (Program Memo regarding Indian Child Welfare Act).

For the 2004 funding year, 759 Native American juveniles were in the legal custody of HHS.  Filing 73, ex. 40 (2004 Demographics Data), HHS-011516.

C.   <u>Oversight by the Nebraska Foster Care Review Board</u>.

The Nebraska Foster Care Review Board has been charged with providing ongoing oversight of placement plans and care provided by HHS to juveniles in foster care (other than voluntary placements).  Neb. Rev. Stat. § 43-1301 et seq,(LEXIS 2005). HHS, every court, and every child-placing agency is required to promptly notify and provide identifying and explanatory information to the state board whenever a child is placed in foster care.  Whenever a court has placed a child in foster care, the court must send to the state or designated local board a copy of the plan or permanency plan for family reunification or adoption of the juvenile, and a copy of any progress reports, the court order, and the report and recommendation of the guardian ad litem.  Neb. Rev. Stat. § 43-1307(LEXIS 2005).

The state and local review boards must review each foster care placement at least every six months to determine what efforts have been made to carry out the plan or permanency plan for family rehabilitation and reunification or for permanent placement of the child.  The board must assess whether continued out-of-home placement is appropriate, whether the child's current placement is safe, and whether parental rights should be terminated, and submit these recommendations and the rationale to the court having jurisdiction over the child.  Neb. Rev. Stat. §

27

43-1308(LEXIS 2005).  See also filing 73, ex. 14 (Foster Care
Rev. Bd. 2004 Annual Report) at HHS-010977-78.  The board must
"[p]romote and encourage stability and continuity in foster care
by discouraging unnecessary changes in the placement of foster
children" and "encouraging the recruitment of foster parents who
may be eligible as adoptive parents."  Neb. Rev. Stat. § 43-
1308(d)(LEXIS 2005).  The court is required to provide the board
with notice of any court review and the right to participate in
hearings pertaining to a child in foster care placement.  Neb.
Rev. Stat. § 43-1314(LEXIS 2005).

    II.  <u>The Named Plaintiffs</u>.

    This lawsuit was filed by named plaintiffs, Carson P.,
Danielle D., Jacob P., Bobbi W., Hannah A., Paulette V. and
Cheryl H., all of whom were in the legal custody of HHS at the
time this lawsuit was filed.[13]  Marcia Robinson Lowry ("Lowry"),
the executive director of Children's Rights, along with four
other attorneys from that national non-profit advocacy
organization, represent the named plaintiffs and request leave to
represent the proposed class.  Filing 12, ex. 1 (Lowry
Affidavit), ¶ 2.  Children's Rights is devoted to helping reform
child welfare systems.  Lowry has litigated class action child
welfare reform cases for more than thirty years, including in
several federal cases within the last five years.  Filing 12, ex.
1 (Lowry affidavit), ¶ 4.

    Children's Rights has also secured commitments from Nebraska
Appleseed Center for Law in the Public Interest ("Nebraska

_____

    [13]Paulette V. and Cheryl H. have now reached the age of 19,
and they are no longer in HHS legal custody.

Appleseed"), and private attorneys from Ogborn, Summerlin &
Ogborn, P.C.; DLA Piper Rudnick Gray Cary US L.L.P.; Cline,
Williams, Wright, Johnson & Oldfather, L.L.P.; and Gross & Welch,
P.C. L.L.O. to assist as needed in the representation of the
proposed class in this case.  Filing 12, ex. 1 (Lowry Affidavit),
¶ 3.  Lowry, and counsel from Nebraska Appleseed and the Ogborn,
Summerlin firm engaged in a two-year investigation of Nebraska's
child welfare system before filing this lawsuit.  Filing 12, ex.
1 (Lowry affidavit), ¶ 6.

   Each of the named plaintiffs has a self-appointed "next
friend" to represent their interests in this lawsuit.  The named
plaintiffs each have (or had) a guardian ad litem appointed by a
Nebraska juvenile court to represent their interests; none of the
"next friends" in this case has ever been a guardian ad litem for
any named plaintiff.

   All of the named plaintiffs were adjudicated under Neb. Rev.
Stat. § 43-247(3); none of them was adjudicated as a juvenile
offender.  There is no evidence or allegation that any of them
are Native American.[14]  All of the named plaintiffs were in out-

---

[14]The amended complaint alleges that HHS has failed to
follow up on Danielle D.'s mother's claim of a tribal
affiliation.  Filing 64 (Amended Complaint), ¶ 75.  This
allegation is in dispute.  According to the evidence before me,
Danielle D.'s mother claimed tribal eligibility in several Apache
tribes, including the Apache tribe of Oklahoma.  The county
attorney has notified the Apache Native American Indian tribe
that Danielle D. may be eligible for membership, and has
contacted the Apache Tribe of Oklahoma and the Federal Bureau of
Indian Affairs to determine the mother's tribal eligibility.  HHS
has also sent letters to the Apache and Cherokee tribes.  The
Apache and Cherokee tribes, and the Apache Tribe of Oklahoma,
have all stated that Danielle D.'s mother is not eligible for
tribal enrollment.  Filing 74 (supplemental evidence index), ex.
3 (HHS file-Danielle D.), p. HHS-000708.  The plaintiffs have

of-home placements within the State of Nebraska at the time this
lawsuit was filed; none has ever lived in an enhanced group
treatment home.  Filing 73, ex. 36 (Reckling Affidavit), ¶ 2.

Aside from these similarities, the named plaintiffs are
children from diverse backgrounds with equally diverse needs.
The following provides a basic summary of each named plaintiff's
entry and history within the HHS system, and their "next friends"
who have agreed to represent their interests as class plaintiffs
in this litigation.

A.   Carson P.

Carson P., an 8-year-old, has fetal alcohol syndrome and is
a sexual abuse victim.  Filing 64 (Amended Complaint), ¶ 46.  He
was placed in HHS custody in September 2003 after police removed
him from his home.  While living with his mother, who is
chemically dependent, Carson P. was subjected to poor living
conditions and verbally aggressive behavior.  A petition and a
motion for immediate custody were filed by the county attorney,
and a Nebraska juvenile court entered an order placing Carson P.
in the temporary custody of HHS on September 18, 2003.  Filing 83
(Plaintiffs' Evidence Index), ex. 1 (HHS file--Carson P.), pp.
HHS-000047-53.  See also filing 64 (Amended Complaint), ¶ 11.
Carson P. was adjudicated as a "3(a) juvenile" on February 3,
2004, remains in HHS custody, and has been in three placements

---

produced no evidence to the contrary.
     This report and recommendation makes no attempt to resolve
the dispute between paragraph 75 of the amended complaint and the
defendants' evidence.  For the purpose of analyzing the motion
for class certification, I consider paragraph 75 of the amended
complaint to be true, but even so, this allegation does not state
that Danielle D. is Native American.

since September 2003.  Filing 83 (Plaintiffs' Evidence Index),
ex. 1 (HHS file--Carson P.), pp. HHS-000027, 021779.

Carson P. was initially placed in a foster care home within
fifty miles of his mother's home.  He lived there for
approximately two years.  Filing 74 (Supplemental Evidence
Index), ex. 1 (HHS file–Carson P.), p. HHS-000027-30.
Visitations with his mother were scheduled, but she did not
reliably attend.  As of April 25, 2005 such visitations were
placed on hold by the HHS caseworker after the mother failed to
attend three consecutive visitations.  Filing 74 (Supplemental
Evidence Index), ex. 1 (HHS file–Carson P.), p. HHS-000032.

Carson P. began visiting his maternal grandmother in April
2005.  Filing 74 (Supplemental Evidence Index), ex. 1 (HHS
file–Carson P.), p. HHS-000030.  The mother had arranged to visit
Carson P. two to three times per week beginning in June 2005, but
she did not follow through.  Filing 74 (Supplemental Evidence
Index), ex. 1 (HHS file–Carson P.), pp. HHS-000027-28.  The
mother also did not complete the chemical dependency treatment
program as recommended by the court.  Filing 74 (Supplemental
Evidence Index), ex. 1 (HHS file–Carson P.), pp. HHS-000030,
000034.  HHS advised the court on July 1, 2005 that poor progress
was being made to alleviate the out-of-home placement.  HHS
recommended that Carson P. remain in its custody, and further
recommended that the court order a primary permanency plan of
adoption by December 1, 2005.  Filing 74 (Supplemental Evidence
Index), ex. 1 (HHS file–Carson P.), pp. HHS-000027-34.

Carson P. was placed with his maternal grandmother on August
13, 2005, and his mother began visiting him at the grandmother's
home and under her supervision in September 2005.  Carson P.'s

31

behavior and social function improved.  Filing 74 (Supplemental
Evidence Index), ex. 1 (HHS file-Carson P.), p. HHS-000038.  HHS
modified its position and recommended the court order a primary
permanency plan of reunification to be achieved by May 1, 2006,
while maintaining an alternative plan of adoption.  Filing 74
(Supplemental Evidence Index), ex. 1 (HHS file-Carson P.), p.
HHS-000038.  On July 5, 2005, and on November 3, 2005 the
juvenile court found that Carson P. should remain in the custody
of HHS.  The July order stated the permanency objective was
reunification with a concurrent plan of adoption (filing 74
(Supplemental Evidence Index), ex. 1 (HHS file-Carson P.), pp.
HHS-000072-74); the November order noted Carson P. was now
staying with a relative and stated the permanency objective was
reunification, "and reasonable efforts have been made to finalize
permanency and/or return the minor child to the parental home."
Filing 74 (Supplemental Evidence Index), ex. 1 (HHS file-Carson
P.), pp. HHS-011196-98.

     Thereafter, Carson P.'s mother was incarcerated and his
grandmother became ill and could no longer care for him.  The
most current information before the court indicates Carson P. was
placed in an agency-based foster home on January 11, 2006.
Carson P.'s guardian ad litem in the juvenile proceedings was
Stephanie A. Martinez, and as of February 7, 2006 she recommended
that Carson P. be allowed liberal and frequent visitation with
his grandmother, be therapeutically reassessed, and that an
action be filed for termination of parental rights.  The juvenile
court set a permanency plan hearing to be held on March 2, 2006.
Filing 83 (Supplemental Evidence Index), ex. 1 (HHS file-Carson
P.), pp. HHS-021779, 021888-21890.  At the March 2, 2006 hearing,
the court concluded:

[T]he permanency objective is reunification with a
concurrent plan of adoption, and reasonable efforts
have been made to finalize permanency and/or to return
the minor child to the parental home. . . , but it
would be contrary to the health and safety of the minor
child to be returned home at this time;

. . . [I]t would be in the best interests of the minor
child to remain in the temporary care and custody of
the Nebraska Department of Health and Human Services
for continued appropriate care and placement, to
**exclude the home of the mother**, until further order of
the Court.

Filing 74 (Supplemental Evidence Index), ex. 50 (Juv. Ct. Order--
Carson P.), p. HHS-021759(emphasis in original).

The plaintiffs' amended complaint specifically alleges
Carson P. has been mistreated while in state custody, (filing 64
(Amended Complaint), ¶¶ 51, 52, 57), allowed to remain in state
custody for an excessive length of time due to lack of case
management and case plans and services, including
adoption-related services, (filing 64 (Amended Complaint), ¶¶ 53,
57), denied access to appropriate treatment and services, (filing
64 (Amended Complaint), ¶ 46, 50-51), placed with foster parents
who were given almost no training or information about his
medical and mental health needs and who were consistently paid
less that the amount needed to cover the costs of his care,
(filing 64 (Amended Complaint), ¶¶ 48, 55-57), and denied
visitation with family members.  Filing 64 (Amended Complaint),
¶¶ 54, 57.

Carson P.'s next friend is Crystal Foreman, his former
foster sister.  She is 22 years old, a sergeant in the U.S. Army
Reserve, a human resource specialist for the Reserve Center, and
is completing her bachelor's degree at Bellevue University.
Filing 74 (Supplemental Evidence Index), ex. 31 (Foreman

33

Deposition), pp. 6-8, 12.  Ms. Foreman never lived in the same
home as Carson P., but saw him once or twice a week for the two
years her parents were his foster parents.  Ms. Foreman also
provided care for Carson P. for two weeks in August 2004.  Prior
to the suit being filed, she last spoke with Carson P. in August
2005.  Carson P. was removed from her parent's home in August
2005, placed with his grandmother, and to aid the transition, the
HHS caseworker initially prohibited communication between the
Foreman family and Carson P.  Filing 74 (Supplemental Evidence
Index), ex. 31 (Foreman Deposition), pp. 13-17.

   Ms. Foreman has not spoken with Carson P.'s grandmother, his
guardian ad litem, his caseworker, or with his teachers or other
school officials concerning his care or progress.  Filing 74
(Supplemental Evidence Index), ex. 31 (Foreman Deposition), pp.
17-18, 22, 29, 54.  She attended one juvenile court hearing in
the spring of 2004, but did not testify, and she has never raised
her concerns about Carson P. before the juvenile court.  Filing
74 (Supplemental Evidence Index), ex. 31 (Foreman Deposition),
pp. 28-29, 54.  She has never reviewed the HHS court reports or
case plans for Carson P., and does not know what the current
permanency plan is for Carson P.  Filing 74 (Supplemental
Evidence Index), ex. 31 (Foreman Deposition), pp. 29-31.

   Ms. Foreman is willing to represent Carson P., and agreed to
do so at the request of plaintiffs' counsel, Doug Gray, an
attorney for Children's Rights.  Ms. Foreman has read the
complaint and regularly receives correspondence from plaintiffs'
counsel, but she cannot explain what a class representative is or
the duties and responsibilities of one appointed to represent a
class.  Filing 74 (Supplemental Evidence Index), ex. 31 (Foreman
Deposition), pp. 31-32, 35, 55.

34

B.    <u>Paulette V</u>.

Paulette V. was 18 when the plaintiffs' suit was filed.  She is now 19 years of age.  Paulette V. is one of three children born to her mother.  Filing 74 (Supplemental Evidence Index), ex. 2 (HHS file-Paulette V.), p. HHS-000212.  Each child has a different father; the identity of Paulette V.'s father is unknown.  Filing 74 (Supplemental Evidence Index), ex. 2 (HHS file-Paulette V.), pp. HHS-000212-13.  Her mother lost custody of Paulette V.'s two siblings in 1992 due to neglect, and both of them were later adopted.  However, Paulette V., who was approximately 5 years old at the time, was residing with relatives when the court proceedings involving her siblings occurred, and she was therefore not included in those proceedings.  Filing 74 (Supplemental Evidence Index), ex. 2 (HHS file-Paulette V.), pp. HHS-000212-13.  Paulette V. was "shuttled around amongst her mother's dysfunctional relatives," and was sexually abused by a teenage cousin when she was 8 years old.  Filing 74 (Supplemental Evidence Index), ex. 2 (HHS file-Paulette V.), p. HHS-000213.  Filing 74 (Supplemental Evidence Index), ex. 2 (HHS file-Paulette V.), p. HHS-000213.

HHS obtained legal custody over Paulette V. in July 1997, and she was placed with her aunt who served as her guardian.  Filing 83 (Supplemental Evidence Index), ex. 2 (HHS file-Paulette V.), p. HHS-000397.[15]  HHS and the Douglas County Juvenile Court closed the case.  This aunt ultimately placed Paulette V. at Midlands Hospital under a mental health admission, and then

---

[15]The evidence filed herein does not appear to support the plaintiffs' claim that "Paulette V. . . . has been in HHS custody for most of the last 12 years."  See filing 64 (Amended Complaint), ¶ 13.

35

refused to take her back, advising the HHS caseworker that "she
cannot handle her niece . . . any longer. [She] has run away from
home twice and is hanging around with an older man."  Filing 83
(Supplemental Evidence Index), ex. 2 (HHS file-Paulette V.), p.
HHS-000397).  HHS re-opened its file.  Filing 74 (Supplemental
Evidence Index), ex. 2 (HHS file-Paulette V.), p. HHS-000213.

        Paulette V. was adjudicated a 3(b) juvenile on September 17,
2002.  Filing 83 (Supplemental Evidence Index), ex. 2 (HHS
file-Paulette V.), pp. HHS-000549-550.  Paulette has been placed
in the Douglas County Youth Detention Center, a group treatment
home, and a group home, before ultimately being placed in long-
term foster care on November 23, 2004.  Filing 83 (Supplemental
Evidence Index), ex. 2 (HHS file-Paulette V.), pp. HHS-000377-78.
Paulette V. does not want to build any relationship with her
mother and has excelled in therapy.  The therapist states the
foster mother "is like a mother to [Paulette V.,] . . . the best
placement that she has been in[,]. . . treats [Paulette V.] like
a daughter and continues to play a motherly role in [her] life."
Filing 74 (Supplemental Evidence Index), ex. 2 (HHS file-Paulette
V.). p. HHS-000214.  According to recent HHS records filed
herein, Paulette V. was successfully working part-time while
attending high school and had adjusted well, both scholastically
and socially, to her school; liked her foster home and foster
parents, and wanted to remain in their care until the summer of
2006, when she graduated from high school and reached the age of
19.  Filing 74 (Supplemental Evidence Index), ex. 2 (HHS
file-Paulette V.), pp. HHS-000214-15.

        The juvenile court's September 29, 2005 ruling stated
Paulette V. was in a "wonderful foster care placement," and
ordered that she remain in the care of her foster parents with a

permanency plan of independence.  Filing 74 (Supplemental
Evidence Index), ex. 2 (HHS file–Paulette V.), p. HHS-000549.
The juvenile court further found that "[t]here has been
documented in the case/permanency plan a compelling reason that a
termination of parental rights should not be filed in that the
Nebraska Juvenile Code does not provide for the filing of such
termination in law violation or status offense cases under
Section 43-247 (1), (2), and 3(b)."  Filing 83 (Supplemental
Evidence Index), ex. 2 (HHS file–Paulette V.), pp. HHS-000549-
550.

     The juvenile court's March 3, 2006 ruling stated the
"programs and services provided by [HHS] adequately address
independent living skills," and Paulette V.'s placement remained
"wonderful."  A Disposition Review Hearing was set for June 5,
2006.  Filing 74 (Supplemental Evidence Index), ex. 43 (Juvenile
Court Orders–Paulette V.), pp. HHS-021754-55.

     The amended complaint alleges Paulette V. was frequently
moved among multiple inappropriate placements, (filing
64 (Amended Complaint), ¶¶ 58, 61, 63); required to stay in an
Omaha emergency shelter for an excessive period of time, (filing
64 (Amended Complaint), ¶¶ 65, 68); mistreated while in state
custody because HHS failed to screen the foster homes,
investigate reports of sexual abuse, or appropriately monitor her
safety and or supervise the adequacy of her placements, (filing
64 (Amended Complaint), ¶¶ 60, 62, 68); provided only minimal
counseling despite the abuse received, (filing 64 (Amended
Complaint), ¶¶ 61, 64, 68); subjected to excessive institutional
placements, (filing 64 (Amended Complaint), ¶ 66); allowed to
languish in the State's foster care custody for most of the last
twelve years due to lack of case management and case plans and

37

services, including adoption-related services, (filing 64
(Amended Complaint), ¶¶ 58-66); denied visitation with family
members, (filing 64 (Amended Complaint), ¶¶ 54, 57, 59, 68, 75,
76); denied transitional living training, (filing 64 (Amended
Complaint), ¶¶ 58, 67); and denied the benefits of an appropriate
and implemented permanency plan adjusted to her individual needs.
Filing 64 (Amended Complaint), ¶ 68.

Paulette V.'s next friend is Sherri Wheeler.  Ms. Wheeler is
employed by the school system Paulette V. started attending in
November 2004.  Filing 74 (Supplemental Evidence Index), ex. 32
(Wheeler Deposition), 7-8.  Ms. Wheeler never talked with
Paulette V.'s foster parents or her teachers about her foster
home placement or her progress in school, and she did not have
access to Paulette V.'s grades.  Filing 74 (Supplemental Evidence
Index), ex. 32 (Wheeler Deposition), 15-16, 21.  She has not
spoken with Paulette V.'s caseworker or her guardian ad litem
appointed by the juvenile court, and she has not contacted the
county attorney or any member of the Foster Care Review Board
regarding Paulette V.'s case.  Ms. Wheeler has not attended any
juvenile court hearings or read any HHS documents or court
reports.  Filing 74 (Supplemental Evidence Index), ex. 32
(Wheeler Deposition), 29, 31-33, 35-36, 61-62.  Ms. Wheeler has
had casual conversations with Paulette V. about "everyday stuff"
while walking in the school hallways, but admits, "We really have
hardly any time to talk at all when there's not very many people
around."  Filing 74 (Supplemental Evidence Index), ex. 32
(Wheeler Deposition) at 14.  "It's really hard to have much of a
conversation at school."  Filing 74 (Supplemental Evidence
Index), ex. 32 (Wheeler Deposition), 24.

Paulette V. asked Ms. Wheeler to "stand by her" and "guide her" as a "next friend" in this litigation.  Paulette V. and Ms. Wheeler read the drafted complaint together, and Paulette V. confirmed that each of the allegations concerning her history in the foster care system was true.  Ms. Wheeler's knowledge of Paulette V.'s background does not extend beyond the allegations set forth in the complaint.  Filing 74 (Supplemental Evidence Index), ex. 32 (Wheeler Deposition), 18-20, 39-55, 64, 66.  She has no opinion concerning whether Paulette V. was in a proper foster home at the time suit was filed, or whether she was receiving appropriate counseling or adequate training for independent living.  Filing 74 (Supplemental Evidence Index), ex. 32 (Wheeler Deposition), 60-63, 65-66.  Ms. Wheeler's concern is basically "about Paulette . . . and the whole foster care system, as to whether these kids are getting things met that need to be met in their daily lives."  Filing 74 (Supplemental Evidence Index), ex. 32 (Wheeler Deposition), 64.

C.  Danielle D.

Danielle D., a 7-year-old, first entered HHS custody in July 2000.[16]  Filing 74 (Supplemental Evidence Index), ex. 3 (HHS file-Danielle D.), pp. HHS-000702-03.  The police removed her from her mother's home after receiving a report of neglect, and following a medical examination, she was placed in protective custody.  Danielle D. was adjudicated a 3(a) juvenile "Fault Abuse/Neglect" and placed in a traditional foster home.  Filing 83 (Supplemental Evidence Index), ex. 3 (HHS file-Danielle D.),

---

[16]Plaintiffs' allegation that "Danielle D. . . . has been in HHS custody for approximately two years" (or since late 2003) is likely based on her most recent 3(a) adjudication date.  Compare filing 64 (Amended Complaint), ¶ 15 with filing 74 (Supplemental Evidence Index), ex. 3 (HHS file-Danielle D.), pp. HHS-000702-04.

pp. HHS-008110-8111.   Thereafter, Danielle D.'s mother received
family support worker services, parent education, and
transportation services.   Filing 74 (Supplemental Evidence
Index), ex. 3 (HHS file-Danielle D.), p. HHS-000703.

Danielle D. was returned to her mother's custody in June
2002 pursuant to a court determination.   Filing 74 (Supplemental
Evidence Index), ex. 3 (HHS file-Danielle D.), p. HHS-000703;
Filing 83 (Supplemental Evidence Index), ex. 3 (HHS file-Danielle
D.), p. HHS-008111.   However, in July 2003, a police officer
detailed to Danielle D.'s school noticed she had bruising
indicative of physical abuse.   Based on this report, the deputy
county attorney filed a motion for temporary custody and by court
order, Danielle D. was immediately returned to HHS temporary
custody pending an adjudication of the issue.   Filing 74
(Supplemental Evidence Index), ex. 3 (HHS file-Danielle D.), p.
HHS-000703.   HHS placed Danielle D. in a foster home within 20
miles of her mother's home.   Filing 74 (Supplemental Evidence
Index), ex. 3 (HHS file-Danielle D.), p. HHS-000706.   Danielle D.
was adjudicated a 3(a) juvenile–"Fault Abuse/Neglect" on January
6, 2004, and she has remained in HHS custody at the same foster
home.   Filing 74 (Supplemental Evidence Index), ex. 3 (HHS
file-Danielle D.), p. HHS-000704; ex. 28 (Juvenile Court
Order-Danielle D.); Filing 83 (Supplemental Evidence Index), ex.
3 (HHS file-Danielle D.), p. HHS-008110).

Danielle D. attends school and has a positive relationship
with her foster mother.   Filing 74 (Supplemental Evidence Index),
ex. 3 (HHS file-Danielle D.), pp. HHS-000707-08.   She does not,
however, enjoy or adjust well to visits with her mother.   See
filing 74 (Supplemental Evidence Index), ex. 3 (HHS file-Danielle
D.), pp. HHS-000704-05, 708-09.   Danielle D.'s mother exhibits

dramatic mood swings, an inability to make good decisions, poor
insight into her actions, and an inability to comprehend
information provided.  She will not take her prescribed
medications.  Filing 74 (Supplemental Evidence Index), ex. 3 (HHS
file-Danielle D.), pp. HHS-000708-09.

    The December 2004 primary permanency plan for Danielle D.
was long term foster care with an alternative plan of
guardianship.  Filing 74 (Supplemental Evidence Index), ex. 3
(HHS file-Danielle D.), p. HHS-001020.  However, in June 2005 a
juvenile court judge ordered that absent an applicable exception
under Neb. Rev. Stat. § 43-292.02(3)(a)(b) or (c), the State must
file a Motion or Petition to Terminate Parental Rights.  Filing
74 (Supplemental Evidence Index), ex. 3 (HHS file-Danielle D.),
p. HHS-001013.  The court's September 2005 order stated the
primary permanency plan for Danielle D. was adoption, (filing 74
(Supplemental Evidence Index), ex. 3 (HHS file-Danielle D.), p.
HHS-000985), based in part on HHS' recommendation that adoption
be achieved by August 6, 2006.  Filing 74 (Supplemental Evidence
Index), ex. 3 (HHS file-Danielle D.), p. HHS-000710.

    The amended complaint alleges Danielle D. was mistreated
while in state custody because HHS failed to adequately monitor
her visits with her mother during attempts at reunification,
(filing 64 (Amended Complaint), ¶¶ 75-76); allowed her to stay in
State custody for an excessive period of time because it failed
to provide appropriate case management, permanency planning, and
services for reunification, and because it failed to promptly
determine that reunification was inappropriate, develop a
permanency plan of searching for a permanent adoptive home rather
than long-term foster care, locate and terminate the rights of
her biological father, or confirm claims of tribal affiliation,

41

(filing 64 (Amended Complaint), ¶¶ 69, 71-76);[17] failed to
provide health services necessary to address her hearing
impairment and developmental delay, (filing 64 (Amended
Complaint), ¶¶ 71, 76); failed to adequately compensate her
foster care providers to cover the expense of her care, (filing
64 (Amended Complaint), ¶¶ 71, 76), and denied her visitation
with family members.  Filing 64 (Amended Complaint), ¶¶ 75, 76.

    Danielle D.'s next friend is Jodell Bruns.  Ms. Bruns is a
friend of Danielle D.'s current foster mother, and was asked by
the foster mother to represent Danielle D.'s interest in this
lawsuit.  Filing 74 (Supplemental Evidence Index), ex. 33 (Bruns
Deposition), 12, 23-26.  Danielle D.'s foster mother has
expressed to Ms. Bruns that she is concerned the state is not
moving quickly to place Danielle D. in an adoptive home, does not
adequately supervise her visits with her mother, and has not
adequately assisted Danielle D. with her hearing and speech
problems.  Filing 74 (Supplemental Evidence Index), ex. 33 (Bruns
Deposition), 13-14, 39-44.  Bruns believes Danielle D. and her
foster mother get along like mother and daughter, and that
Danielle D. has improved while in her foster mother's care.
Filing 74 (Supplemental Evidence Index), ex. 33 (Bruns
Deposition), 27-28, 64-65.

    Ms. Bruns has no opinion concerning the appropriate
permanent placement for Danielle D.  She has reviewed the
complaint in this case, but she has not reviewed any HHS or
Foster Care Review Board reports regarding Danielle D.  Filing 74
(Supplemental Evidence Index), ex. 33 (Bruns Deposition), 10, 37-
38.  Ms. Bruns has not attended any juvenile court hearings, and

---

[17]See footnote 14.

has not spoken with Danielle D.'s teachers, caseworker, or
guardian ad litem.  She has not contacted the county attorney or
the juvenile court judge regarding Danielle D.'s placement or
access to care.  Filing 74 (Supplemental Evidence Index), ex. 33
(Bruns Deposition), 29, 31, 35-36.  She understands that in her
role as a next friend, she will be part of a joint effort to
bring cases to the court as a representative of not only Danielle
D., but everyone in the foster care system.  Filing 74
(Supplemental Evidence Index), ex. 33 (Bruns Deposition), 64.

        D.    Cheryl H.

        Cheryl H. was 18 years old when this lawsuit was filed; she
is currently 19 years old.  Filing 74 (Supplemental Evidence
Index), ex. 4 (HHS file-Cheryl H.), p. HHS-001296.  See also
filing 64 (Amended Complaint), ¶ 17.  Cheryl H. was sexually
abused by her father at or before she was 9 years old, and her
mother failed to care for her.  Filing 74 (Supplemental Evidence
Index), ex. 34 (Nowak Deposition), attachment at HHS-001930.  She
was adjudicated a 3(a) juvenile-"Fault Abuse/Neglect" on May 1,
1996.  Filing 83 (Supplemental Evidence Index), ex. 4 (HHS
file-Cheryl H.), p. HHS-021994).  See also filing 64 (Amended
Complaint), ¶ 17.  Cheryl H. exhibits ongoing problems with
temper tantrums and physically aggressive behavior.  Filing 74
(Supplemental Evidence Index), ex. 29 (Caseworker report-Cheryl
H.), p. HHS-011589; ex. 34 (Nowak Deposition), attachment at HHS-
001931.  Cheryl H. was placed in numerous foster homes and group
home facilities during her years in the foster care system.
Filing 83 (Supplemental Evidence Index), ex. 4 (HHS file-Cheryl
H.), pp. HHS-021994-95.

The amended complaint alleges that beginning at the age of 9, Cheryl H. was shuttled among a dozen inappropriate placements over a period of ten years, (filing 64 (Amended Complaint), ¶ 77-80); at the age of 11, was required to stay in an emergency children's shelter for a year, (filing 64 (Amended Complaint), ¶¶ 78, 81); did not have timely and meaningful contacts with her caseworker, and was poorly monitored by HHS to ensure her safety and well being, (filing 64 (Amended Complaint), ¶ 81); spent significant periods of her life in institutional settings, (filing 64 (Amended Complaint), ¶¶ 77, 78, 80); was placed with inadequately trained, prepared, and informed foster parents who were unable to meet her mental health and behavioral needs and were afforded almost no caseworker supervision, (filing 64 (Amended Complaint), ¶¶ 78, 79); was not afforded the benefit of an appropriate and implemented permanency plan, (filing 64 (Amended Complaint), ¶ 81; and received minimal assistance with planning her transition to adulthood.  Filing 64 (Amended Complaint), ¶¶ 80, 81.

Cheryl H.'s next friend is Susan Nowak of Poughkeepsie, New York.  See filing 64 (Amended Complaint), ¶ 18.  Ms. Nowak has lived in New York since 1998.  Ms. Nowak was Cheryl H.'s foster parent in 1996 for approximately 8 months.  Filing 74 (Supplemental Evidence Index), ex. 34 (Nowak Deposition), 9, 14-16, 48.  She has maintained contact with Cheryl H. and her foster parents since that time.  Although most of the contacts were by telephone, letters were exchanged, and Cheryl H. visited Ms. Nowak in New York for Christmas in 2004.  Filing 74 (Supplemental Evidence Index), ex. 34 (Nowak Deposition), 11-14, 55-57.

Ms. Nowak has had some contact with Cheryl H.'s caseworkers, but she has not attended any court hearings since being a foster

parent, has not read any court orders concerning her placement, and has not reviewed the Foster Care Review Board recommendations.  Filing 74 (Supplemental Evidence Index), ex. 34 (Nowak Deposition), 14-16, 48, 80-81.  She has never spoken with Cheryl H.'s teachers, her guardian ad litem, or the county attorney regarding Cheryl H.'s care and placement.  Filing 74 (Supplemental Evidence Index), ex. 34 (Nowak Deposition), 71-80.

Ms. Nowak states HHS never had a real plan for Cheryl H.'s care.  She believes that instead of focusing on family reunification, HHS should have instituted proceedings for termination of parental rights years ago, thereby allowing Cheryl H. to be placed in a stable home.  Filing 74 (Supplemental Evidence Index), ex. 34 (Nowak Deposition), 48, 85-87.  She further believes HHS provides inadequate training for foster parents attempting to deal with the special problems exhibited by Cheryl H.  Filing 74 (Supplemental Evidence Index), ex. 34 (Nowak Deposition), 96-97.  Ms. Nowak believes that although Cheryl H. has reached the age of majority under Nebraska law, she is not "well equipped for the real world."  Filing 74 (Supplemental Evidence Index), ex. 34 (Nowak Deposition), 63.

Doug Gray asked Ms. Nowak to be Cheryl H.'s next friend in the summer of 2005.  By agreeing to be a next friend, Ms. Nowak intends to improve the situations of all children who are presently or may in the future be in HHS custody.  Filing 74 (Supplemental Evidence Index), ex. 34 (Nowak Deposition), 13-14, 60, 62.

     E.   <u>Jacob P</u>.

     Jacob P., age 13, first entered HHS custody in December 1996
when his mother left him at HHS because she was unable to care
for him.  Jacob P. has fetal alcohol syndrome.  Parental rights
were terminated in 1997.  Filing 74 (Supplemental Evidence
Index), ex. 5 (HHS file–Jacob P.), p. HHS-011596; filing 64
(Amended Complaint), ¶ 87).  He had numerous unsuccessful
placements until he was adopted in November 2000, but he was
reportedly treated poorly by his adoptive parents.  Serious
concerns were raised over whether his adoptive parents were
physically and emotionally abusive.  Filing 74 (Supplemental
Evidence Index), ex. 5 (HHS file–Jacob P.), pp. HHS-002219,
011596; filing 64 (Amended Complaint), ¶¶ 84-86.  Jacob P.'s
adoptive parents relinquished their parental rights in June of
2004.  Filing 64 (Amended Complaint), ¶¶ 87.  Jacob P. was
adjudicated a 3(a) juvenile on May 6, 2004 and has remained in
HHS custody since that time.  Filing 74 (Supplemental Evidence
Index), ex. 5 (HHS file–Jacob P.), pp. HHS-002219, 011595; ex. 30
(Juvenile Court Order–Jacob P.).  See also filing 64 (Amended
Complaint), ¶ 19.

     As of July 25, 2004 Jacob P. displayed symptoms of
attachment problems and grief and loss issues related to his
repeated moves and rejections within the foster care system.
Filing 83, ex. 11 (Counseling Report–Jacob P.), p. NP 000631.  He
has serious behavioral problems, and his first foster home
placement (following the 2004 adoption dissolution) ended at the
foster parents' request following the birth of their new baby.
Filing 74 (Supplemental Evidence Index), ex. 5 (HHS file–Jacob
P.), p. HHS-002220.  Despite significant efforts by Jacob P.'s
next set of foster parents, Jacob P.'s behaviors did not improve

and he was ultimately placed in a group home.  Filing 74
(Supplemental Evidence Index), ex. 5 (HHS file-Jacob P.), pp.
HHS-002220, 011596.

The foster mother remains willing to work with Jacob P.
during the group home placement and stated that if he
successfully completed the group home program and his behavior
improved, he could return to his foster parents' home.  Filing 74
(Supplemental Evidence Index), ex. 5 (HHS file-Jacob P.), p.
HHS-002220.  While in the group home setting, Jacob P. can earn
the privilege of visitation and weekend passes with his foster
parents, but he remains non-compliant with their rules and
expectations.  Filing 74 (Supplemental Evidence Index), ex. 5
(HHS file-Jacob P.), p. HHS-011596.  Jacob P. receives individual
and family therapy with his foster mother focused on learning to
comply with limits set by authority figures, control his anxiety
and impulsive behavior, eliminate inappropriate sexual behaviors,
and accept feedback.  He is working toward the goal of being
discharged from the group home to return to his foster home.
Filing 74 (Supplemental Evidence Index), ex. 5 (HHS file-Jacob
P.), pp. HHS-011599-600.

The amended complaint alleges Jacob P. has been shuffled
among at least 11 different foster care placements while in state
custody, including five different placements in the past year and
a half, (filing 64 (Amended Complaint), ¶ 82); was mistreated
while in state custody because HHS failed to screen the foster
homes, placed him with dangerous children, and failed to
adequately investigate claims of mistreatment by his adoptive
parents, (filing 64 (Amended Complaint), ¶ 85); was required to
stay in state custody for an excessive length of time due to the
lack of a primary permanency plan of adoption and lack of HHS

47

effort to locate adoptive parents, (filing 64 (Amended
Complaint), ¶¶ 88-89); and was neglected medically, given alcohol
by family members to control his behaviors, and denied timely
medical services and testing.  Filing 64 (Amended Complaint), ¶¶
83, 86-87, 89.

Jacob P.'s next friend is Sara Hildreth Jensen, a pastor
from Neola, Iowa.  Filing 74 (Supplemental Evidence Index), ex.
35 (Jensen Deposition), 4-5.  Reverend Jensen has read Jacob P.'s
juvenile court files and various HHS documents and medical
records, but she has never met Jacob P. or talked to him, and she
does not know where he currently lives.  Filing 74 (Supplemental
Evidence Index), ex. 35 (Jensen Deposition), 10, 13-15.  She has
not attended his juvenile court hearings, and has not spoken with
his caseworker, guardian ad litem, the county attorney, or the
attorneys who represented his adoptive parents.  She has not
reviewed the recommendations of the Foster Care Review Board
related to Jacob P.'s care and placement.  Filing 74
(Supplemental Evidence Index), ex. 35 (Jensen Deposition), 12-13,
19, 23.  She has no opinion concerning whether the state has
provided appropriate care for Jacob P. in the past, if his
current placement is appropriate, or if additional services or
care should be provided.  Filing 74 (Supplemental Evidence
Index), ex. 35 (Jensen Deposition), 17, 20, 23-24.

Marnie Jensen, an attorney at the Ogborn, Summerlin & Ogborn
law firm, contacted Reverend Jensen in August 2005 and asked her
to be Jacob P.'s next friend for this federal lawsuit.  Filing 74
(Supplemental Evidence Index), ex. 35 (Jensen Deposition), 10.
Reverend Jensen agreed to do so, and she understands her duties
include representing Jacob P.'s interests and the interests of
foster children in general.  She believes she is qualified to be

a class representative because she has a degree in social work,
understands the system, and as a pastor, has some knowledge of
the issues encountered by families.  Filing 74 (Supplemental
Evidence Index), ex. 35 (Jensen Deposition), 12, 27.

    F.   Bobbi W.

    Bobbi W., age 14, is mentally handicapped, and suffers from
Reactive Attachment Disorder, disruptive behavior disorder, ADHD,
and Oppositional Defiant Disorder.  Filing 74 (Supplemental
Evidence Index), ex. 48 (HHS file-Bobbi W.), pp. HHS-012316-17;
filing 83, ex. 12 (Discharge summary--Bobbi W.), p. NP 001836.
See also filing 64 (Amended Complaint), ¶ 90.  Bobbi W.'s mother
has borderline personality disorder and has never been able to
parent her.  The mother advised police officers in May 2001 that
she "could not take it any longer" and wanted to place her
children in state custody.  Bobbi W. entered HHS custody in May
2001 when a juvenile court found that her mother, through no
fault of her own, was unwilling or unable to care for Bobbi W.
Bobbi W. was adjudicated a 3(a) juvenile--"No Fault
Abuse/Neglect."  Filing 74 (Supplemental Evidence Index), ex. 48
(HHS file-Bobbi W.), p. HHS-016317.  See also filing 64 (Amended
Complaint), ¶ 21.

    Within a month of entering HHS custody in May 2001, Bobbi W.
was returned to her mother, but she reentered HHS custody almost
immediately.  Filing 64 (Amended Complaint), ¶ 91.  She was
adjudicated in September 2001 as a 3(a) juvenile with suspected
abuse and neglect issues.  Filing 74 (Supplemental Evidence
Index), ex. 46 (Creager Deposition), ex. 20 at HHS-012164; filing
83 (Supplemental Evidence Index), ex. 6 (HHS file-Bobbi W.), p.
HHS-016211.

Bobbi W.'s mother also has a guardian ad litem and is represented by counsel. In the spring of 2003 the mother said she wanted to relinquish her parental rights, but she did not sign the relinquishment paperwork on advice of counsel. Counsel stated that she believed the mother was not mentally competent to sign a relinquishment and wanted her client to undergo a psychological evaluation before moving forward. The mother's psychological evaluation was never done. Parental rights remain intact. Filing 83 (Supplemental Evidence Index), ex. 6 (HHS file-Bobbi W.), pp. HHS-012285-86.

Bobbi W. has been placed in child care agencies and assisted living facilities, with brief and intermittent stays in a psychiatric hospital. She was placed in a potential adoptive home in April 2004, (filing 74 (Supplemental Evidence Index), ex. 48 (HHS file-Bobbi W.), pp. HHS-016211-12; filing 83 (Supplemental Evidence Index), ex. 6 (HHS file-Bobbi W.), p. HHS-012286), but in October 2004 she began to exhibit serious aggressive behavior at school, avoid classroom activities, eat excessively, and manipulate and lie to her foster parents.

Motions to terminate the parental rights of Bobbi W.'s parents were filed on October 22, 2004. Filing 74 (Supplemental Evidence Index), ex. 46 (Creager Deposition) exs. 20-21 at HHS-012164-66, 012157-60. Bobbi W. became belligerent and officers were contacted on November 24, 2004 to transport her to the hospital. The prospective adoptive parents refused to allow Bobbi W. to return to their home for fear she would act out aggressively toward their three-year-old daughter. She was thereafter placed in a group home, where her aggressive behaviors have continued. HHS staff have expressed concerns that the slow response by "higher-ups" has thwarted the department's efforts to

50

do what is best for [Bobbi] W., "[w]hatever that is."  Filing 74
(Supplemental Evidence Index), ex. 48 (HHS file-Bobbi W.), pp.
HHS-016211, 016319-20, 016323; filing 83 (Supplemental Evidence
Index), ex. 6 (HHS file-Bobbi W.), pp. HHS-012711, 013029.

On December 20, 2004 the Nebraska juvenile court held:

> Placement continues to be necessary due to the
> children's need for placement, treatment and care.
> Custody of the children shall remain with HHS for
> appropriate care and placement.  The children's needs
> for safety, health and well-being are being met.  Some
> services being provided are in compliance with the case
> plan.  Poor progress is being made to alleviate the
> causes of out-of home placement.  Reasonable efforts
> have been made to preserve and reunify the family prior
> to placement of the children in out-of-home care.  The
> primary permanency plan is reunification.  While HHS is
> working on this plan, it will be working concurrently
> on ways to provide permanency through an alternative
> plan.  At this time the alternative plan is Adoption.

Filing 74 (Supplemental Evidence Index), ex. 48 (HHS file-Bobbi
W.), pp. HHS-013010-11.

The amended complaint alleges Bobbi W. has been frequently
moved while in state custody, with at least eight different case
workers during that time, (filing 64 (Amended Complaint), ¶ 90);
provided no support during transition from one placement to
another; (filing 64 (Amended Complaint), ¶ 94); placed in a
string of institutional group homes, including her current
placement in a group home which also houses two 23 year old
residents, and where her bed consists of a mattress on the floor,
(filing 64 (Amended Complaint), ¶¶ 91-92, 94, ¶ 96); and denied
an appropriate permanency plan and an adoptive home because
although one set of foster parents wanted to adopt her, HHS
continued to pursue reunification though the mother was both

51

unwilling and unable to meet plan goals, and failed to pursue
termination of parental rights until October 2004.  The petition
for termination is still pending.  Filing 64 (Amended Complaint),
¶¶ 92-93, 96.

Bobbi W.'s next friend is Micheline Creager.  Ms. Creager
has a psychology degree and is a mother.  Filing 74 (Supplemental
Evidence Index), ex. 46 (Creager Deposition), 6-8.  She also
volunteers as a citizen advocate for Citizen Advocacy in Lincoln,
Nebraska.  Filing 74 (Supplemental Evidence Index), ex. 46
(Creager Deposition), 34-36.

Ms. Creager was contacted in January 2006 by Bonnie
Arrasmith of Citizen Advocacy and asked if she was willing to be
a next friend for a child in this litigation.  Ms. Creager agreed
to do so, and she was then contacted by Marnie Jensen and asked
to be a next friend for Bobbi W.  Filing 74 (Supplemental
Evidence Index), ex. 46 (Creager Deposition), 34-36.  Ms. Creager
did not previously know Bobbi W., but she has agreed to be her
next friend.  She understands her role to be representing Bobbi
W.'s interests, and since Bobbi W. is a named plaintiff, she
thereby represents the interests of the class.  Filing 74
(Supplemental Evidence Index), ex. 46 (Creager Deposition), 48-49

Ms. Creager has read HHS records, medical records, and
emails from prior foster mothers for Bobbi W., has read the
complaint, and has met with Bobbi W. for one hour.  Filing 74
(Supplemental Evidence Index), ex. 46 (Creager Deposition), 8-10,
38-39.  Ms. Creager has not spoken with Bobbi W.'s teachers or
any school staff, or her HHS caseworkers, mother, father, or
guardian ad litem.  She has not spoken with the juvenile court
judge assigned to Bobbi W.'s case, or attended any juvenile court

hearings.  She has not spoken to the Foster Care Review Board and
cannot state that she has read its recommendations related to
Bobbi W.  Filing 74 (Supplemental Evidence Index), ex. 46
(Creager Deposition), 11-12, 30-32.

Ms. Creager has concerns about Bobbi W.'s placements and
care within the HHS foster care system, believes Bobbi W. has
made no progress, and is unhappy with Bobbi W.'s current
placement in a group home because she needs a "loving, stable
home environment."  Ms. Creager is not able, however, to offer
any opinion that the HHS system has failed to provide proper
custodial care under the circumstances presented.  Filing 74
(Supplemental Evidence Index), ex. 46 (Creager Deposition), 43-
45.

  G.  Hannah A.

Hannah A., a 7-year-old, was placed in protective custody in
January 2002.  Filing 74 (Supplemental Evidence Index), ex. 49
(HHS file-Hannah A.), p. 019600.  See also filing 64 (Amended
Complaint), ¶ 23.  She was returned to her mother and step-
father's home in April 2002 because they agreed to comply with a
case plan.  They did not comply, and Hannah A. and her siblings
were removed from that home in July 2002.  She was adjudicated as
a 3(a) juvenile-"Fault Abuse/Neglect" on October 23, 2002.
Filing 74 (Supplemental Evidence Index), ex. 49 (HHS file-Hannah
A.), pp. HHS-017156, 019600.

Hannah A. has significant behavioral problems including
placement disruption, lying, sexually aggressive behavior, animal
cruelty, and defiant behaviors.  She was initially placed with
her maternal grandmother, (filing 74 (Supplemental Evidence

Index), ex. 49 (HHS file–Hannah A.), p. HHS-019600), and was
thereafter placed in child specific, relative, and traditional
foster homes.  Filing 74 (Supplemental Evidence Index), ex. 49
(HHS file–Hannah A.), pp. HHS-017156-157, 019608-610); filing 83
(Supplemental Evidence Index), ex. 7 (HHS file–Hannah A.), pp.
HHS-017150-51.

The parental rights of Hannah A.'s mother and father were
terminated in September 2004.  Filing 74 (Supplemental Evidence
Index), ex. 49 (HHS file–Hannah A.), p. HHS-019599.  Hannah A.'s
behavior and attachment problems began to escalate, and she was
psychologically re-evaluated in August 2005.  She was placed in a
treatment level foster home in September 2005 to afford her the
recommended higher level of care needed.  Filing 74 (Supplemental
Evidence Index), ex. 49 (HHS file–Hanna A.), p.  HHS-019601.  On
October 12, 2005 the juvenile court adopted the HHS case plan
recommending a primary permanency plan of adoption by October 6,
2006.  Filing 74 (Supplemental Evidence Index), ex. 49 (HHS
file–Hanna A.), pp. HHS-18136-37, 019604.

The amended complaint alleges Hannah A. was subjected to
over 14 different foster care placements over the course of four
years in HHS custody, (filing 64 (Amended Complaint), ¶ 99);
placed in a shelter for homeless families (not even a children's
shelter) at a very young age, (filing 64 (Amended Complaint), ¶
103); initially "reunified" with her biological parents even
though her father had reportedly sexually abused her, and
thereafter placed in inadequately screened and supervised non
family and relative placements, (filing 64 (Amended Complaint), ¶
100); and placed with relative foster parents who had received
little or no additional support or training to care for Hannah A.
Filing 64 (Amended Complaint), ¶¶ 101, 103.  She remains in state

custody because parental rights were not terminated until
September 2004, and since then, she has not been in a stable
long-term placement, much less an adoptive or other permanent
home, (filing 64 (Amended Complaint), ¶ 104); and she has been
denied timely evaluation and treatment of her on-going medical
and mental health needs and learning disabilities.  Filing 64
(Amended Complaint), ¶ 99, 101, 105.

     Hannah A.'s next friend is Vanessa Nkwocha.  Ms. Nkwocha has
a degree in human resources and family science, and is currently
a "stay-at-home mother."  Filing 74 (Supplemental Evidence
Index), ex. 47 (Nkwocha Deposition), 6, 8.  She previously worked
as a family support service provider for Options, and in that
capacity, worked with families to teach parenting skills.
Options has a contract with HHS to provide such services to
families.  Filing 74 (Supplemental Evidence Index), ex. 47
(Nkwocha Deposition), 7-9.

     Ms. Nkwocha was a family support service provider for Hannah
A.'s family for a period of four years.  During the final year,
which ended in May of 2003, she worked with Hannah A.'s mother
for approximately 20 hours a week and reported her findings to
HHS.  Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha
Deposition), 11-12.  She has reviewed her personal notes related
to those services and has discussed Hannah A. with Shari Milan, a
foster parent who cared for Hannah A. from October 2003 until May
2004.  Ms. Nkwocha last saw Hannah A. in May or June of 2004, and
has not spoken to her since.  Filing 74 (Supplemental Evidence
Index), ex. 47 (Nkwocha Deposition), 10, 12-13; filing 83
(Supplemental Evidence Index), ex. 7 (HHS file-Hannah A.), pp.
HHS-017150-51.

Ms. Nkwocha has never been to Hannah A.'s current home placement, has not spoken to her foster parents, and has no opinion as to whether it is an appropriate placement. Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 14, 19. She does not know whether Hannah A.'s current medical needs are being met. Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 28-29. Ms. Nkwocha has not talked to Hannah A.'s teachers or caseworkers regarding Hannah A.'s progress since May 2003. Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 14, 17, 31. Ms. Nkwocha has not contacted the county attorney, the juvenile court, or Hannah A.'s guardian ad litem concerning Hannah A.'s current care and placement. Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 31. She has not attended juvenile court placement hearings, and does not know when the next hearing is scheduled. Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 27, 33-34, 45, 50-51. She has not contacted the Foster Care Review Board regarding Hannah A., and has not reviewed its recommendations. Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 34.

Ms. Nkwocha was contacted by Jennifer Carter of Nebraska Appleseed in December 2005 and was asked to be Hannah A.'s next friend. Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 34-35. She agreed to do so because she believes Hannah A. is worthy of a loving, stable home. However, she does not know if Hannah A. is currently placed in such a home, and does not know what efforts are being made by HHS to locate such a home or adoptive parents for Hannah A. Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 35, 43, 53, 63-64, 74-75.

56

Ms. Nkwocha believes Hannah A. should never have been placed in the home of Linda Milton, but she has no first-hand knowledge of any lack of care provided to Hannah A. since May of 2003. Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 40-41, 46.  Ms. Nkwocha also believes HHS places too much emphasis on relative foster home placement and proceeds too slowly in terminating parental rights.  She believes HHS should hire additional caseworkers, and provide adequate training and higher per diem pay to foster parents.  Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 64-69.

With regard to the relief requested in this case, Ms. Nkwocha believes that as to Hannah A., "the damage has been done," but "the larger picture is that other children would not have to follow in her footsteps with regards to how much time is spent in foster care."  Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 69-70.  She believes that "by reforming the system, . . . more children in foster care could benefit from proactive, appropriate placement," and hopes the results of a federal class action suit will "apply more broadly than just to Hannah. . . ."  Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 77.

III. <u>System Reform and Oversight</u>.

Congress and all three branches of Nebraska's government have addressed the issue of child welfare reform in Nebraska.

A.   <u>Nebraska Oversight and Reform Efforts</u>.

As previously described, the Foster Care Review Board was created in 1982 to provide continuing oversight of HHS, court,

57

and child-agency foster care placements.  The board maintains a
statewide registry of all foster care placements, and prepares an
annual evaluation of such placements.  Neb. Rev. Stat. § 43-1303
(LEXIS 2005).

In addition to the Foster Care Review Board, pursuant to
legislation enacted by Nebraska in 1992, child abuse and neglect
investigation teams were established in each county or contiguous
group of counties in Nebraska.  These teams are required to
develop protocols for investigating child abuse and neglect
cases; ensuring law enforcement participation in investigations;
reducing the risk of harm to child abuse and neglect victims;
ensuring that the child is in safe surroundings (including
removing the perpetrator when necessary); and sharing case
information as needed for the child's protection.  Neb. Rev.
Stat. § 28-728.  The requirements for forming the teams to
establish protocols were effective as of July 15, 1992.  Neb.
Rev. Stat. § 28-732 (LEXIS 2005).  In response to this
legislation, the Protocols Task Force of the Nebraska Commission
for the Protection of Children published a "Model Protocol for
the Investigation of Child Abuse and Neglect Cases" in July of
1992.  See filing 73, ex. 20 (NCPC Model Protocol for the
Investigation of Child Abuse and Neglect Cases).

Governor Ben Nelson issued an executive order in 1993 that
established "The Nebraska Commission for Child Protection."  The
Commission was tasked with assessing Nebraska's progress in
ensuring the safe and healthy development of children and
advising the Governor and public of actions needed to protect
Nebraska's children.  Filing 73, ex. 19 (Executive Order 93-7),
p. HHS-011408.  This newly formed Commission issued a proposed
five-year plan to begin in fiscal year 1995 which addressed

"systems reform and suggest[ed] a framework of governance, detailing both an organizational structure for implementation and timely delivery of program services." Filing 73, ex. 21 (State of Nebraska Family Preservation & Support Program 5-yr. Plan--Neb. Comm. for the Prot. of Children), p. HHS-011457. This commission continues to assess the implementation of child welfare services in Nebraska. See filing 73, ex. 10 (2005 Citizen Review Assessment--Governor's Commission for the Protection of Children)(reviewing the efficacy of the Child Protective Service's intake processes).

B.    <u>Federal Oversight Through Funding Requirements</u>.

Congress has enacted statutes that permit the United States Department of Health and Human Services (USHHS) to oversee state child welfare services in exchange for federal funding. Title IV-B of the Social Security Act offers federal funds to "State public welfare agencies [to] establish[ ], extend[ ], and strengthen[ ] child welfare services." 42 U.S.C. § 620(a). To be eligible for these federal funds, Nebraska must submit a plan in accordance with 42 U.S.C. § 622 for approval by USHHS, and be in substantial compliance with the terms of that plan. Implementing regulations require the state to submit a Child and Family Services Plan (CFSP) to the Administration for Children and Families (ACF), (see 45 C.F.R. § 284.11). "The CFSP will be approved only if the plan was developed jointly by ACF and the State (or the Indian Tribe), and only after broad consultation by the State (and the Indian Tribe) with a wide range of appropriate public and non-profit private agencies and community-based organizations with experience in administering programs of services for children and families (including family preservation and support services)." 45 C.F.R. § 1357.15 (b)(4).

59

ACF, acting through Child and Family Services (CFS), performs reviews to determine if the state is complying with the federally approved CFSP. 45 C.F.R. § 1355.32-1355.33. If a state is not operating in substantial conformity with the CFSP, it is required to develop and implement a program improvement plan (PIP). 45 C.F.R. § 1355.32 (b)(2) & 1355.35. If the state does not comply with the PIP, penalties may be assessed. 45 C.F.R. § 1355.38.

CFS performed initial on-site reviews in 2002 to determine if the states were complying with their approved CFSPs. After its initial review, ACF found that all fifty states plus the District of Columbia were not in substantial compliance with the federal guidelines. Filing 73, ex. 36 (Reckling Affidavit) ¶¶ 8-9; ex. 18 (May 2002 Child and Family Services Review Statewide Assessment).

Areas identified by the review as requiring improvement in Nebraska included:

-- improving the response time on reports of child maltreatment;

-- ensuring a stable living environment by providing reunification within twelve months or adoption within 24 months of the child's entry into foster care;

-- curtailing the practice of establishing guardianship for young children rather than exploring adoption as a permanency goal;

-- increasing the frequency and quality of face-to-face contacts between caseworkers and the children and parents;

-- providing consistent efforts to meet the child's physical and mental health needs;

60

     --   improving case review, quality assurance, the service
            array, and foster and adoptive parent licensing,
            recruitment, and retention.

Filing 73, ex. 16 (Prog. Improvement Plan 2-yr. Summary), p. HHS-011757.  Nebraska has submitted a "Program Improvement Plan Progress Matrix" to ACF for approval.  See filing 73, ex. 13.

    C.   <u>Current Status and Continuing Reform Efforts</u>.

In its 2004 annual report, the Foster Care Review Board noted that "Nebraska has one of the highest national per capita ratios of children in foster care, primarily due to a lack of prevention programs capable of identifying and addressing many family issues before they became so critical that removal is necessary."  Filing 73, ex. 14 (Foster Care Rev. Bd. 2004 Annual Report), p. HHS-010991.  The board made substantial recommendations for restructuring the state's child welfare delivery system, creating expedited review processes to afford quicker permanent placements, using state and federal funds more effectively, and holding perpetrators of abuse accountable. Filing 73, ex. 14 (Foster Care Rev. Bd. 2004 Annual Report), p. HHS-010980-91.

However, the 2004 annual state board report also noted that children's outcomes within the HHS had recently improved due to the efforts of defendants Reckling and Montanez, and the implementation of those efforts by HHS caseworkers, supervisors, managers, and the child welfare system.  Filing 73, ex. 14 (Foster Care Rev. Bd. 2004 Annual Report), p. HHS-010975.  See also filing 73, ex. 9 (Nebraska IV-B progress Report-June 30, 2005), p. HHS-005109 (more finalized adoptions in 2004 than in any of the past 10 years); ex. 42 (Nebraska Child and Family Serv. Rev. Data Profile), p. HHS-011780(reflecting

improvements in reunification within 12 months, adoptions within 24 months, and less than 2 placements within 12 months, though Nebraska still lags behind the federal standard).

On January 6, 2005 Chief Justice John V. Hendry of the Nebraska Supreme Court announced the formation of the Supreme Court Commission on Children in the Courts, with Chief Justice Hendry serving as an ex-officio member of that commission. Filing 73, ex. 37 (Montanez Affidavit), ¶ 2.  See also filing 73, ex. 22 (Neb. Sup. Ct. News Release).  This commission is co-chaired by Judge Everett O. Inbody, Chief Judge of the Nebraska Court of Appeals and Douglas County Separate Juvenile Court Judge Douglas F. Johnson.  The members include judges, lawyers, representatives of the legislative and executive branches, and child advocates.  Filing 73, ex. 37 (Montanez Affidavit), ¶ 3. Filing 73, ex. 23 (Feb. 21, 2005 Meeting Minutes--Commission on Children in the Courts), p. HHS-011499.

The scope of duties assigned to the Commission on Children in the Courts includes determining what improvements can be made in handling juvenile court issues, domestic relations and custody cases, and criminal cases involving child abuse and domestic violence, and whether court reorganization would assist in furthering these improvements.  Filing 73, ex. 23 (Feb. 21, 2005 Meeting Minutes--Commission on Children in the Courts), p. HHS-011499; ex. 37 (Montanez Affidavit), ¶ 4.  To that end, subcommittees were formed and have begun to work on implementing standards and training for guardians ad litem; researching the effectiveness of attorney representation and developing standards and protocols for representing juvenile offenders and abuse and neglect victims; expediting the appeal process for termination of parental rights; and planning a state-wide summit for judges and

62

HHS administrators to assist in developing local collaborative efforts between the courts and agencies.  Filing 73, ex. 23 (Feb. 21, 2005 Meeting Minutes--Commission on Children in the Courts), p. HHS-011500; ex. 24 (May 6, 2005 Meeting Minutes--Commission on Children in the Courts); ex. 25 (Aug. 5, 2005 Meeting Minutes--Commission on Children in the Courts); ex. 37 (Montanez Affidavit), ¶¶ 5-11.

Chief Judge Hendry, Chief Judge Inbody, Juvenile Court Judge Johnson, Nebraska State Court Administrator Janice Walker, defendants Reckling and Montanez, and Dr. Victoria Weisz (a clinical psychologist and member of the Commission on Children in the Courts) attended a National Judicial Leadership Summit for the Protection of Children in September 2005.  Court and child welfare agency leaders from every state, the District of Columbia, and three U.S. territories attended this summit, the focus of which was to prompt nationwide reform in the way child abuse and neglect cases are moved through court systems and to reduce delays in securing safe, permanent homes for children in foster care.  Each state was tasked with developing an individual action plan to improve child protection procedures, with these state plans to be nationally compiled into a National Call to Action for state courts.  The ultimate goal of this multi-state effort is the development of a collaborative reform plan between the courts and child welfare agencies at state and local levels. Filing 73, ex. 37 (Montanez Affidavit), ¶¶ 12-14.

LEGAL ANALYSIS

I.   <u>Motion for Class Certification</u>.

The named plaintiffs move for certification of a class
defined to include:

> All foster children who are or will be in the legal
> custody of [the Nebraska Department of Health and Human
> Services], including those alleged or adjudicated to be
> abused, neglected or abandoned by their parent,
> guardian or custodian, and those alleged or adjudicated
> to be wayward, uncontrollable or habitually truant.

Filing 11.  They claim systemic deficiencies exist in Nebraska's
foster care system, and class certification will save the
resources of both the courts and the parties by facilitating a
global resolution of issues potentially affecting every putative
class member.  See <u>General Tel. Co. v. Falcon</u>, 457 U.S. 147, 155
(1982).

A plaintiff moving for class certification has the burden of
showing that the class should be certified and that the
requirements of Rule 23 are met.  <u>Coleman v. Watt</u>, 40 F.3d 255,
258-59 (8th Cir. 1994).  Under Rule 23(a), one or more members of
a class may sue or be sued as representative parties on behalf of
all class members if:

> (1) the class is so numerous that joinder of all
> members is impracticable;
>
> (2) there are questions of law or fact common to the
> class;
>
> (3) the claims or defenses of the representative
> parties are typical of the claims or defenses of the
> class; and,

64

> (4) the representative parties will fairly and
> adequately protect the interests of the class.

Id.  See also General Telephone Co. v. EEOC, 446 U.S. 318, 330
(1980)(noting that the Rule 23(a) requirements are commonly
referred to as "numerosity, commonality, typicality, and adequacy
of representation.").

The putative class must also satisfy one of the provisions
of Rule 23(b).  Elizabeth M. v. Montenez, 2006 WL 2346469 at *4
(8th Cir. August 15, 2006); Caroline C. v. Johnson, 174 F.R.D.
452, 466 (D.Neb. 1996).  The named plaintiffs seek to certify a
class under Rule 23(b)(2).  Filing 11, p. 2.  Therefore, they
must show that "the party opposing the class has acted or refused
to act on grounds generally applicable to the class, thereby
making appropriate final injunctive relief or corresponding
declaratory relief with respect to the class as a whole."  Fed.
R. Civ. P. 23(b)(2).

The plaintiffs seeks broad declaratory and injunctive relief
against a state agency.  "A federal court may not lightly assume
this power. 'Where, as here, the exercise of authority by state
officials is attacked, federal courts must be constantly mindful
of the special delicacy of the adjustment to be preserved between
federal equitable power and State administration of its own
law.'"  Elizabeth M., 2006 WL 2346469, at *2 (8th Cir. August
15, 2006)(quoting Rizzo v. Goode, 423 U.S. 362, 378 (1976)).
"Federal courts operate according to institutional rules and
procedures that are poorly suited to the management of state
agencies."  Angela R. v. Clinton, 999 F.2d 320, 326 (8th Cir.
1993).  "[T]his concern is heightened in the class action context
because of the likelihood that an order granting class
certification 'may force a defendant to settle rather than incur

65

the costs of defending a class action and run the risk of
potentially ruinous liability.'" Elizabeth M., 2006 WL 2346469,
at *2 (8th Cir. August 15, 2006)(quoting Advisory Committee Notes
to 1998 Amendments adopting Rule 23(f)).

"Consequently, before certifying a class seeking broad
injunctive relief against a state agency, a district court must
ensure that it has Article III jurisdiction to entertain each
claim asserted by the named plaintiffs," . . . "[a]nd the court
must conduct a 'rigorous analysis' to ensure that the
prerequisites of Rule 23 are satisfied." Elizabeth M., 2006 WL
2346469, at *2 (8th Cir. August 15, 2006)(citing Falcon, 457 U.S.
at 161). A "plaintiffs' failure to identify the specific
policies under attack and the nature of their federal statutory
claims" in a massive class action "neither promotes the
efficiency and economy underlying class actions nor pays
sufficient heed to the [principles of] federalism and separation
of powers." Elizabeth M., 2006 WL 2346469, at *6 (8th Cir.
August 15, 2006)(citing Lewis v. Casey, 518 U.S. 343, 349 (1996);
Rizzo, 423 U.S. at 378).

The court may not consider the factual merits or weaknesses
of plaintiffs' underlying claims when determining if a class
should be certified. Eisen v. Carlisle & Jacquelin, 417 U.S. 156
(1974). However, a class determination "generally involves
considerations that are 'enmeshed in the factual and legal issues
comprising the plaintiff's cause of action.'" Falcon, 457 U.S.
at 160 (citing Coopers & Lybrand v. Livesay, 437 U.S. 463
(1978)).

> Sometimes the issues are plain enough from the
> pleadings to determine whether the interests of the
> absent parties are fairly encompassed within the named

>       plaintiff's claim, and sometimes it may be necessary
>       for the court to probe behind the pleadings before
>       coming to rest on the certification question.

Falcon, 457 U.S. at 160.  Although the court does not at this
stage examine and determine the merits of the plaintiffs' case,
it may properly conduct a preliminary inquiry of the evidence
relating to plaintiffs' allegations of systemic deficiencies in
the foster care system and the alleged resulting harm suffered by
the class, as well as the manner in which that evidence fits into
the legal framework governing the claims pleaded.  Blades v.
Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005).  See also
Elizabeth M., 2006 WL 2346469, at *5 (8th Cir. August 15,
2006)("Though class certification is not the time to address the
merits of the parties' claims and defenses, the 'rigorous
analysis' under Rule 23 must involve consideration of what the
parties must prove.").

    The parties do not dispute that the numerosity requirement
of class certification has been met.  The defendants also
"concede that Plaintiffs have provided this Court with
allegations sufficient to satisfy the requirements of Rule
23(b)(2)."  Filing 71 (Defendants' Brief–Class Certification), p.
35.  Finally, there is no claim that counsel for the named
plaintiffs are not qualified and competent to represent the
class, and I specifically find that they are.

    Rather, the defendants oppose class certification for the
following reasons:

  •     The plaintiffs' proposed class definition is vague and
        ambiguous.

  •     The proposed class, as defined, lacks commonality:
        There is no common question of fact because the class

67

definition includes children who came into the foster
care system in different ways, with differing needs,
and whose circumstances must be evaluated on a case-by-
case basis; and there is no common question of law when
the outcome of legal issues depends on individualized
factual determinations.

•   The claims of the named plaintiffs are not typical of
the class as a whole, because the named plaintiffs have
few, if any, complaints at this time and any harm
allegedly occurring within the system is special and
unique to each child.

•   The named plaintiffs, acting by and through their next
friends, cannot adequately represent the class.  The
proposed class is diverse, but the named plaintiffs are
all "3(a) juveniles," and Cheryl H. and Paulette V. are
now adults and therefore no longer have claims.  As to
the next friends, the defendants claim they have little
incentive to direct this litigation, and are using the
named plaintiffs to pursue their personal agendas
rather than truly represent the named plaintiffs'
interests.


A.   <u>The Class Definition</u>.


The plaintiffs' proposed class is:

All foster children who are or will be in the legal
custody of [the Nebraska Department of Health and Human
Services], including those alleged or adjudicated to be
abused, neglected or abandoned by their parent,
guardian or custodian, and those alleged or adjudicated
to be wayward, uncontrollable or habitually truant.

Filing 64 (Amended Complaint), ¶ 35.  This class definition has

spawned considerable briefing by both parties.  The defendants

claim plaintiffs' proposed class definition is ambiguous, and

creates a "fail-safe" class and a standing issue.  Filing 71

(Defendants' Brief--Class Certification), pp. 11-33.  The

plaintiffs claim the class members are capable of ascertainment,

and even if the class definition is not perfect, the plaintiffs'

68

brief explains the intended scope of the class and the court is
empowered to redraft the class definition accordingly.  Filing 13
(Plaintiffs' Brief--Class Certification), pp. 7-9; filing 82
(Plaintiffs' Reply Brief--Class Certification), pp. 9-13, 16.

Having thoroughly reviewed the parties' arguments, the
plaintiffs' amended complaint, and the evidence, and having
interpreted these submissions in the context of Nebraska's
juvenile code, statutes and court system, I conclude the
plaintiffs' proposed class definition is both ambiguous and
inconsistent with their stated intent as set forth in their class
certification briefs, filings 13 and 82.  I also conclude that in
the interest of permitting the court to further consider the
plaintiffs' motion for class certification and the defendants'
motions to dismiss, and to avoid further delaying these
proceedings, the court should exercise its discretion and attempt
to redefine the class in a manner consistent with the plaintiffs'
stated intent.[18]

1.   <u>Proposed Class Definition--Ambiguous and Inconsistent
with the Plaintiffs' Stated Intent</u>.

The defendants claim that the definition is ambiguous
because: 1) the term "foster children" is not defined and it is
unclear whether "in-home" placements of juveniles in HHS legal
custody are considered "foster children" for the purposes of this
litigation, and 2) it is unclear whether adding the phrase
"including those alleged or adjudicated to be abused, neglected
or abandoned by their parent, guardian or custodian, and those
alleged or adjudicated to be wayward, uncontrollable or

_____

[18]The court's attempt to redefine the class in this section
of the report and recommendation should not be interpreted as a
recommendation that a class be certified.

69

habitually truant" to the class definition serves to narrow the
scope of the class, or whether the class nonetheless includes all
juveniles in "foster care" who are or will be in HHS "legal
custody."

    The plaintiffs forcefully claim the scope of the class is
clear from their proposed definition recited above, especially
when interpreted in the context of their initial class
certification brief.  The plaintiffs refer to the defendants'
ambiguity claims and their thorough explanation of Nebraska's
juvenile code and court system as a "tortured and unnecessary
exegesis" supported by "red herring arguments."  Filing 82
(Plaintiffs' Reply Brief--Class Certification), p. 10.  For the
reasons discussed below, I disagree.

    a.   Ambiguity of the Term, "Foster Children."

    The plaintiffs' claim that "children in HHS legal custody
but currently residing in their own homes (either because they
were never removed or are on "trial reunification") are within
the class definition. . . ."  Filing 82 (Plaintiffs' Reply
Brief--Class Certification) at 13.  The defendants claim the use
of "foster children" in the class definition creates ambiguity
because "'foster children'" may be interpreted as either
"including those juveniles residing with their parent or guardian
or excluding those juveniles residing with their parent or
guardian."  Filing 71 (Defendants' Brief–Class Certification) at
30.  Defendants are correct.

    Clarifying the definition of "foster children" is very
important in the context of this case because a substantial
number of proposed class members will either be included or
excluded from the class depending on how the term is defined.  Of

70

the 6124 juveniles who were Child Protective Services wards on
December 31, 2005, 1795 were in "in-home" placements (23.51%);
that is, children who are in HHS legal custody but "placed" in
their own home.  Of these 1795 in-home placements, 546 had never
been "placed" out of their homes.  Filing 73, ex. 17 (Derived
Placement Data), column "01-HHS Ward," (HHS-011293).

The plaintiffs argue that "foster care custody as that term
is commonly used," (Filing 82 (Plaintiffs' Reply
Brief--Class Certification) at 11), includes those children in
HHS legal custody with "in-home" placements.  Id. at 10.  This
definition of "foster children" contradicts the common usage of
that phrase, the definition used in federal regulations governing
federal funding requirements for child welfare programs, and the
implicit meaning of the term under Nebraska's Foster Care Review
Act, Neb. Rev. Stat. § 43-1301 et seq.[19]

A "foster child" is "a child raised by someone who is not
its natural or adoptive parent."  Random House Webster's
Unabridged Dictionary 756 (2d ed. 1997).  A "foster child" is
"[a] child whose care and upbringing are entrusted to an adult
other than the child's natural or adoptive parents."  Black's Law

---

[19]The plaintiffs' argument that "foster children" includes
those in "in-home" placement also appears to contradict the
plaintiffs' use of that term in the Amended Complaint.  For
example, the plaintiffs allege:  "Reasonable professional
judgment and applicable law dictate that the placement of a child
in foster care must be temporary.  Foster children and their
families must be provided with planning and services necessary
for the children to be promptly returned to the custody of their
parents or other caretakers, when it is safe to do so.  When it
is not safe or appropriate for children to be 'reunified' with
their own families, foster children must receive prompt efforts
to find them an alternative permanent home, typically through
adoption."  Filing 64 (Amended Complaint), ¶ 155.

<u>Dictionary</u> 232 (7th ed. 1999).  The federal regulations for "The Administration on Children, Youth and Families, Foster Care Maintenance Payments, Adoption Assistance, and Child and Family Services" define foster care as:

> 24-hour substitute care for children placed away from their parents or guardians and for whom the State agency has placement and care responsibility.  This includes, but is not limited to, placements in foster family homes, foster homes of relatives, group homes, emergency shelters, residential facilities, child care institutions, and preadoptive homes.

45 C.F.R. § 1355.20(a).

Nebraska's Foster Care Review Act defines "[f]oster care placements [as] <u>all</u> placements of juveniles as described in subdivision (3)(b) of section 43-247, placements of neglected, dependent, or delinquent children, including those made directly by parents or by third parties, and placements of children who have been voluntarily relinquished pursuant to section 43-106.01 to the Department of Health and Human Services or any child placement agency licensed by the Department of Health and Human Services."  Neb. Rev. Stat. § 43-1301(4)(LEXIS 2005)(emphasis added).  While the phrase "all placements" of children in HHS legal custody would appear to include "in-home" placements as "foster care placements," the remainder of the Foster Care Review Act places this statutory interpretation in doubt.

Under § 43-1308, the Foster Care Review Board must "[s]ubmit to the court having jurisdiction over such child for the purposes of foster care placement . . . its findings and recommendations regarding the efforts and progress made to carry out the plan or permanency plan . . . regarding the child," including "whether there is a need for continued out-of-home placement. . . . "

72

Neb. Rev. Stat. § 43-1308 (1)(b)(LEXIS 2005).  "If the return of
the child to his or her parents is not likely," the board must
recommend referral for adoption and termination of parental
rights, guardianship, placement with a relative, or, as a last
resort, another planned, permanent living arrangement. . . ."
Neb. Rev. Stat. § 43-1308(1)(c)(LEXIS 2005).  HHS likewise must
pursue termination of parental rights or a permanency plan if a
"child has been placed in foster care," and "the return of the
child to his or her parents is not likely."  Neb. Rev. Stat. §
43-1312 (1)(a) & (2)(LEXIS 2005).  "In reviewing the foster care
status and permanency plan of a child . . ., the court shall
continue placement outside the home upon a written determination
that return of the child to his or her home would be contrary to
the welfare of such child and that reasonable efforts to preserve
and reunify the family . . . have been made."  Neb. Rev. Stat. §
43-1315(LEXIS 2005).

     Although a strict interpretation of "foster care placement"
as that term is defined under Neb. Rev. Stat. § 43-1301(4) could
include placement of juveniles in HHS legal custody (other than
voluntary placements) in the juvenile's own home, I conclude
Nebraska's Foster Care Review Act contemplates defining a foster
child as one who has been placed outside the home.  See e.g.
Matter of Lucinda G., 122 Misc.2d 416, 420, 471 N.Y.S.2d 736, 739
(N.Y. Fam. Ct. 1983)("The definition of 'foster care' in [New
York statutory law] does not contemplate care provided a child in
the home of a natural parent.  Although the term 'foster parent'
as defined . . . is deemed to include 'any person' with whom a
child is placed for care, both the term 'foster parent' and the
term 'foster child' contemplate placement of a person who is
'. . . in the care, custody or guardianship of an authorized
agency.'").

73

More importantly, for the purposes of this litigation, the
question is whether the term "foster children" must be clarified
for the class to be "capable of ascertainment under some
objective standard." Caroline C., 174 F.R.D. at 459.  "[T]he
boundaries of the class must not be amorphous." Id.  Despite the
plaintiffs' claim to the contrary, I conclude that under a common
sense interpretation of the proposed class definition, absent a
modification or clarification of the definition by the court, the
class of "[a]ll foster children who are or will be in the legal
custody of [the Nebraska Department of Health and Human
Services]" would not include children adjudicated under § 43-247
and in HHS legal custody, but "placed" in their own homes.  Since
the plaintiffs' intent was to include "in-home" placements as
members of the class, the class definition should be modified.

       b.   Ambiguity of the "Including" Clause of the Proposed
            Class Definition.

The plaintiffs describe the class as all foster children in
HHS legal custody, "including those alleged or adjudicated to be
abused, neglected or abandoned by their parent, guardian or
custodian, and those alleged or adjudicated to be wayward,
uncontrollable or habitually truant."  The defendants claim it is
unclear whether the "including" clause of the definition limits
the class to "alleged or adjudicated" § 43-247(3)(a) abuse and
neglect victims and "3(b) juveniles," or if the clause merely
explains a sampling of the class of juveniles considered "foster
children who are or will be in the legal custody" of HHS.

The plaintiffs argue that the class definition is clear when
considered in the context of the plaintiffs' complaint and the
arguments in their brief.  They claim that as "set forth in their
Memorandum in Support, Plaintiffs' class definition can be

74

understood, and the class clearly defined, simply by reference to
the language of Neb. Rev. Stat. § 43-247(3)(a) & (b)." Filing 82
(Plaintiffs' Reply Brief--Class Certification) at 10. They
appear to be arguing that the clause "including those alleged or
adjudicated to be abused, neglected or abandoned by their parent,
guardian or custodian, and those alleged or adjudicated to be
wayward, uncontrollable or habitually truant," actually limits
the scope of the class. The plaintiffs state that their
Memorandum in Support and Amended Complaint "make clear that the
juvenile delinquent population--those children placed in the
custody of HHS' Office of Juvenile Services (HHS/OJS) - is
excluded," (id.), [t]hose few children in custody for being
"mentally ill and dangerous" pursuant to Neb. Rev. Stat. § 43-
247(3)(c) are also clearly not included," (id. at 12), and "so-
called 'voluntary' placements . . . are not part of the class."
Id. at 9.

     Contrary to the plaintiffs' argument, there is considerable
reason to challenge the proposed class definition in its current
state. Although the plaintiffs' initial class certification
brief may be interpreted as stating juvenile offenders, voluntary
placements, and "mentally ill and dangerous" juveniles are not
included in the class, it is unclear from the proposed definition
alone whether the plaintiffs intended the class to include "all
foster children in HHS legal custody," or only those "alleged or
adjudicated to be abused, neglected or abandoned by their parent,
guardian or custodian, and those alleged or adjudicated to be
wayward, uncontrollable or habitually truant."

     The class should be clearly defined at the outset of
litigation. Doe v. Lally, 467 F. Supp. 1339, 1343 (D.C.Md.
1979). While briefs can be used to clarify the intended scope of

75

a class definition (and are absolutely necessary when the court
is called upon to redraft the class definition), the definition
should be sufficiently precise, standing alone, to afford the
court and parties the ability to ascertain who is a class member.
Parsing through and deciphering the parties' adversarial briefs
is not a reasonable substitute for a clearly stated class
definition.  Class definitions inform the court, all named
parties, and the class members concerning the scope of putative
members entitled to notice of the proceedings, who can ultimately
enforce a favorable ruling, and who will be bound by an adverse
one.  See Fed. R. Civ. P. 23(c)(2)(B); Garrish v. United Auto.,
Aerospace, and Agricultural Implement Workers of America, 149 F.
Supp. 2d 326, 330-31 (E.D. Mich. 2001); Zapata v. IBP, Inc., 167
F.R.D. 147, 156 (D. Kan. 1996); Vernon J. Rockler and Co., Inc.
v. Graphic Enterprises, Inc., 52 F.R.D. 335, 338 n. 2 (D. Minn.
1971).


     The most straightforward statement explaining the
plaintiffs' intended class is set forth in their reply brief on
class certification.  Plaintiffs state:


     The class definition proposed by Plaintiffs is limited
     and, in effect, requires that only two simple questions
     regarding class members be answered: (1) Is the child
     [] in the legal custody of HHS? (2) Is the child
     alleged or adjudicated pursuant to either Neb. Rev.
     Stat. §§ 43-247(3)(a) or (3)(b)?  Any child not in the
     legal custody of HHS and not alleged or adjudicated to
     be abused, neglected, deprived, a status offender or in
     one of the other enumerated categories of children set
     forth in Sections (3)(a) or (3)(b) - for example a
     child exclusively alleged or adjudicated delinquent
     pursuant [to] Sections 1,2,or 4 - would not be included
     in the class.

Filing 82 (Plaintiffs' Reply Brief--Class Certification) at 10.

76

The plaintiffs' proposed class definition cannot be interpreted consistent with this stated intent.  If the plaintiffs' class definition is interpreted to include all children who are or will be in HHS legal custody, and the "including" clause provides only an example of such juveniles, the class definition is broader than plaintiffs' intent.  Such an interpretation would include, for example, juvenile offenders.  If the class is limited by the "including" clause to "those alleged or adjudicated to be abused, neglected or abandoned by their parent, guardian or custodian, and those alleged or adjudicated to be wayward, uncontrollable or habitually truant," the definition is narrower than plaintiffs' intended class.  The "including" clause of the proposed class definition does not describe all 3(a) juveniles, and in particular, it does not identify 3(a) "dependent" juveniles--those who are homeless or destitute, or without proper support through no fault of their parents, guardians, or custodians--as members of the class.[20]

---

[20]It is important to note that plaintiffs' amended complaint states "over 6,000 abused, neglected or otherwise deprived children" are in HHS legal custody," (filing 64 (Amended complaint) ¶ 3), which would necessarily have to include all 3(a) and 3(b) juveniles.  However, the allegations actually describing the defendants' alleged wrongful conduct identify the victims of that conduct as "abused and neglected" children.  Children "without proper support," and "homeless" or "destitute" children are never specifically mentioned in the amended complaint, and other than in the class definition set forth in paragraph 35, "wayward," "uncontrollable," or "habitually truant" children are never identified as victims of defendants' systemic failures.  See Amended Complaint ¶ 4, "HHS inflicts numerous harms on *abused and neglected* children while they are in state custody;" ¶ 107, "The described experiences of the Named Plaintiffs are not atypical, but instead are all too common illustrations of Defendants' pattern and practice of deliberate indifference towards, and widespread and systemic failure to exercise and implement reasonable professional judgment regarding, the health, safety and welfare of the *abused and neglected* foster children they are legally obligated to care for and protect;" ¶ 109,

I therefore conclude the class must first be redefined if the court is to embark on determining if class certification is appropriate.

2.   <u>Crafting a Class Definition</u>.

The plaintiffs argue that their intended class definition was limited to:  1) children in the legal custody of HHS, 2) who were alleged or adjudicated pursuant to either Neb. Rev. Stat. §§ 43-247(3)(a) or (3)(b).  Filing 82 (Plaintiffs' Reply Brief--Class Certification) at 10.  Using the foregoing statement, and incorporating a clear definition of the "foster children" to be included in the class, the class could be defined as follows:

> All children who:
>
> 1)  have not reached the age of majority as defined under Neb. Rev. Stat. § 43-245(1);
>
> 2)  are or will be in the legal custody of Nebraska's Department of Health and Human Services; and
>
> 3)  are alleged or adjudicated to be the children described in Neb. Rev. Stat. § 43-247(3)(a) and/or § 43-247(3)(b).

---

"Plaintiff children who have been traumatized by *abuse and neglect* and removal from their homes are subject to further harm while in the State's foster care system;" ¶ 129, "Far too often Plaintiff children brought into Nebraska's foster care custody because of *abuse or neglect* at the hands of their own biological parents or other caregivers are subject to further abuse, neglect and other maltreatment and harmful conditions while in the custody of the State." ¶ 149, "Health services are particularly important to foster children, as *abused and neglected* children who enter foster care frequently have more serious health care needs. . . ."  Filing 64 (Amended Complaint)(emphasis added).

78

This definition is simple and straightforward, but it may not
incorporate all the children plaintiffs seek to represent.

As set forth in plaintiffs' class certification reply brief,
"[a]ny child not in the legal custody of HHS and not alleged or
adjudicated to be abused, neglected, deprived, a status offender
or in one of the other enumerated categories of children set
forth in Sections (3)(a) or (3)(b)" is not included in the class.
Filing 82 (Plaintiffs' Reply Brief--Class Certification) at 10.
However, the same reply brief argues that children who are
voluntarily relinquished to the State, (Neb. Rev. Stat. § 43-
247(8)(LEXIS 2005)), should be included in the class even if they
were never  alleged or adjudicated to be 3(a) and/or 3(b)
juveniles.  Filing 82 (Plaintiffs' Reply Brief--Class
Certification), p. 12.  These statements cannot be reconciled.

Since the plaintiffs have advanced two conflicting
arguments, have noted the court is empowered to construct a class
definition that would include voluntarily relinquished children,
(filing 82 (Plaintiffs' Reply Brief--Class Certification), p. 12
n. 10), and the court has decided to redefine the class in this
case, the question now presented is whether juveniles in HHS
custody on the basis of voluntary relinquishment should be
included as members of the putative class.  I agree with
plaintiffs that juveniles adjudicated under 3(a) and/or 3(b) and
voluntarily relinquished under § 43-247(8) should be included in
the class.  However, juveniles in HHS legal custody solely under
§ 43-247(8) should not be included in the class.

The allegations of the plaintiffs' complaint contain no
description and make no mention of the type of juveniles
adjudicated solely under Neb. Rev. Stat. § 43-247(8), yet the

79

plaintiffs' class certification reply brief argues such juveniles
should be class members because "there is no reason for them to
be treated differently than" 3(a) and 3(b) juveniles.  Filing 82
(Plaintiffs' Reply Brief--Class Certification), p. 12.  The
factual record contradicts this sweeping statement.  Moreover,
when tasked with crafting a class definition, the court, like the
plaintiffs, must consider Rule 23(a)'s "numerosity, commonality,
typicality, and adequacy of representation" requirements.
General Telephone Co., 446 U.S. at 330.  See e.g. Barney v.
Holzer Clinic, Ltd., 110 F.3d 1207, 1214 (6th Cir. 1997)(holding
the trial court committed plain error by failing to amend the
class definition and narrow the scope of the class where the
named plaintiffs' claims were not typical of those of the
enormous class certified and they could not adequately represent
such a class).

     Juveniles who were neither 3(a) or 3(b) juveniles, but are
voluntarily relinquished and accepted into HHS legal custody
present a unique situation.[21]  HHS will not accept a
relinquishment of parental rights for a teenager unless the child
and family have been receiving HHS services and there is a plan
for adoption.  Moreover, if the child is not already an HHS
protective services ward (a 3(a) or 3(b) juvenile), HHS does not
provide adoption services to parents seeking to relinquish their
rights unless adoption services are unavailable through private
agencies.  An example of such a situation is where the "[c]hild
is so severely disabled that an adoptive placement would require
a medical subsidy, and the family has been denied services by

---

     [21]Such juveniles are so unique that as of December 31, 2005,
there were no children in HHS legal custody solely on the basis
of a voluntary relinquishment of parental rights.   Filing 73,
ex. 17 (Derived Placement Data), column "05-Direct
Relinquishment," (HHS-011293).

private agencies." Filing 73, ex. 7 (Nebraska Administrative
Code-HHS), §§ 3-005.06, 3-006.07 (HHS-003511, 003513). See also
"Subsidized Adoption" eligibility and procedures at filing 73,
ex. 7 (Nebraska Administrative Code-HHS), § 6-003 et seq
(HHS-003560-3576).

Though the complaint alleges HHS fails to make sufficient
efforts to locate appropriate foster care placements and adoptive
parents for children in its custody, the plaintiffs have not
alleged and have presented no evidence that HHS case management
and permanency planning for juveniles adjudicated solely under §
43-247(8) is, or should be, substantially similar to the efforts
provided by HHS on behalf of 3(a) or 3(b) juveniles. None of the
named plaintiffs was adjudicated solely under § 43-247(8). There
is no showing that the placement difficulties allegedly
experienced by the named plaintiffs, all of whom are 3(a) and/or
3(b) juveniles, are typical of the obstacles to placement and
adoption faced by children voluntarily relinquished and accepted
into HHS custody. I therefore decline the plaintiffs' request to
expand the proposed class definition to include children in HHS
legal custody solely on the basis of voluntary relinquishment.

3.   Potential Subclasses Within the Plaintiffs' Intended
     Class Definition.

The parties disagree on whether "alleged" 3(a) and 3(b)
juveniles in HHS temporary custody, Native American 3(a) and 3(b)
juveniles, and 3(a) and 3(b) juveniles "dually adjudicated" as
juvenile offenders should be included in the class definition.
Finally, the parties' briefs discuss juveniles placed out-of-
state pursuant to the Interstate Compact on the Placement of
Children ("ICPC"), Neb. Rev. Stat. § 43-1101 et seq, and the
plaintiffs argue that such children should be included in the
class. Filing 82 (Plaintiffs' Reply Brief--Class Certification).

81

p. 12.  The court must therefore determine whether these categories of juveniles should be included in the class definition.

a.  "Alleged" 3(a) and 3(b) Juveniles.

The plaintiffs' proposed class definition includes not only adjudicated, but also "alleged" 3(a) and 3(b) juveniles.  Alleged "abused and neglected" juveniles, and alleged status offenders may be placed in HHS temporary legal custody prior to an adjudication.  Where a juvenile is endangered by his or her surroundings, law enforcement may immediately remove the juvenile from those surroundings and place the child in HHS temporary custody, but this temporary custody ceases after forty-eight hours absent a court order extending the temporary custody.  During the forty-eight hour period, HHS' authority is limited to providing and supervising a temporary placement and consenting to any necessary medical, psychological, or psychiatric treatment of the juvenile.  Neb. Rev. Stat. §§ 43-248(3), 43-250(4), 43-254 (LEXIS 2005); filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 7-003.02, 8-001.01 (HHS-003600, 3612).  Where the State requests continued temporary custody, a factual statement in support of continued detention is submitted to the court by affidavit, and "the burden is upon the State to allege and prove in a detention hearing that the juvenile court should not place children with their other natural parent after the expiration of the first 48 hours of emergency detention under Neb. Rev. Stat. § 43-250(4) . . . during a period of temporary detention pending adjudication spawned by allegations under § 43-247(3)(a) against their custodial parent."  In re Stephanie H., 10 Neb. App. 908, 920, 639 N.W.2d 668, 679 (2002).  If the state fails to meet this burden, the child must be returned to his or her parents.

82

In addition to abuse and neglect cases, law enforcement may take a juvenile into temporary custody if there are reasonable grounds to believe the juvenile is a runaway.  Such juveniles, and other status offenders, may be placed by the court (not law enforcement) in HHS temporary legal custody pending adjudication. Neb. Rev. Stat. §§ 43-248(5), 43-250(4), 43-254(5)(LEXIS 2005). HHS obtains legal custody and provides services to 3(b) juveniles only when the court has first conducted a hearing, determined that a child is a status offender, and has ordered the department's involvement.  Filing 73, ex. 7 (Nebraska Administrative Code–HHS), §§  1.006.05, 3-006.04 (HHS-003493, 003513).

Under Neb. Rev. Stat. § 43-278, an adjudication hearing should be conducted within 90 days after a petition is filed.  In re Interest of Brianna B., 9 Neb. App. 529, 531, 614 N.W.2d 790, 793 (2000)(holding that § 43-278 is directory, not mandatory in a 3(a) abuse and neglect case); In re Interest of Brandy M., 250 Neb. 510, 550 N.W.2d 17 (1996)(holding the 90-day provision of § 43-278 is not directory, not mandatory, in 3(b) cases).  The purpose of the adjudication phase is to protect the interests of the child.  In re Interest of Amber G., 250 Neb. 973, 980, 554 N.W.2d 142, 148 (Neb. 1996).  If the State proves the allegations of the petition by a preponderance of the evidence at the adjudication stage, the juvenile court assumes jurisdiction over the minor child.  In re Interest of Heather R. et al., 269 Neb. 653, 663, 694 N.W.2d 659, 667 (2005).  If the State fails to meet this burden, the juvenile court does not have jurisdiction over the child and HHS temporary custody ceases.  Accordingly, "alleged" 3(a) or 3(b) juveniles are in HHS temporary custody for a short period of time, likely less than four months.  Upon

83

adjudication, they will either be returned to parental custody
because the State has failed to prove the § 43-247(3) allegations
of its petition, or they are adjudicated and would therefore be
included in the plaintiffs' putative class as "adjudicated" 3(a)
and 3(b) juveniles.

    For juveniles placed by the court in continuing HHS
temporary custody pending adjudication, HHS prepares and submits
to the court a written report addressing the location of the
child and the child's needs, but the underlying facts prompting
HHS temporary custody are not addressed "so as not to compromise
the due process rights of the parents" pending adjudication.
Filing 73, ex. 7 (Nebraska Administrative Code-HHS), § 8-001.07
(HHS-003614).  The adjudication hearing affords parents the right
to challenge the State's claim that 3(a) or 3(b) circumstances
exist and that such circumstances justify the State's
intervention in the parent-child relationship.  Prior to
adjudication, HHS does not (and should not) engage in formulating
long-term case plans for exploring whether family reunification
is a safe and viable option, or whether parental rights should be
terminated, adoption pursued, or the child placed in long-term
foster care or an appropriate, permanent home as envisioned under
the Adoption Assistance and Child Welfare Act.  See Filing 64
(Amended Complaint), ¶¶ 4(e), 108, 155-176, 184-186 (Second Cause
of Action--AACWA).

    I conclude "alleged" 3(a) or 3(b) juveniles should not be
included in the class definition.  The scope of the plaintiffs'
amended complaint, indeed the gravamen of their claim, focuses on
harm caused by long-term, and "languishing" HHS legal custody
caused by systemic deficiencies in the system.  "Alleged" 3(a) or
3(b) juveniles in HHS temporary custody who never become

84

adjudicated 3(a) or 3(b) juveniles are not subjected to this type
of harm.  In other words, the following alleged "common question
of fact,"

>    c.   [W]hether Defendants fail to provide appropriate
>         and timely permanency planning and services for
>         children in foster care to assure that they are
>         properly cared for and either safely reunited with
>         their families or freed for adoption and promptly
>         placed in another permanent home, consistent with
>         applicable law and reasonable professional
>         standards

(filing 64, (Amended Complaint) ¶ 38(c)), does not apply to
"alleged" 3(a) and 3(b) juveniles.  Though some of the harms
described in the plaintiffs' amended complaint, (for example,
excessive stays in emergency shelters, filing 64 (Amended
Complaint), ¶ 4(b)), may apply to alleged 3(a) or 3(b) juveniles
in HHS temporary custody, the claims of the adjudicated 3(a) or
3(b) juveniles are much broader in scope, and in many respects
dissimilar, from the claims of "alleged" 3(a) and 3(b) juveniles.

I further note that the plaintiffs' allegations are not
specifically focused on "systemic failures" in providing care
during the brief temporary custody phase.  For example, the
plaintiffs' allegations do not focus on HHS' responsiveness to
allegations that a non-adjudicated child is being abused, or the
initial intake and assessment procedures followed by HHS in
response to a new report of child abuse or neglect.  See filing
73, ex. 7 (Nebraska Administrative Code-HHS), §§ 3-001 through 3-
005.01 (HHS-003505-3510).  Absent determining if the "alleged"
3(a) or 3(b) juveniles will be harmed by HHS policies or
procedures applicable to the temporary custody period, the court
is left to determine, on a case-by-case basis, whether "alleged"
3(a) or 3(b) juveniles are provided adequate care.  Such an

85

individualized inquiry is contrary to the purpose of class action litigation and could serve to delay the proceedings.

Finally, children described as "alleged" 3(a) or 3(b) juveniles are within a very fluid subset of the plaintiffs' proposed class. Assuming a class is certified, some "alleged" 3(a) or 3(b) juveniles would not remain in the class for even four months, while most would likely become part of the class as "adjudicated" 3(a) or 3(b) juveniles. Those few juveniles released from temporary HHS legal custody and never adjudicated are not left without recourse; they can pursue their own claims in the juvenile court through a guardian ad litem while in HHS temporary custody, or through a parent or guardian once temporary custody ceases.

For all the foregoing reasons, I conclude children who were only "alleged" to be 3(a) or 3(b) juveniles should not be included in the class definition.

b.   Native American 3(a) and 3(b) Juveniles.

The defendants claim Native American children are "in a category of their own" for several reasons and should not be included in the class. Filing 71, (Defendants' Brief--Class Certification), p. 26. The plaintiffs argue that although some characteristics of having Native American children in HHS legal custody "are distinct, these distinctions do not have the effect of making the proposed class any more or less ascertainable." While this is true, a class needs to be more than "ascertainable" to be certifiable. I conclude that the processes and criteria applied to 3(a) and 3(b) Native American juveniles are so

86

distinctive that these juveniles should not be included in the
class.

The care and placement of Native American children is
subject to the provisions of the Indian Child Welfare Act of
1978, 25 U.S.C. 1901 et seq, and the Nebraska Indian Child
Welfare Act ("NICWA"), Neb. Rev. Stat. § 43-1501 et seq.  Where
an alleged 3(a) or 3(b) Native American child is living within a
reservation, the tribal court has exclusive jurisdiction over the
child; where the child does not live on the reservation, absent
good cause to retain juvenile court jurisdiction or rejection of
the case by a tribal court, Native American juveniles are
adjudicated by a tribal court, not a juvenile court.  Neb. Rev.
Stat. § 43-1504(LEXIS 2005).

Under NICWA, attempts must be made to secure foster and
adoptive placement of Native American children in Native American
homes or institutions.  Neb. Rev. Stat. § 43-1508 (LEXIS 2005).
For example, additional counseling must be provided to parents
seeking to relinquish a Native American child.  See filing 73,
ex. 7 (Nebraska Administrative Code-HHS), § 8-004.01
(HHS-003623).  Where parental rights have been terminated, in the
absence of good cause to deviate from the established placement
order, adoptive placement of a Native American child must occur
in the following order of preference:  1) a member of the child's
extended family; 2) other members of the child's tribe; and 3)
other Native American families.  Neb. Rev. Stat. § 43-1508(LEXIS
2005); filing 73, ex. 7 (Nebraska Administrative Code-HHS), § 6-
002.15 (HHS-003558).  The child's tribe retains authority to
establish a different order of preference so long as the
placement is the least restrictive placement appropriate to meet
the child's particular needs.  Neb. Rev. Stat. § 43-1508(LEXIS

2005); filing 73, ex. 7 (Nebraska Administrative Code–HHS), § 6-002.15 (HHS-003558).

Whenever possible, HHS staff use tribal social services when working with Native American families. Case planning and services are based on the social and cultural standards of the tribe, with "active efforts" made to provide culturally relevant remedial and rehabilitative services to prevent the breakup of the family and to reunify the child and family. This "active efforts" standard is higher than a "reasonable efforts" standard applied to non-Native American 3(a) and 3(b) cases. See filing 73, ex. 7 (Nebraska Administrative Code–HHS), § 5-004.02D (HHS-003539).

To summarize, adjudicated 3(a) and 3(b) Native American juveniles are subject to the jurisdiction of the tribal rather than juvenile court; their case planning is often performed by or in conjunction with tribal social services; foster and permanent placements are subject to orders of preference not applicable to non-Native American juveniles; and "active efforts" must be made to abide by these placement criteria. In a case such as this, where the plaintiffs' claims focus on HHS' alleged failure to provide adequate case planning, manage child placements, and provide proper foster and adoptive homes to 3(a) and 3(b) juveniles, the legally required criteria applicable to only Native American children distinguish those children from non-Native American children. None of the named plaintiffs is Native American, and therefore none has been subjected to placements made in accordance with the ICWA and NICWA. The named plaintiffs have failed to prove that their claims are typical of those which could be brought by Native American juveniles. I therefore

88

conclude that Native American juveniles should not be included in the plaintiffs' proposed class.

     c.   "Dually Adjudicated" Juveniles.

    The defendants also raise the issue of whether "dually adjudicated" juveniles should be included in the class.  I conclude that adjudicated 3(a) and/or 3(b) juveniles, who have also been adjudicated as juvenile offenders and committed to the Office of Juvenile Services, and who have not reached the age of nineteen or been legally discharged from the Office of Juvenile Services, (see Neb. Rev. Stat. § 43-412(1)(LEXIS 2005)), should not be members of the class.[22]

    Juvenile offenders differ from 3(a) and 3(b) juveniles in that juvenile offenders are subject to the Juvenile Service Act. Neb. Rev. Stat. § 43-401 et seq (LEXIS 2005).  The court enters an order stating the type of supervision, care, confinement, and rehabilitation services that must be provided to the juvenile offender, (Neb. Rev. Stat. § 43-408(2)(LEXIS 2005); filing 73, ex. 7 (Nebraska Administrative Code-HHS), § 8-001.10 (HHS-003487, 003614-15)), and based on the court's order, HHS determines if the juvenile offender should be placed in home care, an out-of-home placement, or a Youth Rehabilitation Treatment Center.  Neb. Rev. Stat. § 43-286(1)(b)(LEXIS 2005); filing 73, ex. 7 (Nebraska

---

[22]Note that the defendants' definition of "dually adjudicated" is broader than my use of this term.  The defendants define a "dually adjudicated juvenile" as "one that has been adjudicated in more than one category under statute and may be a combination of any of the following classifications:  Section 3(a) with abuse or neglect, Section 3(a) with dependency issues, Section 3(b) status offender, Section 3(c) mentally ill and dangerous, and/or a Section 1, Section 2, or Section 4 juvenile offender."

Administrative Code-HHS), §§ 7-004.01B, 8.001.01 (HHS-003602,
HHS-003615-16).  The efforts of HHS Juvenile Services Officers
are directed at rehabilitating the juvenile offender and
maintaining public safety.  Filing 73, ex. 7 (Nebraska
Administrative Code-HHS), 1-2, § 5-001.01 at HHS-003484, 3532-33.

        The plaintiffs have explained that juvenile offenders should
not be included in the putative class, apparently recognizing
that HHS and court procedures for supervision of juvenile
offenders differ from those used for the protection of 3(a) and
3(b) juveniles.  A placement chosen to protect a juvenile from
his or her surroundings may differ greatly from a placement
chosen to protect the public from the juvenile or to impose
consequences for the juvenile's illegal acts, yet both may be
quite appropriate under the circumstances presented.  Where both
criteria are simultaneously applicable to the juvenile--that is,
the juvenile is not only an adjudicated 3(a) and 3(b) juvenile,
but also a juvenile offender committed to the Office of Juvenile
Services--the placement criteria and considerations, and the
juvenile court's jurisdiction to order or prohibit placement
changes, (see e.g. In re Interest of Chelsey D., 14 Neb. App.
392, 707 N.W.2d 798 (Neb. App. 2005), differs from that
applicable to 3(a) or 3(b) juveniles who are not in HHS-OJS legal
custody.  Since alleged "systemic failures" in choosing or
changing placements is a significant issue in the plaintiffs'
lawsuit, I conclude that adjudicated 3(a) and/or 3(b) juveniles
who are dually adjudicated as juvenile offenders should not be
members of the class while they are committed to HHS-OJS custody.

90

d.   Juveniles Placed Out-of-State.

The Interstate Compact on the Placement of Children ("ICPC"), Neb. Rev. Stat. § 43-1101 et seq., allows HHS to place 3(a) and 3(b) adjudicated juveniles in another state if an out-of-state placement serves the child's best interests.  Though the juvenile is placed out-of-state, HHS remains the legal custodian and oversees the case assessment and management services provided by the receiving state.  Since HHS continues to be the ultimate decision-maker with respect to placement of such juveniles, there is no reason to exclude such 3(a) and 3(b) juveniles from a class seeking to obtain court-ordered corrections in the placement process.

4.   The Re-Drafted Class Definition.

Based on the foregoing analysis, the class definition has been redefined as:[23]

All children who:

1)   have not reached the age of majority as defined under Neb. Rev. Stat. § 43-245(1);

2)   are or will be in the legal custody of Nebraska's Department of Health and Human Services but are not committed to its Office of Juvenile Services;

3)   have been adjudicated under Neb. Rev. Stat. § 43-247(3)(a) and/or § 43-247(3)(b); and

4)   are not Native American.

_____

[23]Unlike the plaintiffs' proposed definition, this definition is sufficiently precise to clearly identify the class members without first evaluating each individual member's case. Christina A. ex rel. Jennifer A. v. Bloomberg, 197 F.R.D. 664, 667 (D.S.D. 2000).

91

This definition is written to clarify the plaintiffs'
intended class, but narrows the class to exclude those potential
subclasses which are discussed in the parties' briefs and which
should or cannot be included in a class represented by the named
plaintiffs.  The court must now consider whether the putative
class, as redefined, should be certified.

B.   Rule 23(a) Requirements.

A class may "only be certified if the trial court is
satisfied, after a rigorous analysis, that the prerequisites of
[Federal Rule of Civil Procedure 23(a)] 23(a) have been
satisfied." Falcon, 457 U.S. at 161.  The purpose of this
rigorous analysis is to protect unknown or unnamed potential
class members, and by definition those people who do not directly
participate in the proceedings.  Hervey v. City of Little Rock,
787 F.2d 1223, 1227 (8th Cir. 1986).

1.   Numerosity.

There were over 2500 non-Native American adjudicated 3(a)
and 3(b) juveniles in HHS legal custody in December 2005.  The
parties do not dispute, and I specifically find, that the
numerosity requirement of class certification has been met.

2.   Commonality.

Evaluating commonality requires assessing the specific facts
presented for the court's review and determining whether common
issues of law and fact exist among the plaintiffs.  Elizabeth M.,
2006 WL 2346469, at *4-5 (8th Cir. August 15, 2006).

92

The plaintiffs' alleged common questions of fact are:

a.    Whether Defendants fail to provide foster children in
      their custody with safe, stable and appropriate foster
      care placements, as required by law and reasonable
      professional standards;

b.    Whether Defendants fail to provide foster children in
      their custody with legally required safety, protection
      and services necessary to prevent them from
      deteriorating physically, psychologically, emotionally,
      or otherwise, while in state custody;

c.    Whether Defendants fail to provide appropriate and
      timely permanency planning and services for children in
      foster care to assure that they are properly cared for
      and either safely reunited with their families or freed
      for adoption and promptly placed in another permanent
      home, consistent with applicable law and reasonable
      professional standards; and

d.    Whether Defendants fail to provide foster children in
      their custody with the opportunity to maintain critical
      family relationships, including through visitation with
      their siblings.

Filing 64 (Amended Complaint), ¶ 38.  Based on the allegations of
the amended complaint, these common questions of fact encompass
various specific types of alleged misconduct by the defendants,
not all of which have been experienced by each named plaintiff,
or any of them.  See footnote 25, infra.

    The plaintiffs allege HHS' "systemic deficiencies and
pattern and practice of conduct". . . "cause[s] the overall
physical, emotional and psychological deterioration of foster
children while in State custody," (filing 64 (Amended Complaint),
¶ 6), and defendants' actions and inactions subject Nebraska's
foster children to significant and ongoing harms.  Filing 64
(Amended Complaint), ¶ 8.  The plaintiffs allege the defendants
have known of the injuries and harms suffered by the children in
the state's foster care system as a result of defendants' pattern

and practice of action and inaction, but the defendants have failed to take the steps necessary to ameliorate these ongoing, systemic harms.  Filing 64 (Amended Complaint), ¶ 108.

The plaintiffs' amended complaint alleges that defendants' systemic deficiencies and pattern and practice of conduct raises the following common questions of law:

   a.   Whether Defendants' actions and inactions violate
        Plaintiffs' rights under the Due Process Clause of the
        Fourteenth Amendment to the United States Constitution
        to be safe from harm while in state custody;

   b.   Whether Defendants' actions and inactions violate
        Plaintiffs' rights under the Adoption Assistance and
        Child Welfare Act of 1980, as amended by the Adoption
        and Safe Families Act of 1997, and relevant federal
        regulations, to mandated foster care and adoption
        services and foster care maintenance payments;

   c.   Whether Defendants' actions and inactions violate
        Plaintiffs' rights under the Early and Periodic
        Screening, Diagnosis and Treatment program of the
        Medicaid Act, and relevant federal regulations;

   d.   Whether Defendants' actions and inactions violate
        Plaintiffs' rights to familial association under the
        First, Ninth and Fourteenth Amendments to the United
        States Constitution; and

   e.   Whether Defendants' actions and inactions breach
        contractual rights enjoyed by Plaintiffs as third-party
        beneficiaries to Nebraska's State Plan contracts with
        the federal government pursuant to Titles IV-B and IV-E
        of the Social Security Act.

Filing 64 (Amended Complaint), ¶ 39.

The plaintiffs urge that these common questions of law and fact warrant a finding of commonality.  The defendants, on the other hand, claim 3(a) and 3(b) juveniles present with vastly

differing needs, no two children are alike, each child must be
evaluated individually and provided with HHS services in
accordance with that evaluation, and there is no common question
of law or fact that binds the plaintiffs together as a class.

Commonality under Rule 23(a)(2) may be found "where the
question of law linking the class members is substantially
related to the resolution of the litigation even though the
individuals are not identically situated." Paxton v. Union
National Bank, 688 F.2d 552, 561 (8th Cir. 1982). Where the
plaintiffs are challenging institutional conditions, policies and
practices, and not their application to each individual member of
the class, the fact that each member of the class may be affected
differently by the policies does not necessarily preclude a
finding of commonality. Christina A. ex rel. Jennifer A. v.
Bloomberg, 197 F.R.D. 664, 667 (D.S.D. 2000)(certifying class of
"all juveniles who are now or in the future will be confined at
the State Training School in Plankinton" who challenged the
constitutionality of the institution's policies on the use of
excessive force). See also Baby Neal for and by Kanter v. Casey,
43 F.3d 48, 56 (3d Cir. 1994)("Challenges to a program's
compliance with the mandates of its enabling legislation, even
where plaintiff-beneficiaries are differently impacted by the
violations, have satisfied the commonality requirement.")
Moreover, commonality is not required on every question raised in
a class action. Rule 23(a)(2) is satisfied when the "legal
question linking the class members is substantially related to
the resolution of the litigation." DeBoer v. Mellon Mortg. Co.,
64 F.3d 1171, 1174 (8th Cir. 1995)(citing Paxton, 688 F.2d at
561.

The circuit and district courts have considered and reached differing conclusions on whether classes seeking reform of state or local child welfare systems meet the commonality requirement. Compare J.B. ex rel. Hart v. Valdez, 186 F.3d 1280 (10th Cir. 1999), and Reinholdson v. State of Minnesota, 2002 WL 31026580, *9 (D.Minn. 2002)(relying on J.B.), with Baby Neal, supra. and Kenny A. ex rel. Winn v. Perdue, 218 F.R.D. 277, 300-302 (N.D.Ga. 2003)(relying on Baby Neal and specifically rejecting J.B.).[24] Thus, there appears to be split in the circuits on this issue, though the differing outcomes may in reality only reflect the highly case-specific nature of motions to certify a class.

---

[24] The plaintiffs cite to numerous cases where a class was certified, (see Filing 13 (Plaintiffs' Brief--Class Certification), pp. 11-12 & n. 4.), but the persuasive value of these opinions is very limited.

In Jeanine B. by Blondis v. Thompson, 877 F.Supp. 1268, 1287 (E.D.Wis. 1995), the State defendants requested the formation of subclasses but did not oppose formation of the class itself.

The following cases were class action lawsuits, but the opinions do not discuss whether a class should be certified under Rule 23: Lynch v. Dukakis, 719 F.2d 504, 506 n. 1 (1st Cir. 1983); LaShawn A. v. Dixon, 762 F.Supp. 959, 960 (D.D.C. 1991); B.H. v. Johnson, 715 F.Supp. 1387, 1389 (N.D.Ill. 1989); L.J. By and Through Darr v. Massinga, 699 F.Supp. 508, 509 (D.Md. 1988); G.L. By and Through Shull v. Zumwalt, 564 F.Supp. 1030 (D.C.Mo. 1983). Wilder v. Bernstein, 499 F.Supp. 980, 992-993 (D.C.N.Y. 1980), certified a class of children who were allegedly denied placement because of their race and religion, but Wilder predated General Tel. Co. v. Falcon, 457 U.S. 147, 155 (1982), and the continuing value of its analysis is suspect.

Carr v. Wilson-Coker, 203 F.R.D. 66, 67 (D.Conn. 2001) certified a class of "all individuals in Connecticut who are or will be eligible for Medicaid managed care [dental] benefits, and are or will be seeking dental health services," alleging the state's systemic deficiencies resulted in a lack of access to oral health services in violation of the EPSDT. The scope of allegations in Carr was much narrower than the allegations raised in this action, and on the issue of commonality, Carr's analysis of relevant case law discussing the requirements of Rule 23(a)(2) is very limited.

In <u>Baby Neal</u>, the Third Circuit held the district court
abused its discretion by refusing to certify a class where the
plaintiffs were "challenging common conditions and practices
under a unitary regime," . . . "the children in the class are
subject to the risk that they will suffer from the same
deprivations resulting from the DHS's alleged violations,". . .
"all of their injuries alleged here would be cured if DHS
remedied the systemic deficiencies," and "as the children
challenge the scheme for the provision of child welfare services,
their claims share a common legal basis." <u>Baby Neal</u>, 43 F.3d at
60. <u>Baby Neal</u> held that since the complaint did not seek
damages, factual differences among the plaintiffs were largely
irrelevant. <u>Baby Neal</u>, 43 F.3d at 61.

> The children challenge DHS's pattern of conduct, which
> is subjecting them all to violations of their statutory
> and constitutional rights. Because of the dearth of
> trained caseworkers, for example, DHS (allegedly) fails
> to investigate reports of abuse and neglect promptly or
> adequately and fails to reliably provide the children
> in its care with written case plans, with appropriate
> placements, with proper care while in custody, and with
> periodical dispositional hearings. Similar violations
> of the rights of children in custody to be free from
> harm can (allegedly) be traced to the scarcity of
> properly trained foster parents or to DHS's lack of an
> adequate information system.

<u>Baby Neal</u>, 43 F.3d at 62. <u>Baby Neal</u> specifically noted that a
trial would not require an individualized inquiry into a vast
network of institutions because only Philadelphia's child welfare
system was at issue. <u>Baby Neal</u> further held:

> [T]he [district] court failed to give effect to the
> proper role of (b)(2) class actions in remedying
> systemic violations of basic rights of large and often
> amorphous classes. . . . Because the children in the
> system are comparably subject to the injuries caused by
> this systemic failure, even if the extent of their

97

> individual injuries may be affected by their own
> individual circumstances, the challenge to the system
> constitutes a legal claim applicable to the class as a
> whole.

Baby Neal, 43 F.3d at 64.

In contrast, in J.B. ex rel. Hart v. Valdez, 186 F.3d 1280
(10th Cir. 1999), the Tenth Circuit affirmed the district court's
order denying certification of a class comprised of "[a]ll
children who are now or in the future will be (a) in or at risk
of State custody and (b) determined by defendants and/or their
agents to have any form of mental and/or developmental disability
for which they require some kind of therapeutic services or
support."  The Tenth Circuit specifically noted that its
conclusion differed from that reached in Baby Neal in a similar
case.  J.B., 186 F.3d at 1289 n. 5.

In J.B., the plaintiffs, acting through next friends, sought
structural reform of New Mexico's system for evaluating and
treating children with mental and developmental disabilities in
its custody.  The court specifically acknowledged that based on
the allegations of the named plaintiffs, New Mexico's child
welfare system was having "terrible difficulties providing the
children with the kind of care and treatment they deserve."
J.B., 186 F.3d at 1282.  The plaintiffs alleged "systemic
deficiencies" existed in the system such that the plaintiffs'
federal constitutional and statutory rights were being violated.
J.B. affirmed the district court's conclusion that no common
question of fact existed where the children's entry into the
system, particular placements, and movement within the system
differed drastically from person to person. "Other than all being
disabled in some way and having had some sort of contact with New

98

Mexico's child welfare system, no common factual link joins these plaintiffs." <u>J.B.</u>, 186 F.3d at 1289.

Though the plaintiffs in <u>J.B.</u> claimed "systemic failures in the defendants' child welfare delivery system deny all members of the class access to legally-mandated services which plaintiffs need because of their disabilities," <u>J.B.</u> concluded there was no "discrete legal question" applicable to all class members.

> We refuse to read an allegation of systematic failures as a moniker for meeting the class action requirements. Rule 23(a) requires a common question of law or fact. For a common question of law to exist, the putative class must share a discrete legal question of some kind.

<u>J.B.</u>, 186 F.3d at 1289.  See also <u>Reinholdson</u>, 2002 WL 31026580, at *8("The reciting of the word "systemic" in mantra-like fashion throughout the briefing and argument does not overcome the prerequisites to class certification.").  "Given the complex facts and legal issues involved in this case, we cannot say the district court abused its discretion when it refused to characterize plaintiffs' claims as a systematic violation." <u>J.B.</u>, 186 F.3d at 1289.  <u>Adashunas v. Negley</u>, 626 F.2d 600, 603 (7th Cir. 1980)(affirming denial of a plaintiff class consisting of children entitled to a public education who have learning disabilities and who are not properly identified and/or who are not receiving special education).

Finally, <u>Marisol A. v. Giuliani</u>, 126 F.3d 372, 375 (2d Cir. 1997), cited by the plaintiffs herein (see filing 13 (Plaintiffs' Brief--Class Certification), p. 11), affirmed certification of a class similar to that requested in this action, but it did so with noted reservation and issued specific instructions to the

trial court.  <u>Marisol A</u>. affirmed the district court's
certification of a class composed of "[a]ll children who are or
will be in the custody of the New York City Administration for
Children's Services ("ACS"), and those children who, while not in
the custody of ACS, are or will be at risk of neglect or abuse
and whose status is or should be known to ACS."  As in this case,
the named plaintiffs alleged the child welfare system
inadequately trained and supervised foster parents, failed to
properly investigate reports of suspected neglect and abuse,
unconscionably delayed removing children from abusive homes, and
was unable to secure appropriate placements for adoption.  The
claimed deficiencies implicated various statutory,
constitutional, and regulatory schemes.  The trial court
identified the common question of law as "whether each child has
a legal entitlement to the services of which that child is being
deprived," and it identified the common question of fact as
"whether defendants systematically have failed to provide these
legally mandated services."  <u>Marisol A</u>., 126 F.3d at 377.

     The Second Circuit identified the "core issue" presented as
"whether, by conceptualizing the common legal and factual
questions at this high level of abstraction (or, understood
differently, by aggregating all of the plaintiffs' claims into
one 'super-claim'), the district court abused the discretion
granted it by Rule 23 to provide for the orderly and efficient
maintenance of this lawsuit."  <u>Marisol A</u>., 126 F.3d at 377.  In
affirming the district court's certification of a class, the
Second Circuit explained that although it believed "the district
court is near the boundary of the class action device," it was
"not prepared to say that it has crossed into forbidden
territory."

100

Marisol A. found no abuse of discretion "at this stage of
the litigation," but further held that the class was, in reality,
composed of subclasses consisting of smaller groups of children
with separate and discrete legal claims based on one or more
specific alleged deficiencies of the child welfare system.
Marisol A., 126 F.3d at 378-79.  It ordered the trial court to
"engage in a rigorous analysis of the plaintiffs' legal claims
and factual circumstances in order to ensure that appropriate
subclasses are identified, that each subclass is tied to one or
more suitable representatives, and that each subclass satisfies
Rule 23(b)(2)," and specifically ordered the district court to
"identify (1) the discrete legal claims which are at issue, (2)
the named plaintiffs who are aggrieved under each individual
claim at issue, and (3) the subclasses that each named plaintiff
represents."  Marisol A., 126 F.3d at 379.

Having reviewed the law and its application to the
allegations of plaintiffs' amended complaint and the evidentiary
submissions, I conclude the plaintiffs' intended class lacks
sufficient commonality for class certification.  A close reading
of the amended complaint reveals that named plaintiffs each
allege the following factual claim:  Under the State's current
"systemically deficient" policies and procedures, the State fails
to adequately supervise them or the placements they are in, and
fails to develop and implement appropriate permanency plans for
their benefit, instead moving them from placement to placement,
some of which are harmful, unsafe, or inappropriate in the
context of their individual needs.[25]  Thus, the claim is that due

---

[25]There are several specific claims not shared by all named
plaintiffs; for example, whether HHS paid foster care providers
grossly inadequate amounts, (Carson P. and Danielle D., filing 64
(Amended Complaint), ¶¶ 55, 57, 71, 76); improperly withheld
visitation with family members, (Carson P., Paulette V., and

to a lack of monetary resources, caseworkers, and more and better placement options, and the State's reluctance to pursue termination of parental rights, the named plaintiffs are languishing in the child welfare system rather than living a normal family life.  No doubt the concern is both valid and heartbreaking, but I disagree with <u>Baby Neal</u>'s holding that because injunctive relief is requested, "the factual differences [among the class members] are largely irrelevant."  <u>Baby Neal</u>, 43 F.3d at 61.

Though the plaintiffs and defendants agree this is a 23(b)(2) case, the court must still consider whether the plaintiffs' intended class is sufficiently cohesive to pursue a 23(b)(2) class claim.  Unlike Rule 23(b)(3), the language of Rule

---

Danielle D., filing 64 (Amended Complaint), ¶¶ 54, 57, 59, 68, 75, 76; inadequately trained, prepared, or informed foster parents, (Carson P., Cheryl H., and Hannah W., filing 64 (Amended Complaint), ¶¶ 56, 78, 79, 101, 103); failed to provide necessary transitional living training, (Paulette V. and Cheryl H., filing 64 (Amended Complaint), Filing 64 (Amended Complaint), ¶¶ 58, 67, 80, 81; placed children in emergency shelters and other temporary facilities for excessive periods of time (Paulette V. and Cheryl H., filing 64 (Amended Complaint), ¶¶ 65, 68, 78, 81); and failed to provide emotional support for foster children moving from one placement to another, (Bobbi W., filing 64 (Amended Complaint), ¶ 94.  While the presence of individual "uncommon" claims will not defeat an otherwise appropriate class, they do punctuate the diverse circumstances of the individuals within plaintiffs' intended class.  See also <u>Marisol A.</u>, 126 F.3d at 378-79 (affirming class certification but requiring the court to create subclasses for children with discrete legal claims based on specific alleged deficiencies in the system).
    The amended complaint also alleges the state placed children in overcrowded foster homes, (filing 64 (Amended Complaint), ¶¶ 4 (d), 5(a), 109, 122); and underused institutional placement options and therapeutic foster homes.  Filing 64 (Amended Complaint), ¶¶ 113, 118.  The amended complaint does not specifically allege that any of the named plaintiffs were subjected to these types of alleged misconduct.

23(b)(2) does not specifically state the court must find
"questions of law or fact common to the members of the class
predominate over any questions affecting only individual
members," (Fed. R. Civ. P. 23(b)(3), but determining whether a
Rule 23(b)(2) class action can be pursued depends, in part, on
the level of commonality found under Rule 23(a)(2).[26]   The Eighth
Circuit recently held:

> Although Rule 23(b)(2) contains no predominance or
> superiority requirements, class claims thereunder must
> be cohesive. . . .   Because "unnamed members are bound
> by the action without the opportunity to opt out" of a
> Rule 23(b)(2) class, even greater cohesiveness
> generally is required than in a Rule 23(b)(3) class.  A
> "suit could become unmanageable and little value would
> be gained in proceeding as a class action . . . if
> significant individual issues were to arise
> consistently."

In re St. Jude Medical, Inc., 425 F.3d 1116, 1121-1122 (8th Cir.
2005)(citing Barnes v. American Tobacco Co., 161 F.3d 127, 144
(3d Cir. 1998), and quoting Lemon v. Int'l Union of Operating
Eng'rs, 216 F.3d 577, 580 (7th Cir. 2000)).   Compare Baby Neal,
43 F.3d at 59-60 (holding the Rule 23(b)(2) injunctive class
provision was "designed for . . . a numerous and often
unascertainable or amorphous class of persons." . . . "Although
the [trial] court took cognizance of cases holding that common
questions need only exist--not predominate--for (b)(2) actions,
it nevertheless proceeded to demand higher demonstrations of
commonality and typicality than the rule requires."), and Kenny
A. ex rel. Winn v. Perdue, 218 F.R.D. 277, 299-300 (N.D.Ga.

---

[26]The concerns that drive the threshold findings under Rule
23(a) may also influence the determination of whether a class
should be certified under the subdivisions of Rule 23(b).  See
Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 n. 18 (1997).

2003)("[B]ecause plaintiffs seek class certification under Rule 23(b)(2), there is no requirement that common issues of law or fact predominate."). "At base, the (b)(2) class is distinguished from the (b)(3) class by class cohesiveness . . . . Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries." St. Jude, 425 F.3d at 1121-22(reversing certification of a 23(b)(2) medical monitoring class where the need for monitoring and treatment depended on individual circumstances and medical histories).

The plaintiffs have challenged a whole host of actions and the various affects of those actions on a whole host of wards. They challenge all, or nearly all, aspects of Nebraska's child welfare system. There is no benchmark for determining when the State's policies--considered as a whole--or its allocation of funds--considered as a whole--have reached the "reasonable professional judgment" standard for the benefit all members of the class, as opposed to the individually named plaintiffs.

The lack of commonality within the putative class is evidenced by the lack of any suggested and specific request for injunctive relief. Although the plaintiffs argue that discovery is needed before they can determine what specific relief to request, not even a minimal effort has been made to identify what measures the state should implement to address their needs or the needs of the class. The likely reason is the substantial difficulty (and perhaps impossibility) of identifying any specific form of relief that will benefit all members of the highly diverse putative class. Should the court enter an order granting the relief requested in the plaintiffs' amended complaint--that is, an order to obey the law--the injunction is unenforceable. Language in an injunction that essentially

requires a party to obey the law is overbroad and unenforceable
because those against whom the injunction is issued must "receive
fair and precisely drawn notice of what the injunction actually
prohibits." <u>Calvin Klein Cosmetics Corp. v. Parfums de Coeur,
Ltd.</u>, 824 F.2d 665, 669 (8th Cir. 1987).

As is evidenced by the histories and allegations of the
named plaintiffs, they have entered Nebraska's child welfare
system for vastly different reasons with highly specific and
challenging needs.  They all have a court-approved permanency
plan; but they challenge whether those plans are appropriate.
They are each in "placements;" but they challenge the quality,
suitability, and adequacy of supervision in those placements.
They each have a caseworker and have been contacted by the
caseworker; they challenge those contacts as insufficient to
determine their needs and safety, or support sound placement
recommendations and decisions.

What the named plaintiffs ultimately seek is a court order
requiring the investment of funds and the implementation of State
policies that will lead to the exercise of "reasonable
professional judgment" in developing permanency plans, making
placements, supervising children within its custody, and finding
them homes.  See filing 64 (Amended Complaint), ¶¶ 38(a), 38(c),
57, 68, 76, 81, 89, 98, 106, 107, 108, 130, 133, 137, 147, 154,
155, 174, 178, 183, 190, 192.  Were the court to enter an
injunction requiring the defendants to implement policies
directed at exercising "reasonable professional judgment" on
behalf of each child, any later attempt of any child seeking to
enforce the judgment, or to find the State in contempt, would
require this court to review that child's unique circumstances.
In such circumstances, there is nothing to be gained by

permitting class certification because, due to lack of
cohesiveness within the class, "significant individual issues
[will] arise consistently." In re St. Jude Medical, 425 F.3d at
1122.

The individualized nature of the harm experienced by
children in Nebraska's child welfare system cannot be hidden
behind the term "systemic deficiencies." J.B., 186 F.3d at 1289.
Each child in HHS custody is entitled to the State's reasonable
professional judgment in placement planning and allocating State
monetary and human resources to meet that goal, and therefore, on
an abstract level, the class is cohesively bound by common issues
of law and fact. However, an injunctive and declaratory remedy
cannot globally ensure that reasonable professional judgment is
followed on behalf of not only the named plaintiffs, but unnamed
and future members of the class with differing individual needs
and concerns. Indeed, assuming this court granted injunctive
relief as requested by the named plaintiffs, it is certainly
foreseeable that the State may comply with the terms of that
injunction, by spending more or re-allocating resources to meet
the needs of the named plaintiffs and/or other members of the
class, and yet still fail to provide the level of supervision and
placement planning owed to a specific individual child.

The circumstances of each child in HHS custody remain a
paramount consideration. The members of the putative class are
highly diverse in terms of needs to be met and services to be
provided by HHS. The plaintiffs' allegation of "systemic"
violations does not create a common issue of fact within this
purported class. When the resolution of a "common" legal issue
is dependent on factual determinations that will be different for
each putative class plaintiff, a common issue of law does not

106

exist for the purposes of Rule 23(a)(2).  Elizabeth M., 2006 WL
2346469, at *5 (8th Cir. August 15, 2006); Reinholdson, 2002 WL
31026580 at *8.  See also Laurie Q. v. Contra Costa County, 304
F. Supp. 2d 1185, 1198-99 (N.D.Cal. 2004)(noting continued
certification was doubtful where the court warned at the outset
that decertification was likely "if the adequacy of maintenance
payments breaks down into particularized individual inquiries,"
and the plaintiffs were now arguing the plaintiffs' needs must be
assessed individually).

    3.   Typicality.

    Typicality exists if there are other members of the class
who "have the same or similar grievances as the plaintiff."
Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir.
1996).  Factual differences in the plaintiffs' claims will not
normally preclude class certification "if the claim arises from
the same event or course of conduct as the class claims, and
gives rise to the same legal or remedial theory."  Id.

    The plaintiffs' putative class is diverse, both in
membership and claims specific members can raise.  The proposed
class includes children ranging in age from newborn to nineteen,
whose have entered HHS legal custody because they were abused and
neglected, abandoned, homeless, destitute, unable to be cared for
by their parents, or uncontrollable, wayward, or truant.

    The named plaintiffs were all adjudicated under 3(a), and
each initially entered the child welfare system by removal from
their homes for their protection.  Children who are homeless and
destitute (but not abused or neglected) or whose parents cannot
care for them, and children who are rebelliously truant, wayward,

and uncontrollable likely do not share the same interest (or
perhaps any interest) in the named plaintiffs' goal of focusing
state and federal resources on locating foster and adoptive homes
for long-term and permanent out-of-home placement.  Children who
are abused and neglected need safety, care, and protection from
their family; homeless and destitute families and their children
(3(a) dependents) need a home where they can live together;
children with parents who are physically unable to care for them
(3(a) dependants) may need out-of-home placement with adequate
parental and family visitation, but not termination of parental
rights and adoption; parents of children who are wayward, truant,
or uncontrollable need (and have usually asked for) state
assistance in raising their children, preferably within the home.

     The plaintiffs have the burden of proving the other members
of the proposed class possess claims similar to theirs.  Alpern,
84 F.3d at 1540.  As individuals, the named plaintiffs are not
similar to one another.  Even acting collectively for policy
change, the named plaintiffs have failed to prove they "have the
same or similar grievances" of other members of the putative
class such that their claims for relief are typical of the class
as a whole.  See e.g. Elizabeth M., 2006 WL 2346469, at *5 (8th
Cir. August 15, 2006)(holding Rule 23(a) requirements were not
met where the complaint alleged defendants violated class
members' constitutional and statutory rights by failing "to
provide appropriate essential services necessary for the
treatment, habilitation, rehabilitation, and amelioration of the
Plaintiffs' mental illnesses and/or developmental disabilities,"
and "pleaded a laundry list of desired policy changes, alleged
that their injuries are caused by the absence of these policies,
and asserted that Rule 23's requirements are satisfied because

108

all class members live in facilities where the desired policies
are absent.").

     4.   <u>Adequacy of Representation/Dismissal for Lack of
          Standing</u>.

The adequacy of representation issue is of critical
importance in all class actions, and the court is under an
obligation to pay careful attention to the Rule 23(a)(4)
prerequisite in every case.  <u>Vervaecke v. Chiles, Heider & Co.,
Inc</u>., 578 F.2d 713, 719 (8th Cir. 1978).  To satisfy the
requirement of Rule 23(a)(4), the plaintiffs must show:

    (1)  the representatives and their attorneys are able and
        willing to prosecute the action competently and
        vigorously, and

    (2)  each representative's interests are sufficiently
        similar to those of the class such that it is unlikely
        that their goals and viewpoints will diverge.

<u>Hervey v. City of Little Rock</u>, 787 F.2d 1223, 1230 (8th Cir.
1986); <u>Paxton</u>, 688 F.2d at 562-63.[27]  The defendants claim the
named plaintiffs cannot adequately represent the class because
their interests and claims are significantly different from those
of the class, (filing 71 (Defendants' Brief--Class
Certification), p. 50), and their next friends are mere
"figureheads" who have neither the incentive nor the ability

_____

     [27]The factors in determining adequacy of representation by
class counsel include capability, experience, and potential for
conflicts of interest.  <u>Wrighten v. Metropolitan Hospitals</u>, 726
F.2d 1346 (9th Cir. 1984).  Although inadequate legal
representation precludes a finding of adequate class
representation, the defendants concede that counsel for the
putative class is competent, and I find no evidence to the
contrary.

to direct this litigation.  Filing 71 (Defendants' Brief--Class
Certification), p. 53.

The defendants' have also moved to dismiss under Rule
12(b)(1) on the basis of lack of standing.  "In every federal
case, the party bringing the suit must establish standing to
prosecute the action."  Elk Grove Unified School Dist. v. Newdow,
542 U.S. 1, 11 (2004).  The question of standing is "whether the
litigant is entitled to have the court decide the merits of the
dispute or of particular issues."  Elk Grove, 542 U.S. at 11.
There are two separate areas of inquiry for determining standing:
"Article III standing, which enforces the Constitution's case or
controversy requirement, . . . and prudential standing, which
embodies judicially self-imposed limits on the exercise of
federal jurisdiction."  Elk Grove, 542 U.S. at 11 (internal
citations omitted).  The State raises both grounds for arguing
this case must be dismissed for lack of standing.

Under the Article III limitation on standing, "[t]he
plaintiff must show that the conduct of which he complains
has caused him to suffer an 'injury in fact' that a favorable
judgment will redress."  Elk Grove, 542 U.S. at 11.  The
defendants allege the named plaintiffs lack standing because they
request injunctive and declaratory relief, but they face no real
and imminent threat of harm, either because they are now adults,
or because, at the time this case was filed, their "needs for
safety, health and well being [were] being met," (filing 72
(Defendants' Brief-Motion to Dismiss), p. 54).

The defendants also claim the case must be dismissed under
the "prudential dimensions of the standing doctrine."  They claim
the self-appointed next friends have only an ideological stake in

110

this litigation and are not appropriate next friends to pursue
litigation on the named plaintiffs' behalf.  "[P]rudential
standing encompasses 'the general prohibition on a litigant's
raising another person's legal rights. . . . '"  <u>Elk Grove</u>, 542
U.S. at 11 (quoting <u>Allen v. Wright</u>, 468 U.S. 737, 751 (1984).
"Without such limitations--closely related to Art. III concerns
but essentially matters of judicial self-governance--the courts
would be called upon to decide abstract questions of wide public
significance even though other governmental institutions may be
more competent to address the questions and even though judicial
intervention may be unnecessary to protect individual rights."
<u>Elk Grove</u>, 542 U.S. at 11 (quoting <u>Warth v. Seldin</u>, 422 U.S. 490,
500 (1975)).  A named party "is not a proper representative of
the class where he himself lacks standing to pursue the claim."
<u>Hall v. Lhaco, Inc</u>., 140 F.3d 1190, 1196 (8th Cir. 1998).

     Finally, the defendants argue that since a class
representative must "possess the same interest and suffer the
same injury" as the class, (<u>Falcon</u>, 457 U.S. at 156), named
plaintiffs who have reached the age of nineteen cannot be class
representatives--their claims are moot and became moot before a
class was certified.

     Therefore, the defendants' motion to dismiss for lack of
standing, the determination of mootness for claims brought by
named plaintiffs who are adults, and the question of whether the
named plaintiffs have proven they can adequately represent the
class, (Rule 23(a)(4)), are interrelated.  See e.g. <u>Elizabeth M</u>.,
2006 WL 2346469, at *3 (8th Cir. August 15, 2006).  These issues
will be addressed together in this report and recommendation.

111

      a.   Adequacy of Representation/Lack of Article III
         Standing--the Named Plaintiffs.

      i.   Adequacy of Representation/Mootness:  Cheryl H.
         and Paulette V.

Cheryl H. and Paulette V. have reached the age of nineteen and are now adults under Nebraska law.  The defendants claim that named plaintiffs who are adults will no longer be subjected to the alleged harm caused by the Nebraska child welfare system,[28] and cannot be class representatives because they are no longer members of the class.  Filing 71 (Defendants' Brief--Class Certification), p. 52.  They further argue that once a named plaintiff becomes an adult, any claim for injunctive relief is moot, no justiciable controversy exists, and the claim must be dismissed for lack of standing.  Filing 72 (Defendants' Brief-- Motion to Dismiss), p. 55-57.

In response, the plaintiffs acknowledge that once a named plaintiff reached the age of nineteen, they are no longer in HHS legal custody.  They argue, however, that Cheryl H. and Paulette V. should remain named plaintiffs in this litigation under the doctrine of "capable of repetition, but evading review."  Filing 82 (Plaintiffs' Reply Brief-Class Certification), pp. 37-41.  The doctrine has "been applied where the named plaintiff does have a personal stake at the outset of the lawsuit, and where the claim

---

[28]Only Cheryl H. is identified as an adult in the motions and briefs; Paulette V. is identified as nearing adulthood. Filing 71 (Defendants' Brief--Class Certification), p. 52. However, Paulette V. turned nineteen after the motions and briefs were filed.  See Filing 83 (Supplemental Evidence Index), ex. 2 (HHS file-Paulette V.), p. HHS-000377.  Since the analysis of their continuing ability to pursue this litigation, either personally or as class representatives, applies with equal force to both Paulette V. and Cheryl H., both will be discussed in this portion of the report and recommendation.

may arise again with respect to that plaintiff; the litigation
then may continue notwithstanding the named plaintiff's current
lack of a personal stake." United States Parole Commission v.
Geraghty, 445 U.S. 388, 398 (1980).  If the "litigant faces some
likelihood of becoming involved in the same controversy in the
future, vigorous advocacy can be expected to continue."
Geraghty, 445 U.S. at 398.  Moreover, some claims are so
"inherently transitory that the trial court will not have even
enough time to rule on a motion for class certification before
the proposed representative's individual interest expires."
Geraghty, 445 U.S. at 398-399.

     The amended complaint seeks declaratory and injunctive
relief.  However, by operation of law and based solely on their
age (not on the discretion of any HHS representative), Cheryl H.
and Paulette V. are not now and never will be in HHS legal
custody again.  They face no present or future risk of exposure
to HHS' allegedly deficient policies and procedures.  Therefore,
Paulette V. and Cheryl H. cannot show they "face[] some
likelihood of becoming involved in the same controversy in the
future," because their claims for injunctive relief "may arise
again."  Geraghty, 445 U.S. at 398.

     The plaintiffs argue that "foster care" claims are
"inherently transitory" and therefore the "capable of repetition,
but evading review" doctrine must be applied on that basis.
However, the plaintiffs have not cited and the court has not
found any law stating that the claims at issue in this litigation
are considered sufficiently "transitory" to invoke the
application of the doctrine.[29]   To the contrary, both Cheryl H.

_____

     [29]Claims specifically addressing HHS response to initial
reports of child abuse or its conduct or inactions during

and Paulette V. allege they were allowed to "languish" or were
required to remain in HHS legal custody for many years.  Filing
64 (Amended Complaint), ¶¶ 58-66, 78-80.  The evidence submitted
in this case demonstrates that the claims of Cheryl H. and
Paulette V., as well as the other named plaintiffs, are not
transitory in nature.

    Cheryl H. and Paulette V. were juveniles in HHS legal
custody when this litigation was filed, but they are now adults.
As such, they have neither a current nor a potential future claim
for injunctive relief against HHS arising from its allegedly
deficient child welfare system.  A case can become moot if
events occur after it was filed that make it absolutely clear
that the allegedly wrongful behavior at issue in the lawsuit
cannot reasonably be expected to occur again.  Friends of the
Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528
U.S. 167, 189 (2000).  Since Cheryl H. and Paulette V. will not
"suffer a future injury that will be remedied" by the relief
requested in this lawsuit, their claims are moot.  Elizabeth M.,
2006 WL 2346469, at *3 (8th Cir. August 15, 2006).  Their
continued presence in the class "poses a substantial risk to the
'efficiency and economy of litigation which is a principal
purpose' behind the class action device."  Elizabeth M., 2006 WL

---

temporary HHS custody pending a 3(a) adjudication may be
sufficiently "transitory" for application of the doctrine.  But
as previously explained, the amended complaint does not allege
the HHS fails to initial claims of child abuse, and the amended
complaint does not specifically challenge HHS policies applicable
to pre-adjudication temporary custody of children.  Accordingly,
even if the doctrine of "capable of repetition, but evading
review" is applicable to claims challenging HHS temporary custody
procedures, (a determination I need not and do not make), it is
not applicable under the facts of this case.

2346469, at *3 (8th Cir. August 15, 2006)(citing <u>Falcon</u>, 457 U.S. at 159).

Since Cheryl H. and Paulette V. cannot be members of the class they seek to represent, they cannot be class representatives.  For the same reasons, their claims for injunctive and declaratory relief should be dismissed.[30]  See e.g. <u>Elizabeth M.</u>, 2006 WL 2346469, at *3 (8th Cir. August 15, 2006)(holding the district court abused its discretion by including former residents of residential mental health facilities in a class seeking declaratory and injunctive relief for allegedly harmful state practices and policies).  See also <u>31 Foster Children v. Bush</u>, 329 F.3d 1255, 1263 (11th Cir. 2003)(holding that two plaintiffs who had been adopted had no legally cognizable interest in the outcome of a lawsuit for injunctive relief--they were "no longer in the defendants' legal or physical custody and therefore cannot be further harmed by the defendants' alleged illegal practices.  Because the plaintiffs' amended complaint seeks only prospective injunctive relief against the defendants to prevent future harm, no live controversy exists between them and these two plaintiffs.");  <u>J.B</u>., 186 F.3d at 1290 (granting defendants' motions to dismiss certain named plaintiffs because they had reached the age of majority or otherwise fallen outside of state custody, rendering their claims moot); <u>Robinson v. Leahy</u>, 73 F.R.D. 109, 113-14 (D.C.Ill. 1977)(holding that a post-adjudication child welfare

_____

[30]The basis for dismissal is not lack of standing.  Both Cheryl H. and Paulette V. were minors when the suit was filed.  However, "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."  <u>Friends of the Earth</u>, 528 U.S. at 189 (quoting <u>Arizonans for Official English</u> v. Arizona, 520 U.S. 43, 68, n. 22 (1997)(quoting <u>Geraghty</u>, 445 U.S. at 397)).

custody, unlike pretrial detention (distinguishing <u>Gerstein v. Pugh</u>, 420 U.S. 103 (1975)), cannot be characterized as so transitory that a putative class representative whose claim became moot before a class was certified can nonetheless represent the class).

      ii. <u>Lack of Article III Standing:  Carson P., Danielle D., Jacob P., Bobbi W., and Hannah A.</u>

      The defendants also argue that since the lawsuit requests injunctive relief, and each of the remaining named plaintiffs-- Carson P., Danielle D., Jacob P., Bobbi W., and Hannah A--were in suitable placements approved by the juvenile court when this case was filed, they cannot represent the class because no case or controversy existed when the case was filed, and the case must be dismissed for lack of standing.  Filing 72 (Defendants' Brief-Motion to Dismiss), p. 54-55.  The defendants claim that "none of the named Plaintiffs faces a real and immediate threat of future injury, and any relief this Court could grant would not benefit the named Plaintiffs."  Filing 72 (Defendants' Brief-Motion to Dismiss), p. 54-55.  In contrast, the plaintiffs argue that this court cannot consider the evidence submitted by the defendants--including the juvenile court rulings applicable to each named plaintiff--in assessing whether a "real and immediate threat of future injury exists."  The plaintiffs argue that on a motion to dismiss for lack of standing, the defendants can facially challenge the complaint, but a factual challenge is not permitted if it requires a pretrial determination of the merits of the case.  Filing 88 (Plaintiffs' Brief--Motion to Dismiss), p. 32-34.

      The amended complaint thoroughly discusses past and repeated harms experienced by named plaintiffs Carson P., Danielle D.,

Jacob P., Bobbi W., and Hannah A. due to the alleged systemic
deficiencies in the child welfare system.  As explained in Park
v. Forest Service of U.S., 205 F.3d 1034, 1037 (8th Cir. 2000),
"[p]ast exposure to illegal conduct does not in itself show a
present case or controversy regarding injunctive relief . . . if
unaccompanied by any continuing, present adverse effects. . . ."
Park, 205 F.3d at 1037.  If the alleged unlawful conduct is not
ongoing, the plaintiff does not have standing unless he or she
demonstrates the existence of a real and immediate threat of
suffering a similar injury in the future.  Park, 205 F.3d at
1037.

    I need not resolve the issue of whether the defendants can
properly raise a "factual" challenge to the plaintiffs' standing.
Under either a "facial" or "factual" analysis, named plaintiffs
Carson P., Danielle D., Jacob P., Bobbi W., and Hannah A. have
demonstrated a risk of future harm that is sufficiently real and
imminent to support standing.  The evidence of record does not
contradict the allegations of the complaint.  Both the evidence
and the allegations reflect that these named plaintiffs remain in
state custody and have been in state custody for a significant
period of time; they have been moved from one placement to
another and have encountered difficulties in those placements;
and they each seek stable home environments but have yet to be
placed in permanent homes.  Under this undisputed factual
history, the fact that their "needs for safety, health and well
being [were] being met," (filing 72 (Defendants' Brief—Motion to
Dismiss), p. 54), when the lawsuit was filed does not eliminate
their future risk of ongoing problems within the HHS child
welfare system.  As past HHS practice would indicate, they can be
moved to another placement; as the plaintiffs' allegations would
indicate, they could begin to encounter problems in their current

117

placements and not be promptly moved.  The lawsuit filed does not
seek to change the named plaintiffs' current placement.  Rather,
the plaintiffs seek an order enjoining HHS from continuing to
implement its current policies, because those policies present a
real and continuous threat that past harms from HHS' actions or
inactions will occur again.

The claims of named plaintiffs Carson P., Danielle D., Jacob
P., Bobbi W., and Hannah A. to enjoin HHS' current policies and
practices "may arise again" in the future.  Geraghty, 445 U.S. at
398.  See e.g. 31 Foster Children, 329 F.3d at 1266 (holding
foster children involuntarily in defendants' custody could not
avoid exposure to the defendants' alleged systemic deficiencies
which presented a substantial and sufficiently imminent
likelihood that past injurious conduct would continue); Carr v.
Wilson-Coker, 203 F.R.D. 66 (D.Conn. 2001)(holding that named
plaintiffs, who had been denied dental services in the past,
still had standing to pursue class claims for lack of access to
dental services even after they received dental care); Christina
A., 197 F.R.D. at 670(holding doctrine applied in suit against
institution, where four named plaintiffs were transferred out of
institution, but could be transferred back and again subjected to
the conditions, policies and practices at issue in the
litigation).  Whether the ongoing risk these plaintiffs face
arises from the HHS' allegedly deficient practices and policies,
from some other culpable behavior, or through no fault of anyone,
remains at issue, but it cannot be decided on a motion to dismiss
for lack of standing.

118

iii. <u>Adequacy of Representation:  Carson P., Danielle D.,
     Jacob P., Bobbi W., and Hannah A.</u>

"The adequacy inquiry under Rule 23(a)(4) serves to uncover
conflicts of interest between named parties and the class they
seek to represent." <u>Amchem</u>, 521 U.S. at 625.  Though the
plaintiffs' broad brush allegations tend to blur the differences
among the putative class members in this case, careful
consideration reveals that the priority of relief and remedies
requested, and the allocation of HHS resources demanded, by
putative class members may vary greatly.  Conflicts of interest
may well exist between those named plaintiffs who primarily seek
long-term permanency planning with adoption, and putative class
members (or even named plaintiffs) who are focusing on access to
health care, resources for reunification, or assistance with a
wayward child.[31]  This suit seeks to benefit not only the named
plaintiffs, but also unnamed and unknown 3(a) and 3(b)
adjudicated children who are currently or may later enter the
child welfare system.  I cannot conclude that the interests of
3(a) "abused and neglected" juveniles are sufficiently similar to
those of 3(a) "dependent" and 3(b) juveniles such that their
viewpoints and goals are unlikely to diverge.

Even among 3(a) "abused and neglected" juveniles, the
interests and goals of this litigation may differ.  For example,
while some may be seeking an order requiring HHS to implement
policies for expeditiously terminating parental rights and
locating adoptive homes, other 3(a) "abused and neglected"
juveniles may want an order requiring the HHS to implement
policies and direct its resources toward family rehabilitation

---

[31]See also the "Typicality" section of this report and
recommendation.

119

with a goal of reunification.  While these policy goals can co-exist, they are at tension--these groups likely agree that in most cases, reunification should be attempted, but they certainly may disagree concerning when HHS should cease reunification efforts and re-direct its attention to terminating parental rights and, accordingly, what any court order on this issue should require.

In this case, the named plaintiffs allege the following common question of fact:

> c.  Whether Defendants fail to provide appropriate and
> timely permanency planning and services for children in
> foster care to assure that they are properly cared for
> and either safely reunited with their families or freed
> for adoption and promptly placed in another permanent
> home, consistent with applicable law and reasonable
> professional standards.

Filing 64 (Amended Complaint), ¶ 38(a).  To the extent the named plaintiffs ask this court to order and enforce an HHS policy assuring safe reunification or prompt placement in another permanent home in accordance the "applicable law and reasonable professional standards," it is foreseeable that even 3(a) "abused and neglected" juveniles will have divergent viewpoints and goals in this litigation.  The plaintiffs have failed to prove they can adequately represent, and bind by that representation, the class as a whole.

> b.   Adequacy of Representation/Lack of Prudential
>      Standing--the Next Friends.

The defendants further argue that the named plaintiffs' "next friends" will not adequately represent the class.  The defendants claim the next friends lack sufficient knowledge concerning the named plaintiffs or their current custodial

120

placement, and while purporting to represent the interests of an
individually named plaintiff they are, in reality, merely
attempting to advance their personal ideological goal of
reforming Nebraska's foster care system.  The defendants argue
that each named plaintiff has a guardian ad litem familiar with
his or her needs, and who was authorized to pursue this action on
a named plaintiff's behalf had a federal claim been
appropriate.[32]  Filing 71, (Defendants' Brief--Class
Certification), pp. 51-59; filing 72 (Defendants' Brief--Motion
to Dismiss), pp. 43-53.

In the context of challenging the "next friends" as class
representatives, the question is whether they, like the
plaintiffs' counsel, "are able and willing to prosecute the
action competently and vigorously." Elizabeth M.,, 2005 WL
1206150 at *7.  "Next friends" of class representatives must not
only represent the interests of an individually named plaintiff,
but must also vigorous prosecute the interests of the class as a
whole.  The defendants in this case are not challenging the next
friends' fervor to litigate for class-wide relief; indeed, they
argue that each next friend is personally motivated to pursue a
class-wide claim without regard to representing the actual
interests of any specific child, including a named plaintiff.

---

[32]I recognize that having concluded the named plaintiffs
cannot adequately represent the proposed class, I need not
address whether their "next friends" are appropriate
representatives.  However, this is a report and recommendation.
Should Judge Kopf order that the named plaintiffs are appropriate
class representatives, the capacity, ability, and standing of the
"next friends" to represent the named plaintiffs will be
relevant.

Rule 17(c) of the Federal Rules of Civil Procedure provides:

> Whenever an infant . . . has a representative, such as
> a general guardian, committee, conservator, or other
> like fiduciary, the representative may sue or defend on
> behalf of the infant . . . .  An infant . . . who does
> not have a duly appointed representative may sue by a
> next friend or by a guardian ad litem.  The court shall
> appoint a guardian ad litem for an infant . . . not
> otherwise represented in an action or shall make such
> other order as it deems proper for the protection of
> the infant . . . .

Fed. R. Civ. P. 17(c).

The defendants argue that next friend representation is not
appropriate in this case because each named plaintiff has a
guardian ad litem appointed by the juvenile court, and therefore
"a representative . . . [that] may sue or defend" on his or her
behalf.  Fed. R. Civ. P. 17(c).  See filing 72 (Defendants'
Brief--Motion to Dismiss), pp. 9, 42-45.  When any juvenile is
brought before the Nebraska juvenile court, "the court, on its
own motion or upon application of a party to the proceedings,
shall appoint a guardian ad litem for the juvenile . . . in any
proceeding pursuant to the provisions of subdivision (3)(a) of
section 43-247."  Neb. Rev. Stat. § 43-272(2)(e)(LEXIS 2005).

The named plaintiffs' court-appointed guardians ad litem are
not, however, considered a "general guardians."  Orr v. Knowles,
215 Neb. 49, 58, 337 N.W.2d 699, 705 (1983).  "A guardian ad
litem . . . is different than a parent or legal guardian, [and]
only has the power to act in the single situation for which he or
she is appointed."  Orr, 215 Neb. at 58, 337 N.W.2d at 705.  A
guardian ad litem has the duty to "protect the interests of the
juvenile for whom he or she has been appointed guardian, and
shall be deemed a parent of the juvenile as to those proceedings

122

<u>with respect to which his or her guardianship extends</u>."  Neb.
Rev. Stat. § 43-272(LEXIS 2005)(emphasis added).  Nebraska law
does not grant guardians ad litem the statutory authority to
assist in initiating litigation beyond the proceedings for which
they were appointed.  <u>In re Interest of Brittany S</u>., 12 Neb. App.
208, 218-219, 670 N.W.2d 465, 473 (Neb. App. 2003).

    The defendants argue that the plaintiffs' allegations in
this forum are related to the juvenile court proceedings, and
therefore the named plaintiffs' guardians ad litem could pursue
this federal litigation as an extension of the juvenile court
proceedings.  This argument impermissibly extends the scope of
Nebraska guardian ad litem authority.[33]  Neb. Rev. Stat. § 43-272
limits the guardian ad litem's role to representing the child in
the forum of appointment on matters pending at the time of
appointment.  The named plaintiffs' guardians ad litem are not
authorized to represent the named plaintiffs in this forum.

    Moreover, to the extent the guardians ad litem appointed by
the juvenile court concurred with HHS' recommendations during
initial and periodic placement proceedings before the juvenile
court, a conflict of interest will arise if those same guardians

---

    [33]The defendants cite <u>In re Antonio S</u>., 270 Neb. 792, 795,
708 N.W.2d 614, 617 (2005) as exemplifying the expansive role of
the guardian ad litem in representing the interests of the child.
See filing 72 (Defendants' Brief--Motion to Dismiss), pp. 44-45.
However, in <u>In re Antonio S</u>., the guardian ad litem appealed the
juvenile court's order to the Nebraska Supreme Court.  The
guardian ad litem had been appointed by the juvenile court to
represent the child, and requesting appellate review of that
court's order was clearly within the realm of that appointment.
    <u>In re Antonio S</u>. does not authorize a guardian ad litem
appointed by the state juvenile court to initiate a separate
proceeding in federal court challenging HHS practices and
placement determinations on federal constitutional and statutory
grounds.

ad litem are tasked in this forum with challenging the
department's placement and permanency plan recommendations.
Though a guardian ad litem appointed by the juvenile court "is
deemed a parent of the juvenile," (Neb. Rev. Stat. § 43-272
(LEXIS 2005)), the federal court may permit a next friend to
pursue litigation or appoint guardian ad litem "when it appears
that the minor's general representative has interests which may
conflict with those of the person he is supposed to represent."[34]
<u>Developmental Disabilities Advocacy Center, Inc. v. Melton</u>, 689
F.2d 281, 285 (1st Cir. 1982)(holding that advocate for the
disabled with no "natural or other official relationship" to
disabled person had no standing to sue under rule 17(c)).  See
also <u>M. S. v. Wermers</u>, 557 F.2d 170, 175 (8th Cir. 1977)("When
there is a potential conflict between a perceived parental
responsibility and an obligation to assist the court in achieving
a just and speedy determination of the action," the court must
appoint a guardian ad litem to represent the child's interests).

        Rule 17(c) permits a child who does not have a duly
appointed representative to sue by "next friend" or by "a
guardian ad litem" appointed by the federal court to represent
the child's interests.[35]  The defendants claim the named

_____

        [34]Even when a plaintiff has a duly appointed guardian and
Rule 17(c) "would appear to preclude suit by a next friend," Rule
17(c) mandates that the Court utilize its discretion to override
the duly appointed guardian's position if necessary "for the
protection of the infant. . . ."  <u>Gonzalez ex rel. Gonzalez v</u>.
<u>Reno</u>, 86 F. Supp. 2d 1167, 1185 (S.D. Fla. 2000)(quoting <u>In</u>
<u>Developmental Disabilities Advocacy Ctr., Inc. v. Melton</u>, 689
F.2d 281, 285 (1st Cir. 1982), and citing <u>Chrissy F. v.</u>
<u>Mississippi Dept. of Public Welfare</u>, 883 F.2d 25 (5th Cir.
1989)).

        [35]As used in rule 17(c), the terms "next friend" and
"guardian ad litem" are essentially interchangeable, but "next
friend" is normally used when the child is the plaintiff, and

plaintiffs' self-appointed next friends cannot adequately
represent the named plaintiffs or the interests of the class
because they are generally unfamiliar with the basic claims and
parties involved in this litigation, have displayed a lack of
incentive to direct the litigation, do not understand what it
means to be a fiduciary charged with the protection of a class,
and are not knowledgeable of the current circumstances or the
history of the named plaintiff they have agreed to represent.
Filing 71 (Defendants' Brief--Class Certification), pp. 53-54.
The plaintiffs refer to this argument as a "misguided challenge
to the adequacy of the next friend," supported by "selective and
out-of-context quotation[s] from the depositions. . . ."  Filing
82 (Plaintiffs' Reply Brief–Class Certification), p. 41.  A
review of the entirety of each the next friend's deposition
reveals the defendants did not distort the deposition testimony;
there is substantial reason to question whether the plaintiffs'
next friends will adequately represent their individual
interests.

     "Next friends" usually appear in federal court on behalf of
detained prisoners who are unable, usually because of mental
incompetence or inaccessibility, to seek relief themselves.
Whitmore v. Arkansas, 495 U.S. 149, 163-164 (1990).  "Next
friend" status is not granted automatically to whomever seeks to
pursue an action on behalf of another."  Whitmore, 495 U.S. at
163-164.  A self-appointed "next friend" who files a complaint on
behalf of another has the burden of establishing the propriety of
proceeding as plaintiff's next friend.  Gonzalez, 86 F. Supp. 2d
at 1184.

"guardian ad litem" when the child is the defendant.  T.W. by Enk
v. Brophy, 124 F.3d 893, 895 (7th Cir. 1997).

Whitmore identified "at least two firmly rooted prerequisites for 'next friend' standing." Whitmore, 495 U.S. at 163.

> First, a "next friend" must provide an adequate explanation--such as inaccessibility, mental incompetence, or other disability--why the real party in interest cannot appear on his own behalf to prosecute the action. . . . Second, the "next friend" must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, . . . and it has been further suggested that a "next friend" must have some significant relationship with the real party in interest.

Whitmore, 495 U.S. at 163-164 (internal citations omitted).

The majority of courts have held that the "significant relationship" criteria mentioned in Whitmore is a third requirement for next friend status. Hamdi v. Rumsfeld, 294 F.3d 598, 604 (4th Cir. 2002)("[T]he significant-relationship inquiry is in fact an important requirement for next friend standing."); Massie ex rel. Kroll v. Woodford, 244 F.3d 1192, 1194 (9th Cir. 2001)(holding the next friend must prove he or she "has some significant relationship with, and is truly dedicated to the best interests of, the petitioner"); T.W. v. Brophy, 124 F.3d 893, 897 (7th Cir. 1997)("It follows, as the Court suggested in the Whitmore case, that not just anyone who expresses an interest in the subject matter of a suit is eligible to be the plaintiff's next friend--that he "must have some significant relationship with the real party in interest.").[36]  But see Sanchez-Velasco v.

_____

[36]In a footnote, the Eighth Circuit has cited Whitmore and interpreted its holding to mean a next friend has the burden of establishing why the real party in interest cannot prosecute the action, that the "next friend" is "truly dedicated" to the best interests of person on whose behalf she proposes to litigate, and that she has some significant relationship with real party in

Secretary of Dept. of Corrections, 287 F.3d 1015, 1026 (11th Cir.
2002) ("'[S]ome significant relationship,' . . . may not be an
additional, independent requirement but instead may be one means
by which the would-be next friend can show true dedication to the
best interests of the person on whose behalf he seeks to
litigate.").

    Although Whitmore's next friend analysis was first
enunciated in the context of habeas law, it has been extended to
general civil litigation, including actions filed on behalf of
children.  See e.g. Gonzalez, 86 F. Supp. 2d 1167, 1184-85 (S.D.
Fla. 2000)(finding great uncle who provided plaintiff's care for
two months and initiated suit to enjoin his deportation to Cuba
demonstrated sufficient interest in the child to be his next
friend where the child's father objected to the litigation); T.W.
v. Brophy, 954 F. Supp. 1306, 1309 (E.D. Wis. 1996), aff'd 124
F.3d 893, 896-97 (7th Cir. 1997)(refusing to allow a child
advocate to act as next friend of a minor).

    Applying Whitmore to the facts herein, it is questionable
whether any of the self-appointed next friends have established
that they are truly next friends under Rule 17(c).  The first
Whitmore criteria, though applicable to all the named plaintiffs
when this suit was initiated, is no longer applicable to Cheryl
H. and Paulette V.  Named plaintiffs Cheryl H. and Paulette V.
are now adults, and there is no evidence that they lack capacity
to sue on their own behalf.

---

interest.  Amerson v. State of Iowa, Dept. of Human Services by
Palmer, 59 F.3d 92, 93 (8th Cir. 1995)(holding natural mother
whose parental rights were terminated could serve as the next
friend of her disabled child in challenging the child's removal
from parental custody and placement in "secured facilities").

As to the remaining named plaintiffs, the first requirement of <u>Whitmore</u> is established; Carson P., Danielle D., Jacob P., Bobbi W., and Hannah A. live in Nebraska and are all minors under Nebraska law. As such, they lack capacity to sue. See Fed. R. Civ. P. 17(b)("The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile. . ."); Neb. Rev. Stat. 25-307(LEXIS 2005)("[T]he action of an infant shall be commenced, maintained, and prosecuted by his [or her] guardian or next friend.").

The question is whether the "next friends" are truly dedicated to pursuing the best interests of the named plaintiffs. In claiming "next friend" status is supported by the evidence of record, the plaintiffs cite to <u>Ad Hoc Committee of Concerned Teachers v. Greenburgh No. 11 Union Free School Dist.</u>, 873 F.2d 25, 30-31 (2d Cir. 1989), a case that pre-dates <u>Whitmore</u>. <u>Ad Hoc Committee</u> held:

> [A] court should consider the good faith of those claiming to speak for the infant and satisfy itself that the "next friend" is motivated by a sincere desire to seek justice on the infant's behalf. In addition, a court should explore the ability of the "next friend"-- financial or otherwise--to prosecute the type of action at hand. We would not sanction any attempt to assert the legitimate rights of children as a mere pretext for advancing ulterior political or economic aims. Nor would we approve of persons who, despite their good intentions, find themselves unable to finish what they start. Since the facts and circumstances of each case will vary, a court should conduct an inquiry into the application of any adult or group of adults seeking to represent a child's interests as "next friend."
>
> . . .
>
> The term ["next friend"] is broad enough to include anyone who has an interest in the welfare of an infant

128

who may have a grievance or a cause of action . . .
The right of access to courts by those who feel they
are aggrieved should not be curtailed; and this is
particularly so in the instance of children who,
rightly or wrongly, attribute such grievances to their
very custodians.  Those who propose to speak for the
plaintiffs have manifested an interest in their welfare
and should, under the circumstances here presented, be
allowed to proceed.

Ad Hoc Committee, 873 F.2d at 31.  See also Child v. Beame, 412
F. Supp. 593 (S.D.N.Y. 1976)(holding that in the absence of
anything to impugn his good faith, a self-appointed next friend
of foster children could pursue litigation on their behalf even
though he did not know the children until his aid was enlisted by
the attorneys).

     The plaintiffs claim the next friends' "good faith"
motivation to represent the plaintiffs cannot reasonably be
questioned, and therefore the next friends should continue to
represent the named plaintiffs' interests.  Filing 88
(Plaintiffs' Brief--Motion to Dismiss), p. 40-41.  The defendants
claim the next friends have no "significant relationship" with
the named plaintiffs and therefore cannot serve as their next
friends.  Filing 72 (Defendants' Brief--Motion to Dismiss), p.
48-53.

     In T.W. by Enk v. Brophy, 124 F.3d 893 (7th Cir. 1997), the
Seventh Circuit held that a child abuse prevention advocate could
not bring an action as the next friend of children who were
allegedly removed from the home of their white foster parents and
placed in the home of a black (and sexually abusive) aunt on the
basis of race.  The self-appointed "next friend" was described as
"a professional children's advocate who, having interested
himself in the [case] at the behest of the lawyer appearing for

129

the plaintiffs in this suit and having been persuaded or
persuaded himself that they are being ill-used by their aunt, by
their guardian ad litem, and by the entire Wisconsin
child-welfare establishment and judiciary, seeks to represent
them so that they can bring this suit." T.W., 124 F.3d at 896.
In concluding this "next friend" could not represent the
plaintiffs' interests, the court reasoned:

> Bearing in mind the considerations that we have
> discussed, and the almost complete lack of authority on
> the question, we think the proper rule is that the next
> friend must be an appropriate alter ego for a plaintiff
> who is not able to litigate in his own right; that
> ordinarily the eligibles will be confined to the
> plaintiff's parents, older siblings (if there are no
> parents), or a conservator or other guardian, akin to a
> trustee; that persons having only an ideological stake
> in the child's case are never eligible; but that if a
> close relative is unavailable and the child has no
> conflict-free general representative the court may
> appoint a personal friend of the plaintiff or his
> family, a professional who has worked with the child,
> or, in desperate circumstances, a stranger whom the
> court finds to be especially suitable to represent the
> child's interests in the litigation. . . . Without
> such a rule, and specifically its exclusion of purely
> ideological "friends," we may find [this next friend]
> popping up in children's suits all over the circuit,
> perhaps all over the country.

T.W., 124 F.3d at 897 (Posner, J.)(internal citations omitted).

The self-appointed next friends in this case are not family
members, conservators, or other guardians of the named
plaintiffs.  Before this suit was filed, the next friends had
little prior or no recent contact, and in some cases no contact
at all, with the named plaintiffs they seek to represent.
Specifically,

- Carson P.:  Ms. Foreman was Carson P.'s foster sister
  for two years, but she did not live at home during that

130

time.  She has not seen or spoken with Carson P. since
August 2005.  Filing 74 (Supplemental Evidence Index),
ex. 31 (Foreman Deposition), pp. 13-17.

- Danielle D.:  Ms. Bruns is a friend of Danielle D.'s
  current foster mother.  Filing 74 (Supplemental
  Evidence Index), ex. 33 (Bruns Deposition), 12, 23-26.

- Jacob P.:  Reverend Jensen has never met Jacob P. or
  talked to him, and she does not know where he currently
  lives.  Filing 74 (Supplemental Evidence Index), ex. 35
  (Jensen Deposition), 10, 13-15.

- Bobbi W.:  Ms. Creager is a citizen advocate who did
  not previously know Bobbi W., but after agreeing to be
  her next friend, met with her for an hour.  Filing 74
  (Supplemental Evidence Index), ex. 46 (Creager
  Deposition), 8-10, 38-39, 48-49.

- Hannah A.:  Ms. Nkwocha was a family support service
  provider for Hannah A.'s family for a period of four
  years, but has not worked with her since May 2003, and
  has not seen or spoken to her since June 2004.  Filing
  74 (Supplemental Evidence Index), ex. 47 (Nkwocha
  Deposition), 10-13; filing 83 (Supplemental Evidence
  Index), ex. 7 (HHS file-Hannah A.), pp. HHS-017150-51.
  Ms. Nkwocha has never been to Hannah A.'s current home
  placement.  Filing 74 (Supplemental Evidence Index),
  ex. 47 (Nkwocha Deposition), 14, 19.


    The next friends have made little, if any, effort to
communicate with members of the community who may have relevant
information concerning the named plaintiffs' well being.
Specifically, Ms. Foreman does not know where Carson P. attends
school and has not spoken with Carson P.'s grandmother (with whom
he is now placed), teachers, or other school officials concerning
his care or progress, (filing 74 (Supplemental Evidence Index),
ex. 31 (Foreman Deposition), pp. 17-18); Ms. Bruns has never
talked to Danielle D.'s teachers, (filing 74 (Supplemental
Evidence Index), ex. 33 (Bruns Deposition), 29, 31, 35-36);
Reverend Jensen has spoken to no one other than the plaintiffs'

131

attorneys concerning Jacob P., (filing 74 (Supplemental Evidence Index), ex. 35 (Jensen Deposition), 12-13, 19, 23); Ms. Creager has not spoken with any teachers or school staff concerning Bobbi W., (filing 74 (Supplemental Evidence Index), ex. 46 (Creager Deposition), 11-12, 30-32); and Ms. Nkwocha has not talked to Hannah A.'s foster parents or her teachers.  Filing 74 (Supplemental Evidence Index), ex. 47 (Nkwocha Deposition), 14, 17, 19, 31.

With the exception of Reverend Jensen, each of the next friends has expressed concerns regarding the prior or current placements and services provided to the named plaintiff they represent.  Filing 74 (Supplemental Evidence Index), ex. 31 (Foreman Deposition), pp. 18-21, 53-54; ex. 33 (Bruns Deposition), 10, 13-14, 27-28, 38-44, 64-65; ex. 35 (Jensen Deposition), 17, 20, 23-24; ex. 46 (Creager Deposition), 43-45; ex. 47 (Nkwocha Deposition), 14, 19, 28-29, 35, 40-41, 43, 46, 53, 63-70, 77.  They have not, however, contacted the juvenile court, the named plaintiffs' appointed guardians ad litem, HHS caseworkers, or the Foster Care Review Board concerning the named plaintiffs.  None has participated in or even attended any recent juvenile court proceedings for her named plaintiff.  Many of them have never reviewed the court reports, case plan, or permanency plans for their named plaintiffs.  Filing 74 (Supplemental Evidence Index), ex. 31 (Foreman Deposition), pp. 17-18, 22, 28-32, 35, 54-55; ex. 33 (Bruns Deposition), 10, 29, 31, 35-38; ex. 35 (Jensen Deposition), 12-13, 19, 23; ex. 46 (Creager Deposition), 8-12, 30-32, 38-39; ex. 47 (Nkwocha Deposition), 27, 31, 33-34, 45, 50-51.

Ms. Bruns was recruited to be a next friend by Danielle D.'s current foster mother, (filing 74 (Supplemental Evidence Index),

132

ex. 33 (Bruns Deposition), 12, 23-26), but the next friends for
Carson P., Jacob P. Bobbi W., and Hannah A. agreed to represent a
named plaintiff at the request of plaintiffs' counsel.  As to
Reverend Jensen and Ms. Creager, there is no evidence they knew
precisely who they would be assigned to represent before agreeing
to be a "next friend."  Ms. Foreman is appearing at the request
of Doug Gray, an attorney for Children's Rights, (filing 74
(Supplemental Evidence Index), ex. 31 (Foreman Deposition), pp.
31-32, 35, 55); Reverend Jensen was contacted by Marnie Jensen,
an attorney at the Ogborn, Summerlin & Ogborn law firm, (filing
74 (Supplemental Evidence Index), ex. 35 (Jensen Deposition),
10); after initially agreeing to be a next friend at the request
of Citizen Advocacy, Ms. Creager was contacted by Marnie Jensen,
(filing 74 (Supplemental Evidence Index), ex. 46 (Creager
Deposition), 34-36); and Ms. Nkwocha was contacted by Jennifer
Carter of Nebraska Appleseed, (filing 74 (Supplemental Evidence
Index), ex. 47 (Nkwocha Deposition), 34-35).

With the exception of Ms. Foreman, (filing 74 (Supplemental
Evidence Index), ex. 31 (Foreman Deposition), pp. 31-32), each
next friend has at least a basic understanding of the
responsibilities of a next friend for a class representative.
See filing 74 (Supplemental Evidence Index), ex. 33 (Bruns
Deposition), 64; filing 74 (Supplemental Evidence Index), ex. 35
(Jensen Deposition), 27; filing 74 (Supplemental Evidence Index),
ex. 46 (Creager Deposition), 48-49; filing 74 (Supplemental
Evidence Index), ex. 47 (Nkwocha Deposition), 34-35, 77.

The evidence supports a finding that each of these next
friends have "an ideological stake" in the named plaintiffs'
case; their primary objective appears to be changing Nebraska's
child welfare system.  This is especially true with Reverend

Jensen and Ms. Creager, neither of whom had met their assigned named plaintiff before agreeing to be a next friend.

There is also reason to question the "good faith" motivation, initiative, fortitude, and dedication of these next friends to represent the named plaintiffs' interests. The record reflects that the next friends expended little, if any, effort to seek out sources and discover the current circumstances or the potential risk of harm faced by their assigned named plaintiff. They filed a complaint on behalf of the child without this knowledge; and as of the time their depositions were taken (at least three months after this suit was filed), they still lacked the information necessary to assess the state's current efforts on behalf of the child, and had little, if any, reliable information concerning the circumstances and suitability of the child's current placement. Whatever concerns they did have were not voiced to the juvenile court, guardians ad litem, county attorneys, HHS caseworkers, or the Foster Care Review Board.[37] The evidence currently before me indicates that while each next friend may have sincere empathy for her named plaintiff's plight, her goal in this litigation is system change on behalf of others and not advocating the individual interests of her named plaintiff.

I have previously concluded that with respect to named plaintiffs Carson P., Danielle D., Jacob P., Bobbi W., and Hannah

---

[37]While there is some evidence that foster parents were instructed not to speak to the next friends, (filing 83 (supplemental evidence index), ex. 10 (Carter affidavit)), that does not explain the next friends' failure to pursue any recent investigation before apparently deciding litigation would serve the named plaintiffs' best interests, nor their failure to raise concerns before state agencies and authorities who could assist the child.

A., the amended complaint alleges a case or controversy and
should not be dismissed for lack of standing.  Assuming this case
is not otherwise dismissed or the court does not abstain under
Younger or Rooker-Feldman, these named plaintiffs need "next
friend" representation in this forum because they lack capacity
to sue.  I am not currently convinced that their self-appointed
next friends will appropriately represent their individual
interests.  The next friends have failed to prove they should
continue to represent a named plaintiff's interests in this
forum.[38]

The defendants advocate that since the next friends who
filed this suit are not suitable representatives, dismissal for
lack of standing is required.  In the context of habeas
litigation, the law supports the defendants' argument.  Whitmore,
495 U.S. at 165 (holding no case or controversy existed where a
self-appointed next friend challenged a death sentence, but the
capital defendant was mentally competent and able to represent
his own interests and chose not to pursue habeas relief);
Coalition of Clergy, Lawyers, and Professors v. Bush, 310 F.3d
1153, 1162 (9th Cir. 2002)(dismissing habeas action where the
plaintiff coalition had no relationship with detainees at Camp X-
Ray and therefore could not serve as their next friends).

But the issue is much more difficult when applied to foster
children.  Foster children likely have no "significant
relationship" with any adult who can or will litigate on their

_____

[38]If their primary motivation for agreeing to be a next
friend was, as it would appear, to obtain child welfare system
reform, I also question whether they will remain interested in
this lawsuit at all if the court ultimately concludes the
proposed class should not be certified.

behalf.[39]  Parents, adult family members, close adult friends,
and general guardians often do not exist, are unmotivated to
help, are irresponsible, or have a personal interest in the
outcome.  Where child welfare reform is the issue, caseworkers
have a conflict of interest, and foster parents and HHS-
compensated service providers (e.g. therapists) likely have a
conflict of interest.  Nebraska court-appointed guardians ad
litem are not only unauthorized by the state court to pursue
federal proceedings on a child's behalf, but may have a conflict
of interest.

Ultimately, a foster child's access to this forum may rest
with private citizens who are ideologically motivated to
represent such children, irrespective of whether they know the
individual child they agree to represent.  Where such
circumstances exist, child advocates can be suitable next friends
for a child litigant provided they convince the court that they
are not solely motivated by ideological goals, (T.W., 124 F.3d at
897 ("persons having only an ideological stake in the child's
case are never eligible"); that the individual child's best

----

[39]However, "the contours of the requisite 'significant
relationship' do not remain static, but must necessarily adapt to
the circumstances facing each individual . . . 'Significance' is
a relative concept, dependent on the individual [person's]
plight.  Not all [persons] have a relative [or] friend able or
willing to act on their behalf.  In such an extreme case it is
plausible that a person with 'some' relationship conveying some
modicum of authority or consent, 'significant' in comparison to
the [person's] other relationships, could serve as the next
friend.  Moreover, the concept of 'true dedication' is a
subjective one, difficult of measurement.  The existence of some
relationship, whether it be from authorized representation to
friendship or alliance to familial, serves as an objective basis
for discerning the 'intruder' or 'uninvited meddler' from the
true 'next friend.'"  Coalition of Clergy, Lawyers, and
Professors v. Bush, 310 F.3d 1153, 1162 (9th Cir. 2002).

interests have been thoroughly considered, and that those
interests will remain paramount throughout the litigation.[40]   See
e.g. <u>Bowen v. Rubin</u>, 213 F. Supp. 2d 220, 226 (E.D.N.Y.
2001)(holding that attorneys who were willing to be guardians ad
litem for mentally disabled adults on a pro bono basis were not
"unwanted meddlers" where plaintiffs' counsel requested the
assistance, the proposed guardians met and spoke with the
plaintiffs, and being attorneys, the proposed guardians ad litem
understood their fiduciary obligations to the plaintiffs and
their roles as officers of the court).

Where a self-appointed next friend has filed suit on behalf
of a foster child, is successfully challenged as lacking
authority to act on behalf of that child, and no other
alternative exists, the court is authorized to appoint "a
stranger whom the court finds to be especially suitable to
represent the child's interests in the litigation." <u>T.W</u>., 124
F.3d at 897.  Such a procedure assures the court that a child's
ability to assert legitimate claims in this forum is not
summarily denied because an unsuitable next friend filed the
lawsuit, while safeguarding the child from being named a
plaintiff in litigation that is not being pursued with his or
best interest in mind.

---

[40]Assuming the child is represented by a suitable "next
friend," either through self-appointment or court-appointment,
the court must remain watchful for "any attempt to assert the
legitimate rights of children as a mere pretext for advancing
ulterior political or economic gains." <u>Ad Hoc Comm</u>., 873 F.2d at
31.  "[H]owever worthy and high minded the motives of 'next
friends' may be, they inevitably run the risk of making the
actual [plaintiff] a pawn to be manipulated on a chessboard
larger than his [or her] own case." <u>Lenhard v. Wolff</u>, 443 U.S.
1306, 1312 (1979).

Although the defendants may argue that such a procedure is not supported by the holding in <u>Whitmore</u>, there is a discernable difference between filing a next friend habeas suit on behalf of a prisoner, and filing a next friend civil suit on behalf of a foster child.  A prisoner who is competent can decide for himself if the suit should be filed, and a next friend who presumes to make that decision for him is an "intruder" or "uninvited meddler," but a child is in no position to understand and challenge a next friend's status or whether the suit filed is in his or her best interest.  Moreover, an incompetent prisoner who cannot make rational decisions often has a family member, close friend, general guardian, or attorney who can serve as a next friend, and the mere existence of this relationship creates some indicia that the prisoner's best interests were considered before filing the suit; for a foster child, there is often no other adult who has a "significant relationship" with the child.  In such cases, challenging the suit on the basis of the next friend's lack of standing is left to the defendant and/or the court.  The defendant may move for immediate dismissal for lack of standing based on the next friend's unsuitability, but the court's ultimate responsibility is providing access to the courts and justice.

Until an appropriate next friend is appointed to represent a child litigant, and absent a valid challenge to the face of the complaint itself, the court lacks any reliable basis for determining if the claims purportedly raised on the child's behalf present a justiciable controversy or should be asserted in the child's interests.  If the allegations of a foster child's complaint, considered true, may present a cognizable claim within this court's jurisdiction, the court should appoint a suitable representative for the child before addressing whether the case

138

should be dismissed.  T.W., 124 F.3d at 898 (noting that but for
dismissal on the basis of Rooker-Feldman abstention, child
advocate would be afforded a chance to seek court appointment as
the child's next friend before the suit was dismissed on the
basis of lack of capacity to sue).  An appropriately appointed
"next friend," who understands the responsibilities of the
position and has evaluated the child's interests, may decide on
the child's behalf to either dismiss the suit or continue to
litigate.  If the latter is chosen, the defendant may still
respond that dismissal is appropriate because no case or
controversy exists.

    Accordingly, should the court determine that the named
plaintiffs' amended complaint alleges a potentially cognizable
claim, and that abstention is not required, next friends should
be appointed to represent these named plaintiffs.  The named
plaintiffs' self-appointed next friends, Ms. Foreman, Ms. Bruns,
Reverend Jensen, Ms. Creager, and Ms. Nkwocha, may move to be
appointed, and may be appointed upon a showing, made in an
evidentiary hearing, that they meet the standards for appointment
as next friends as set forth in this report and recommendation.
The defendants' motion to dismiss based on the next friends' lack
of standing, and therefore the named plaintiffs' lack of capacity
to sue, should be held in abeyance.

    II.  Motion to Dismiss--Abstention.

    The defendants claim the court lacks subject matter
jurisdiction pursuant to D.C. Court of Appeals v. Feldman, 460
U.S. 462, 476 (1983) and Rooker v. Fid. Trust Co., 263 U.S. 413,
415 (1923)(the Rooker-Feldman doctrine), and is obligated to
abstain under the doctrine announced in Younger v. Harris, 401

U.S. 37 (1971).  As to their request for Younger abstention, they claim that federal injunctive relief would interfere with the ongoing judicial oversight provided by the Nebraska juvenile court system, juvenile proceedings are a matter of important state interest, and any federal claims raised in this case could be raised in the juvenile court forum.  As to the request for Rooker-Feldman abstention, the defendants claim any federal court relief entered in this case could effectively reverse prior state court determinations regarding juvenile placement and care.

    A.    The Rooker-Feldman Doctrine.

    Under the Rooker-Feldman doctrine, except in habeas cases, lower federal courts lack subject matter jurisdiction over challenges to state court judgments.  Ballinger v. Culotta, 322 F.3d 546, 548 (8th Cir. 2003).  "The doctrine bars federal courts from hearing cases brought by the losing parties in state court proceedings alleging 'injury caused by the state-court judgment and seeking review and rejection of that judgment.'"  Mosby v. Ligon, 418 F.3d 927, 931 (8th Cir. 2005)(quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 125 S.Ct. 1517, 1526 (2005)).

        District courts may not review state court decisions,
        "even if those challenges allege that the state court's
        action was unconstitutional," Feldman, 460 U.S. at 486,
        103 S.Ct. 1303, because "[f]ederal jurisdiction to
        review most state court judgments is vested exclusively
        in the United States Supreme Court," Lemonds, 222 F.3d
        at 492 (citing 28 U.S.C. § 1257; Feldman, 460 U.S. at
        486, 103 S.Ct. 1303).  A party who was unsuccessful in
        state court thus "is barred from seeking what in
        substance would be appellate review of the state
        judgment in a United States district court based on the
        losing party's claim that the state judgment itself
        violates the loser's federal rights." Johnson v. De
        Grandy, 512 U.S. 997, 1005-1006 (1994) (citing Feldman,
        460 U.S. at 482; Rooker, 263 U.S. at 416.  This

                                140

jurisdictional bar extends not only to "straightforward
appeals but also [to] more indirect attempts by federal
plaintiffs to undermine state court decisions."
Lemonds, 222 F.3d at 492. Federal district courts thus
may not "exercis[e] jurisdiction over general
constitutional claims that are 'inextricably
intertwined' with specific claims already adjudicated
in state court."  Id. at 492-93.

Ballinger, 322 F.3d at 548-49.


   Ballinger held that under Rooker-Feldman, the court lacked
subject matter jurisdiction over a father's § 1983 action
alleging the state child support services and his child's
maternal grandfather violated his constitutionally protected
rights of parental association, due process, and equal protection
by awarding child custody to stemming from state court's award of
child custody to the grandfather.  The court reasoned that since
the father could prevail on his federal claims only if the
district court determined that the state court judge wrongly
decided the legal questions at issue, the relief requested in the
§ 1983 action would effectively reverse the state court decision
or void its ruling.  Accordingly, the federal court action was
effectively a prohibited attempt to appeal the state-court
judgment, and the Rooker-Feldman doctrine barred the district
court from considering the father's claims.


   Unlike the state court judgment in Barringer, the
plaintiffs' complaint does not seek reversal of any prior
juvenile court rulings, but asks for prospective relief.
Juvenile court rulings remain subject to future modification and
review so long as the child remains in HHS legal custody.  The
plaintiffs' requested injunction seeks HHS policy changes that
may affect the outcome of future juvenile court review
proceedings, but this requested relief will not effectively

141

reverse past rulings.  Since this court could enter prospective relief in favor of the plaintiffs without addressing the merits and reasoning of past juvenile court rulings, the plaintiffs' § 1983 claim does not represent an attempt to appeal a state court judgment by filing federal court litigation.  The <u>Rooker-Feldman</u> doctrine does not apply to this case.

    B.    <u>Younger Abstention</u>.

    Unlike <u>Rooker-Feldman</u> abstention, <u>Younger</u> abstention goes to the exercise of equity jurisdiction, not to the federal court's jurisdiction of the to hear the case.  <u>Younger</u> abstention "does not arise from lack of jurisdiction in the District Court, but from strong policies counseling against the exercise of such jurisdiction where particular kinds of state proceedings have already been commenced."  <u>Ohio Civil Rights Com'n v. Dayton Christian Schools, Inc</u>., 477 U.S. 619, 626 (1986).

    <u>Younger</u> abstention applies to federal claims for declaratory relief and injunctive relief.  The motivating force behind <u>Younger</u> abstention is the promotion of comity between state and federal judicial bodies.  <u>Aaron v. Target Corp</u>., 357 F.3d 768, 774 (8th Cir. 2004).  Under <u>Younger</u>, a federal court should abstain from exercising jurisdiction in cases where equitable relief would interfere with pending state proceedings in a way that offends principles of comity and federalism.  <u>Aaron</u>, 357 F.3d at 774.  Accordingly, abstention under <u>Younger</u> is appropriate where: (1) there are ongoing state judicial proceedings; (2) those state proceedings implicate important state interests; (3) the federal litigation will interfere with the state proceedings; and (4) the state proceedings provided the federal plaintiff with an adequate opportunity to raise the

federal claims.  Norwood v. Dickey, 409 F.3d 901, 903 (8th Cir.
2005)(citing Middlesex County Ethics Comm. v. Garden State Bar
Ass'n, 457 U.S. 423, 431-32 (1982).

For the reasons discussed hereafter, I conclude the court
should abstain under Younger from exercising jurisdiction over
the plaintiffs' claims.

1.   Ongoing State Proceedings.

Each of the plaintiffs, and every child adjudicated under
Neb. Rev. Stat. 3(a) or 3(b) and in HHS legal custody, is subject
to the continuing jurisdiction of the Nebraska juvenile court
system.  Following adjudication, the court conducts a
disposition hearing to determine the child's placement and the
rights of the parties in the action.  In re Interest of Joshua
M., 256 Neb. 596, 591 N.W.2d 557 (1999).  The court must
determine where the child will be placed and must review this
dispositional order for each child at least once every six months
to reaffirm the order or direct another disposition of the child.
Neb. Rev. Stat. § 43-1313.  As such, the named plaintiffs, and
all members of the putative class, are subject to ongoing state
proceedings before the Nebraska juvenile court system.  31 Foster
Children, 329 F.3d at 1277 (holding that state proceedings were
ongoing where the state court holds an initial adjudicatory
hearing regarding a potential foster child, "retains continuing
jurisdiction over a dependency case and reviews the child's
status at least every six months," must approve the case plan,
and may amend the plan); J.B., 186 F.3d at 1291 ("We hold that
the continuing jurisdiction of the Children's Court to modify a
child's disposition, . . . coupled with the mandatory six-month
periodic review hearings, . . . constitutes an ongoing state

judicial proceeding."); <u>Laurie Q. v. Contra Costa County</u>, 304 F.
Supp. 2d 1185, 1204 (N.D.Cal. 2004)("[T]he substantial oversight
role that the Juvenile Court must play during the pendency of a
child's care within the foster system is sufficient to create an
ongoing judicial proceeding for the purposes of Younger.");
<u>Olivia Y. ex rel. Johnson v. Barbour</u>, 351 F. Supp. 2d 543, 567-68
(S.D. Miss. 2004)("In view of the continuing nature of the duties
and responsibilities statutorily imposed upon the state's youth
courts, . . . [the] proceedings may fairly be said to be
"ongoing" in the case of each child over whom the youth courts
have assumed jurisdiction.").

2.   <u>State Proceedings Implicate Important State Interests.</u>

"Family relations are a traditional area of state concern."
<u>Moore v. Sims</u>, 442 U.S. 415, 435 (1979).  The state has a
compelling interest in quickly and effectively removing the
victims of child abuse and neglect from their parents and placing
them in safe and suitable homes.  State conduct performed and
proceedings instituted to protect children from abuse implicate
sufficiently important state interests to justify <u>Younger</u>
abstention.  <u>Moore</u>, 442 U.S. at 435 (applying Younger abstention
to case challenging the state's temporary removal of a child from
an allegedly abusive home environment).

Nebraska's interest in this issue is evidenced by its
current and ongoing welfare reform efforts.  The state's Foster
Care Review Board 2004 report includes extensive recommendations
for restructuring the state's child welfare delivery system,
creating expedited review processes to afford quicker permanent
placements, using state and federal funds more effectively, and

144

holding perpetrators of abuse accountable.  Filing 73, ex. 14
(Foster Care Rev. Bd. 2004 Annual Report), p. HHS-010980-91.
The Chief Justice of the Nebraska Supreme Court formed the
Supreme Court Commission on Children in the Courts in 2005, and
that committee continues state-wide efforts to address many of
the issues raised by the plaintiffs in this case.  The State is
also participating in collaborative national and multi-state
efforts to develop welfare reform plans for implementation at
state and local levels.  Filing 73, ex. 37 (Montanez Affidavit),
¶¶ 12-14.[41]

---

[41]Though the defendants argue that Younger abstention is
mandatory, Warmus v. Melahn, 62 F.3d 252, 255 (8th Cir. 1995),
rev'd on other grounds, 517 U.S. 1241 (1996), held that "when a
federal action is projected to unduly interfere with ongoing
state proceedings 'so important that exercise of federal judicial
power would disregard the comity between the states and federal
government,' federal courts have the discretion to abstain."
Warmus, 62 F.3d at 255 (citing Pennzoil v. Texaco, Inc., 481 U.S.
1, 11 (1987), and Yamaha Motor Corp. v. Riney, 21 F.3d 793, 798
(8th Cir. 1994)(district court's decision to abstain under
Younger reviewed for an abuse of discretion).  See also
Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 718-719
(1996)("[I]t has long been established that a federal court has
the authority to decline to exercise its jurisdiction when it is
asked to employ its historic powers as a court of equity.");
Addiction Specialists, Inc. v. Township of Hampton, 411 F.3d 399
(3d Cir. 2005)("A federal district court has discretion to
abstain from exercising jurisdiction over a particular claim
where resolution of that claim in federal court would offend
principles of comity by interfering with an ongoing state
proceeding.").  But see Canatella v. California, 404 F.3d 1106,
1113 (9th Cir. 2005)("District courts applying Younger must
exercise jurisdiction except when specific legal standards are
met, and may not exercise jurisdiction when those standards are
met; there is no discretion vested in the district courts to do
otherwise.").  To the extent that Younger abstention is
discretionary, the efforts already underway, and especially the
efforts of the Supreme Court's Commission on Children in the
Courts, should be considered.  Litigating claims in federal
court, with evidence presented through adversarial and competing
expert testimony, is no substitute for the contemplative and
reasoned analysis of the State's judiciary and the committee
members it has entrusted with tackling this difficult problem.

3.    <u>The Federal Litigation Will Interfere with the State
      Proceeding</u>.

The plaintiffs have not requested any specific type of
injunctive relief.  The prayer for relief in their complaint
essentially requests the court to enter an order requiring the
defendants to cease violating the plaintiffs' constitutional
rights and comply with federal statutory requirements.  Under
circumstances such as this, some courts have refused to abstain
under <u>Younger</u> because, absent a specific request for injunctive
relief, they could not conclude that a federal order would
necessarily interfere with ongoing state proceedings.  See <u>Olivia
Y.</u>, 351 F. Supp. 2d at 570; <u>Kenny A</u>., 218 F.R.D. at 286 n. 5.  As
explained in <u>Olivia Y</u>.:

> [T]he question presented under . . . the <u>Younger</u>
> inquiry is not simply whether there are ongoing state
> judicial proceedings, but whether the federal
> proceeding at issue will interfere with such state
> proceedings.  Unfortunately, owing to the generality of
> plaintiffs' prayer for relief in the case at bar, that
> determination is not as readily made as it might
> otherwise have been.  Although plaintiffs' complaint
> challenges defendants' actions and inaction in numerous
> areas, their request for relief is quite general.  They
> broadly request that this court "[d]eclare
> unconstitutional [/or] and unlawful ..." defendants'
> violation of their rights under the due process clause,
> equal protection clause, the AACWA and Mississippi Code
> Annotated § 43-21-609(b) and (c)(ii), that the court
> "[p]ermanently enjoin defendants from subjecting
> members of the Plaintiff class to practices that
> violate their rights," and "[o]rder appropriate
> remedial relief to ensure that a detailed plan is
> developed, implemented, and monitored to ensure
> Defendants protect the legal rights of Plaintiffs as
> set forth in this complaint."
>
> . . . .

146

> This court does recognize that the interference at
> which <u>Younger</u> is aimed need not be direct, but rather
> may be indirect interference. . . .  In the case at
> bar, the court still would be hard-pressed to conclude
> that any specific relief plaintiffs seek in this action
> would necessarily interfere with ongoing youth court
> proceedings.  Or stated another way, it is not apparent
> that *all* the relief plaintiffs might request would
> interfere, either directly or indirectly, with ongoing
> youth court proceedings.  Accordingly, the court will
> deny defendants' request for <u>Younger</u> abstention.

<u>Olivia Y</u>., 351 F. Supp. 2d at 570 (emphasis in original).


    I conclude, however, that the plaintiffs' artful pleading
and lack of specificity should not serve to circumvent the
principles of comity protected by <u>Younger</u> abstention; that is,
the plaintiffs' failure to identify the specific relief requested
should not assist them in defeating defendants' motion to dismiss
on the basis of <u>Younger</u> abstention.  Therefore, rather than
relying on the plaintiffs' prayer for relief to determine what
injunctive remedy the plaintiffs may request, the court will rely
on the allegations of the amended complaint, the presumption
being that the plaintiffs will ultimately request an order
remedying each allegedly wrongful action or inaction performed by
HHS.

    Based on the specific allegations of the amended complaint,
it appears the plaintiffs will request an injunction requiring
the State to:[42]


--   Change its policies applicable to locating, re-
locating, and selecting placements for children; specifically,

------

    [42]See also filing 42 (Report of Parties' Planning
Conference), pp. 5-11, summarized in this report and
recommendation at pages 2-4.

- Move children less frequently and to more appropriate placements, (filing 64 (Amended Complaint), ¶¶ 4(a), 114, 110-111);

- Provide transitional support to children moving from one placement to another, (filing 64 (Amended Complaint), ¶¶ 115-16);

- Limit the placement time spent in emergency shelters and other temporary facilities, (filing 64 (Amended Complaint), ¶ 4(b));

- Eliminate or sparingly use emergency shelters and other temporary facilities for placement of small children, (filing 64 (Amended Complaint), ¶ 4(c));

- Limit the number of children placed in a particular foster home, (filing 64 (Amended Complaint), ¶ 4(d));

- Screen foster homes, (filing 64 (Amended Complaint), ¶¶ 4(e), 129);

- Limit the use of institutional placements for children, (filing 64 (Amended Complaint), ¶ 4(f));

- Use institutional placements and therapeutic foster homes when warranted, (filing 64 (Amended Complaint), ¶ 113, 118);

- Segregate dangerous or sexually reactive children from other foster children.  Filing 64 (Amended Complaint), ¶¶ 4(e), 129);

- Adequately train, prepare, inform, or support foster parents, (filing 64 (Amended Complaint), ¶¶ 56, 110, 112, 127); and

- Pay foster care providers amounts which are sufficient to cover the expenses of the child's necessary care, (filing 64 (Amended Complaint), ¶¶ 5(f), 124-126).

--   Reduce the length of stay in state custody by developing and implementing better case plans and terminating parental rights more quickly, (filing 64 (Amended Complaint), ¶¶ 4(g), 5(e), 57, 68, 69, 71, 76, 81, 88, 89, 97-98, 106, 155-171).

148

-- Adopt policies aimed at providing better supervision of children in its care; specifically,

- Limit HHS caseworker caseloads, and provide caseworkers with more experience and training, (filing 64 (Amended Complaint), ¶¶ 5(b)&(c), 110, 117, 128, 131-36, 138-147);

- Monitor foster homes and supervise biological parents more closely during reunification or visitation, (filing 64 (Amended Complaint), ¶¶ 4(e), 129).

-- Provide basic health services for foster children, such as services necessary to address acute health problems, and basic medical examinations and dental health services, (filing 64 (Amended Complaint), ¶¶ 5(d), 148-154, 188).

-- Afford access to visitation with family members, (filing 64 (Amended Complaint), ¶¶ 172, 190).

-- Perform all the foregoing and upgrade its computerized information systems so that Nebraska can reach the compliance levels and reporting requirements of its federally approved Child and Family Services Plan (CFSP), (see 45 C.F.R. §§ 284.11, 1355.32-1355.33, and any program improvement plan (PIP), (45 C.F.R. § 1355.32 (b)(2) & 1355.35), and thereby secure federal funding, (filing 64 (Amended Complaint), ¶¶ 5(g), 175-179, 186, 196-197).

Assuming the plaintiffs request each of the foregoing types of relief, the question is whether a federal order granting such relief will interfere with the ongoing proceedings in the Nebraska juvenile courts. This determination, in turn, depends on the extent to which Nebraska juvenile court judges are already vested with oversight responsibility and authority to consider

the impact of the foregoing complaints with respect to each child and enter orders for the benefit of such children under their jurisdiction.

Nebraska law provides:

> [T]he Nebraska Juvenile Code . . . must be liberally construed to accomplish its purpose of serving the best interests of the juveniles who fall within it.  The juvenile court has broad discretion as to the disposition of those who fall within its jurisdiction. . . .  The basis for such power is the power of the State.  The State's jurisdiction arises out of the power that every sovereignty possesses as parens patriae to every child within its borders to determine the status and custody that will best meet its needs and wants.
>
> The juvenile court is a product of the solicitude of the law for the welfare of infants.  Its powers and duties are described more or less in detail in our statutes, and because of their humanitarian and benefi[cial] purpose, they should be liberally construed to the end that their manifest purpose may be effectuated to the fullest extent compatible with their terms.

In re Interest of R.A., 225 Neb. 157, 168, 403 N.W.2d 357, 365 (1987)(quoting In re McCauley, 178 Neb. 412, 415, 133 N.W.2d 921, 924 (1965)(internal citations and quotation marks omitted).

> [T]he foremost purpose and objective of the juvenile code is the protection of a juvenile's best interests, with preservation of the juvenile's familial relationship with his or her parents where the continuation of such parental relationship is proper under the law. . . .  Thus, the goal of juvenile proceedings is not to punish parents, but to protect children and promote their best interests.
>
> . . .

150

> The potential consequences of child protection
> proceedings range from an order requiring supervision
> of the child by a child protection agency, to leaving
> the child in the custody of the parents, to an order
> for the temporary or permanent removal of the child.

In re Corey P., 269 Neb. 925, 934, 697 N.W.2d 647, 655 (2005).

Consistent with their expansive scope of authority, juvenile court judges decide the appropriate placement for children in HHS custody. Nebraska statutory law requires HHS Protective Service Workers to prepare a court report and written case plan tailored to the child's individual needs and provide the report to the juvenile court and all other interested parties prior to any placement hearing or review hearing, (Neb. Rev. Stat. § 43-1311(1)).[43]   The regulations further require the caseworker to attend the court hearing and provide testimony as requested or oral recommendations as necessary. However, the juvenile court determines whether the HHS placement recommendations should be adopted. Interest of Crystal T., 7 Neb. App. 921, 925, 586 N.W.2d 479, 482 (Neb. App. 1998). See also filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 8-001.08 through 8-001.10 (HHS-003487, 003614-15). The juvenile court can decide to adopt the HHS recommendation, (see e.g. In re Interest of Brandon G. 2006 WL 1460399, *6 (Neb. App. 2006)), or modify or reject the recommendation sua sponte, (see e.g. In re Devin W., 270 Neb.

---

[43]HHS shall "[c]onduct or cause to be conducted an investigation of the child's circumstances designed to establish a safe and appropriate plan for the rehabilitation of the foster child and family unit or permanent placement of the child."  Neb. Rev. Stat. § 43-1311(1).  See also filing 73, ex. 7 (Nebraska Administrative Code-HHS), §§ 8-001.08, 8-001.10 (HHS-003487, 003615); filing 74, ex. 44 (Plaintiffs' Answers to Interrogatories), Nos. 25 & 26, pp. 35-36; filing 83, ex. 9 (Plaintiffs' Supplemental Answers to Interrogatories), Nos. 25 & 26, pp. 42-43).

640, 707 N.W.2d 758 (2005)(ordering out-of-home placement in
licensed foster care where state recommended placement in
physical care of the mother and father), and it must disapprove
the department's plan upon the request of "any other party,
including, but not limited to, the guardian ad litem, parents,
county attorney, or custodian [who] proves by a preponderance of
the evidence that the department's plan is not in the juvenile's
best interests."  Neb. Rev. Stat. § 43-285.

    The juvenile court's disposition order may permit the
adjudicated juvenile to remain in his or her home subject to
supervision, or it may commit the juvenile to (1) institutional
care, (2) inpatient or outpatient mental health treatment, (3)
the care of a reputable citizen of good moral character, (4) the
care of an accredited association dedicated to caring for and
obtaining homes for juveniles and willing to receive the
juvenile, (5) the care of a suitable family, or (6) the care and
custody of the Department of Health and Human Services.  Neb.
Rev. Stat. § 43-284.  If the juvenile court enters an order
directing the implementation of a plan different from the plan
prepared by HHS concerning the care, placement, or services to be
provided to the juvenile, the juvenile court's determination is
subject to review by the juvenile review panel.  Neb. Rev. Stat.
§ 43-287.03.  This request for review may be filed by HHS or any
other person who  believes the court's order is not in the best
interests of the juvenile, but it must be filed within 10 days
after the juvenile court entered its order.  Neb.Rev.Stat. §
43-287.04 (LEXIS 2005).  "The proper and exclusive forum for
review of a juvenile court's deviation from a case plan
recommended by the Department is a juvenile review panel, and a
failure to timely seek such review renders [an appellate] court

without jurisdiction to hear an appeal in the case." <u>Crystal T</u>.,
7 Neb. App. at 925, 586 N.W.2d at 482.[44]

   The initial determination must be reviewed at least every
six months by HHS, the Foster Care Review Board, and the juvenile
court.  Upon review, and based upon the information provided at
the hearing by not only HHS, but the board, the child's guardian
ad litem, the child's foster parent, or and any other person who
may provide information to the court, the juvenile court judge
must decide if the child's placement, care and permanency plan
should be modified or changed.  Neb. Rev. Stat. §§ 43-1307 to
43-1315.  "The court shall, when reviewing the foster care status
of a child, determine whether the individual physical,
psychological, and sociological needs of the child are being met.
The health and safety of the child are of paramount concern in
such review."  Neb. Rev. Stat. § 43-1316.

   The juvenile court "can order a juvenile under its
jurisdiction to receive medical, psychological, or psychiatric
study or treatment," with costs to be paid by the parent or
guardian of the juvenile or by HHS.  <u>In re Interest of J.T.B.</u>,
245 Neb. 624, 630-631, 514 N.W.2d 635, 639 (1994)(citing Neb.
Rev. Stat. § 43-290).

   The juvenile court has the jurisdictional authority to
determine whether parents or other family members should be

_____

      [44] The juvenile court does not have authority to order
specific placements of juvenile offenders and cannot enter
blanket orders prohibiting OJS from making any change in
placement without the court's approval.  <u>In re Interest of
Chelsey D</u>., 14 Neb. App. 392, 396, 707 N.W.2d 798, 801 (Neb. App.
2005).  However, the plaintiffs are 3(a) juveniles; they are not
in HHS-OJS custody.

allowed visitation with a 3(a) or 3(b) juvenile, (<u>In re Interest of Dylan W</u>., 8 Neb. App. 1039, 606 N.W.2d 847 (2000)(grandparent visitation), and whether parental visitation rights should be suspended.  See e.g. <u>In re Sarah T</u>., 2006 WL 1736280, *1 (Neb. App. 2006).

The juvenile court can order the degree of HHS supervision to be afforded a child in HHS legal custody, the number of visits to be made, the types of reports to be provided, and the requisite level of training and experience for an HHS caseworker assigned to a particular child's case.  <u>In re Crystal T</u>., supra., <u>In re Veronica H.</u>, 14 Neb. App. 316, 707 N.W.2d 29 (2005).  In <u>In re Crystal T</u>., the Nebraska Court of Appeals denied an HHS appeal and held that the juvenile court could modify an HHS recommended case plan and order HHS to make 10 to 12 unannounced visits to the home of the juvenile's mother between hours of 9:00 p.m. and 6:00 a.m. to ensure that the child was safe and the court's custodial orders were being followed.  Under the liberal authority granted to the juvenile court, a juvenile court judge may enter orders requiring HHS to remove a child's case manager and reassign the case to a trained and experienced caseworker. <u>In re Veronica H.</u>, 14 Neb. App. 316, 707 N.W.2d 29 (2005). "[T]he court, having determined the current team of caseworkers had not fulfilled its statutory obligation to report, simply ordered the removal and reassignment of an alternative team." <u>In re Veronica H</u>., 14 Neb. App. at 324-25, 707 N.W.2d at 35-36.  In affirming this ruling and denying HHS' appeal, the Nebraska Court of Appeals held:

> [T]hrough § 43-285(1), the Legislature gave juvenile
> courts the power to assent and dissent from the
> placement and other decisions of DHHS, as well as of
> other entities to whom the court might commit the care
> of a minor, and that the Legislature intended to remove

154

> DHHS' complete control of a minor whose care is given
> to DHHS under the Nebraska Juvenile Code.  Thus, we
> conclude that the Legislature, when it elected to add
> the phrase "by and with the assent of the court" to §
> 43-285(1), did in fact give juvenile courts the
> authority to issue orders such as that issued in the
> instant case.

In re Veronica H., 14 Neb.App. at 324, 707 N.W.2d at 35.

The juvenile court decides whether a child should be separated from his or her parents for protection, where the child should be placed, whether efforts to reunify should be attempted, the conditions and supervision required for such attempts, when and if parental rights should be terminated, whether the parents should be afforded an opportunity to complete a rehabilitation plan before such rights are terminated, and when or if a child should be released from HHS custody (other than by reaching adulthood).  All such orders are subject to appellate review by the Nebraska Court of Appeals and the Nebraska Supreme Court. See e.g. In re Eden K., 14 Neb. App. 867, 881-82 (2006)(reversing termination of parental rights where mother was making progress toward reunification); In re Corey P., 269 Neb. at 929, 697 N.W.2d at 651 (holding the Fourth Amendment was not violated by warrantless entries into the parental home by HHS personnel to determine compliance with court-imposed conditions for retaining physical custody of the children); In re Shelby L., 270 Neb. 150, 699 N.W.2d 392 (2005)(reversing juvenile court and Nebraska Court of Appeals determination that mother's parental rights should be terminated); In Interest of Boyles, 204 Neb. 546, 553-554, 283 N.W.2d 382, 387 (1979)(affirming termination of parental rights and holding the court correctly concluded that rehabilitative efforts would have served no useful purpose).

155

Based on the foregoing analysis, I conclude that injunctive orders by this court which attempt to impose parameters on HHS for determining where a child should be placed; if and how often a child should be moved to another placement; the child's length of stay in HHS custody; the methods employed and attention given to parental rights termination proceedings; the supervision of the children while in HHS custody; the level of training, experience, and workload capability of HHS caseworkers assigned to a child; the level of reporting provided to the court by HHS; the rights to visitation with family or former foster families; and the types of medical, dental, mental health, and behavioral treatment a child may need, would both directly and indirectly interfere with the plenary jurisdictional and decision-making authority of the Nebraska juvenile courts.  The injunctive relief ordered would give the federal district court an oversight role over Nebraska's child welfare program, and would give it direct control over decisions currently vested in the juvenile court. J.B., 186 F.3d at 1292.

> In this case, the plaintiffs are seeking relief that would interfere with the ongoing state dependency proceedings by placing decisions that are now in the hands of the state courts under the direction of the federal district court.  The declaratory judgment and injunction that they request would interfere with the state proceedings in numerous ways.  The federal and state courts could well differ, issuing conflicting orders about what is best for a particular plaintiff, such as whether a particular placement is safe or appropriate or whether sufficient efforts are being made to find an adoptive family.  The federal court relief might effectively require an amendment to a child's case plan that the state court would not have approved, and state law gives its courts the responsibility for deciding upon such an amendment. . . . . .  To say the least, taking the responsibility for a state's child dependency proceedings away from state courts and putting it under federal court control constitutes "federal court oversight of state court

156

> operations, even if not framed as direct review of
> state court judgments" that is problematic, calling for
> <u>Younger</u> abstention. . . . The relief that the
> plaintiffs seek would interfere extensively with the
> ongoing state proceedings for each plaintiff.

<u>31 Foster Children</u>, 329 F.3d at 1278-1279 (dismissing plaintiffs'
substantive and procedural due process claims, constitutional
claims for denial of family association, claims based on alleged
violations of the AACWA and EPSDT on the basis of <u>Younger</u>
abstention).  See also <u>J.B.</u>, 186 F.3d at 1291-92 (concluding
<u>Younger</u> abstention was required because the plaintiffs' federal
action would interfere with the proceedings of New Mexico's
Children's Court in that the federal court would, in effect,
assume an oversight role over the entire state program for
children with disabilities).

Citing <u>Kenny A</u>., the plaintiffs argue that their litigation
is directed at the HHS department, not the courts, and any
federal order would assist rather than interfere with the
juvenile court by imposing higher standards on HHS.  The Georgia
juvenile court system at issue in <u>Kenny A</u>. distinguishes that
case from this lawsuit.  As noted by <u>Kenny A</u>., "under Georgia
law, once the juvenile court grants legal custody of a child to
DFCS, the court is powerless to order DFCS to give physical
custody of the child to any particular foster parent or otherwise
restrict the actual placement of the child." <u>Kenny A</u>., 218
F.R.D. at 286 n. 6.  In <u>Kenny A</u>., the juvenile court's authority
over the state social service department was very limited, and
the federal court could arguably assist that juvenile court by
issuing orders against the state agency, orders that the juvenile
court itself was powerless to enter.  Such is not the case in
Nebraska.

157

Article V, § 27 of the Nebraska Constitution authorized the Nebraska legislature to "establish courts to be known as juvenile courts, with such jurisdiction and powers as the Legislature may provide." Ne. Const. Art. V, § 27.  Consistent with this authority, the legislature enacted Neb. Rev. Stat. § 43-285 which states:

> When the court awards a juvenile to the care of the Department of Health and Human Services, an association, or an individual in accordance with the Nebraska Juvenile Code, the juvenile shall, unless otherwise ordered, become a ward and be subject to the guardianship of the department, association, or individual to whose care he or she is committed.  Any such association and the department shall have authority, <u>by and with the assent of the court</u>, to determine the care, placement, medical services, psychiatric services, training, and expenditures on behalf of each juvenile committed to it.

Neb. Rev. Stat. § 43-285(1)(LEXIS 2005)(emphasis added). Accordingly, "[e]ven though any remedial order would run against the Department, state law makes it a duty of state courts to decide whether to approve a case plan, and to monitor the plan to ensure it is followed." <u>31 Foster Children</u>, 329 F.3d at 1279. Exercising federal court oversight over HHS' conduct on behalf of a child would serve to duplicate the authority already afforded to the Nebraska juvenile court by the Nebraska legislature. Federal court injunctive orders against HHS would undermine and interfere with the Nebraska juvenile court's ability to exercise the full extent of its authority over juvenile court proceedings.

4.   <u>The State Proceedings Provided the Federal Plaintiff</u>
<u>with an Adequate Opportunity to Raise the Federal</u>
<u>Claims</u>.

The plaintiffs in this case seek widespread reform of the
Nebraska's child welfare system, which is governed by a complex
system of state statutes and regulations and aimed at an
important state interest--the care and protection of children.
Federal lawsuits seeking orders to "fix" portions of the state's
integrated system raise substantial abstention issues.   As
stated by the United States Supreme Court in <u>Moore v. Sims</u>, 442
U.S. 415 (1979):

> The breadth of a challenge to a complex state statutory
> scheme has traditionally militated in favor of
> abstention, not against it.  This is evident in a
> number of distinct but related lines of abstention
> cases which, although articulated in different ways,
> reflect the same sensitivity to the primacy of the
> State in the interpretation of its own laws and the
> cost to our federal system of government inherent in
> federal-court interpretation and subsequent
> invalidation of parts of an integrated statutory
> framework.

<u>Moore</u>, 442 U.S. at 427.  However, "[t]he notions of comity
underlying <u>Younger</u> abstention do not compel federal courts to
refrain from hearing federal statutory and constitutional claims
when the pending state proceeding is an inadequate or
inappropriate forum for pursuing these claims." <u>LaShawn A. by</u>
<u>Moore v. Kelly</u>, 990 F.2d 1319, 1322 (D.C. Cir. 1993).

The pertinent issue is not whether the plaintiffs' claims
were raised in the pending state proceedings, but whether they
could have been raised.  That the plaintiffs' juvenile court
proceedings have not specifically addressed, for example,

159

insufficient supervision by HHS caseworkers is not the
determining factor.  "The question is whether that challenge can
be raised in the pending state proceedings subject to
conventional limits on justiciability."[45]  Moore, 442 U.S. at 425
(holding the district court should have abstained under Younger
from considering a constitutional challenge to portions of Texas'
statutory scheme for investigating suspected child abuse, though
not every issue, including whether its computerized system for
collecting and disseminating child-abuse information was
constitutional, had been raised in a state judicial proceeding).

      The plaintiffs bear the burden of proving that their
individual claims could not be adequately raised in Nebraska's
juvenile court.  J.B., 186 F.3d at 1292 (citing Pennzoil Co. v.
Texaco, Inc., 481 U.S. 1, 14-15 (1987); Moore, 442 U.S. at 432).
The plaintiffs must prove they could not have obtained a juvenile
court ruling protecting them from HHS' allegedly unlawful conduct
which caused them harm or the imminent risk of future harm,
either because the juvenile court had no jurisdiction to consider
the federal questions raised in this case, had no authority to
award a remedy, or because the plaintiffs lacked adequate
representation in that forum.

      Nebraska juvenile courts are courts of limited jurisdiction,
but as previously discussed, these courts have very broad power
to issue rulings for the protection and welfare of children.  The
plaintiffs appear to be arguing that the juvenile court lacks the

_____

      [45]On this issue, I note that the amended complaint does not
identify any plaintiff harmed by every alleged act of HHS
misconduct, and as to some of the claims, none of the plaintiffs
have alleged resulting harm.  For example, none of the plaintiffs
alleges he or she was personally harmed by HHS' use of an
outdated computer database system.

functional equivalent of federal question subject matter
jurisdiction--that it is not empowered to issue a ruling that HHS
violated or will likely violate the plaintiffs' rights under
federal constitutional or statutory law.

Claims challenging statutes as unconstitutional can be
raised in the Nebraska juvenile court.  In re Kantril P., 257
Neb. 450, 458, 598 N.W.2d 729, 737 (1999)(affirming the juvenile
court's denial of a motion to dismiss where the parent argued
that § 43-272.01(2) is unconstitutional and deprived her
constitutional right to due process of law).  A Nebraska
appellate court will not consider a constitutional question
arising in juvenile cases unless the question was properly
presented in the first instance to the juvenile court for
disposition.  In re Phyllisa B., 265 Neb. 53, 58, 654 N.W.2d 738,
742 (2002); In re Interest of Rachael M., 258 Neb. 250, 254-255,
603 N.W.2d 10, 14 (1999).

Moreover, the precise question is not whether a Nebraska
juvenile court can be called upon to issue a ruling declaring
that specific HHS policies violate the constitution or federal
law.  Rather, the plaintiffs must prove the juvenile courts
cannot adequately consider evidence of HHS' conduct or likely
future conduct toward the individual plaintiffs, determine if
such conduct violates their rights under federal constitutional
or statutory law, and enter orders protecting the plaintiffs from
HHS' allegedly unlawful conduct.  A "federal court should assume
that the state procedures will afford an adequate remedy, in the
absence of unambiguous authority to the contrary." Pennzoil Co.,
481 U.S. at 14.  The court "will not engage any presumption 'that
the state courts will not safeguard federal constitutional
rights.'"  Norwood, 409 F.3d at 904 (quoting Neal v. Wilson, 112

161

F.3d 351, 357 (8th Cir. 1997) (quoting <u>Middlesex County Ethics</u>
<u>Comm.</u>, 457 U.S. at 431)).  There is no evidence before this court
indicating that Nebraska's juvenile court judges are unaware of
or unable to interpret the federal statutory or constitutional
laws governing or impacting their rulings and procedures, nor to
the extent a party claims federal law was violated at the
juvenile court level, that appellate review is not available in
the Nebraska Court of Appeals or Supreme Court.

The plaintiffs argue that the juvenile court forum cannot
provide class-wide relief and therefore is not an adequate forum
for resolution of their claims.  I have concluded that a class
should not be certified.  Moreover, as the court held in <u>Joseph</u>
<u>A. ex rel. Corrine Wolfe v. Ingram</u>, 275 F.3d 1253, 1274 (10th
Cir. 2002), there is no persuasive authority holding "that a
party is entitled to avoid the effects of the <u>Younger</u> abstention
doctrine in cases where relief is available to individual
litigants in ongoing state proceedings but not to represented
parties in a class action."  <u>Joseph A.</u>, 275 F.3d at 1274.[46]

---

[46]Although the court in <u>Kenny A</u>. held that the Georgia
juvenile court could not afford an adequate forum for plaintiffs'
requested class-based relief, it reasoned that under Georgia law,
"[e]ven in individual cases, the juvenile court cannot order DFCS
to provide a particular placement for a child, develop new
placements, or enter orders regarding staff training, caseloads,
the creation of new resources or other issues affecting what
happens to children who come before it."  <u>Kenny A.</u>, 218 F.R.D. at
287.  <u>Brian A. ex rel. Brooks v. Sundquist</u>, 149 F. Supp. 2d 941,
957 (M.D. Tenn. 2000) held that "[a]lthough technically
Plaintiffs could raise constitutional questions in their
individual juvenile proceedings," the juvenile court was not a
"more appropriate vehicle" for litigating multifaceted requests
for broad-based, class-wide injunctive relief based on the
Constitution and federal and state law.  However, in <u>Brian A.</u>,
the plaintiffs alleged that although Tennessee had extensive
judicial and quasi-judicial procedures, the juvenile courts
failed to provide those procedures, failed to conduct

The Nebraska juvenile court can exercise substantial control over HHS for the protection of a child, can issue rulings governing HHS' conduct on behalf of that child, and can modify or reject HHS's recommendations regarding a child's care and placement while in HHS custody.  The plaintiffs each have a court-appointed guardian ad litem to assist in the juvenile court proceedings--an attorney and officer of the court statutorily obligated to act for the plaintiff and protect his or her interests.[47]   Neb. Rev. Stat. 43-272.

---

administrative or judicial reviews, and failed to conduct permanency hearings.  No such allegations have been raised in this case.

[47]Though not specifically raised as an issue in this case, the role of Nebraska guardians ad litem distinguishes Nebraska's system from Georgia's.  Kenny A. discussed the juvenile's lack of meaningful access to counsel as a basis for concluding juveniles in Georgia could not adequately raise federal claims in Georgia's juvenile forum.  However, each of the named plaintiffs in this case has a guardian ad litem appointed pursuant to Neb. Rev. Stat. § 272.  Such guardians ad litem are attorneys, and absent a conflict of interest, these attorneys act as both a guardian ad litem and an advocate for the child.  As explained in In re J.K., 265 Neb. 253, 257-258, 656 N.W.2d 253, 259 (2003):

> § 43-272(2) and (3) envisions a dual role for an attorney appointed under these subsections.  First, the attorney serves as guardian ad litem.  Generally, a guardian ad litem determines the best interests of the juvenile and reports that determination to the court. . . .  Under the Nebraska Juvenile Code, the guardian ad litem is given somewhat broader powers; he or she not only determines and reports to the court what is in the juvenile's best legal and social interests, but also advocates that position.  Neb. Rev. Stat. § 43-272.01. . . .  Second, an attorney appointed under § 43-272(2) and (3)) serves as counsel for the juvenile.  As counsel, an attorney is required to zealously advocate the wishes of the juvenile (as opposed to the best interests of the juvenile), as long as those wishes are within the bounds of the law. . . .

I conclude that as to each individual plaintiff, the issues
raised in this case could have been (or could be) adequately
raised before the juvenile court.  "Unless plaintiffs can adduce
specific evidence indicating that agency inaction has neutered
the Juvenile Court--an act which plaintiffs' pleadings fail to
accomplish--this court has no choice but to abstain under
Younger."  Laurie Q., 304 F. Supp. 2d at 1207 (interpreting
California's comparable juvenile court system and dismissing the
plaintiffs' AACWA case under Younger abstention).  See also 31
Foster Children, 329 F.3d at 1280-82 (holding New Mexico's
juvenile court provided an adequate forum where each plaintiff
was represented by counsel, no procedural constraints prevented
presentation of the claims, and the court was authorized to
consider the case plan, the appropriateness of placements, the
length of time in foster care, any special needs of the child,
and any issues of family visitation); J.B., 186 F.3d at 1292-93
(finding abstention under younger where the plaintiffs failed to
prove New Mexico Children's Court, which had "wide power" to
determine the needs and claims of children, lacked jurisdiction
or ability to adjudicate federal statutory and constitutional
claims during authorized periodic review proceedings).

I conclude that child welfare and protection is an important
state interest, the injunctive relief at issue in this case, if
granted, will interfere with the ongoing jurisdiction and
proceedings for each plaintiff in the Nebraska juvenile court,
and that court provides an adequate opportunity to raise the
federal claims asserted in this action.  I therefore recommend
that this case be dismissed on the basis of Younger abstention.

---

In re J.K., 265 Neb. at 257-258, 656 N.W.2d at 259 (internal case
and ethics code citations omitted).

III. <u>Rule 12(b)(6) Motion to Dismiss--No Private Right of
     Action</u>.

The defendants have moved to dismiss Counts II and III of
the plaintiffs' amended complaint:  Count II alleges a claim
based on based on the Adoption Assistance and Child Welfare Act
("AACWA"), and Count III seeks injunctive relief under the Early
and Periodic Screening, Diagnosis and Treatment program of the
federal Medicaid Act ("EPSDT").  The defendants claim these acts
contain no terms conferring benefits to individual persons, and
create no private right to recovery.  They therefore seek
dismissal under Rule 12(b)(6) of the Federal Rules of Civil
Procedure for failure to state a claim.  Filing 72 (Defendants'
Brief--Motion to Dismiss), pp. 57-66.

The plaintiffs argue that the AACWA imposes mandatory
criteria on Nebraska's foster care system in exchange for receipt
of federal funding.  They argue that the AACWA statutory and
regulatory scheme is not merely systemic in scope, but includes
rights-creating language and thereby affords a private right of
action under 42 U.S.C. § 1983 to those harmed by violations of
the AACWA.  Filing 88 (Plaintiffs' Brief--Motion to Dismiss), pp.
48-66.  The plaintiffs further claim that under binding Eighth
Circuit law, the plaintiffs can assert a right to recover under
the EPSDT.

The Supreme Court's decision in <u>Maine v. Thiboutot</u>, 448 U.S.
1 (1980), established that a § 1983 action can be pursued based
on "purely statutory" violations of federal law.  However,
relying on its previous findings in <u>Pennhurst State School and
Hospital v. Halderman</u>, 451 U.S. 1 (1981), and <u>Middlesex County
Sewerage Authority v. National Sea Clammers Assn</u>., 453 U.S. 1
(1981), the Court's decision in <u>Wright v. Roanoke Redevelopment &</u>

165

<u>Hous. Auth</u>., 479 U.S. 418, 423 (1987), clarified that since §
1983 speaks in terms of "rights, privileges, or immunities," not
mere violations of federal law, only "federal rights" are
enforceable under § 1983, and even if a right is created by
federal statute, plaintiffs cannot sue under § 1983 where
"Congress has foreclosed such enforcement of the statute in the
enactment itself." <u>Wright</u>, 479 U.S. at 423.

The defendants did not raise, and the parties have not
argued, that either the AACWA or the ESPDT contain language
evidencing Congress' intent to foreclose private enforcement.
<u>Wright</u>, 479 U.S. at 423.  The disputed issue is whether either
statute creates a federal right that can be enforced by the named
plaintiffs under 42 U.S.C. § 1983.  The parties' briefs also
present extensive arguments discussing the applicable standard
for determining if a federal statute and its accompanying
regulations create a private right of action.  Filing 72
(Defendants' Brief-Motion to Dismiss), pp. 57-61; filing 88
(Plaintiffs' Brief-Motion to Dismiss), pp. 48-50.

The Court in <u>Wilder v. Virginia Hosp. Ass'n</u>, 496 U.S. 498
(1990), summarized previous decisions and held that determining
whether a statute creates a "federal right" enforceable under §
1983 "turns on whether the provision in question was intend[ed]
to benefit the putative plaintiff. . . .  If so, the provision
creates an enforceable right unless it reflects merely a
congressional preference for a certain kind of conduct rather
than a binding obligation on the governmental unit, . . . or
unless the interest the plaintiff asserts is too vague and
amorphous such that it is beyond the competence of the judiciary
to enforce." <u>Wilder</u>, 496 U.S. at 510-511. <u>Wilder</u> held that
health care providers assert an enforceable right to reasonable

166

and adequate compensation rates based on an amendment to the
Medicaid Act.  The amendment required State plans to provide for
payment of services through the use of rates (determined in
accordance with methods and standards developed by the State)
which the State assured, to the satisfaction of the Secretary,
were reasonable and adequate.  The Court reasoned that the care
providers were intended beneficiaries of the amended statute.
"The provision establishes a system for reimbursement of
providers and is phrased in terms benefitting health care
providers." Wilder, 496 U.S. at 510.  The state plan was
mandatory in that states "must" "provide for payment. . . of
hospital[s]" according to rates the State finds are reasonable
and adequate," and receipt of federal funds was expressly
conditioned on reasonable and adequate state payments.  Wilder,
496 U.S. at 512.  Wilder further held that the obligation was not
"too vague and amorphous" to be judicially enforceable because
both the statute and accompanying regulations set out factors a
State was to consider in adopting its rates and the statute
provided the objective benchmark of an "efficiently and
economically operated facility."  Wilder, 496 U.S. at 519.

> While there may be a range of reasonable rates, there
> certainly are some rates outside that range that no
> State could ever find to be reasonable and adequate
> under the Act.  Although some knowledge of the hospital
> industry might be required to evaluate a State's
> findings with respect to the reasonableness of its
> rates, such an inquiry is well within the competence of
> the Judiciary.

Wilder, 496 U.S. at 519-20.

     In Blessing v. Freestone, 520 U.S. 329 (1997), the Court
further clarified the standard for determining whether a
particular statutory provision can give rise to a federal private

right of action.  The Court's three-part test, commonly known as
the "Blessing test," provided:

> First, Congress must have intended that the provision
> in question benefit the plaintiff. . . .  Second, the
> plaintiff must demonstrate that the right assertedly
> protected by the statute is not so "vague and
> amorphous" that its enforcement would strain judicial
> competence. . . .  Third, the statute must
> unambiguously impose a binding obligation on the
> States.  In other words, the provision giving rise to
> the asserted right must be couched in mandatory, rather
> than precatory, terms.

Blessing, 520 U.S. at 340 (citing Wright, 479 U.S. at 430-32;
Wilder, 496 U.S. at 510-511; Pennhurst, 451 U.S. at 17).


The Blessing test was re-examined by the Court in Gonzaga
University v. Doe, 536 U.S. 273 (2002).  The defendants in this
action argue that Gonzaga substantially limited the holdings of
Wilder and Blessing.  The plaintiffs argue Gonzaga simply re-
emphasized and explained the Blessing test.


In Gonzaga, the Supreme Court held that certain privacy
provisions of the Family Educational Rights and Privacy Act of
1974 ("FERPA") created no personal rights enforceable under 42
U.S.C. § 1983.  Gonzaga reiterated the Blessing test but noted
that since several courts disagreed on how those opinions should
be applied, the Court's prior opinions "may not be models of
clarity."  Gonzaga, 536 U.S. at 278.  The Court granted
certiorari "to resolve the conflict among the lower courts and in
the process resolve any ambiguity in [its] own opinions."
Gonzaga, 536 U.S. at 278.  Specifically, the Court noted that the
language in Blessing could be read to "suggest that something
less than an unambiguously conferred right is enforceable by §
1983."  Gonzaga, 536 U.S. at 282.  Blessing had been interpreted

168

by some courts "as allowing plaintiffs to enforce a statute under
§ 1983 so long as the plaintiff falls within the general zone of
interest that the statute is intended to protect; something less
than what is required for a statute to create rights enforceable
directly from the statute itself under an implied private right
of action." Gonzaga, 536 U.S. at 283. Gonzaga expressly
"reject[ed] the notion that [the Court's] cases permit anything
short of an unambiguously conferred right to support a cause of
action brought under § 1983." Gonzaga, 536 U.S. at 283. "[I]t
is rights, not the broader or vaguer 'benefits' or 'interests,'
that may be enforced under the authority of that section."
Gonzaga, 536 U.S. at 283.

Relying on the foregoing cases, the Eighth Circuit very
recently clarified the applicable three-part test for determining
whether Spending Clause legislation, such as the AACWA and the
EPSDT, creates a private right of action enforceable under 42
U.S.C. § 1983. Lankford v. Sherman, 451 F.3d 496 (8th Cir.
2006). In Lankford, the plaintiffs, who were disabled adult
Medicaid recipients, sought an injunction prohibiting the
Missouri Director of Social Services from enforcing a new state
regulation which curtailed providing durable medical equipment
("DME") to Medicaid recipients other than blind persons, pregnant
women, needy children, or those who receive home health care
services under the state plan. The plaintiffs sought to enjoin
enforcement of the Missouri regulation because it allegedly
violated federal comparability and reasonable-standards laws
requiring states to treat Medicaid recipients equally and with
reasonable, non-discriminatory standards. 42 U.S.C. §§
1396a(a)(10)(B), (a)(17).

169

Lankford held that the plaintiffs had no individualized federal right to reasonable Medicaid standards enforceable under 42 U.S.C. § 1983.  Lankford explained:

> For legislation enacted pursuant to Congress's spending power, like the Medicaid Act, a state's non-compliance typically does not create a private right of action for individual plaintiffs, but rather an action by the federal government to terminate federal matching funds. See Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 28, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).  While the Supreme Court has rarely found enforceable rights in spending clause legislation, it has not foreclosed the possibility that individual plaintiffs may sue to enforce compliance with such legislation.  See Wright v. City of Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 430, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (Federal Housing Act supports a cause of action under section 1983); Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 510, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (Medicaid providers had an individual right to reasonable reimbursement rates under the now-repealed Boren Amendment).  Still, the Court has since limited the circumstances where a private right of action is found under section 1983.  See Suter v. Artist M., 503 U.S. 347, 363, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992)(no private right of action under the Adoption Assistance and Child Welfare Act, which requires states to make "reasonable efforts" to keep children out of foster homes); Blessing v. Freestone, 520 U.S. 329, 344-45, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)(no private right of action under Title IV-D of the Social Security Act, which requires states to "substantially comply" with requirements designed to ensure timely payment of child support); Gonzaga, 536 U.S. at 290, 122 S.Ct. 2268 (no private right of action under the Family Educational Rights and Privacy Act, which prohibits federal funding of educational institutions that have a policy of releasing confidential records to unauthorized persons).

Lankford, 451 F.3d at 508.

Where, as in this case, the plaintiffs seek recovery under a statutory scheme as broad as Title IV-E and Title IV-B of the Social Security Act, the plaintiffs must identify with particularity the rights the claimed.  "Only when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights." <u>Blessing</u>, 520 U.S. at 342.  To determine whether specific Spending Clause legislation creates a private right of action enforceable under 42 U.S.C. § 1983, the court must consider whether:

> (1) Congress intended the statutory provision to benefit the plaintiff;
>
> (2) The asserted right is not so "vague and amorphous" that its enforcement would strain judicial competence; and
>
> (3) The provision clearly imposes a mandatory obligation upon the states.

<u>Lankford</u>, 451 F.3d at 508 (citing and affirming continued use of the <u>Blessing</u> test).  If so, it is presumably enforceable under § 1983.  This presumption is rebutted if Congress explicitly or implicitly forecloses section 1983 enforcement, but the availability of administrative mechanisms alone cannot defeat the plaintiffs' claim under § 1983 if the other requirements of the three-part test are met.  <u>Lankford</u>, 451 F.3d at 508 (citing <u>Blessing</u>, 520 U.S. at 341, 347).

A.   <u>The AACWA</u>.

The AACWA provides for federal reimbursement for certain expenses incurred by the states in administering foster care and

171

adoption services if the state satisfies the requirements of the
Act.  To participate in the program, a state must submit a plan
for approval by the Secretary of Health and Human Services which
includes severally statutorily imposed requirements.  The
plaintiffs herein claim their rights secured under some of these
statutorily imposed plan requirements--specifically, the
requirements of 42 U.S.C. §§ 622(b)(10)(B), 627(b)(2), 671(a)(1),
671(a)(10), 671(a)(11), 671(a)(15), 671(a)(16), 671(a)(19),
671(a)(22), 672, 675(1), 675(4), 675(5)(B), 675(5)(D), 675(5)(E),
and 45 C.F.R. Parts 1355-1357--have been and will continue to be
violated absent federal declaratory and injunctive relief.

    1.   <u>42 U.S.C. § 671(a)(15)</u>.

    The plaintiffs allege the defendants "are engaging in a
policy, pattern, practice, or custom of depriving Plaintiffs the
rights individually conferred upon them," including "the right of
each Plaintiff child to a timely written case plan containing
mandated elements, and to the implementation of this plan;. . .
the right of each Plaintiff child whose permanency goal is
adoption to planning and services to obtain a permanent
placement, including documentation of the steps taken to secure
permanency; [and] the right of each Plaintiff child to services
to facilitate that child's return to his family home or the
permanent placement of the child in an alternative permanent
home."  Filing 64 (Amended Complaint), ¶ 186.

    These allegations attempt to raise claims under 42 U.S.C. §
671(a)(15).  Section 671(a)(15) states that federally approved
state plans must include provide that:

    (A) in determining reasonable efforts to be made with
    respect to a child, as described in this paragraph, and

172

in making such reasonable efforts, the child's health and safety shall be the paramount concern;

(B) except as provided in subparagraph (D), reasonable efforts shall be made to preserve and reunify families--

    (i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and

    (ii) to make it possible for a child to safely return to the child's home;

(C) if continuation of reasonable efforts of the type described in subparagraph (B) is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan, and to complete whatever steps are necessary to finalize the permanent placement of the child;

(D) reasonable efforts of the type described in subparagraph (B) shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that--

    (i) the parent has subjected the child to aggravated circumstances (as defined in State law, which definition may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse);

    (ii) the parent has--

        (I) committed murder (which would have been an offense under section 1111(a) of Title 18, if the offense had occurred in the special maritime or territorial jurisdiction of the United States) of another child of the parent;

        (II) committed voluntary manslaughter (which would have been an offense under section 1112(a) of Title 18, if the offense had occurred in the special maritime or territorial jurisdiction of the United States) of another child of the parent;

173

(III) aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter; or

(IV) committed a felony assault that results in serious bodily injury to the child or another child of the parent; or

(iii) the parental rights of the parent to a sibling have been terminated involuntarily;

(E) if reasonable efforts of the type described in subparagraph (B) are not made with respect to a child as a result of a determination made by a court of competent jurisdiction in accordance with subparagraph (D)--

(i) a permanency hearing (as described in section 675(5)(C)) shall be held for the child within 30 days after the determination; and

(ii) reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan, and to complete whatever steps are necessary to finalize the permanent placement of the child; and

(F) reasonable efforts to place a child for adoption or with a legal guardian may be made concurrently with reasonable efforts of the type described in subparagraph (B).

42 U.S.C. § 671(a)(15)(A-E).

The Supreme Court has considered whether 42 U.S.C. § 671(a)(15) creates a private right of action enforceable under § 1983. In Suter v. Artist M., 503 U.S. at 359 (1992), a class of foster children[48] brought an action for injunctive relief

---

[48]The defendants in Suter did not object to class certification. Suter, 503 U.S. at 353. The opinion does not address whether a class should have been certified.

174

alleging the state violated § 671(a)(15) of the AACWA by failing
to make reasonable efforts to prevent removal of children from
their homes and facilitate reunification of families.  <u>Suter</u> held
that § 671(a)(15) did not create a private right of action
enforceable under § 671(a)(15).

The <u>Suter</u> opinion identifies at least three reasons for this
finding:

- The AACWA "places a requirement on the states, but that
  requirement only goes so far as to ensure that the
  State <u>have a plan</u> approved by the Secretary" which
  contains the requirements of the Act.  <u>Suter</u>, 503 U.S.
  at 358 (emphasis added).  The accompanying regulations
  also provided no notice that anything other than
  submitting a plan was required as a condition for
  receipt of federal funds.  <u>Suter</u>, 503 U.S. at 362.

- "[I]f Congress intends to impose a condition on the
  grant of federal moneys, it must do so unambiguously."
  <u>Suter</u>, 503 U.S. at 356.  However, neither § 671(a)(15)
  nor the regulations adopted pursuant to the AACWA
  provided specific, detailed guidance as to how the
  state's "reasonable efforts" were to be measured.  To
  the extent the statutes and regulations imposed a
  directive on the states, the meaning of that directive
  "obviously var[ied] with the circumstances of each
  individual case," and the decision of how to comply
  with the Act was left largely to the discretion of the
  State.  <u>Suter</u>, 503 U.S. at 359-360.

- While the Act does not include a comprehensive
  enforcement mechanism clearly indicating Congress'
  intent to foreclose remedies under § 1983, it
  nonetheless did permit the Secretary to impose
  consequences for the state's lack of "reasonable
  efforts" as required under § 671(a)(15).  The Secretary
  was permitted to reduce or eliminate payments to a
  State if the State's plan failed to comply, or the plan
  administration substantially failed to comply with §
  671(a).  Therefore, the Act could be enforced without
  resort to private claims under § 1983.  <u>Suter</u>, 503 U.S.
  at 360-361.

175

Accordingly, <u>Suter</u> held:

> Careful examination of the language relied upon by
> respondents, in the context of the entire Act, leads us
> to conclude that the "reasonable efforts" language does
> not unambiguously confer an enforceable right upon the
> Act's beneficiaries.  The term "reasonable efforts" in
> this context is at least as plausibly read to impose
> only a rather generalized duty on the State, to be
> enforced not by private individuals, but by the
> Secretary in the manner previously discussed.

<u>Suter</u>, 503 U.S. at 363.

Following <u>Suter</u>, courts grappled and disagreed over whether
<u>Suter</u> modified, effectively overruled, or imposed additional
requirements to the <u>Blessing</u> test for Spending Clause cases.
<u>Stowell v. Ives</u>, 976 F.2d 65, 69-70 (1st Cir. 1992)(<u>Suter</u> "held
that an intended recipient of programmatic benefits could not sue
under section 1983 if the federal statute merely required that
the State submit a plan to a federal agency satisfying certain
criteria, because such a 'requirement only goes so far as to
ensure that the State have a plan approved by the Secretary which
contains [the listed criteria].'"); <u>Marshall v. Switzer</u>, 10 F.3d
925, 929 (2d Cir. 1993)("[T]he significant point in <u>Suter</u> was not
that the statute in question only required a state to submit a
plan to the federal agency but that the statute provided no
guidance for measuring "reasonable efforts."); <u>White by White v.
Chambliss</u>, 112 F.3d 731, 739 (4th Cir. 1997)("<u>Suter</u> itself was
not a novel holding, but rather rested upon settled legal
principles with regard to private rights of action in the context
of the AACWA."); <u>Arkansas Medical Soc., Inc. v. Reynolds</u>, 6 F.3d
519, 525 (8th Cir. 1993)(holding <u>Suter</u> did not create an
analytical framework to replace or overrule previous Supreme
Court rulings, but it did place "great emphasis on the fact that

176

rights must be 'unambiguously' conferred to be enforceable," and "each statute must be examined on its own basis."); <u>Jeanine B</u>., 877 F. Supp. at 1282-83 (<u>Suter</u> "announced a new approach to federal funding statutes requiring plans, stating that the only private right arising from such statutes is a right to the plan itself, and not to the implementation of the plans' required provisions.").

In 1994, Congress enacted the following amendment, (often called the "<u>Suter</u> fix"), in response to the <u>Suter</u> decision.

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan.  This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in <u>Suter v. Artist M.</u>, 112 S.Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in <u>Suter v. Artist M</u>. that section 671(a)(15) of this title is not enforceable in a private right of action.

42 U.S.C.A. § 1320a-2.  The courts have not uniformly interpreted the meaning of § 1320a-2.  Compare <u>Brian A</u>., 149 F. Supp. 2d at 946 (reading the <u>Suter</u> fix as requiring lower courts to apply pre-<u>Suter</u> case law) and <u>Marisol A</u>., 929 F. Supp. 2d at 682 (same); <u>Jeanine B</u>. 877 F. Supp. at 1283 (holding the court must "rewind the clock" and look to cases prior to <u>Suter</u> to determine the enforceability of AASWA provisions other than § 671(a)(15)), with <u>Harris v. James</u>, 127 F.3d 993, 1002-03 (11th Cir. 1997)(holding § 1320a-2 does not requires application of pre-<u>Suter</u> case law); <u>White v. Chambliss</u>, 112 F.3d 731, 739 n.4

177

(4ᵗʰ Cir. 1997)(holding that § 1320a-2 had no effect at all on the application of <u>Suter</u> to future cases).

The confusion lies in the following statutory phrasing: "This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in <u>Suter v. Artist M.</u>, 112 S.Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability." The courts had not yet determined whether <u>Suter</u> actually announced a new principle of law, but were now statutorily required to disregard any new pronouncements made in <u>Suter</u>. However, of the three grounds identified in <u>Suter</u>, the potentially "new" criteria arose from <u>Suter</u>'s discussion of whether the provisions of a state plan could provide the basis for a federal private right of action when the statute itself (§ 671(a)(15)) merely required any federally approved plan to include certain provisions. <u>Suter</u>, 503 U.S. at 358.⁴⁹

Accordingly, most courts hold that if § 1320a-2 effectively overruled anything in <u>Suter</u>, it overruled only that portion of the opinion identifying and allowing a court to rely exclusively on the "state plan" criteria in determining the existence of a federal right. A provision of the Medicaid act cannot be "deemed unenforceable by an individual merely because the provision

---

⁴⁹In other words, must a private right of action arise from violating the statute itself, or can it arise from failing to <u>implement</u> the plan provisions that were required by statute? The analogous question is whether federal regulations adopted to implement a federal statute have the "force of law" sufficient to provide the basis for a federal private right of action. See the extensive discussion at <u>Harris v. James</u> 127 F.3d 993, 1005-10 (11ᵗʰ Cir. 1997).

contains state plan requirements." Watson v. Weeks  436 F.3d
1152, 1158 (9th Cir. 2006).  See also S.D. ex rel. Dickson v.
Hood, 391 F.3d 581, 603 (5th Cir. 2004); Harris v. James  127
F.3d 993, 1002 (11th Cir. 1997); Doe by Fein v. District of
Columbia, 93 F.3d 861, 876 n. 1 (D.C. Cir. 1996).  "The mere fact
that all the Medicaid laws are embedded within the requirements
for a state plan does not, by itself, make all of the Medicaid
provisions into ones stating a mere institutional policy or
practice rather than creating an individual right." Rio Grande
Community Health Center, Inc. v. Rullan, 397 F.3d 56, 74 (1st
Cir. 2005)(interpreting § 1320a-2).

      42 U.S.C.A. § 1320a-2 does not, however, alter Suter's
ultimate conclusion that § 671(a)(15) of the AACWA is not
enforceable in a private right of action.  First, the language of
the statute specifically states:  "[T]his section is not intended
to alter the holding in Suter v. Artist M. that section
671(a)(15) of this title is not enforceable in a private right of
action."

      Second, the primary, or at least the alternative basis for
the Suter ruling was the Court's determination that the AACWA
lacked specific, detailed guidance as to how the state's
"reasonable efforts" were to be measured.  Suter, 503 U.S. at
356-360.  Absent such information, the right is so "vague and
amorphous" that enforcement of the act would strain judicial
competence.  Wilder identified this independent basis for finding
no private right of action in 1990, two years before Suter, and
the criteria is now the second prong of the Blessing test.
Blessing, 520 U.S. at 340; Wilder, 496 U.S. at 510-511.  The
reasoning from Suter based on "prior Supreme Court decisions
respecting such enforceability" remains in effect under the

179

express language of 42 U.S.C.A. § 1320a-2.  Therefore, <u>Suter</u>'s
holding that § 671(a)(15) does not create a private enforceable
right under the second prong of the <u>Blessing</u> test was unaltered
by 42 U.S.C.A. § 1320a-2 and remains the law.  I therefore
conclude that to the extent the plaintiffs seek injunctive and
declaratory relief under 42 U.S.C. § 671(a)(15),[50]  no private
right of action exists, and the defendant's Rule 12(b)(6) motion
to dismiss should be granted.

        2.    <u>42 U.S.C. §§ 671(a)(1), 672, and 675(4)</u>.


        Under 42 U.S.C. § 671(a)(1), the state's federally approved
plan must provide "for foster care maintenance payments in
accordance with section 672 of this title and for adoption
assistance in accordance with section 673 of this title."
Section 672 outlines the eligibility requirements and
circumstances under which the state must pay foster care
maintenance payments.  "The term 'foster care maintenance

---

        [50]The plaintiffs' complaint alleges a listing of the AACWA
"rights" violated, and then string-cites the statutory references
at the end.  The language of the allegations does not mirror the
language of the statutes, yet the Supreme Court requires an
allegation-by-allegation and statute-by-statute analysis in
private right of action cases.
        This report and recommendation will attempt to correlate the
plaintiffs' allegations to the statutes at issue.  As previously
stated, § 671(a)(15) would appear to encompass the plaintiffs'
claim that the defendants have violated the "the right of each
Plaintiff child to a timely written case plan containing mandated
elements, and to the implementation of this plan; . . . the right
of each Plaintiff child whose permanency goal is adoption to
planning and services to obtain a permanent placement, including
documentation of the steps taken to secure permanency; [and] the
right of each Plaintiff child to services to facilitate that
child's return to his family home or the permanent placement of
the child in an alternative permanent home," (filing 64 (Amended
Complaint), ¶ 186).

payments' means payments to cover the cost of (and the cost of
providing) food, clothing, shelter, daily supervision, school
supplies, a child's personal incidentals, liability insurance
with respect to a child, and reasonable travel to the child's
home for visitation."  42 U.S.C. § 675(4)(A).

The plaintiffs' amended complaint alleges the defendants'
policies, practices and customs deprive the plaintiffs of their
right to have "foster care maintenance payments paid to the
foster parents or foster care providers with whom the child is
placed that cover the actual cost (and the cost of providing) the
Plaintiff child's food, clothing, shelter, daily supervision,
school supplies, reasonable travel to visitation with family, and
other expenses."  Filing 64 (Amended Complaint), ¶ 186.

Relying on Missouri Child Care Ass'n v. Martin, 241 F. Supp.
2d 1032 (W.D.Mo. 2003), the plaintiffs claim "Congress intended
Plaintiffs to have the right to foster care maintenance payments
(to be paid on their behalf to foster parents or foster care
providers with whom the child is placed). . . .  Filing 88
(Plaintiffs' Brief--Motion to Dismiss), p. 52.  Missouri Child
Care held that foster care institutional providers had an
enforceable right under § 672 to seek an order requiring the
defendants to determine a reimbursement rate for the costs of
care and services provided to foster children.  The court
reasoned that the reimbursement provisions of § 672 were intended
to benefit foster care institutions and such institutions had
standing to pursue the claims.

Missouri Child Care is not persuasive authority for
recognizing a private right of action on behalf of the named
plaintiffs.  Missouri Child Care held that the foster care

providers, not the foster children, can pursue a private claim to set foster care rates.  As noted by Missouri Child Care, in enacting § 672, "Congress would . . . have been aware that as a general proposition foster care institutions, not foster children, would be in a better position to enforce those rights, thereby ensuring the continued implementation of congressional intent."  Missouri Child Care, 241 F. Supp. 2d at 1041.

Foster children do not directly receive the benefit of a claim brought under § 672, and while adequate foster care maintenance payments may enhance the likelihood of increasing the available pool of foster parents, such indirect benefits do not support a private right of action in favor of the named plaintiffs.  See Blessing, 520 U.S. at 344-345 (holding that compliance with Title IV-D's detailed requirements for state data processing systems and staffing in exchange for federal funding of the state's child support payment collection system did not create a federal right enforceable against the state under § 1983).  The link between increased foster care maintenance payments and the services provided to any particular child "is far too tenuous" to support the notion that Congress meant to give each and every Nebraska juvenile in foster care a right to have foster care providers paid at a sufficient level.  See Blessing, 520 U.S. at 345.  For the purpose of determining if a federal private right of action exists, the named plaintiffs are not the intended beneficiaries of 42 U.S.C. §§ 671(a)(1), 672, and 674(4)(A).

Although Missouri Child Care held to the contrary, I also conclude the plaintiffs cannot assert a right to foster care maintenance payments under the second prong of the Blessing test.  Missouri Child Care held that the plaintiffs' claims were

182

indistinguishable from the type of claims asserted in Wilder.
Wilder held that under federal Medicaid statutes and regulations,
health care providers had an enforceable right to reimbursement
at "reasonable and adequate rates," but the statutes and
regulations under consideration in Wilder included specific
factors to be considered in determining the methods for
calculating rates.  Wilder, 496 U.S. at 519.  For example, Wilder
noted:

> [W]hen determining methods for calculating rates that
> are reasonably related to the costs of an efficient
> hospital, a State must consider:  (1) the unique
> situation (financial and otherwise) of a hospital that
> serves a disproportionate number of low income
> patients, (2) the statutory requirements for adequate
> care in a nursing home, and (3) the special situation
> of hospitals providing inpatient care when long-term
> care at a nursing home would be sufficient but is
> unavailable.

Wilder, 496 U.S. at 520 n. 17.  Suter, decided two years later,
noted that the specific statutory and regulatory methods for
calculating rates in Wilder supported finding a private right of
action for the health care providers.  However, no private right
of action existed in Suter because § 671(a)(15) and its
regulations provided no guidance as to how the "reasonable
efforts" required under § 671(a)(15) were to be measured.

    With respect to "foster care maintenance payments," neither
§ 672 nor the definition of that term in § 675(4)(A) provide any
language for discerning how rates should be set for paying foster
care providers the "cost" of caring for a foster child, and in
the case of institutional care, "the reasonable costs of
administration and operation of such institution as are
necessarily required" to care for a foster child."  42 U.S.C. §
675(4)(A).  The plaintiffs' brief cites to no regulations

183

governing the calculation of foster care maintenance payments.  I
therefore disagree with <u>Missouri Child Care</u>, and conclude that
like § 671(a)(15), and in accord with the analysis of <u>Suter</u>, the
plaintiffs' asserted right to foster care maintenance payments is
too "vague and amorphous" to support a federal right enforceable
under § 1983.  Compare <u>ASW v. Oregon</u>, 424 F.3d 970, 975-76 n.9
(9th Cir. 2005)(holding § 673 created an individual right to
adequate adoption assistance payments where the statute required
an individualized process with each family to determine the
amount by mutual agreement with the state which could be
readjusted only "with the concurrence of the adopting parents,
depending upon changes" in the circumstances.  "Unlike foster
care maintenance payments, codified in a standardized rate
schedule, § 673(a)(3) explicitly creates a right to
individualized payment determinations for adoption assistance
payments." <u>Id</u>. at 976 n. 9).

     The plaintiffs' claim under 42 U.S.C. §§ 671(a)(1), 672, and
674(4)(A) fails under both the first and second prongs of the
<u>Blessing</u> test.  These claims should be dismissed under Rule
12(6)(6).

     3.   <u>42 U.S.C. § 671(a)(10) and (11)</u>.

     42 U.S.C. § 671(a)(10) requires federally approved state
plans to provide for the "establishment or designation of a State
authority or authorities which shall be responsible for
establishing and maintaining standards for foster family homes
and child care institutions which are reasonably in accord with
recommended standards of national organizations concerned with
standards for such institutions or homes," and to provide that
"the standards so established shall be applied by the State to

184

any foster family home or child care institution receiving funds.
. . . ."  42 U.S.C. § 671(a)(11) requires periodic review of these
standards.  The plaintiffs' amended complaint alleges the
defendants violate and continue to violate their right "to
placement in a family foster home or institutional placement that
is licensed, re-licensed and operated in conformity with national
standards."  Filing 64 (Amended Complaint), ¶ 186.

Section § 671(a)(10) does not create an individual federal
right enforceable under § 1983.  <u>White by White v. Chambliss</u>, 112
F.3d 731, 739 (4th Cir. 1997).

> The requirement that a state's plan be "reasonably in
> accord with recommended standards of national
> organizations," is no more specific than section
> 671(a)(15)'s "reasonable efforts" requirement.
> Furthermore, the AACWA provides no "statutory guidance"
> to clarify the meaning of the requirements of
> 671(a)(10).  Lastly, section 671(a)(10) is enforceable
> through the same alternative enforcement mechanism
> provided for section 671(a)(15).  As the Supreme Court
> noted in <u>Suter</u>, "[t]he Secretary [of Health and Human
> Services] has the authority to reduce or eliminate
> payments to a State on finding that the State's plan no
> longer complies with § 671(a) or that 'there is a
> substantial failure' in the administration of a plan
> such that the State is not complying with its own
> plan." . . .  <u>Suter</u> thus forecloses the argument that
> section 671(a)(10) of the AACWA provides the source for
> an enforceable right through section 1983.

<u>White</u>, 112 F.3d at 739.  See also <u>Yvonne L., By and Through Lewis</u>
<u>v. New Mexico Dept. of Human Services</u>, 959 F.2d 883, 889 (10th
Cir. 1992)(holding § 671(a)(10)'s reference to "standards of
national organizations concerned with standards for such
institutions or [foster] homes,". . ."is the type of vague and
amorphous language identified in <u>Wilder</u>, 110 S.Ct. at 2517, and
<u>Wright</u>, 479 U.S. at 431-32, 107 S.Ct. at 774-75, that cannot be

185

judicially enforced."); <u>Olivia Y</u>., 351 F. Supp. 2d at 563
(holding § 671(a)(10) does not create a federal right enforceable
under § 1983); <u>Charlie H. v. Whitman</u>, 83 F. Supp. 2d 476, 491
(D.N.J. 2000)("42 U.S.C. § 671(a)(10) is too vague and
amorphous under the <u>Blessing</u> test to be enforced pursuant §
1983."); <u>Whitley v. New Mexico Children, Youth & Families Dept</u>.
184 F. Supp. 2d 1146, 1165 (D.N.M. 2001)("[T]he language of §
671(a)(10). . . [is] too vague and amorphous to support a cause
of action under § 1983."); <u>Del A. v. Roemer</u>, 777 F. Supp. 1297,
1310 (E.D.La. 1991)(§ 671(10)'s "provision requiring placement in
foster homes and institutions that are 'reasonably in accord
with' national standards is vague and unenforceable.").

The plaintiffs' claim under 42 U.S.C. §§ 671(a)(10) and (11)
fails under the second prong of the <u>Blessing</u> test, and should be
dismissed under Rule 12(6)(6).

4.   <u>42 U.S.C. § 671(a)(22)</u>.

Section 671(a)(22) requires the State to develop and
implement standards to ensure that children in foster care
placements are provided "quality services that protect the safety
and health of the children."  The plaintiffs allege the
defendants' policies and practices violate the "right of each
Plaintiff child to services that protect the child's safety and
health."  Filing 64 (Amended Complaint), ¶ 186.

Section 671(a)(22) contains no definition or criteria for
determining whether the state is providing "quality services" to
the child.  The language of § 671(a)(10) is too vague and
amorphous to support a cause of action under § 1983.  <u>Whitley</u>,

186

184 F. Supp. 2d at 1164-65.  Plaintiffs' claim under § 671(a)(22) should be dismissed under Rule 12(b)(6).

     5.   <u>42 U.S.C. §§ 622(b)(10)(B), 671(a)(16), 675(1), and 675(5)(B, (D), and (E)</u>.

42 U.S.C. § 671(a)(16) requires that all federally approved state plans provide "for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provide[] for a case review system which meets the requirements described in section 675(5)(B) of this title with respect to each such child."  The term "case plan" means a written document which includes:

    (A)  a description of the type of home or institution in which a child is to be placed and the reasons for that decision;

    (B)  a plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents;

    (C)  to the extent available and accessible, the health and education records of the child;

    (D)  where appropriate, for a child age 16 or over, a written description of the programs and services which will help such child prepare for the transition from foster care to independent living; and

    (E)  in the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find an adoptive family or other permanent living arrangement for the child, to place the child with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship.

187

42 U.S.C. § 675(1).  Section 675(5) defines "case review system,"
and § 675(5)(B), the only portion of § 675(5) incorporated into §
671(a)(16), requires that the system include a procedure assuring
that:

> [T]he status of each child is reviewed periodically but
> no less frequently than once every six months by either
> a court or by administrative review (as defined in
> paragraph (6)) in order to determine the safety of the
> child[,] the continuing necessity for and
> appropriateness of the placement, the extent of
> compliance with the case plan, and the extent of
> progress which has been made toward alleviating or
> mitigating the causes necessitating placement in foster
> care, and to project a likely date by which the child
> may be returned to and safely maintained in the home or
> placed for adoption or legal guardianship.

42 U.S.C.A. § 675(5)(B).  Sections 675 (1) and (5)(B) are
definitional in nature--"they alone cannot and do not supply a
basis for conferring rights enforceable under § 1983."  31 Foster
Children, 329 F.3d at 1271.

   42 U.S.C. 622(b)(10)(B) requires that every plan for child
welfare services must "provide assurances" that the state "is
operating, to the satisfaction of the Secretary:"

> (i) a statewide information system from which can be
> readily determined the status, demographic
> characteristics, location, and goals for the placement
> of every child who is (or, within the immediately
> preceding 12 months, has been) in foster care;
>
> (ii) a case review system (as defined in section 675(5)
> of this title) for each child receiving foster care
> under the supervision of the State;
>
> (iii) a service program designed to help children--
>
> > (I) where safe and appropriate, return to families
> > from which they have been removed; or

(II) be placed for adoption, with a legal
guardian, or, if adoption or legal guardianship is
determined not to be appropriate for a child, in
some other planned, permanent living arrangement;
and

(iv) a preplacement preventive services program
designed to help children at risk of foster care
placement remain safely with their families.

42 U.S.C. § 622(b)(10)(B).[51]  42 U.S.C. § 675(5)(D) requires that
all case review plans include a procedure assuring that a child's
health and education record is reviewed, updated, and supplied to
the child's foster parent or foster care provider at the time of
each placement.  42 U.S.C. § 675(5)(E) requires case review plans
to include procedures which acknowledge that in the absence of a
compelling reason, a relative placement, or the potential for
reunification, petitions to terminate parental rights must be
filed under certain circumstances and within certain time frames.

Considered in combination, 42 U.S.C. §§ 622(b)(10)(B),
671(a)(16), 675(1), and 675(5)(B, (D), and (E) cover nearly every
allegation of the plaintiffs' AACWA claim including:

[T]he right of each Plaintiff child to a timely written
case plan containing mandated elements, and to the
implementation of this plan; the right of each
Plaintiff child to have a petition to terminate
parental rights filed, or have a compelling reason
documented why such a petition has not been filed, in
accordance with specified, statutory standards and time
frames; the right of each Plaintiff child whose
permanency goal is adoption to planning and services to

_____

[51]Though specifically identified in the plaintiffs'
complaint, 42 U.S.C. 627(b)(2), the predecessor of §
622(b)(10)(B), was repealed and became unenforceable before any
named plaintiff entered HHS legal custody.

189

obtain a permanent placement, including documentation
of the steps taken to secure permanency; the right of
each Plaintiff child to services to facilitate that
child's return to his family home or the permanent
placement of the child in an alternative permanent
home;. . . the right of each Plaintiff child to
services that protect the child's safety and health;
the right of each Plaintiff child to have health
records reviewed, updated, and supplied to foster
parents or other foster care providers with whom the
child is placed at the time of placement; . . . and in
the case of a Plaintiff child who has reached 16 years
of age, the right to services needed to help the child
prepare for the transition from foster care to
independent living.

Filing 64 (Amended Complaint), ¶ 186.


     The language of 42 U.S.C. § 622(b)(10)(B)(ii) provides that

each plan for child welfare services under 42 U.S.C. § 622(a)

must include assurances that the state is operating a case review

system to the "satisfaction of the Secretary."  "Clearly, this

Court does not sit to oversee [Nebraska's] child welfare system

to determine whether certain components of the system are

"operating, to the satisfaction of the Secretary." Charlie H.,

83 F. Supp. 2d at 485.  See also Olivia Y., 351 F. Supp. 2d at

564.  Further, regardless of the detailed nature of the

definitions of "case plan" and "case review system" set forth in

42 U.S.C. § 675, "the statutory provisions relied upon by

Plaintiffs in support of their alleged right 'to timely written

case plans that contain mandate elements and to the

implementation and review of these plans' are not so unambiguous

so as to confer upon Plaintiffs a right enforceable under §

1983." Charlie H. v. Whitman, 83 F. Supp. 2d 476, 489 (D.N.J.

2000).  See also Olivia Y., 351 F. Supp. 2d at 564 (holding the

plaintiffs had no enforceable rights under § 675, alone or in

conjunction with either § 671(a)(16) or § 622(b)(10)(B)(ii)).

Moreover, the plaintiffs' claims under §§ 671(a)(16 and 622 fail the first prong of the <u>Blessing</u> test.  Under 42 U.S.C. § 1320a-2, the Secretary "in consultation with the State agencies administering the State programs . . . shall promulgate regulations for the review of such programs to determine whether [they] are in substantial conformity with-- (1) State plan requirements under such parts B and E, (2) implementing regulations promulgated by the Secretary, and (3) the relevant approved State plans."  42 U.S.C. § 1320a-2.  Section 1320a-2 requires the regulations to specify a timetable for conformity reviews of State programs, including when the initial review will occur, when any follow up review will occur if the state program is not in substantial conformity, and the schedule for less frequent reviews if the state program is in substantial conformity.  The regulations must address the criteria used to measure conformity, and the withholding of federal funds when a state program does not substantially conform.  42 U.S.C. § 1320a-2 (1-4).

Federal statutes requiring operation of a program in "substantial compliance" with federal law are not intended to benefit individuals, and cannot create federal rights.  <u>Blessing</u>, 520 U.S. at 343.  <u>Blessing</u> held that a provision in Title IV-D of the Social Security Act which required a state receiving federal child-welfare funds to "operate its child support program in 'substantial compliance' with Title IV-D was not intended to benefit individual children and custodial parents, and therefore [did] not constitute a federal right."  <u>Blessing</u>, 520 U.S. at 343.

> T]he requirement that a State operate its child
> support program in "substantial compliance" with Title
> IV-D was not intended to benefit individual children
> and custodial parents, and therefore it does not

191

> constitute a federal right.  Far from creating an
> individual entitlement to services, the standard is
> simply a yardstick for the Secretary to measure the
> systemwide performance of a State's Title IV-D program.
> Thus, the Secretary must look to the aggregate services
> provided by the State, not to whether the needs of any
> particular person have been satisfied.

Blessing, 520 U.S. at 343.  Based on that determination, the
Secretary can increase the frequency of audits and reduce
the state's federal grant to induce or improve the state's
systemwide performance level, both of which are reasonable means
for enforcing a Spending Clause statutory scheme.  Blessing, 520
U.S. at 343-44.

Though the case plans and reviews contemplated under §§ 622
and 671(a)(16) are specific to each child, Congress expects the
states to "substantially comply" with these statutes in exchange
for federal funds.  42 U.S.C. §§  622(b)(10)(B), 671(a)(16),
675(1), and 675(5)(B, (D), and (E) have an "aggregate" focus.
They are not concerned with "whether the needs of any particular
person have been satisfied," and they cannot "give rise to
individual rights."  Gonzaga, 536 U.S. at 288-289.  Where the
federal statute focuses on the aggregate practices of the states
in establishing reasonable Medicaid services and not on
individual entitlement to medical services, the first requirement
of the Blessing test is not met.  Lankford, 451 F.3d at 509.

Plaintiffs' claim under 42 U.S.C. §§  622(b)(10)(B),
671(a)(16), 675(1), and 675(5)(B, (D), and (E) should be
dismissed under Rule 12(b)(6).

192

    6.   <u>42 U.S.C. § 671(a)(19)</u>.

    42 U.S.C. § 671(a)(19) requires that all federally approved state plans provide "that the State shall consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards." 42 U.S.C. § 671(a)(19).  The plaintiffs' AACWA claim raises no allegations related to this statutory language, and § 671(a)(19) is not addressed in their brief.  I shall therefore shall recommend that defendants' 12(b)(6) motion to dismiss plaintiffs' § 671(a)(19) claim be granted.

    B.   <u>EPSDT</u>.

    The plaintiffs claim a right to injunctive and declaratory relief based on 42 U.S.C. §§ 1396, 1396a, 1396d(a), 1396d(r), 1396n(c); and 42 C.F.R. Parts 420-421.  Filing 64 (Amended Complaint), ¶ 188.  Under these statutes, collectively referred to as the Early and Periodic Screening, Diagnosis and Treatment program of the federal Medicaid Act, Medicaid eligible children are to receive "diagnostic, screening, preventive, and rehabilitative services, including any medical or remedial services . . . recommended by a physician or other licensed practitioner of the healing arts within the scope of their practice under State law, for the maximum reduction of physical or mental disability and restoration of an individual to the best possible functional level."  42 U.S.C. § 1396d(a)(13).

    The plaintiffs allege the State violates the EPSDT by failing to assure each child receives periodic, timely, and appropriate vaccinations and boosters, lead blood tests, and

193

physical, mental, dental, and eye examinations, screenings, and treatments; and failing to provide each child with diagnostic, screening, preventive, and rehabilitative services for maximum reduction of physical and mental disabilities and restoration to the best possible functional level.  Filing 42 (Report of Parties' Planning Conference), pp. 7-8 (Claim III).  See also filing 64 (Amended Complaint), ¶¶ 187-88.

The defendants have raised the issue, but readily acknowledge the Eighth Circuit has recently held that rights conferred under the EPSDT are clearly established federal rights which can be enforced under 42 U.S.C. § 1983.  Pediatric Specialty Care, Inc. v. Arkansas Dept. of Human Services, 443 F.3d 1005, 1016 (8th Cir. 2006).  The defendants' Rule 12(b)(6) motion to dismiss the plaintiffs' ESPDT claim should be denied.

RECOMMENDATION

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b) that:

a.  The plaintiffs' motion for class certification, filing 11, be denied;

b.  The claims of plaintiffs, Cheryl H. and Paulette V. be dismissed as moot;

c.  The defendants' motion to dismiss, filing 70, be granted in part and denied in part as follows:

   i.  That the motion to dismiss the claims of Carson P., Danielle D., Jacob P., Bobbi W., and Hannah A. for lack of Article III standing be denied;

194

    ii.   The motion to dismiss the claims of Carson P.,
Danielle D., Jacob P., Bobbi W., and Hannah A.,
for lack of prudential standing because their
self-appointed next friends, Crystal Foreman,
Jodell Bruns, Sara Jensen, Micheline Creager, and
Vanessa Nkwocha, are not capable and adequate next
friends be held in abeyance pending a final ruling
on the remainder of defendants' motion to dismiss;

    iii.  The defendants' motion to dismiss on the basis of
<u>Rooker-Feldman</u> abstention be denied;

    iv.   The defendants' motion to dismiss on the basis of
<u>Younger</u> abstention be granted;

    v.    The defendants' Rule 12(b)(6) motion to dismiss
the plaintiffs' claims based on the federal
Adoption Assistance and Child Welfare Act
("AACWA") be granted;

    vi.   The defendants' Rule 12(b)(6) motion to dismiss
the plaintiffs' claims based on the Early and
Periodic Screening, Diagnosis and Treatment
program of the federal Medicaid Act ("EPSDT") be
denied.

The parties are notified that a failure to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

Dated this 16th Day of August, 2006.

BY THE COURT:

s/ *David L. Piester*
_____
David L. Piester
United States Magistrate Judge

195