## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEBRASKA

| | |
|---|---|
| CARSON P., by his next friend Crystal Foreman; DANIELLE D., by her next friend, Jodell Bruns; and JACOB P., by his next friend, Sara Jensen; BOBBI W., by her next friend, Micheline Creager; and HANNAH A., by her next friend, Vanessa Nkwocha, on their own and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>DAVE HEINEMAN, as Governor of the State of Nebraska; CHRISTINE PETERSON, as acting Director of Services, Nebraska Department of Health and Human Services; JOANN SCHAEFER, as the Director of Regulation and Licensure, Nebraska Department of Health and Human Services; RICHARD NELSON, as the Director of Finance and Support, Nebraska Department of Health and Human Services; DENNIS LOOSE, as the Chief Deputy Director, Nebraska Department of Health and Human Services; and TODD RECKLING, as the Administrator of the Department of Health and Human Services' Office of Protection and Safety,<br><br>          Defendants. | )<br>)<br>)  Case No. 4:05CV3241 (RK)(DP)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF STATEMENT OF
## OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

# TABLE OF CONTENTS

Page No.

Table of Authorities ........................................................................................... iv

Preliminary Statement ......................................................................................... 1

Argument ............................................................................................................. 4

I.   The Court Should Certify Plaintiffs as a Class Pursuant to Fed. R. Civ. P. 23 ................... 4

    A.   Rule 23 Does Not Contain an Exhaustion Requirement ........................................... 4

    B.   The Proposed Class Is Narrowly Defined and Cohesive ......................................... 5

    C.   Commonality and Typicality Are Satisfied Here as All Putative Plaintiff
        Class Members Are Being Subjected to Similar Custodial Risks of Harm ............ 6

II.   *Younger* Abstention Should Not Bar Plaintiffs from Seeking to Enforce
    Their Federal Constitutional and Statutory Rights in Federal District Court ................... 11

    A.   Federal Law Establishes That Nebraska HHS Is Responsible for
        Ensuring a System That Has the Capacity to Meet All Children's
        Basic Needs ......................................................................................... 12

    B.   Numerous Forms of Relief Available in This Action Would Only
        Enhance, and Not in Any Respect Interfere With, Any Ongoing
        Juvenile Court Proceedings .................................................................... 15

        1.   An Order Requiring HHS to Remedy Its Chronic Placement
            Shortage ..................................................................................... 15

        2.   An Order Directing HHS to License, Screen and Otherwise
            Supervise Foster Placements, Limit Caseloads, and Increase
            Caseworker Training .................................................................... 17

        3.   An Order Directing HHS to Ensure Class Members Receive
            Medical Evaluations .................................................................... 19

    C.   Plaintiffs Have No "Adequate Opportunity" to Seek Redress for
        Their Federal Claims in Juvenile Courts ................................................... 20

    D.   The Cases Cited By Defendants Are Readily Distinguishable ............................... 22

III.   The Next Friends Are Adequate Representatives for the Named Plaintiffs ...................... 25

ii

IV.   As the R&R Correctly Determined, Plaintiffs Have Properly Alleged
      Article III Standing ............................................................................................................27

V.    Plaintiffs Have an Enforceable Federal Statutory Right to Foster Care
      Maintenance Payments That Cover the Actual Cost of Their Care....................................31

Conclusion .......................................................................................................................................34

# TABLE OF AUTHORITIES

## Supreme Court Decisions

*Allen v. McCurry,* 449 U.S. 90 (1980)...........................................................................................22

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997)....................................................................6

*Blessing v. Freestone,* 520 U.S. 329 (1997) ..................................................................................32

*Cannon v. Univ. of Chicago,* 441 U.S. 677 (1979) ........................................................................32

*General Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147 (1982) ) ..........................................................5

*Gonzaga Univ. v. Doe,* 536 U.S. 273 (2002) .................................................................................32

*Huffman v. Pursue, Ltd.,* 420 U.S. 592 (1975) ......................................................................... 15-16

*Monell v. Dept. of Soc. Serv.,* 436 U.S. 658 (1978)........................................................................22

*Monroe v. Pape,* 365 U.S. 167 (1961) ...........................................................................................21

*Moore v. Simms,* 442 U.S. 415 (1979) ...........................................................................................24

*O'Shea v. Littleton,* 414 U.S. 488 (1974) ......................................................................................24

*Pennhurst Sate Sch. & Hosp. v. Halderman,* 451 U.S. 1 (1981) ....................................................13

*Suter v. Artist M.,* 503 U.S. 347 (1992) ....................................................................................7, 13

*Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498 (1990) ...........................................................................33

*Youngberg v. Romeo,* 457 U.S. 307 (1982) ................................................................................5, 12

## Other Federal Cases

*31 Foster Children v. Bush,* 329 F.3d 1255 (11th Cir. 2003).............................................14, 21, 24

*Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48 (3d Cir. 1994) .................................................5, 7, 9

*B.H. v. Johnson,* 715 F. Supp. 1387 (N.D. Ill. 1989).......................................................................7

*Caldwell v. Camp,* 594 F.2d 705 (8th Cir. 1979)...........................................................................16

*Caroline C. ex rel. Carter v. Johnson,* 174 F.R.D. 452 (D. Neb. 1996)...........................................6

*Charlie H. v. Whitman,* Civil Action No. 99-3678 (D.N.J. Mar. 7, 2002) .......................................7

*Christina A. ex rel. Jennifer A. v. Bloomberg*, 197 F.R.D. 664 (D.S.D. 2000) ................................9

*Donaldson v. Pillsbury Co.*, 554 F.2d 825 (8th Cir. 1977)................................................................7

*Elizabeth M. v. Montenez*, 458 F.3d 779 (8th Cir. 2006)......................................................5, 8, 9-10

*Executive Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783 (6th Cir. 2004)......................15

*Gardner v. First Am. Title Ins. Co.*, 294 F.3d 991 (8th Cir. 2002)..................................................29

*G.L. ex rel. Shull v. Zumwalt*, 564 F. Supp. 1030 (W.D. Mo. 1983) ...............................................7

*Greening v. Moran*, 953 F.2d 301 (7th Cir. 1992).....................................................................22, 23

*Grovatt v. St. Jude Medical, Inc. (In re St. Jude Medical, Inc.)*, 425 F.3d 1116 (8th Cir. 2005)....5

*Hammes v. AAMCO Transmissions, Inc.* 33 F.3d 774 (7th Cir. 1994)...........................................29

*Holmes v. Cont'l Can. Co.*, 706 F.2d 1144 (11th Cir. 1983)............................................................5

*Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1273 (10th Cir. 2002).........................................18, 23

*J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280 (10th Cir. 1999).......................................7, 8, 14, 23

*Jeanine B. ex rel. Blondis v. Thompson*, 877 F. Supp. 1268 (E.D. Wis. 1995)...............................7

*Jensen v. Clarke*, 94 F.3d 1191, 1198-1200 (8th Cir. 1996)...............................................9, 10, 11

*Kenny A. ex rel. Winn v. Purdue*, 218 F.R.D. 277 (N.D. Ga. 2003).................................................7

*LaShawn A. ex rel. Moore v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993).......................................10, 21

*LaShawn A. v. Dixon*, 762 F. Supp. 959 (D.D.C. 1991)............................................................7, 10

*Laurie Q v. Contra Costa County*, 304 F. Supp. 2d. 1185 (N.D. Cal. 2004) .................................23

*L.J. ex rel. Darr v. Massinga*, 838 F.2d 118 (4th Cir. 1988).....................................................10, 11

*L.J. ex rel. Darr v. Massinga*, 699 F. Supp. 508 (D. Md. 1988)........................................................7

*Lynch v. Dukakis*, 719 F.2d 504 (1st Cir. 1983) ...............................................................................7

*Marisol A. ex rel. Forbes v. Giuliani*, 126 F.3d 372 (2d Cir. 1997).........................................7, 12

*Marisol A. ex rel. Forbes v. Giuliani*, 929 F. Supp. 662 (S.D.N.Y. 1996).....................................12

*Missouri Child Care Ass'n v. Cross*, 294 F.3d 1034 (8th Cir. 2002) ..............................................13

*Missouri Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032 (W.D. Mo. 2003) ............................33

*Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289 (8th Cir. 1993) ...................................12

*Olivia Y. v. Barbour*, Civil Action No. 3:04CV251LN (S.D. Miss. Mar. 11, 2005) .......................7

*Parkerson v. Carrouth*, 782 F.2d 1449 (8th Cir. 1985) ...................................................................22

*Paxton v. Union Nat'l Bank*, 688 F.2d. 552 (8th Cir. 1982) ......................................................... 5-6

*Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 443 F.3d 1005 (8th Cir. 2006).....32

*Reinholdson v. Minnesota*, No. CIV, 02-795, 2002 WL 31026580, (D. Minn. Sept. 9, 2002) ...6, 8

*T.W. ex rel. Enk  v. Brophy*, 124 F.3d 893 (7th Cir. 1997) .............................................................26

*Wilder v. Bernstein*, 499 F. Supp. 980 (S.D.N.Y. 1980) ...................................................................7

## State Cases

*In re Interest of Brittany S.*, 12 Neb. App. 208 (Neb. App. 2003) ..................................................27

*State v. Arnoldo T. (In re Interest of Veronica H.)*, 272 Neb. 370 (2006) ......................................18

*State v. Robert K. (In re Sarah K)* 258 Neb. 52 (1999) ..................................................................15

## Federal Statutes, Regulations, Rules

42 U.S.C. §§ 622 ..................................................................................................................................15

42 U.S.C. §§ 671 ......................................................................................................................15, 32, 34

42 U.S.C. §§ 672 ......................................................................................................................15, 32, 34

42 U.S.C. §§ 675 ..............................................................................................................15, 32, 33, 34

ACYF-PR-82-02, issued 8/13/82 ........................................................................................................13

Fed. R. Civ. P. 17(c) ...........................................................................................................................28

Fed. R. Civ. P. 23(b)(2) ...............................................................................................................1, 2, 6, 7

## State Statutes

Neb. Rev. Stat. Ann. § 43-247 ...........................................................................................................15

Neb. Rev. Stat. Ann. § 43-254 ...........................................................................................................15

Neb. Rev. Stat. Ann. § 43-278 .......................................................................................................5, 15

Neb. Rev. Stat. Ann. § 43-285 .................................................................................................15

Neb. Rev. Stat. Ann. § 43-296 .................................................................................................17

Neb. Rev. Stat. Ann. §§ 43-701 to 43-703..................................................................................17

Neb. Rev. Stat. Ann. § 43-1301 ...............................................................................................19

Neb. Rev. Stat. Ann. § 43-1311 ...........................................................................................15, 19

Neb. Rev. Stat. Ann. § 43-1312 ...............................................................................................15

Neb. Rev. Stat. Ann. § 43-1313 ...............................................................................................15

Neb. Rev. Stat. Ann. § 43-1314.01(2) .......................................................................................15

Neb. Rev. Stat. Ann. § 68-1207 ...........................................................................................17, 18

Neb. Rev. Stat. Ann. §§ 71-1901 to 71-1907.........................................................................16, 17

## State Administrative Codes

390 Neb. Admin. Code § 7-001.06 .............................................................................................16

390 Neb. Admin. Code § 7-003.04 .............................................................................................19

## Other Authorities

1 Alba Conte & Herbert Newberg, *Newberg on Class Actions*, § 3:10 (4th ed. 2002) ...............2, 6

2 Alba Conte & Herbert Newberg, *Newberg on Class Actions*, § 4:11 (4th ed. 2002) ...................1

7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
*Federal Practice and Procedure*, § 1776.1 n.1 ..............................................................................1

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
*Federal Practice and Procedure*, § 1763 at 201..............................................................................6

United States Department of Agriculture, Expenditures on Children by Families, 2005, Misc.
Publication No. 1528-2005 .......................................................................................................34

## Preliminary Statement

This Court has considerable discretion in resolving the class certification and *Younger* abstention issues now before it. If ever there was a case that supported an order for class-wide treatment and to maintain the Court's "virtually unflagging" obligation to hear a case properly within its jurisdiction, this is it.

Underlying Magistrate Judge Piester's Report and Recommendation (the "R&R") and Defendants' opposition are two incorrect premises: (1) that the resolution of this case turns on the Court adjudicating and remedying the harms of individual children, defeating class certification; and (2) that the limited foster care review proceedings pending in individual Nebraska Juvenile Courts, and individual remedies purportedly available in those proceedings, require *Younger* abstention. These premises should be rejected.

Class actions under Fed. R. Civ. P. 23(b)(2) are of fundamental importance in adjudicating and vindicating the federal constitutional and statutory rights of litigants like Plaintiffs who do not otherwise have the resources or power to act individually. A leading treatise characterizes claims brought in class actions on behalf of children in state foster care custody as "precisely the kinds targeted by Rule 23(b)(2)." 2 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 4:11 (4th Ed. 2002) (hereinafter, "*Newberg*"); *see also* 7AA Charles Alan Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1776.1, at n.1 (hereinafter, "*Wright & Miller*"). As shown below and in prior briefing, numerous courts have certified Rule 23(b)(2) classes in such actions.

Plaintiffs properly allege, among other things, that the Nebraska Department of Health and Human Services ("HHS") fails to have the *capacity* to provide safe and appropriate foster homes and other placements for all foster children; that HHS fails to have the *capacity* to provide

1

a workforce that can adequately monitor the safety and well-being of all foster children; and that HHS fails to have the *capacity* to provide basic health evaluations for all foster children. Such claims that Defendants have acted or refused to act on grounds generally applicable to the class amply support class certification pursuant to Rule 23(b)(2), as Defendants *concede. (See* Filing #11, Brief in Opposition to Motion for Class Certification ("Defs.' Br. in Opp. Class Cert.") at 34-35.) A determination that a case meets the requirements of Rule 23(b)(2) "necessarily includes a finding that common questions are shared by class members." 1 Newberg at § 3:10. The individual differences that exist among these Plaintiff children who all share the same legal claims, such as how or why they entered HHS custody, or exactly how the common problems and harms affected them, simply do not, and cannot, defeat class certification.

The inapplicability of *Younger* abstention hinges on a similar, plain distinction between the system-wide capacity issues pled in this lawsuit and issues addressed in individual periodic hearings before the Nebraska Juvenile Courts. While there is no legal requirement to plead all possible remedies in a federal complaint, neither the R&R, nor Defendants, address the fact that there are numerous types of relief available to the Court that would only better serve the Juvenile Courts, as opposed to interfere with them. These include requiring HHS to develop an adequate pool of foster homes and other placements for the children in its custody, an adequate workforce to monitor child safety and well-being, and the capacity to provide health evaluations for all children.

Similarly, neither the R&R, nor Defendants, contend that systemic, injunctive relief on these issues – the very basis for this lawsuit – is available in the Juvenile Courts. The Juvenile Court determinations concern individual children at a particular point in time, and are made within the confines of an HHS with capacity limitations so profound and dangerous that they

2

violate Plaintiffs' constitutional substantive due process rights. Put another way, if the system only has the capacity to provide adequate homes, oversight and health evaluations to a small number of the children in its custody, as is alleged and must be accepted as true prior to discovery, the Juvenile Courts cannot remedy the systemic deficiencies at issue in this case through individual orders. Thus, individual Juvenile Court proceedings cannot possibly provide a basis for the Court to exercise its discretion to abstain pursuant to the *Younger* doctrine.

Indeed, if Defendants' own position is taken to its logical conclusion, and the Juvenile Courts have the power to grant the relief that Plaintiffs require (which they clearly do not), then the Juvenile Courts' inability or unwillingness to act in the face of the harms alleged in the Amended Complaint would *compel* the federal courts to act in order to protect the federal rights of the Plaintiff children. Defendants cannot use inherently limited Juvenile Court proceedings to shield HHS from constitutional liability and to prevent Plaintiffs from ever obtaining the systemic relief they need.

No more availing is Defendants' continued contention that every aspect of the Plaintiff children's lives is controlled by the Juvenile Courts. HHS is the state agency responsible for abused and neglected children in Nebraska who are removed from their homes and placed into foster care, not the Juvenile Courts. A clear, undisputed line of federal decisions establishes the constitutional right of children to basic protection and treatment by the state executive agency in whose legal custody they are placed, which includes the right not to be subjected to harm and to deterioration, and to the risk of such harms, while in state custody. Moreover, Nebraska, along with every state in the country, has chosen to accept considerable federal funding under the Title IV-E foster care program, under which Nebraska HHS agrees to comply with "federally imposed conditions" in operating its foster care system. Title IV-E regulations and policies clearly

3

identify the controlling role HHS plays in the lives of Plaintiff children. The controlling role of HHS in the operation of Nebraska's foster care system cannot credibly be disputed.

This lawsuit asserts that HHS, as *parens patriae* for all Plaintiff children, fails to fulfill its most basic charge in providing for their protection and well-being. The facts, law, and equities of this case should lead the Court to exercise its discretion to grant class certification and refuse to abstain pursuant to the *Younger* doctrine. To rule otherwise, without any merits discovery, would prematurely and unfairly shut the courthouse door to children for whom the Court is the only real recourse.[1]

## Argument

## I. THE COURT SHOULD CERTIFY PLAINTIFFS AS A CLASS PURSUANT TO FED. R. CIV. P. 23

### A. Rule 23 Does Not Contain an Exhaustion Requirement.

Defendants' suggestion in their opposition that Rule 23 class certification is inappropriate because the Plaintiff children can petition the Juvenile Courts, the Legislature, and even Defendants themselves for the reforms needed to address their federal claims (Defs.' Opp. Br. at 40-42) should be rejected. Rule 23 does *not* require a showing that Plaintiff children have exhausted their remedies in other fora or that their federal remedy is exclusive. Although the Eighth Circuit requires "a rigorous analysis to ensure that the prerequisites of Rule 23 are satisfied," it certainly does not add any such other requirements outside the scope of the Rule.

---

[1] In an effort to distract the Court from the very real harms currently suffered by Plaintiff children, Defendants have repeatedly focused on Plaintiffs' attorneys, accusing Children's Rights, for example, of a "thinly veiled attempt to further its reform agenda *riding on the backs of foster children through the federal judiciary* . . . ." (Defs.' Opp. Br. at 42 (emphasis added).) Though Plaintiffs do not think it productive or necessary to respond to these various attacks, it should be noted that this case was brought by Nebraska attorneys with the support of child welfare advocates in Nebraska. Plaintiff children are being represented in this action by respected attorneys from large, medium, and small law firms and non-profit legal organizations, including Nebraska Appleseed Center for Law in the Public Interest; Ogborn, Summerlin & Ogborn, P.C.; DLA Piper US LLP; Cline, Williams, Wright, Johnson & Oldfather, L.L.P.; Woods & Aitken LLP; Gross & Welch, P.C., L.L.O; and Children's Rights.

4

*Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006) (*citing Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

## B.   The Proposed Class Is Narrowly Defined and Cohesive.

Contrary to Defendants' opposition, the class definition in this case properly includes foster children in HHS legal custody who have not yet been adjudicated as needing longer-term HHS care and custody. These children are state wards in the legal and physical custody of HHS and as such are subject to the same risks of harm from inadequate numbers and types of placements, monitoring and health care as post-adjudication children. (Am. Compl. at ¶¶ 109-54.) Unlike the "single, essentially unmanageable class" in *Elizabeth M.* that included post-discharge patients who did not share the same causes of action or burden of proof with present residents, *Elizabeth M.*, 458 F.3d at 785, pre- and post-adjudication foster children share the identical constitutional substantive due process right to freedom from harm based on their custodial status as wards of the state.[2] *Youngberg v. Romeo*, 457 U.S. 307, 316-317 (1982). All members of the putative Plaintiff class are thus "bound together through 'preexisting [and] continuing legal relationships'" by virtue of their common custodial status and dependency on HHS for their safety and well-being. *Grovatt v. St. Jude Medical, Inc. (In re St. Jude Medical, Inc.)*, 425 F.3d 1116, 1122 (8th Cir. 2005) (*quoting Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 n.8 (11th Cir. 1983)); *see also Baby Neal ex. rel. Kanter v. Casey*, 43 F.3d 48, 60-63 (3d Cir. 1994) (stating that commonality was satisfied by virtue of the fact that "every plaintiff shares the essential circumstance of being in the custody or the care of DHS"). Rule 23 certainly does not require that all claims be identical. *See Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561

---

[2] *All* post-adjudication children are initially pre-adjudication children. *See* Neb. Rev. Stat. Ann. § 43-278 (LexisNexis 2006) ("[A]ll cases filed under subdivision (3) of section 43-247 shall have an adjudication hearing not more than ninety days after a petition is filed" unless "good cause" is shown for a continuance beyond the 90 days). As the R&R notes, "most" pre-adjudication children become post-adjudication children. (R&R at 86.)

5

(8th Cir. 1982) (stating that federal rules "do[] not require that every question of law or fact be common to every member of the class").

Further, this is not a case in which the relief sought somehow defeats class "cohesiveness" under Rule 23(a). Unlike plaintiffs who seek individually determined medical monitoring and treatment to compensate for past medical injuries that require individualized relief determinations, Plaintiffs here seek to prospectively enjoin systemic HHS deficiencies and practices that result in the failure to provide necessary minimum care and supervision as discussed further below. *See St. Jude Medical, Inc.*, 425 F.3d at 1122 (addressing medical products mass torts litigation); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597 (1997) (addressing asbestos mass torts litigation); *Reinholdson v. Minnesota*, No. CIV. 02-795 ADM/AJB, 2002 WL 31026580, at *9 (D. Minn. Sept. 9, 2002) (addressing individualized "non-injunctive relief for the class in the form of 'compensatory education for any time period when IDEA was found to be violated'").

## C.   Commonality and Typicality Are Satisfied Here As All Putative Plaintiff Class Members Are Being Subjected to Similar Custodial Risks of Harm.

The R&R fails to address commonality and typicality in light of Defendants' *concession* that Plaintiffs' allegations are "sufficient to satisfy the requirements of Rule 23(b)(2)." (Defs.' Br. in Opp. Class Cert. at 34-35.) Indeed, "a ruling that an action meets the requirements of Rule 23(b)(2), that the party opposing the class has acted or refused to act on grounds generally applicable to the class, necessarily includes a finding that common questions are shared by class members." 1 *Newberg* at § 3:10; *see also Caroline C. ex rel. Carter v. Johnson*, 174 F.R.D. 452, 464 (D. Neb. 1996) (noting that "injunctive actions 'by their very nature often present common questions satisfying Rule 23(a)(2)'") (*quoting Wright & Miller* at § 1763, 201). "When the claim arises out of the same legal or remedial theory, the presence of factual variations is normally not

6

sufficient to preclude class action treatment." *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 831 (8th Cir. 1977) (finding abuse of discretion not to certify class of all African-Americans and women employed by defendant despite individual differences where plaintiff alleged "patterns and practices" of employment discrimination establishing typicality).

Further, there is no "split" in authorities, as presented by Defendants. To the contrary, all cases cited by the parties involving a putative class challenging the conditions of their care in the child welfare custody of a single government agency *have been certified.*[3] In the face of such authority, the cases relied on in the R&R and by the Defendants (*see* Defs.' Opp. Br. at 45, 52, 56-58, 61-64) are inapposite and unpersuasive, and certainly not "controlling" as Defendants argue. In every one of those cases, insufficient commonality was found precisely because the plaintiffs were *not* challenging a unitary regime subjecting them to common risks of harm, as the plaintiffs did in the child welfare cases cited in footnote 3, and as Plaintiffs do here.

In *J.B. ex rel. Hart v. Valdez*, the plaintiffs were disabled children who were only unified by "some sort of contact with New Mexico's child welfare system" and were challenging the

---

[3] *See Marisol A. ex. rel. Forbes v. Giuliani*, 126 F.3d 372, 375 (2d Cir. 1997) (affirming certification of Rule 23(b)(2) subclass consisting of children in the custody of the New York City Administration for Children's Services); *Baby Neal*, 43 F.3d at 54 (finding abuse of discretion not to certify Rule 23(b)(2) class including all children in the custody of the Philadelphia Department of Human Services); *Lynch v. Dukakis*, 719 F.2d 504, 506 n.1 (1st Cir. 1983), *abrogated on other grounds by Suter v. Artist M.*, 503 U.S. 347, 353-54 n.5 (1992), (affirming certification of Rule 23(b)(2) class consisting of all children subject to Massachusetts's foster family home care system); *Kenny A. ex. rel. Winn v. Purdue*, 218 F.R.D. 277, 305 (N.D. Ga. 2003) (certifying Rule 23(b)(2) class consisting of all alleged or adjudicated deprived children in State custody in Fulton and DeKalb Counties (Atlanta)); *LaShawn A. v. Dixon*, 762 F. Supp. 959, 960-61 (D.D.C. 1991), *aff'd in relevant part*, 990 F.2d 1319 (D.C. Cir. 1993) (certifying Rule 23(b)(2) class included all foster children under the supervision of the District of Columbia Department of Human Services); *Jeanine B. ex. rel. Blondis v. Thompson*, 877 F. Supp. 1268, 1287-88 (E.D. Wis. 1995) (certifying Rule 23(b)(2) subclass of children in Milwaukee County foster care custody); *B.H. v. Johnson*, 715 F. Supp. 1387, 1389 (N.D. Ill. 1989) (certifying Rule 23(b)(2) class consisted of children in the custody of the Illinois Department of Children and Family Services and placed out of home); *L.J. ex rel. Darr v. Massinga*, 699 F. Supp. 508, 510 (D. Md. 1988) (certifying class consisted of children in the custody of Baltimore City Department of Social Services); *G.L. ex. rel. Shull v. Zumwalt*, 564 F. Supp. 1030, 1031 (W.D. Mo. 1983) (certifying Rule 23(b)(2) class consisted of all children in the custody of the Jackson County office of the Missouri Division of Family Services); *Wilder v. Bernstein*, 499 F. Supp. 980, 992-94 (S.D.N.Y. 1980) (certifying Rule 23(b)(2) class of all New York City black non-Catholic, non-Jewish children in out of home placement). *See also Olivia Y. v. Barbour*, Civil Action No. 3:04CV251LN(TL) (S.D. Miss. Mar. 11, 2005) (attached at Addendum A); *Charlie H. v. Whitman*, Civil Action No. 99-3678(GEB) (D.N.J. Mar. 7, 2002) (attached at Addendum B).

7

operation of three separate state agencies responsible for child welfare, mental health and public education services. *J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1289 (10th Cir. 1999). In *Reinholdson,* the plaintiffs were disabled students challenging "the decisions made by the hearing officers" regarding their Individualized Educational Plans (IEPs) without alleging violations of the Individuals with Disabilities Education Act (IDEA) sufficient to "implicate the [systemic] integrity of the administrative review process." *Reinholdson,* 2002 WL 31026580 at *6. In *Elizabeth M.,* the plaintiffs were current and former mental health patients who "did not identify one or more policies or practices common to all three facilities that caused the[] alleged violations," and who had distinct causes of action based on whether they remained in custody. *Elizabeth M.,* 458 F.3d at 786-88. In each of these cases, the courts identified relevant differences among putative class members that were not counter-balanced by *any* common claim for purposes of Rule 23(a) commonality. Plaintiffs here, in sharp contrast, are unified in their claims that their single executive agency state custodian does not have the current capacity to adequately protect them and meet their basic placement, health care, and other service needs.

Defendants' further suggestion, that Plaintiffs' detailed allegations of the types of harms to which children are subjected preclude a finding of commonality, is also wrong. (Defs.' Opp. Br. at 48-49.) Those harms, of course, are by definition suffered individually, but are fairly read to result from alleged system-wide deficiencies.[4] (*See, e.g.,* Am. Compl. at ¶¶ 4, 5, 57, 76, 89, 98, 106, 130, 137, 147, 154, 178 & 183.) As the R&R acknowledges, "[w]here the plaintiffs are challenging institutional conditions, policies and practices, and not their application to each individual member of the class, the fact that each member of the class may be affected differently by the policies does not necessarily preclude a finding of commonality." (R&R at 95,

---

[4] On their face, six of the seven specific harms Defendants excerpt from Plaintiffs' Amended Complaint (*see* Defs.' Opp. Br. at 48-49, nos. (1)-(4), (6)-(7)) directly relate to broader system-wide deficiencies in HHS' placement, monitoring, and health care practices, and thus *support* commonality.

8

*citing Christina A. ex rel. Jennifer A. v. Bloomberg*, 197 F.R.D. 664, 667 (D.S.D. 2000); *Baby Neal*, 43 F.3d at 56.) Plaintiff children are *not* seeking damages for individual injuries or even individualized injunctive relief. Plaintiff children are seeking to prospectively enjoin HHS' system-wide deficiencies and practices that put them, and all putative class members, at daily risk of further harms. *See Jensen v. Clarke*, 94 F.3d 1191, 1198-1200 (8th Cir. 1996) (affirming injunction for class of inmates in Nebraska State Penitentiary where practice of "double celling" based on bed availability without referral to initial evaluation for propensity for violence shown to place all inmates at risk of harm).

It is also axiomatic that the need for some level of aggregated individual violations to establish class-wide liability cannot preclude the availability of class-wide remedies. Defendants' attempts to dismiss Plaintiffs' legitimate class-wide grievances thus do not withstand scrutiny.[5] (Defs.' Opp. Br. at 49-54.) For example, Plaintiffs allege that HHS' placement practices are fundamentally flawed due to the failure to develop adequate resources. (Am. Compl. at ¶ 109.) Having failed to develop an adequate number and array of homes for children, HHS' practice is to place children randomly as opposed to matching a child with a home or other placement that can meet the child's needs and keep him or her safe from further injury. (*Id.* at ¶¶ 110-11.) This practice places foster children at risk of constitutional harm and is thus just as susceptible of class-wide proof and remedies justifying Rule 23(a) commonality as the "random assignment of violent inmates to overcrowded prison cells."[6] *Elizabeth M.*, 458

---

[5] Additionally, HHS' alleged failure to pay foster care providers sufficiently to assure sufficient homes for the children in HHS custody cannot be "disregarded" simply because Defendants dispute the facts. (Defs.' Opp. Br. at 53-54).

[6] That the Juvenile Courts *approve* what the Amended Complaint makes clear are limited placements (Am. Compl. at ¶¶ 109-30) does not in any way affect the Court's ability to require HHS to develop additional placements to meet class-wide needs. To be concrete, if trial shows, for example, that the class includes 1,000 foster children that Defendants have identified as needing special therapeutic care, and Plaintiffs prove that HHS only has a total of 250 therapeutic beds available with 750 children being denied safe and stable placements in violation of their constitutional rights as a result, the Court can order the development of additional therapeutic resources. For reasons

9

F.3d at 787 n.4, (citing Jensen, 94 F.3d at 1198-1200 (affirming injunction where class members' risk of assault by violent cellmates was supported by statistics on rising level of institution-wide violence in light of increased use of and known characteristics of double cells)).

Indeed, aggregate class data and expert testimony, which Plaintiffs have not yet been given the opportunity to develop or present, will provide the basis for much of the liability determination and the nature of the required relief herein, as in any case where institutional practices that do not meet minimum professional standards for the protection of the class are challenged.[7] See LaShawn A. v. Dixon, 762 F. Supp. 959, 965-66, 68, 71, 73-75, 79-81, 96-98 (D.D.C. 1991) (finding that District of Columbia's Department of Human Services violates the rights of all children in foster care based on expert study of foster care records and other statistical evidence), aff'd in relevant part, 990 F.2d 1319 (D.C. Cir. 1993); L.J., 838 F.2d at 121 (affirming preliminary injunction supported by expert study of foster care case records documenting systemic problems in Baltimore's foster care program).

Likewise, it is well within the competency of the Court to determine whether current HHS staffing is so far below professional standards that foster children cannot be adequately supervised and protected. Defendants concede that "each [child] requires 'monitoring,'' screening,'' tracking,' and 'visitation,' as an ordinary part of his or her custody." (Defs.' Opp. Br. at 58.) Plaintiffs seek to have the Court determine that HHS is not meeting constitutionally required minimum "monitoring," "screening," "tracking," and "visitation." Such findings *do not arise from any child's individual needs.* Rather, they arise from Plaintiff children's undeniable federal constitutional right to reasonable safety and well-being as wards of the state and HHS'

---

discussed further in Section II, such an order would only increase dispositional alternatives available to HHS and the Nebraska Juvenile Courts, not interfere with any Juvenile Court proceedings.

[7] The need for expert testimony to help determine the nature of the required relief is among the reasons that it is premature to require a full formulation of Plaintiffs' requested relief at the pleading stage. (See also Section II, *infra*.)

10

chronic failure to address staffing issues. If all children are being placed at risk because of Defendants' failure to meet such minimums, as Plaintiffs allege, imposing such minimum requirements would not require any child-specific inquiry or relief, as erroneously suggested by both the R&R and Defendants. (*See* Defs.' Opp. Br. at 59-60.) Much like the inmates in *Jensen*, for example, Plaintiffs here are being subjected to deficient screening practices that put the whole class at risk of harmful placements and must be enjoined. *Jensen*, 94 F.3d at 1198-1200.

Similarly, determining and remedying HHS' failure to provide basic health evaluations and services as alleged is possible without individual factual determinations or relief. Once Plaintiffs show that class members are significantly at risk of not receiving timely medical screens and services as constitutionally required, the Court can fashion a remedy that requires adequate resources and a process to ensure that all children have access to and are provided basic health evaluations and services regardless of their individual needs. *See, e.g., L.J.*, 838 F.2d at 120 (affirming preliminary injunction requiring Baltimore Department of Social Services to expand its medical services to foster children). Moreover, that Nebraska has codified some professional standards requiring routine medical care is not, as Defendants suggest, a basis for precluding the Court from enforcing a federal constitutional duty to provide basic medical care. (Defs.' Opp. Br. at 52-53, 60.)

For these reasons, the Court should decline the R&R's recommendations regarding class certification and grant Plaintiffs' motion seeking certification of the defined Rule 23(b) class.

## II. *YOUNGER* ABSTENTION SHOULD NOT BAR PLAINTIFFS FROM SEEKING TO ENFORCE THEIR FEDERAL CONSTITUTIONAL AND STATUTORY RIGHTS IN FEDERAL DISTRICT COURT

Defendants fail to rebut Plaintiffs' showing that there are numerous types of relief that the Court can and should grant – after discovery and a trial establishing constitutional harm and

11

linking it to systemic causes – that will not even arguably interfere with the Nebraska Juvenile Courts. Nor do Defendants credibly challenge that the broad-based relief required by Plaintiffs is unavailable in the individually-focused state status review hearings which Defendants claim to be an adequate alternative to the Court's exercise of jurisdiction.

## A. Federal Law Establishes that Nebraska HHS is Responsible for Ensuring a System That Has the Capacity to Meet All Children's Basic Needs.

Defendants' incorrect contention that the Nebraska Juvenile Courts control every aspect of the Plaintiff children's lives and, therefore, that all possible relief in this case would interfere with individual Plaintiffs' proceedings in the Nebraska Juvenile Courts, must be addressed in the context of HHS' constitutional and statutory duties and obligations. HHS – which has been entrusted under Nebraska law with the legal and physical custody of all Plaintiffs – is legally obligated pursuant to the substantive due process clause of the 14th Amendment of the United States Constitution to meet the basic needs of these vulnerable state wards. *See Youngberg*, 457 U.S. at 315-16 (holding that mentally retarded patients in state institution have constitutionally protected liberty interest in treatment and care that does not depart from "reasonable professional judgment"); *Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993) (holding that foster children have constitutional right to "adequate medical care, protection and supervision"); *Marisol A. ex rel. Forbes v. Giuliani*, 929 F. Supp. 662, 675-77 (S.D.N.Y. 1996), *aff'd,* 126 F.3d 372 (2d Cir. 1997) (holding that foster children have constitutional right to "reasonably safe conditions of confinement" and freedom from "unreasonable and unnecessary intrusions into their emotional well-being"). Defendants do not, and cannot, disclaim this fundamental federal constitutional responsibility to meet the basic needs of Plaintiffs and to protect them from being harmed or from deteriorating while in state custody.

12

Moreover, in 1980, based upon the considered judgment of federal lawmakers that the states were failing in their individual efforts to protect and care for the nation's foster children, Congress enacted the Title IV-E foster care program with the passage of AACWA.[8]   As described by the Eighth Circuit in *Missouri Child Care*:

> Enacted by Congress pursuant to its powers under the Spending Clause, [AACWA] creates a *joint federal-state program* that provides federal funds to participating states to pay for certain foster-care and adoption expenses. 'The Act provides that States will be reimbursed for a percentage of foster care and adoption assistance payments *when the State satisfies the requirements of the Act.*'

*Missouri Child Care Ass'n v. Cross*, 294 F.3d 1034, 1036 (8th Cir. 2002) (*citing Suter v. Artist M.*, 503 U.S. 347, 351 (1992)) (emphasis added). "Although Congress may not require a state to participate in a program created pursuant to the Spending Clause, once a state agrees to take the funds offered through such programs *the state is bound to 'comply with federally imposed conditions.*'" *Missouri Child Care*, 294 F.3d at 1036 (*quoting Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)) (emphasis added).

By virtue of the "State Plan for Title IV-E" executed between the U.S. Department of Health and Human Services ("USHHS") and Nebraska HHS, the State of Nebraska has elected to participate in the uncapped flow of federal entitlement dollars under the Title IV-E program.[9] Thus, as the designated Title IV-E administrator for the State of Nebraska, HHS has primary

---

[8] As stated by the U.S. Department of Health and Human Services in publishing the Final Regulation implementing AACWA in 1982: "The impetus behind the passage of Pub. L. 96-272 [AACWA] was the belief of Congress, and most State child welfare administrators, supported by extensive research, that the public child welfare system responsible for serving children, youth and families had become a receiving or holding system for children living away from parents rather than a system that assists parents in carrying out their roles and responsibilities and provides alternative permanent placement for children who cannot return to their own homes . . . The passage and enactment into law of Pub. L. 96-272 (formerly HR 3434) demonstrates a Federal commitment to provide financial and technical assistance to States to make changes in their child welfare service systems." ACYF-PR-82-02, issued 8/13/82.

[9] Plaintiffs have alleged a statutory cause of action pursuant to AACWA. (*See* Am. Compl. at ¶¶ 184-86.) Plaintiffs have also alleged a cause of action – which Defendants have not moved to dismiss on grounds other than abstention – pursuant to the "State Plans" entered into by HHS under Titles IV-B and IV-E of the Social Security Act, the broader statutory authority for AACWA. (*See id.* at ¶¶ 195-97.)

13

responsibility for managing Nebraska's foster care program, including the placement and care of foster children, in accordance with all controlling federal law, regulation and policy. (*See* Filing #45, Defendants' Answer at ¶ 159 ("HHS is responsible for the administration of the foster care programs in accordance with applicable law and [] the federal government has approved the State Plans.").) Indeed, under 45 C.F.R. 1356.21(g)(3), a duly promulgated federal USHHS regulation, the State of Nebraska may not collect federal Title IV-E funds where responsibility for the placement and care of children has been transferred from HHS control to the Juvenile Courts.[10] Defendants cannot credibly deny their responsibility for the care and protection of Plaintiff children.

Defendants cite a number of Nebraska state laws providing for (i) Juvenile Court adjudicatory and dispositional hearings regarding the initial need for foster care, (ii) six month reviews by Juvenile Courts of the dispositions of individual foster children, (iii) Juvenile Court review and modification of individual foster children's case plans, and (iv) twelve month "permanency hearings" by the Juvenile Courts for all foster children. (*See* Defs.' Opp. Br. at 10 (*citing 31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003); and *J.B.*, 186 F.3d 1280).) However, these very features, that Defendants contend demonstrate interference between this suit and the working of the Juvenile Courts, are in fact mandated by AACWA as part of the

---

[10] 45 C.F.R. 1356.21(g)(3) provides: "In order to satisfy the case plan requirements of sections 471(a)(16), 475(1) and 475(5)(A) and (D) of the Act, *the State agency must promulgate policy materials and instructions for use by State and local staff to determine the appropriateness of* and necessity for *the foster care placement of the child.* The case plan for each child must: . . . (3) Include a discussion of how the case plan is designed to achieve a safe placement for the child in the least restrictive (most family-like) setting available and in close proximity to the home of the parent(s) when the case goal is reunification and a discussion of how the placement is consistent with the best interests and special needs of the child. *(FFP* [referring to Federal Financial Participation under Title IV-E] *is not available when a court orders a placement with a specific foster care provider.)*" (Emphasis added.)

14

federal statutory scheme.[11] These provisions thus cannot somehow negate Nebraska HHS' and
Defendants' *federal* obligations to meet Plaintiff children's basic needs.

**B.     Numerous Forms of Relief Available in This Action Would Only Enhance,
and Not in Any Respect Interfere With, Any Ongoing Juvenile Court
Proceedings.**

Plaintiffs maintain that it is entirely appropriate to ask the Court to craft prospective
injunctive relief tailored to the violations proven at trial and have highlighted numerous forms of
relief available to the Court that could not possibly interfere with individual proceedings in the
Nebraska Juvenile Courts. To the contrary, such relief would only enhance the ability of the
Juvenile Courts to perform their obligations under the Nebraska Juvenile Code.[12]

**1.  An Order Requiring HHS to Remedy Its Chronic Placement Shortage**

Entry of an order requiring HHS to address the chronic and pervasive shortage of HHS-
developed and licensed foster homes and other placements is a clear example of non-interfering
relief available to the Court. This remedy would only aid the Juvenile Courts by increasing the
dispositional alternatives available in the system. Defendants' "short answer" to this non-
interfering remedy is that it "may be interpreted as 'reflecting negatively upon the [juvenile
courts'] ability to enforce constitutional principles.'" (Defs.' Opp. Br. at 15 *(quoting Huffman v.*

---

[11] Juvenile Court adjudication/disposition of children coming into foster *(compare* Neb. Rev. Stat. Ann. § 43-254
*with* 42 U.S.C. Ann. §§ 672(a)(1) and 671(15) (2006)); six-month reviews by the Juvenile Court *(compare* Neb.
Rev. Stat. Ann. §§ 43-278, 43-1313, 43-1314.01(2) *with* 42 U.S.C. Ann. §§ 671(a)(16), 675(5)(B),
622(b)(10)(B)(ii)); Juvenile Court review of case plans with mandated elements *(compare* §§ 43-247(3), § 43-
285(2), 43-1311, 43-1312 *with* 42 U.S.C. Ann. §§ 671(a)(16), 675(1) & (5)(B)); twelve-month reviews by the
Juvenile Court *(compare* Neb. Rev. Stat. Ann. §§ 43-1312(3) *with* 42 U.S.C. Ann. § 675(5)(C); *State v. Robert K.
(In re Sarah K.)*, 258 Neb. 52, 57-58 (1999) ("the amendments effectuated . . . were necessitated by the terms of the
Federal Adoption and Safe Families Act of 1997 (ASFA), which mandated certain changes to state juvenile codes as
a condition to continued federal funding of certain state programs, including foster care.")). *(See also* Filing #88,
Memorandum Brief in Opposition to Motion to Dismiss at 8-12.)

[12] For reasons discussed throughout all of the briefs on this issue (including the prospective nature of the relief
sought, the pre-discovery posture of the case, and the need for expert guidance in this case), it is not possible for
Plaintiffs to identify all the components of the injunctive order they will seek at trial. Nevertheless, should the Court
adopt the R&R's *Younger* abstention recommendation, dismissal on *Younger* grounds should be without prejudice
and Plaintiffs should be provided leave to replead to provide further specification of the remedy sought. *See
Executive Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783, 792 (6th Cir. 2004) (noting with approval district
court's requirement that federal plaintiff replead in response to *Younger* abstention challenge).

*Pursue, Ltd.*, 420 U.S. 592, 604 (1975)).) This argument warrants little attention, as it is the responsibility of HHS to develop and maintain an appropriate pool of homes and placements (*see, e.g.*, Neb. Rev. Stat. Ann. §§ 71-1901 to 1907; 390 Neb. Admin. Code § 7-001.06) (2000), not the Juvenile Courts. As alleged, it is HHS that has failed to provide a minimally adequate pool of available homes and other placements for foster children, thereby harming children and placing them at risk of harm.[13]   (Am. Compl. at ¶¶ 113-14 & 130.)

In another easily rejected effort, Defendants attempt to portray this lawsuit as a challenge to the Juvenile Courts themselves, noting that there is no placement order in the record reflecting that "a Juvenile Court judge abdicated their judicial responsibility and simply chose the 'lesser of two evils' for a foster child's placement." (Defs.' Opp. Br. at 16.) Plaintiffs do not contend that *any* Juvenile Court judge is abdicating his or her judicial responsibilities in approving placements from among a constitutionally inadequate pool of foster homes and other placement options. Nor could the Court expect (particularly prior to any merits discovery) evidence of a Juvenile Court formally finding that the "lesser of evils" was being selected for children.

Finally, Defendants erroneously contend that the Court will ultimately be unable to order relief directing HHS to develop sufficient placements to meet the needs of children because such an order would "turn on proof" that decisions of the Juvenile Courts *cause* dangerous and deficient placement of minors, and thus a prospective order remedying the system-wide shortage would constitute reversals of past Juvenile Court placement approvals, including past placements of the named Plaintiffs. (Defs.' Opp. Br. at 16.) To obtain prospective systemic relief, however,

---

[13] Unlike in the case at bar, in the cases cited by Defendants, *Huffman*, 420 U.S. 592, and *Caldwell v. Camp*, 594 F.2d 705 (8th Cir. 1979), the defendants were judicial officers (including a chief of police, a prosecuting attorney and sheriff), the relief sought was an injunction of a state court proceeding and/or facial attack on the constitutionality of a state statute underlying a state court proceeding, and there was no question that the relevant state courts had the powers to grant the same relief sought in federal court. *See Huffman*, 420 U.S. at 594-95; *Caldwell*, 594 F.2d at 706-08.

Plaintiffs will demonstrate, as alleged and as must be taken as true at this stage of the case, that it is HHS' shortage of properly supervised and screened foster homes and other placements that is resulting in severe and pervasive harms and future risk of harm to class members. As the legal custodian of *all* Plaintiffs and the voluntary recipient of federal monies pursuant to AACWA, it is HHS that is constitutionally and statutorily obligated to ensure the development of an adequate number of placements to meet the needs of all children in its custody. A finding, in the aggregate, that HHS lacks sufficient places to meet the basic needs of those in its custody and an order directing it to increase placement resources would not in any sense constitute interference with, much less a reversal of, Juvenile Court orders simply approving or disapproving individual placements within a limited range of HHS-developed options.

### 2. An Order Directing HHS to License, Screen and Otherwise Supervise Foster Placements, Limit Caseloads, and Increase Caseworker Training

Defendants do not dispute that HHS has the statutory responsibility for licensing placements, training, conducting criminal history checks and otherwise supervising foster placements, and for establishing and maintaining adequate workloads for caseworkers. *See* Neb. Rev. Stat. Ann. §§ 43-296, 43-701 to 43-703, 71-1901 to 71-1907, 68-1207. Rather, Defendants oppose the remedies suggested by Plaintiffs in these areas on the grounds that Plaintiffs have purportedly not linked such remedies to the allegations of individual named Plaintiffs. This is not true, and to the extent this inquiry is relevant, it is only relevant to Article III standing, not abstention.[14] For purposes of *Younger* abstention, the inquiry is focused on the potential interfering impact of a grant of injunctive or declaratory relief on ongoing state court proceedings. Defendants' "causation" argument thus misses the mark entirely.

---

[14] In Section III, *infra*, and in their separate brief addressed to Defendants' Article III standing objections (Filing #94), Plaintiffs demonstrate how each of the non-interfering remedies identified is "likely to redress" injuries the named Plaintiffs have suffered and are at future risk of suffering.

Defendants also contend that the requested remedies would "both directly and indirectly interfere with the plenary jurisdictional and decision-making authority of the Nebraska juvenile courts" (Defs.' Opp. Br. at 17 (*quoting* R&R at 156)), but in support point only to the holding of *State v. Arnoldo T. (In re Veronica H.)*, 272 Neb. 370, 375 (2006), which determined only that Juvenile Courts have "the authority to . . . direct the removal of a case manager when the facts and circumstances require a change for the best interest of the juvenile." Defendants cannot show how remedying HHS' system-wide failure to "hire and retain a sufficient number of caseworkers," the resulting high turnover rate of caseworkers, and the harms to Plaintiffs caused by such failures, including the fact that "high caseloads interfere with the ability of caseworkers to adequately monitor the safety of foster children assigned to them" (*see* Am. Compl. at ¶¶ 5(c), 131-37), might interfere with the Juvenile Courts' authority.[15] *See Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1273 (10th Cir. 2002) ("training of social workers . . . and qualifications for social workers do not appear to risk interference with state court proceedings."). A Juvenile Court's ability to reassign a caseworker within a system that does not have enough caseworkers to adequately monitor the safety of all children cannot possibly address this system-wide deficiency. Only the Court may grant such relief. Conversely, the Court's grant of such system-wide relief would not interfere with *any* Juvenile Court decision to reassign an individual caseworker, and would, if anything, only enhance the ability of the Juvenile Courts to make such reassignments.

Likewise, Plaintiffs have alleged in detail that HHS "fail[s] to take basic screening precautions before Plaintiff children are placed in foster homes and other placements"; "fails . . . to consistently conduct criminal and child abuse background checks on the people it relies upon

---

[15] HHS is exclusively charged with "establishing and maintaining caseloads to carry out adequate, timely, and in-depth investigations and services to children." Neb. Rev. Stat. Ann. § 68-1207.

18

to care for foster children"; and "fails to adequately license and otherwise oversee private providers with whom [HHS] contracts for the provision of group and institutional foster care to Plaintiff children." (Am. Compl. at ¶¶ 138-40.)  Plaintiffs allege in equally clear terms that Defendants "continue the pattern and practice of failing to appropriately screen foster homes and failing to supervise the Plaintiff children in their custody despite the risk it poses for and harm it inflicts upon the children they are charged with protecting. . . . This pattern and practice of conduct has caused, and is causing, direct and severe harm to Plaintiff children."  (*Id.* at ¶ 147.) Again, Defendants do not explain how enjoining these harmful and unlawful executive-branch practices could possibly interfere with the Juvenile Courts.

### 3. An Order Directing HHS to Ensure Class Members Receive Medical Evaluations

With respect to an order requiring HHS to provide medical evaluations for *all* class members, particularly upon their entry into out-of-home care, Defendants argue that the statute assigning responsibility for ensuring that children receive a medical examination within two weeks of their removal from the home places the responsibility with the "person or court in charge of the child." (Defs.' Opp. Br. at 18 (*citing* Neb. Rev. Stat. Ann. § 43-1311).) But the statute, read in conjunction with Section 43-284, indicates that the "care and custody" of the Plaintiff children is placed with HHS, and thus the responsibility for this particular medical exam and any required health evaluations and treatment are the charge of HHS, not the Juvenile Courts. *See* Neb. Rev. Stat. Ann. § 43-1301 ("person or court in charge of the child shall mean (a) [HHS], an association, or an individual who has been made the guardian of a neglected, dependent, or delinquent child by the court and has the responsibility of the care of the child . . . *[or]* (b) the court which has jurisdiction over the child . . ."); *see also* 390 Neb. Admin. Code 7-003.04 ("The worker will gather information about the child's health from his/her parents.

19

Children in out-of-home care . . . will receive a health examination during the first 14 days of placement . . . children in out-of-home care will receive ongoing coordinated medical care *under the direction and supervision of the worker . . .*") (emphasis added). Thus, an order requiring HHS to ensure children's access to timely Early Periodic Screening Diagnosis and Treatment ("EPSDT") medical screens and treatment would not, in any sense, interfere with the prerogatives of the Juvenile Courts.

Moreover, as with the development, screening and licensing of a sufficient number and type of placements, and the hiring and training of a sufficient number of caseworkers to meet the needs of class members, the failure to ensure timely access to medical evaluations for *all* children in foster care in Nebraska is fundamentally a systemic problem that the Juvenile Courts, with only periodic oversight of individual cases, are simply not in a position to address.

For all these reasons, the R&R's recommendation that this case is likely to "unduly interfere" with ongoing proceedings in the Nebraska Juvenile Courts should not be adopted.

## C. Plaintiffs Have No "Adequate Opportunity" to Seek Redress for Their Federal Claims in Juvenile Courts.

Plaintiffs properly allege, among other things, that HHS has failed to develop the *capacity* to provide safe and appropriate foster homes and other placements for foster children (*see* Am. Compl. at ¶¶ 110, 118, 120, 122); that HHS fails to have the *capacity* to provide a workforce that can adequately monitor the safety and well-being of all foster children (*id.* at ¶¶ 131-34); and that HHS fails to have the *capacity* to provide basic health evaluations for all foster children. (*Id.* at ¶¶ 148-52.) Defendants concede that Plaintiffs are unable to seek systemic or class-wide relief in their individual ongoing Juvenile Court proceedings. (*See* Defs.' Opp. Br. at 21.) Defendants argue, however, that access to such relief is a mere "procedural 'convenience'"

20

provided that it is technically possible for individual Plaintiffs to bring constitutional issues before the Juvenile Court. (Defs.' Opp. Br. at 19.)

As noted by Defendants, however, a federal court determining whether to exercise its discretion to apply the extraordinarily narrow *Younger* abstention doctrine cannot make such a determination "in a vacuum." (*See* Defs.' Opp. Br. at 22 (*citing 31 Foster Children*, 329 F.3d at 1279, n.11).) The facts are that Plaintiffs cannot seek *any* of the systemic relief they require in order to protect themselves in their dispositional review proceedings in Juvenile Courts given that the very problems targeted by this lawsuit are ones of systemic incapacity.[16] As made clear by the D.C. Circuit in *LaShawn A.*, these hearings – requirements of the federal foster care scheme outlined at Section II.A., *supra* – are "intended merely to reassess periodically the disposition of the child" and therefore clearly are not an "adequate forum for the class of children . . . to present [a] multifaceted request for broad based injunctive relief based on the Constitution and on federal and local statutory law." *LaShawn A.*, 990 F.2d at 1323.

Defendants suggest that Plaintiffs have a "lack of respect" (and worse) for the Juvenile Courts. (*See, e.g.*, Defs.' Opp. Br. at 2.) Plaintiffs, however, intend no such disrespect. Taken to its logical end, it is *Defendants' argument* that the Juvenile Courts have the power to grant the complete relief Plaintiffs' seek – a proposition Plaintiffs vehemently contest – that would signify that the Juvenile Courts have willingly failed or refused to use that power in the face of long-standing systemic deficiencies that harm children. This abdication would *compel* federal court involvement. *See Monroe v. Pape*, 365 U.S. 167, 183 (1961), *overruled in part on other*

---

[16] In their *Younger* abstention briefing, as in their Article III standing and *Rooker-Feldman* briefing, Defendants refer repeatedly to a series of named Plaintiff dispositional review orders made by the Juvenile Courts during 2004-2005. (*See* Defs.' Opp. Br. at 16-17.) Contrary to Defendants' contention, these orders cannot shield Defendants from possible liability at this stage of the case. These point-in-time orders are issued within the context of a system marked by HHS' failure to develop the *capacity* to meet the needs of Plaintiffs. If these failures of capacity violate Plaintiffs' substantive due process rights, as is alleged and must be presently taken as true, these individual court orders cannot possibly justify the exercise of the Court's discretion to abstain.

21

*grounds*, *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658, 701 (1978); *Parkerson v. Carrouth*, 782 F.2d 1449, 1454 (8th Cir. 1985) (federal civil rights laws "provide a remedy where state law is adequate in theory but unavailable in practice"); *see also Allen v. McCurry*, 449 U.S. 90, 101 (1980) ("In short, federal courts could step in where the state courts were unable or unwilling to protect federal rights.")

Far clearer is the conclusion that the Nebraska Juvenile Courts do *not* have such power and therefore are not, as Defendants would apparently suggest, in any sense complicit in the system-wide failures alleged in this lawsuit. The context of the functioning of the Juvenile Courts, as alleged in this case, is critical. The Juvenile Courts, and the guardians *ad litem*, court appointed special advocates, and other committed entities that work on behalf of children in those courts, are constrained to work within a system that is so under-resourced and poorly managed that it systematically violates the substantive due process rights of Plaintiff children. Plaintiffs thus have no legal recourse, but to the Court.

For these reasons, the R&R's recommendation that the Court find that Plaintiffs have an "adequate opportunity" to vindicate their federal claims in their ongoing Nebraska Juvenile Court proceedings should not be adopted.

## D.   The Cases Cited By Defendants Are Readily Distinguishable.

Defendants cite a pair of cases for the proposition that *Younger* determinations must be made at a preliminary phase of the proceedings. These cases in fact demonstrate why this case is not appropriate for application of the *Younger* doctrine, particularly at this stage of the proceedings. In *Greening v. Moran*, defendants were the Chief Justice of the Illinois Supreme Court and the Attorney Registration and Disciplinary Commission considering the federal plaintiff's disbarment proceedings. *Greening v. Moran*, 953 F.2d 301 (7th Cir. 1992). The relief

sought in federal court was a direct injunction halting those state proceedings. *Greening*, 953 F.2d at 302-03. Similarly, in *Local Union No. 12004 v. Massachusetts*, there was no question as to whether the relief sought would "interfere" with ongoing proceedings. *Local Union No. 12004 v. Massachusetts*, 377 F.3d 64 (1st Cir. 2004). Plaintiffs sued the Massachusetts Commission Against Discrimination and three of its commissioners in order to federally enjoin the Commission from taking further action on a state administrative complaint. *Local Union No. 12004*, 377 F.3d at 71.

While it may be true, as stated in *Local Union No. 12004*, that "[o]rdinarily, the *Younger* question must be decided before decision on the merits of the underlying claims," *id.* at 76, n.11, this is so because *ordinarily* – as in *Greening* and *Local Union No. 12004*, and the vast majority of the other cases cited by Defendants – the relief sought by the federal plaintiffs is termination of the relevant state court proceeding, either though an injunction or a facial challenge to the constitutionality of the state statutes upon which the proceeding is predicated. There could be no clearer examples of the appropriate exercise of the *Younger* doctrine and no circumstances less applicable to the present case.[17]

Relying principally on *O'Shea v. Littleton*, 414 U.S. 488 (1974), and *31 Foster Children*, Defendants contend that *Younger* abstention is required where an injunction would indirectly accomplish the type of interference that *Younger* and its progeny sought to prevent. (Defs.' Opp. Br. at 6.) The R&R similarly concluded, incorrectly, that even though a remedial order would

---

[17] Indeed, it is telling that every Supreme Court and Eighth Circuit *Younger* abstention case cited by Defendants involved a request to terminate a state court proceeding, usually through a lawsuit naming as defendant one or more judge, county attorney, commissioner, or other officer acting in a clearly judicial capacity, and in all events seeking relief that would directly enjoin, or have the effect of enjoining, the ongoing state proceeding. (*See* Pls.' Br. in Opp. MTD at 17 nn. 17 & 18.) In fact, of *all* the cases cited by Defendants on *Younger* abstention, only a few – *31 Foster Children*, 329 F.3d 1255; *J.B.*, 186 F.3d 1280; *Joseph A.*, 275 F.3d 1253; and *Laurie Q. v. Contra Costa County*, 304 F. Supp. 2d 1185 (N.D. Cal. 2004) – did not involve such facial attacks on state court proceedings or the statutes upon which they are premised. Each of these non-binding cases is thoroughly distinguished and/or shown not to be persuasive in prior briefing. (*See* Filing #97, Plaintiffs' Brief in Support of Statement of Objections ("Pls.' Obj. Br.") at 44-46 & 49-50; *see also* Pls.' Br. in Opp. MTD at 17-26.)

23

"run against the Department," interference would result because it would "*duplicate* the authority already afforded to the Nebraska juvenile court by the Nebraska legislature." (R&R at 158 (emphasis added) (relying on *31 Foster Children*).) But *O'Shea* establishes only that, in addition to barring remedies that cause the federal courts to enjoin present state court hearings, the *Younger* doctrine applies to prospective relief that would inevitably lead to a similar result. Michael O'Shea was a state court judge, and the injunction at issue contemplated "interruption of state proceedings to adjudicate assertions of noncompliance by petitioners" which the Court viewed as "nothing less than an ongoing federal audit of state criminal proceedings." *O'Shea*, 414 U.S. at 500.  Such relief, which directly targeted judicial officers and the criminal proceedings they oversaw, even if only prospectively, is far different from the exclusively executive branch-focused relief sought in this case.[18]

Finally, Defendants seek to rely on the Supreme Court's decision in *Moore v. Simms*, 442 U.S. 415 (1979), a case also cited extensively by the R&R. But again, the facts of *Moore* are so distinguishable that to the extent the case is relevant it only demonstrates why *Younger* abstention is not appropriate in this case. In *Moore*, federal plaintiffs sought to challenge the removal of their biological children pursuant to various orders of the Texas Juvenile Court. *Moore*, 442 U.S. at 419-20. Plaintiffs initially fought the removals exclusively in Texas court but then filed a separate challenge in federal court seeking (i) a declaration that all of Title 2 of the Texas Family Code unconstitutionally infringed on family integrity; (ii) an order enjoining the prosecution of the abuse/neglect proceedings involving their children; *and* (iii) an order

---

[18] Plaintiffs note in their Objections Brief that "ellipsed" from the R&R's quotation of *31 Foster Children* was the Eleventh Circuit's reference to the relief that is the keystone of the Court's decision in that case – *i.e.*, that plaintiffs sought to "have the district court appoint a panel and give it authority to implement a system-wide plan to revamp and reform dependency proceedings in Florida . . ." (Pls.' Obj. Br. at 45.) Unable to rebut this language that forcefully distinguishes *31 Foster Children*, Defendants decry Plaintiffs' conduct in bringing this pivotal provision to the attention of the Court as an accusation that the Magistrate Judge "intentionally omitt[ed] language" from his citation. (Defs.' Opp. Br. at 11.)

24

"enjoining the Department [of Human Services] and other defendants from filing or prosecuting any state suit under the challenged state statutes . . . ." *Id.* at 422. Importantly, *Moore* dealt with a facial attack on the constitutionality, not just of a single state statute, but of a "complex state statutory scheme." *Id.* at 427. There was no dispute in *Moore* that plaintiffs were empowered to seek, and the Texas courts were empowered to grant, the requested finding of unconstitutionality. *Id.* at 426 n.9. Nor was there any question that the relief sought – invalidation of the statutory foundation on which the State of Texas' entire child protection scheme rested and an injunction prohibiting the prosecution in state court of any legal proceedings pursuant to this scheme – would directly interfere with the province of the Texas Juvenile Court. None of these issues are implicated by this lawsuit.

For all these reasons, the R&R's recommendation that the Court abstain pursuant to the *Younger* doctrine should not be adopted and Defendants' motion to dismiss denied.

## III.    THE NEXT FRIENDS ARE ADEQUATE REPRESENTATIVES FOR THE NAMED PLAINTIFFS

Defendants contend that the Court should bar the named Plaintiffs from pursuing their case because, as a result of their status as foster children and the very HHS failures targeted by this lawsuit, the named Plaintiffs have no stable adult in their life to represent them in this lawsuit. Defendants further contend that the named Plaintiffs' "self-appointed" representatives are pursuing exclusively systemic relief on their behalf and must therefore be "ideologues" incapable of representing the named Plaintiffs' interests in these proceedings. (Defs.' Opp. Br. at 24-27.)

What Defendants' argument misses is that the next friends seek class-wide relief necessary to fix the broken system that has harmed and will continue to harm the individual children they represent. Seeking systemic relief is not inconsistent with the individual needs of

25

the named Plaintiff children, and is manifestly in their individual best interests. Plaintiffs allege, for example, that HHS' pattern and practice of "failing to develop and maintain appropriate foster homes and other placements . . . results in a high rate of psychologically damaging placement disruptions, with Plaintiff children being repeatedly and unnecessarily shuffled from one placement to another." (Am. Compl. at ¶ 114.) Indeed, this is precisely what has happened to the named Plaintiffs, who have experienced, on average, ten different placements while in HHS custody. (*See* Plaintiffs' Brief in Support of Statement of Objections ("Pls.' Obj. Br.") at 12.) This chronic placement shortage is a problem that can only be addressed by systemic relief. Obviously, to say that Plaintiffs seek systemic relief is not to say that they "could not care less about obtaining 'individualized relief'" for the children they represent.[19] (*See* Defs.' Opp. Br. at 24.)

Nor is there any evidence, unlike in *T.W. v. Brophy*, 124 F.3d 893 (7th Cir. 1997), that the next friends are "ideologues," unsuited to adequately represent the named Plaintiffs and the class. There is no evidence or even suggestion that these next friends have ever challenged a foster care system in the past or have done anything else to promote an ideology or agenda that they would be pursuing through this case. *Compare with T.W. v. Brophy*, 124 F.3d at 896 (noting in case involving damages claim for $120M that proposed next friend was a

---

[19] To the contrary, Crystal Foreman's understanding of what it meant to be a "next friend" in this lawsuit is "to represent Carson [P.] and to be his voice." (Defs.' Ex. 31, C. Foreman Tr. at 30:23.) Vanessa Nkwocha testified that she wants to be Hannah A.'s next friend because she "believe[s] that Hannah A. is worthy of a loving and stable family" (Defs.' Ex. 47, Nkwocha Tr. at 35:9-10), and she thinks "it would be wonderful for HHS to diligently recruit a family who would be capable of dealing with [Hannah's] needs as they exist today" (*id.* at 70:12-15). Micheline Creager is committed to Bobbi W.'s best interests and would like to see Bobbi W. in a "loving, stable home environment," and successfully adopted. (Defs.' Ex. 46, Creager Tr. at 46:19-21; 47:3-5.) Jodell Bruns' focus on Danielle D.'s individual interests is evidenced by her knowledge of HHS' various failures with regard to Danielle D. (Defs.' Ex. 33, Bruns Tr. at 17:23-18:17 & 41:7-18.) Asked about her ability to represent Jacob P., his next friend Sara Jensen stated, "I'm looking out for his best interests." (Defs.' Ex. 35, Jensen Tr. at 13:15-16.)

26

"professional children's advocate" who had tracked the case in the media.[20]   The next friends are not professional child advocates pursuing their own personal agenda at the expense of the children they represent.   They are average citizens with their own careers who have agreed in good faith to represent the named Plaintiffs' interests in these proceedings.   (*See* Filing #82, Reply Brief in Further Support of Motion for Class Certification at 44-53.)   Even the Defendants themselves concede, "[o]bviously, the purported next friends in this case are not 'self interested.'"   (Defs.' Opp. Br. at 27.)

Finally, in light of the inherent obstacles foster children face in securing an interested and un-conflicted representative (*see* Pls.' Obj. Br. at 33-34),[21] it is unrealistic to require that a non-custodian next friend could or should have previously intervened with participants in closed proceedings before the Juvenile Courts and the Foster Care Review Board or obtained confidential information from HHS and current foster parents.   (*See* Pls.' Obj. Br. at 33-34.)

To refuse class certification or dismiss this case because the named Plaintiffs purportedly do not have a sufficiently close relationship to an adult capable of representing their interests in these proceedings would be to penalize them for being foster children and for the effects of the very same fundamentally flawed system that they are challenging with this lawsuit.[22] Accordingly, that portion of the R&R challenging the adequacy of the next friends to represent

---

[20] In *T.W.*, the Seventh Circuit was particularly concerned with the proposed next friend's tactic of naming the children's aunt and guardian ad litem as defendants in what the court termed an "attempt[] to disqualify . . . the most natural candidates" to represent the children.   *T.W.*, 124 F.3d at 897.   Of course, Plaintiffs have made no such attempt here.

[21] The R&R correctly determined, and Defendants do not challenge, that the named Plaintiffs' respective guardians ad litem are not empowered to represent their interests in these proceedings.   (*See* R&R 123-24 (*citing In re Interest of Brittany S.*, 12 Neb. App. 208, 218-19 (Neb. App. 2003)).)

[22] Defendants' own cases recognize that it is appropriate in certain circumstances for a third party to serve as a next friend.   Because the Plaintiff children have no adult relative or family friend to represent them, this case presents just such extraordinary circumstances.

the interests of the named Plaintiffs, either for purposes of class certification or Defendants'

motion to dismiss for lack of prudential standing, should not be adopted.[23]

## IV.  AS THE R&R CORRECTLY DETERMINED, PLAINTIFFS HAVE PROPERLY ALLEGED ARTICLE III STANDING

As the Magistrate Judge properly recommended, Plaintiffs have adequately alleged that

they have Article III standing to pursue their claims. The R&R determined that "[t]he amended

complaint thoroughly discusses past and repeated harms experienced" by the named Plaintiffs

"due to the alleged systemic deficiencies in the child welfare system;" and further that Plaintiffs

"have demonstrated a risk of future harm that is sufficiently real and imminent to support

standing." (R&R at 116-17.) Nonetheless, Defendants attempt to re-argue that Plaintiffs lack

*standing* because in the *abstention* section of their opening brief, Plaintiffs allegedly did not

demonstrate that they personally have suffered any injury that can be redressed by the Court.[24]

To the contrary, Plaintiffs have alleged, in detail, the redressable harms caused them by

Defendants' actions and inactions.[25]

A plaintiff adequately alleges standing where "the complaint 'say[s] enough about

jurisdiction to create some reasonable likelihood that the court is not about to hear a case that it is

---

[23] At most, these children should have next friends appointed for them whom the Court deems suitable to pursue their claims – not have their claims thrown out entirely due to circumstances beyond their control, including circumstances created by Defendants. *See* Fed. R. Civ. P. 17(c) ("the Court shall appoint a guardian ad litem for an infant . . . not otherwise represented in an action or shall make such other order as it deems proper *for the protection of the infant*." (emphasis added).

[24] On September 28, 2006, Defendants filed their Statement of Objection (Filing #93) and supporting brief (Filing #94) articulating Defendants' limited objections to the R&R's recommendation that the named Plaintiffs have standing to pursue their claims. Plaintiffs responded in detail to Defendants' various standing arguments in their November 13, 2006 Brief in Opposition to Defendants' Objections to the Magistrate's Report and Recommendation (Filing #106). Apparently unsatisfied with the scope of their prior objections, Defendants are seeking another "bite at the apple" in their Opposition Brief. This is improper under NECivR 72.3. Given the straightforward flaws in Defendants' standing argument, even as reframed and broadened by Defendants, Plaintiffs have addressed the substance of these objections here but the Court is respectfully referred to the parties' briefing *on the Article III standing issue* for a fuller presentation of Plaintiffs' position.

[25] The R&R notes, correctly, that as a matter of Article III standing, "the plaintiffs seek an order enjoining HHS from continuing to implement its current policies, because those policies present a real and continuous threat that past harms from HHS' actions or inactions will occur again." (R&R at 118.)

not supposed to have the power to hear.'" *Gardner v. First Am. Title Ins. Co.*, 294 F.3d 991, 994 (8th Cir. 2002) (*quoting Hammes v. AAMCO Transmissions*, Inc., 33 F.3d 774, 778 (7th Cir. 1994)). The Amended Complaint establishes far more than "some reasonable likelihood" of standing. It alleges in great detail the specific redressable harms suffered by each named Plaintiff as well as the specific harms those Plaintiffs continue to suffer and are at risk of suffering in the future by virtue of their ongoing HHS custody. In particular, Plaintiffs have alleged the harms caused to them by the lack of appropriate placement options, lack of proper training and staffing at HHS, lack of access to medical and psychological services and failure to monitor them appropriately.

First, contrary to Defendants' argument (Defs.' Opp. Br. at 32), Plaintiffs have alleged that they have personally been harmed by a lack of appropriate placement options. For example:

- Bobbi W. is a victim of sexual abuse who suffers from numerous disorders and has been subjected to over twenty different foster care placements during her time in HHS custody. (Am. Compl. at ¶ 90.) Bobbi is currently languishing in a group home that is incapable of meeting her needs, where she has been for more than a year. (*Id.* at ¶ 96.) HHS has taken no steps to achieve permanency for Bobbi and she currently is on the waiting list to be admitted into the Beatrice State Developmental Center. (*Id.* at ¶¶ 96-97.)

- Jacob P. has been shuffled amongst at least eleven different foster care placements during his years in foster care. (*Id.* at ¶ 82.) "As a result of his extensive time in State custody and multiple placement moves, Jacob suffers from severe attachment problems." (*Id.* at ¶ 88.)

Defendants contend that "the clear remedy for the lack of a stable placement would be for this Court to order a new placement." (Defs.' Opp. Br. at 33.) But Plaintiffs' point is precisely that, in the absence of appropriate placement options, children like Bobbi W. and Jacob P. are constantly at risk of being repeatedly moved from inappropriate placements or left to languish in institutional settings. (*See, e.g.,* Am. Compl. at ¶¶ 114, 120.)

29

Second, Defendants contend that none of the Plaintiffs have suffered from inadequate criminal background checks, inadequate caseworker training or high caseworker turnover rates— all injuries Plaintiffs contend can be remedied by hiring more caseworkers and greater caseworker supervision. (Defs.' Opp. Br. at 32-33.) Again, Defendants are wrong. For example:

- HHS has repeatedly failed to oversee Hannah during her time in foster care, and has repeatedly had her placed in unsafe and otherwise inadequate foster homes, including with at least one relative with a criminal record. (Am. Compl. at ¶¶ 99-106.) As is alleged at paragraph 103 of the Amended Complaint:

   During 2004, HHS moved Hannah on a number of occasions, *including through several inadequately screened and supervised non-family and relative placements. On one occasion, Hannah was sent out of state to live with a relative with a criminal record.* She was returned with marks and bruises and was alleged to have sexually acted out on another child in the out-of-state home. Thereafter, Hannah was placed with an unprepared and largely unsupported foster family that after only six weeks dropped Hannah off at a shelter for homeless families (not even a children's shelter), where HHS permitted her to spend at least one night before she was rescued – not by HHS – but by a former foster mother. (Emphasis added.)

- Bobbi W. has had at least eight different caseworkers during her time in HHS custody. (Am. Compl. at ¶ 90.)

- "During [Carson P.'s] first eight months in foster care, Carson's HHS caseworker failed to visit him even a single time." (Am. Compl. at ¶ 51.)

Moreover, simply ordering a new caseworker assigned to a child each time there is a problem or one quits will never address the chronic staffing shortage that causes or risks harm to all Plaintiff children in HHS foster care custody. Only an order requiring an adequate workforce that can monitor child safety, a remedy unavailable in Juvenile Courts, can address this problem.

Third, the named Plaintiffs have alleged that they have been harmed by a lack of access to appropriate medical screens and attendant care and require increased access to such screening and care. For example:

30

- HHS has repeatedly denied Hannah appropriate medical treatment while in state custody. While in foster care, "[Hannah] developed a severe ear infection and her ear drained foul smelling and discolored liquid for weeks before being treated . . . ." (Am. Compl. at ¶¶ 100-01.) "HHS failed to properly evaluate her for nearly three years, during which time some of Hannah's more serious problems remained undiagnosed and unaddressed." (*Id.* at ¶ 99.)

- HHS has repeatedly denied Carson urgently needed mental health screens and services despite his considerable mental health needs. As is alleged in the Amended Complaint, "[a] victim of sexual abuse and fetal alcohol syndrome, Carson has serious mental and behavioral health needs. Throughout his term in foster care Carson has routinely been, and is now being, denied access to treatment and services appropriate to these significant needs, to his great detriment." (*Id.* at ¶ 46.) HHS did not have Carson P. assessed in any formal manner at or around the time he came into care. (*Id.* at ¶ 50.) Moreover, HHS has consistently impeded any and all efforts to obtain appropriate treatment for Carson's various mental health and behavioral problems. (*Id.* at ¶¶ 50-52, 56.)

Thus, Defendants' argument that Plaintiffs do not seek individual relief misses the mark. If relief is granted reducing caseloads, providing better caseworker training, improving placement options, and improving access to medical care, *then each of these named Plaintiffs will obtain the relief they need.* Simply because the harms to Plaintiffs have a systemic cause does not mean that Plaintiffs individually will not obtain relief when that cause is remediated.

In sum, all the allegations and evidence to date support Plaintiffs' Article III standing to pursue their claims.

## V.   PLAINTIFFS HAVE AN ENFORCEABLE FEDERAL STATUTORY RIGHT TO FOSTER CARE MAINTENANCE PAYMENTS THAT COVER THE ACTUAL COST OF THEIR CARE

Plaintiffs object to the R&R's determination that there is no private right of action under certain defined sections of AACWA, 42 U.S.C. §§ 671(a)(1), 672, and 675(4), requiring HHS to make foster care maintenance payments on behalf of Plaintiffs that cover the actual "cost" of their care. Specifically, Plaintiffs object to the R&R's finding that these sections fail to meet the first and second prongs of the *Blessing* test: (1) that Congress intended the statutory provision at

31

issue to benefit the plaintiff and (2) that the right granted by those provisions is not so vague or amorphous as to be unenforceable by the courts. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).

As to the first *Blessing* prong, the R&R reasons that foster children do not have an enforceable right to foster care maintenance payments because (1) they are not the direct beneficiaries of §§ 671(a)(1), 672, and 675(4) and (2) the "link between increased foster care maintenance payments and the services provided to any particular child 'is far too tenuous.'" (R&R at 182.) However, as Plaintiffs have noted, the plain language of the statute in fact makes clear that these provisions were intended to benefit the Plaintiffs. The statute is "phrased in terms of the persons benefited" – the payments are made "on behalf of *each child*" (emphasis added); and there is an *"unmistakable focus* on the benefited class" – the payments are made to satisfy the most basic needs of children in foster care. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (*citing Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13, 691-92 (1979)) (emphasis in original).

In addition, the link between foster care maintenance payments and the services provided to children in foster care is direct and not at all tenuous. The clear intent of the statutory provisions and the direct result of those payments are to provide for the child's most basic needs such as clothing, food, and shelter.[26] The provision of basic necessities is a direct benefit to foster children, and includes "food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation."[27] 42 U.S.C. § 675(4).

---

[26] In addition, Plaintiffs' expert will testify at trial that providing adequate foster care payments has a direct impact on the state's ability to recruit and retain a sufficient number of appropriate foster parents.

[27] Defendants also suggest that *Pediatrics Specialty Care, Inc. v. Arkansas Dept. of Human Services*, 443 F.3d 1005 (8th Cir. 2006) (*Pediatrics III*) is irrelevant. (Defs.' Opp. Br. at 36.) However, the R&R can be fairly read to suggest

As to the second prong of the *Blessing* test, Plaintiffs also object to the R&R's conclusion that the determination of Medicaid reimbursement rates found to be privately enforceable in *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990) is distinguishable from the determination of foster care maintenance payments at issue here. (R&R at 182-84.) The Supreme Court in *Wilder* found that the reasonableness of a state's Medicaid rates was not too vague or amorphous to enforce even if it required the court to gain "some knowledge of the hospital industry." *Wilder*, 496 U.S. at 520. Defendants insist, however, that such "judicial inquiry" was only allowable because the determination of reasonable Medicaid rates was guided by "specific factors and objective benchmarks" in the statute. (Defs.' Opp. Br. at 37.) These guidelines required a court to look at the "unique" or "special" situations of hospitals serving certain populations. *Wilder*, 496 U.S. at 520 n. 17.

The statutory provisions at issue here are much more concrete than those found to support a private right of action in *Wilder*. Foster care maintenance payments are based on the actual cost of "food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation."[28] 42 U.S.C. § 675(4). Information relevant to the average cost of clothing, food, rent, day care, insurance and transportation is readily available. For example, the U.S. Department of Agriculture issues estimates of family expenditures on children, broken down by category and geographic region, for the purpose of assisting states in calculating appropriating

---

that Magistrate Judge Piester did not believe a right to foster care maintenance payments could be vested in foster children because that right has already been found to vest in foster care providers. (R&R at 181-82 "*Missouri Child Care* is not persuasive authority for recognizing a private right of action on behalf of the named plaintiffs. *Missouri Child Care* held that the foster care providers, not the children, can pursue a private claim . . . ." (*citing Missouri Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032 (W.D.Mo. 2003)).) Therefore, *Pediatrics III* and its holding that enforceable rights can vest in more than one group are highly relevant.

[28] Defendants try to argue that this section does not provide any guidance to the court for determining the reasonableness of foster care maintenance payments because section 675(4) just defines foster care maintenance payments. (Defs.' Opp. Br. at 38.) But the definition itself provides the guidance. The state must provide payments that cover the *cost* of a detailed list of objective and tangible basic necessities.

33

foster care maintenance payments.[29] *See* United States Department of Agriculture, Expenditures on Children by Families, 2005, Misc. Publication No. 1528-2005, available at http://www.cnpp.usda.gov/Publications/CRC/crc2005.pdf. Thus, the foster care maintenance payment provision, far from being "vague and amorphous," is subject to enforcement by the Court.

Contrary to Defendants' assertions, Plaintiffs' objections to the R&R are well-founded and §§ 671(a)(1), 672, and 675(4) should be found to be privately enforceable.

## Conclusion

For the foregoing reasons, Plaintiffs request that the Court not adopt the R&R's recommendations with respect to class certification, prudential standing, *Younger* abstention, and the existence of a private right of action to foster care maintenance payments under defined provisions of AACWA; grant Plaintiffs' Motion for Class Certification; deny Defendants' Motion to Dismiss in its entirety; and grant such other and further relief as seems just and proper.

Dated: November 30, 2006

Respectfully submitted,

By:   /s/ Gene Summerlin
V. GENE SUMMERLIN (Bar No. 19611)
MARNIE A. JENSEN (Bar No. 22380)
OGBORN, SUMMERLIN & OGBORN, P.C.
610 J Street, Suite 200
Lincoln, NE 68508
Phone: (402) 434-8040
Facsimile: (402) 434-8044

---

[29] Thus, Plaintiffs allege in their Amended Complaint that "HHS pays many foster parents only $222 a month – less than $8 a day – to raise a newborn to two-year-old child, when the *federal government estimates that it costs an average family $755 a month to raise a child of that age in the rural United States and $761a month for the urban Midwestern United States.*" (Am. Compl. at ¶ 125 (emphasis added).)

34

MARCIA ROBINSON LOWRY (*pro hac vice*) IRA P.
LUSTBADER (*pro hac vice*)
DOUGLAS C. GRAY (*pro hac vice*)
ELISSA A. HENDLER (*pro hac vice*)
PRIY SINHA (*pro hac vice*)
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, New York 10001
Phone: (212) 683-2210
Facsimile: (212) 683-4015

D. MILO MUMGAARD (Bar No. 19919)
JENNIFER A. CARTER (Bar No. 22819)
NEBRASKA APPLESEED CENTER FOR LAW
IN THE PUBLIC INTEREST
941 'O' Street, Suite 105
Lincoln, NE 68508-3626
Phone: (402) 438-8853
Facsimile: (402) 438-0263

STANLEY J. ADELMAN (*pro hac vice*)
ANNE C. AUTEN (*pro hac vice*)
DLA PIPER US LLP
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
Phone: (312) 368-4095
Facsimile: (312) 236-7516

**OF COUNSEL:**

EDWARD H. TRICKER (Bar No. 15504)
WOODS & AITKEN LLP
301 South 13th Street, Suite 500
Lincoln, Nebraska 68508
Phone: (402) 437-8500

THOMAS A. GRENNAN (Bar No. 15675)
GROSS & WELCH, P.C., L.L.O.
1500 Omaha Tower
2120 South 72nd Street
Omaha, Nebraska 68124-2342
Phone: (402) 392-1500

## CERTIFICATE OF SERVICE

I certify that on November 30, 2006, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent notification of the filing to the following:

Timothy R. Engler
Christopher R. Heinrich
Gregory D. Barton
Special Assistant Attorneys General
800 Lincoln Square
121 South 13th Street
P.O. Box 82028
Lincoln, NE 68501-2028
tengler@hsdlegal.com
cheinrich@hsdlegal.com
gbarton@hsdlegal.com

BY:  _____/s/ Marnie A. Jensen_____
     One of Plaintiffs' Attorneys

36

# ADDENDUM A

## UNPUBLISHED CASE:

**Olivia Y., et al. v. Barbour, et al.**
**U.S. District Court for the Southern District of Mississippi**
**Jackson Division**
**Case N. 3:04CV251LN**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

OLIVIA Y ., BY AND THROUGH HER
NEXT FRIEND, JAMES D. JOHNSON;
JAMISON, J., BY AND THROUGH HIS
NEXT FRIEND, CLARA LEWIS; DESIREE,
RENEE, TYSON AND MONIQUE P., BY AND
THROUGH THEIR NEXT FRIEND, SYLVIA
FORSTER; JOHN A., BY AND THROUGH HIS
NEXT FRIEND, JAMES D. JOHNSON; CODY B.,
BY AND THROUGH HIS NEXT FRIEND, SHARON
SCOTT, MARY, TOM, MATTHEW AND DANA W.,
BY AND THROUGH THEIR NEXT FRIEND,
ZELETRA W.; AND SAM H., BY AND THROUGH
HIS NEXT FRIEND, YVETTE BULLOCK, ON
THEIR OWN BEHALF AND ON BEHALF OF
OTHERS SIMILARLY SITUATED                          PLAINTIFFS

VS.                                   CIVIL ACTION NO. 3:04CV251LN

HALEY BARBOUR, AS GOVERNOR OF THE
STATE OF MISSISSIPPI; DONALD TAYLOR,
AS EXECUTIVE DIRECTOR OF THE DEPARTMENT
OF HUMAN SERVICES; AND BILLY MANGOLD,
AS DIRECTOR OF THE DIVISION OF FAMILY
AND CHILDREN'S SERVICES                            DEFENDANTS

## MEMORANDUM OPINION AND ORDER

On March 30, 2004, plaintiffs herein moved, pursuant to Rules

23(a) and (b)(2) of the Federal Rules of Civil Procedure, for

certification of this action as a class action, with two plaintiff

classes, defined, respectively, as follows:

(1) "all children who are or will be in the legal and/or
physical custody of DFCS" (the "In-Custody Class"); and

(2) "all of those children who are not in DFCS custody,
but have been or are at risk of being abused and
neglected, and about whom Defendants have received a

> report of abuse or neglect (the "Protective Services
> Class").

Subsequently, defendants Haley Barbour, Governor of the State of

Mississippi, Donald Taylor, Executive Director of the Department

of Human Services (DHS) and Billy Mangold, Director of the

Division of Family and Children's Services (DFCS), moved to

dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  Defendants moved to stay consideration of the motion

for class certification pending a ruling on the motion to dismiss.

On November 18, the court issued its opinion on defendants'

motion.  The court therein dismissed all claims sought to be

asserted by and on behalf of the "Protective Services Class," and

also dismissed the claims of the "In-Custody Class" for violation

of their alleged procedural due process rights and for violation

of the Adoption Assistance and Child Welfare Act.  In the wake of

that ruling, there remain only claims of the putative "In-Custody

Class" for violation of their substantive due process rights.

Plaintiffs, who seek class certification pursuant to Rule

23(a) and (b)(2), bear the burden of demonstrating that the

requirements of the rule have been met.  The pertinent provisions

of the rule are as follows:

> (a) Prerequisites to a Class Action.  One or more
> members of a class may sue or be sued as representative
> parties on behalf of all only if (1) the class is so
> numerous that joinder of all members is impracticable,
> (2) there are questions of law or fact common to the
> class, (3) the claims or defenses of the representative
> parties are typical of the claims or defenses of the

2

> class, and (4) the representative parties will fairly
> and adequately protect the interests of the class.
>
> (b) Class Actions Maintainable. An action may be
> maintained as a class action if the prerequisites of
> subdivision (a) are satisfied, and in addition:
> . . .
> (2) the party opposing the class has acted or refused to
> act on grounds generally applicable to the class,
> thereby making appropriate final injunctive relief or
> corresponding declaratory relief with respect to the
> class as a whole.

Thus, plaintiffs must establish the four factors of Rule
23(a)--numerosity, commonality, typicality, and adequacy--as well
as the requirements of Rule 23(b)(2).

Defendants admit that the proposed class, which would include
all of the approximately 3,000 children currently in DHS custody,
satisfies the requirement of numerosity, but they maintain that
plaintiffs' efforts toward establishing the propriety of class
certification begin and end there.

The gist of defendants' opposition to class certification is
their insistence that in presenting this as as a prospective class
action, plaintiffs are seeking a "one size fits all" approach to
claims and issues that simply cannot be treated in such a fashion.
This is not a case of "generic children with generic claims," say
defendants, but rather of individual children whose cases DHS is
mandated to address in an individualized fashion based on each
child's individual circumstances and individual needs.  They note
that a child can wind up in DHS custody in one of several ways,
from the Baby Drop-Off Law to orders of the Youth Court, and that

3

while there may be a common basic cause which leads to DHS's assuming custody, i.e., abuse and neglect, it does not follow that all abused and neglected children are alike or have the same problems and needs. Indeed, they say, abused and neglected children are of different ages, genders and family backgrounds and have different medical, psychological and behavior problems, intellect and education, so that the treatment, care and services DHS is mandated to provide must be assessed on a child-specific basis.

Defendants further contend that plaintiffs cannot legitimately label their claims "common" merely by broadly alleging that "systemic deficiencies have resulted and continue to result in violations of their federal and statutory and constitutional rights." They argue, that is, that the requisite commonality cannot be found to exist where plaintiffs have not challenged specific practices or procedures utilized by DHS but rather have simply alleged generally that DHS has a practice and procedure of failing to meet the needs of children in its custody and has thereby violated the substantive due process rights of all children in its custody. In sum, defendants submit that plaintiffs have impermissibly attempted to group together children with very different needs, rights and problems, and they conclude that since plaintiffs cannot demonstrate that all children in the proposed class have experienced the same problems or the same

4

difficulties in receiving required services from DHS as plaintiffs or as each other, then plaintiffs cannot possibly satisfy Rule 23(a)'s requirements of commonality and typicality.

With reference to the requirement of Rule 23(b)(2), defendants similarly argue that because plaintiffs have not identified any specific policy or practice that could be the subject of injunctive relief but rather have alleged generally that defendants have a policy and practice of not meeting the needs of children in its custody, it is difficult to conceive of an injunction that could remedy the alleged deficiencies, and certainly not a "classwide" injunction that could remedy the deficiencies encountered by individual children.

To meet the test for commonality, plaintiffs need not show that "[t]he interests and claims of the various plaintiffs . . . are identical. Rather, the commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.'" Forbush v. J.C. Penney Co., Inc., 994 F.2d 1101, 1106 (5th Cir. 1993) (quoting Stewart v. Winter, 669 F.2d 328, 335 (5th Cir. 1982)). "For this reason, '[t]he threshold of "commonality" is not high'." Id. (quoting Jenkins v. Raymark Industries, 782 F.2d 468, 472 (5th Cir. 1986)). Neither is the test for typicality demanding. Smith v. Texaco, Inc., 263 F.3d 394, 406 (5th Cir. 2001). The requirement of typicality "'focuses on the similarity between the

5

named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent,' and is satisfied when the resolution of common questions affects all or a substantial number of class members." Id. at 406-07 (citations omitted).

Here, the court, having considered plaintiffs' arguments, is persuaded that plaintiffs have sufficiently identified issues common to all or most of the proposed class members. These include, by way of example only, the legal questions whether defendants' actions and inactions have violated the substantive due process rights of children in DHS custody to be safe from harm while in state custody and whether defendants' actions and inactions have resulted in a denial of necessary health services in violation of their substantive due process rights, and the factual questions whether defendants have failed to provide children in their custody with safe, licensed foster care placements, whether defendants have failed to provide children in foster care with required services necessary to keep them safe and prevent them from deteriorating physically, psychologically or otherwise while in custody and whether DHS staffing shortage endangers children in DHS custody.[1]

---

[1]    A plaintiff cannot clear the commonality hurdle by "merely describing issues at the highest level of generality." Smith v. Texaco, Inc., 263 F.3d 394, 405 -406 (5th Cir. 2001). Thus, for example, it is not sufficient merely to allege, without more, that all members of the proposed class have been victims of race discrimination. Here, while defendants challenge plaintiffs' complaint as too general to support class certification, the court

6

In the court's opinion, it is reasonably clear from their complaint that plaintiffs have identified alleged shortcomings by DHS, in terms, inter alia, of its staffing, policies and practices, which if proven, could readily be found to place every child in DHS custody at substantial risk of harm. Consequently, even though each plaintiff and each proposed class member may not yet have suffered the same type or degree of harm (though some surely have), because it appears that defendants' alleged acts and omissions pose a significant risk of similar harm to all (or at least the requisite "significant number" of) children in DHS custody, the court concludes that the requirements of commonality and typicality are satisfied.

It also follows from the court's conclusion in this regard that plaintiffs have satisfied the requirements of Rule 23(b)(2), in that the plaintiffs' allegations do relate to defendants' actions and inaction with respect to the class as a whole and the relief plaintiffs seek is classwide declaratory and injunctive relief with respect to the class as a whole. The court does acknowledge defendants' contention that effective injunctive relief for the benefit of the proposed class, as opposed to relief for the specific named plaintiffs, cannot feasibly be granted in view of the extensiveness of the failures alleged by plaintiffs.

---

finds that it is sufficiently specific in terms of the violations identified and relief sought.

7

In the court's opinion, however, the fact that it could prove difficult to fashion fully responsive and effective injunctive relief (in the event violation(s) are proven) is not a basis for refusing to undertake the task in the first place. That is to say, the court does not perceive this to be an impossible undertaking, and it is not one the court is unwilling to assume.

In addition to the foregoing, defendants also contend that plaintiffs have failed to satisfy the "adequacy" requirement of Rule 23(a). As to this requirement, the Fifth Circuit has made clear that

> [t]o meet Rule 23 requirements, the court must find that class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members. Stirman v. Exxon Corp., 280 F.3d 554, 562 (5th Cir. 2002). Class representatives must satisfy the court that they, and not counsel, are directing the litigation. To do this, class representatives must show themselves sufficiently informed about the litigation to manage the litigation effort. Berger, 257 F.3d at 479.

Unger v. Amedisys Inc., 2005 WL 375684, *2 (5th Cir. 2005).

Defendants in this case do not question the adequacy of class counsel. They do, however, contend that the "next friends" through whom the named plaintiffs are suing are "uninterested and inexperienced" and hence are not adequate class representatives. In this regard, they note that at their depositions, Sharon Scott, next friend to Cody B., and Sylvia Forester, next friend to the P. Children, both testified that they do not know where these children are now, and next friend James Johnson testified that he

8

has never met John A. and that while he knows John A. is in a
foster home, he does not know the name of the foster parent and
has never spoken with the foster parent.

Plaintiffs vigorously dispute defendants' characterization of
these persons as uninterested and inexperienced, and insist that
the next friend for each of the named In-Custody plaintiffs is an
adequate representative.[2]  Specifically, plaintiffs note that
James Johnson serves as guardian ad litem for both Olivia Y. and
John A., having been appointed by the Mississippi Youth Court and
that his representation of the children in this case is
specifically authorized by Federal Rule of Civil Procedure 17(c).
As for the others, plaintiffs point out that Sharon Scott is a
family friend of Cody B.'s former foster parent and helped care
for him for approximately eighteen months, until he was moved.
Ms. Scott testified that she has repeatedly tried to get
information from DHS as to his whereabouts but DHS will not give
her the information.

Zelatra W., next friend to Mary, Tom, Matthew and Dana W., is
the children's aunt who, as a licensed foster care provider, cared
for the children in her home for two and a half years before they
were removed.  She testified that although she has been unable to
get information from DHS concerning the children, it has not been

---

[2]     Plaintiffs point out that Sylvia Forester is not a next
friend on behalf of any of the In-Custody plaintiffs.

9

for lack of effort on her part. Clara Lewis, next friend to Jamison J., is his former foster parent who has known him for years, stayed in touch with him, knows where he is currently and is Jamison J.'s biological sister's adoptive parent.

In the court's opinion, the suggestion by defendants that these representatives of the named plaintiff children are uninterested.or inexperienced is unfounded in fact. To the contrary, each is generally knowledgeable about the nature and purpose of this litigation, and has a good faith interest in the named plaintiffs' welfare and in the prosecution of this litigation.[3]

In conclusion, based on the foregoing, it is ordered that plaintiffs' motion for class certification is granted to the extent they seek certification of an "In-Custody Class."[4]

SO ORDERED this 11th day of March, 2005.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

---

[3] Copies of the next friends' deposition transcripts were provided at the court's request, and the court's review refutes defendants' characterization of these individuals.

[4] The court notes that plaintiffs have moved to strike Exhibit 1 which was submitted by defendants with their response to the motion for class certification. In the court's opinion, plaintiffs are correct that for present purposes, the exhibit is not relevant and it is therefore stricken.

10

# ADDENDUM B

## UNPUBLISHED CASE:

**Charlie H., et al. v. Whitman, et al.**
**U.S. District Court for the District of New Jersey**
**Case No. 2:99CV3678(GEB)**

Case 2:99-cv-03678-GEB-CCC Document 136 Filed 03/07/2002 Page 1 of 1

RECEIVED
WILLIAM T. WALSH, CLERK

2002 MAR -7 P 3: 37

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES
DISTRICT COURT

:
CHARLIE and NADINE H., et al.,    :
:
    Plaintiffs,    :    Civ. No. 99-3678 (GEB)
:
    v.    :    **ORDER**
:
CHRISTINE TODD WHITMAN, et al.,    :
:
    Defendants.    :
:

This matter having come before the Court upon plaintiffs' motion for class certification;

and the Court having considered the submissions and the oral arguments of the parties; and for

the reasons set forth in the Memorandum Opinion filed herewith; and for good cause shown;

IT IS THIS 6th Day of MARCH, 2002

ORDERED that plaintiffs' motion for class certification [118-1] be and hereby is

GRANTED; and it is further

ORDERED that the classes to be certified shall be:

(1) all children who are or will be in the involuntary custody of New Jersey DYFS; and

(2) all African-American and Hispanic children who are or will be in the custody of New
Jersey DYFS, and who have been or are subject to the immediate risk of being denied or
delayed adoption or foster care placement based on their race, color or national origin.

**ENTERED**
on
**THE DOCKET**
on
**WILLIAM T. WALSH, CLERK**
By
(Deputy Clerk)

GARRETT E. BROWN, JR., U.S.D.J.

**FILED**

**MAR 7 2002**

WILLIAM T. WALSH
CLERK

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CHARLIE and NADINE H., et al., | |
| Plaintiffs, | Civ. No. 99-3678 (GEB) |
| v. | **MEMORANDUM OPINION** |
| CHRISTINE TODD WHITMAN, et al., | |
| Defendants. | |

**BROWN, District Judge**

This matter comes before the Court upon the plaintiffs' Third Motion for Class Certification, pursuant to Fed. R. Civ. P. 23(a) and (b)(2). This Court exercises jurisdiction pursuant to 28 U.S.C. § 1331; and having considered the submissions and arguments of the parties, grants plaintiffs' motion.

### I. BACKGROUND

The facts and procedural history of the instant lawsuit have been thoroughly set forth in prior Opinions of this Court. *See Charlie H. v. Whitman,* 83 F. Supp. 2d 476 (D.N.J. 2000); Memorandum Opinion filed September 18, 2000 ("9/18/00 Mem. Op."). Therefore, only the facts and arguments necessary to the instant motion practice will be reviewed herein. In the most recent Memorandum Opinion in this matter, this Court determined that the class plaintiffs proposed for certification was overly broad in light of the limited surviving claims. *See* Memorandum Opinion filed June 28, 2001 ("6/28/01 Mem. Op.") at 4-5, 16. This Court denied plaintiffs' motion and granted them leave to file a new motion for class certification of two

FILED

MAR 7 2002

WILLIAM T. WALSH
CLERK

smaller classes as defined in that Memorandum Opinion. *See id.* at 15-16. Plaintiffs then filed

the instant "Third Modified Motion for Class Certification." Plaintiffs' Brief in Support ("Pls.'

Br.") at 1. As discussed in this Court's 6/28/01 Memorandum Opinion, only two of plaintiffs'

original allegations are currently at issue: (1) the substantive due process claim on behalf of

children who are involuntarily in state custody; and (2) plaintiffs' claim under the Multiethnic

Placement Act ("MPA"). *See* 6/28/01 Mem. Op. The Court will examine plaintiffs' newly

proposed classes based upon these two remaining claims.

## II. DISCUSSION

Plaintiffs seek class certification under Fed. R. Civ. P. 23(a) and (b)(2).

In defining class actions, Fed. R. Civ. P. 23(a) initially requires satisfaction of four elements:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there
> are questions of law or fact common to the class, (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the representative
> class, (4) the representative parties will fairly and adequately protect the interests
> of the class.

Fed. R. Civ. P. 23(a). These requirements, more commonly referred to as numerosity,

commonality, typicality, and adequacy of representation, "'are meant to assure both that class

action treatment is necessary and efficient and that it is fair to the absentees under the particular

circumstances.'" *See Barnes v. American Tobacco Co.,* 161 F.3d 127, 140 (3d Cir. 1998)

(quoting *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir. 1994)). Once these four pre-requisites

have been established, plaintiffs must also demonstrate compliance with one of the requirements

of Fed. R. Civ. P. 23(b). *See Baby Neal,* 43 F.3d at 58. The burden is on plaintiffs to

demonstrate that all four requisites for Rule 23(a) and at least one part of 23(b), in this case

23(b)(2), have been met. *See Morisky v. Public Service Electric and Gas Co.,* 111 F. Supp. 2d

2

493, 499 (D.N.J. 2000). In addition, the moving party must identify an appropriate proposed class. *See In re School Asbestos Litig.*, 56 F.3d 515, 519 (3d Cir. 1995). The proposed class must be adequately defined so individual class members are readily identifiable. *See id.* Class certification should not be granted where membership in the class can only be determined by a mini-trial on the merits of each case. *See Froman v. Data Transfer Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995). Furthermore, a proposed class definition must not be overly broad. *See Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 445 (E.D. Pa. 2000). Before certifying a class, courts must undertake "a rigorous analysis" to ensure that the proposed class and the named representatives satisfy each of the prerequisites to class certification. *See Morisky*, 111 F. Supp. 2d at 499 (citing *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)). However, in a motion for class certification, the merits of the case are not at issue. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974); *Hawker v. Consovoy*, 198 F.R.D. 619, 624 (D.N.J. 2001).

In accord with the Court's Memorandum Opinion regarding class certification, plaintiffs now propose two smaller classes of children in the custody of the Division of Youth and Family Services ("DYFS"), with slight modifications. Plaintiffs propose the certification of classes consisting of: (1) all children who are or will be in the involuntary custody of New Jersey DYFS; and (2) all African-American and Hispanic children who are or will be in the custody of New Jersey DYFS, and who have been, or are subject to the risk of being denied or delayed adoption or placement in a proper foster home based on their race, color or national origin.[1] *See* Pls.' Br.

---

[1] Defendants contest the inclusion of future class members in the proposed class definitions. *See* Defendants' Opposition at 4-6. However, potential future class members are often included in situations where declaratory or injunctive relief is sought. *See Smith v. First Union Mortgage Corp.*, No. Civ. A. 98-5360, 1999 WL 509967, at *3 (E.D. Pa. July 19, 1999). Defendants concede that any relief afforded would be applicable to all foster children even if they

3

at 2. Plaintiffs contend that these newly proposed classes satisfy the requirements for

certification. *See id.* Defendants argue that plaintiffs' proposed classes impose an unreasonable

extension on the classes suggested by the Court and that the proposed classes remain overly

broad and ill-defined. *See* Defendants' Opposition to Class Certification ("Defs.' Opp'n.") at 1.

## A. Federal Rule of Civil Procedure 23(a) Requirements

### 1. Numerosity

Rule 23(a) requires that the class be "so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1). The exact size of a class need not be known, plaintiffs

must only show that the proposed class is sufficiently large to meet the numerosity requirements.

*See Collier v. Montgomery County Housing Auth.*, 192 F.R.D. 176, 182 (E.D. Pa. 2000). In

determining numerosity, the number of potential class members is not, in itself, determinative.

*See Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.*, 149 F.R.D. 65, 73 (D.N.J. 1993).

The determination is very fact-specific; courts have granted class certification to a group of as

few as 20 members, but have denied class certification to groups ranging from 38 to 123

members. *See id.* at 74. Furthermore, when potential class members are able to protect and

defend their own interests, class certification is less appropriate. *See id.*

#### a. Substantive Due Process Class

Plaintiffs argue that the newly proposed substantive due process class meets the

numerosity requirements because there are approximately 9,250 children in DYFS custody, and

conclude that "[i]t is clear that thousands of these children are placed involuntarily." Pls.' Br. at

---

are not in the defined class. *See* Defendants' Opposition at 5. As plaintiffs do not rely upon the
inclusion of these unidentified future members to satisfy the class certification criteria, there is
not a compelling reason to exclude them from the class definitions at this time.

4

9. Plaintiffs make this assumption because defendants have stated that DYFS does not maintain statistics on the number of children who are involuntarily in the custody of the organization. Thus plaintiffs are unable to determine the exact number of children who are involuntarily in custody. *See id.* at 10-11. Defendants respond that plaintiffs cannot rely upon conclusory or speculative allegations that joinder is impracticable, and that they have not shown numerosity.[2] *See* Defs.' Opp'n. at 7. Plaintiffs reply that defendants do not dispute that there are thousands of children who are involuntarily in DYFS custody, and children included in the class will be readily identifiable. *See* Plaintiffs' Reply Brief ("Pls.' Reply") at 5. Plaintiffs are not obliged to define the exact class size, but must simply demonstrate that the class is large enough to meet the numerosity requirement. *See Collier*, 192 F.R.D. at 182. As it is undisputed that there are thousands of children in the involuntary custody of DYFS, it appears that sufficient numerosity of the substantive due process class has been established.

### b. Multiethnic Placement Act Class

Plaintiffs also argue that the proposed class of plaintiffs asserting a Multiethnic Placement Act ("MPA") claim satisfies the numerosity requirement. *See* Pls.' Br. at 11. Plaintiffs argue that defendants have identified more than 6,500 African-American and Hispanic children in foster care, and that all of those children are subject to the risk of suffering a delay or denial of adoption based on their race, color, or national origin due to defendants' alleged policies. *See id.* Defendants respond that plaintiffs have not alleged a system-wide policy of

---

[2] Defendants' arguments in this regard are interesting because they first contend that the proposed class is overbroad, and then argue that plaintiffs have not demonstrated numerosity. *See* Defs.' Opp'n. at 7. While the two concepts are not mutually exclusive, it does stand to reason that if there are too many plaintiffs included in the definition, at a minimum, the proposed class would satisfy the numerosity requirement.

5

delaying or denying adoptions based on the child's race. *See* Defs.' Opp'n. at 16. Defendants also contend that plaintiffs have failed to identify any children other than the named plaintiffs who have allegedly suffered such a delay or denial. *See id.* Finally, defendants argue "recent cases suggest that DYFS does not delay of [sic] deny the placement of [sic] adoption of children based upon race." *Id.* Plaintiffs reply that the complaint specifically alleges a system of ongoing discriminatory practices and policies of racial matching in foster and adoptive placements. *See* Pls.' Reply at 9 (quoting Plaintiffs' Amended Complaint ("Am. Compl.") ¶ 158). Plaintiffs also object to defendants' attempt to test the merits of their claims in opposing this motion for class certification. *See id.* at 8 n.5.

The amended complaint alleges that DYFS engages in a practice of discriminatory placement which results in the delay or denial of adoptions and foster care placements. *See* Am. Compl. ¶¶ 97, 158, 198. Plaintiffs have alleged that all African-American and Hispanic children in DYFS custody are subject to claimed discriminatory policies and practices within that organization. *See id.* At this time, the number of African-American and Hispanic children subject to the risk of such practices appear to satisfy the numerosity requirement of Rule 23(a)(1).

### 2. Commonality

Rule 23(a)(2) does not require that all issues presented be common, only that common questions exist. *See Collier*, 192 F.R.D. at 182. This requirement can be satisfied if the named defendants "share at least one question of fact or law with the grievances of the prospective class." *Baby Neal*, 43 F.3d at 56. There is no requirement that all putative class members share identical claims, and because this requirement may be satisfied by a single common issue, it is

6

easily met. *See id.* Further, putative class members may assert "a single common complaint

even if they have not all suffered actual injury; demonstrating that all class members are *subject*

to the same harm will suffice." *Id.* (emphasis in original).

### a. Substantive Due Process Class

Plaintiffs once again liken their position to that of the plaintiffs in *Baby Neal,* and argue

that all of the children in this proposed class share the common constitutional injury of a pattern

of unsupervised, untrained and overworked caseworkers. *See Pls.' Br.* at 12. Plaintiffs claim

that this pattern results in deficiencies of a constitutional dimension such as an insufficient

number of safe foster home placements as well as inadequate physical and mental health care for

children in the agency's custody. *See id. citing* Am. Compl. ¶¶ 164-217. Plaintiffs argue that

this pattern "subjects the proposed class to potential violations of their substantive due process

rights to be protected from harm" while in the involuntary care of the State, thereby establishing

commonality. *Id.* at 12.

Defendants respond that plaintiffs' alleged "systemic violations" do not create

commonality among the proposed class. *See* Defs.' Opp'n. at 8. They further argue that even

though the whole class does not need to suffer an identical injury; plaintiffs are not excused from

establishing that class members have suffered some type of injury.[3] *See id.* Defendants attempt

_____

[3] This argument relies upon the precedent addressing standing discussed in *Lewis v. Casey,* 518 U.S. 343 (1996). The Supreme Court in that case vacated an injunction crafted by the District Court and affirmed by the Ninth Circuit. *See Lewis,* 518 U.S. at 356. The injunction granted broad relief at the law libraries in the defendant prisons. *See Lewis,* 518 U.S. at 346-47. The Supreme Court held that such a broad injunction was unwarranted because the District Court had found only two isolated incidents of actual injury requiring relief under *Bounds v. Smith,* 430 U.S. 817. *See id.* However, *Lewis* does not stand for the proposition, as defendants argue, that each member of a potential class must demonstrate actual injury for standing purposes before a class may be certified. Rather, the Supreme Court held that the remedy imposed was beyond

7

to distinguish *Baby Neal,* solely on the fact that statutory as well as constitutional violations were at issue in that case. *See id.* at 10. Finally, defendants argue that plaintiffs' proposed class lacks commonality because it is "a farfetched contention: that all children involuntarily placed with DYFS have suffered an actual constitutional injury." *Id.* (emphasis in original). Plaintiffs reply that the questions of law and fact among the proposed class based upon the continual failure of DYFS to adequately provide for the children in its custody establish commonality. *See* Pls.' Reply at 5.

This Court has already rejected defendants' attempt to distinguish the *Baby Neal* case because it involved both statutory and constitutional allegations. *See* 6/28/01 Mem. Op. at 8-9. In the prior Memorandum Opinion denying class certification of one large class, this Court opined that a class such as the one certified in *Baby Neal* would be inappropriate because there are substantially fewer claims at issue in the instant matter than in *Baby Neal. See id.* at 9. Contrary to defendants' argument, Rule 23 does not require that all plaintiffs actually suffer the same injury. *See Baby Neal,* 43 F.3d at 57. Rather, "the commonality standard requires only that a putative class share either the injury or the immediate threat of being subject to the injury."[4] *Id.* at 60.

Plaintiffs allege that all children in the involuntary custody of DYFS are subject to the immediate threat of suffering due process violations of the State's duty to keep them free from

what was necessary to provide relief to the injured plaintiffs. *See id.* at 360.

[4] The Court is also not persuaded by defendants' insinuation that the Third Circuit incorrectly interpreted its own precedent while discussing *Hassine v. Jeffes,* 846 F.2d 169, 178 (3d Cir. 1988), in the context of the *Baby Neal* class certification decision. *See* Defs.' Opp'n. at 9 (quoting *Baby Neal,* 43 F.3d at 60).

8

harm. *See e.g.* Am. Compl. ¶¶ 165, 170, 180. This alleged harm results from inadequate placements or the failure to provide appropriate physical or mental health care. *See id.* Plaintiffs claim that these deficiencies stem from a pattern of inadequate training and supervision of caseworkers. *See id.* ¶¶ 199-201. These allegations are sufficient to create a finding of commonality among the newly proposed substantive due process class.

### b. MPA Class

Plaintiffs also contend that the proposed MPA class also satisfies the commonality requirement because all of the proposed members are subject to the risk of experiencing a delay or being denied adoption or foster placement based on their race, color or national origin. *See* Pls.' Br. at 13. Plaintiffs argue that racial matching violates the MPA, and that this claim is central to all of the putative class members. *See id.* Defendants respond that commonality is defeated because the Court will have to determine, on an individual basis, whether race was a determining factor in each class member's placement. *See* Defs.' Opp'n. at 17. Defendants further contend that there is no showing that all of the proposed class members are subject to the immediate threat of being subject to the injury of racial matching. *See id.* at 18. Plaintiffs reply that class certification is not defeated simply because there may be individual questions. *See* Pls.' Reply at 9.

As already noted, the commonality requirement does not demand that the questions presented by the named plaintiff be identical to those of the class members. *See Baby Neal,* 43 F.3d at 56. As such, the commonality inquiry is generally easily satisfied. *See Osgood v. Harrah's Entertainment, Inc.,* 202 F.R.D. 115, 123 (D.N.J. 2001). Plaintiffs allege a pattern of racial matching with respect to the proposed MPA class of African-American and Hispanic

9

children. Contrary to defendants' argument, there is no requirement that either plaintiffs or this Court attempt to determine whether each unidentified class member individually has sufficient standing to pursue the MPA claims at issue. Such a searching inquiry would defeat the purpose of class action lawsuits. At this time its appears that all of the proposed class members are subject to the risk of a MPA violation. Therefore, plaintiffs' allegations establish a sufficiently common thread to satisfy the commonality requirement at this time.

### 3. Typicality

The typicality inquiry is designed to assess whether the action can be efficiently pursued as a class and whether the named parties are adequately aligned with the interests of the class. *See Baby Neal*, 43 F.3d at 57. The typicality requirement is "intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Id.* Typicality looks to whether the claim of the proposed class "arises from the same events or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *See Liberty Lincoln Mercury, Inc.*, 149 F.R.D. at 77 (quotation omitted). It is important to not to confuse "typical" with "identical," because "even atypical elements of a claim may often be adequately treated by judicial severance, or the use of subclasses or other separate treatment of individual issues." *Id.* Factual differences among the proposed class members will not defeat certification. *See Baby Neal*, 43 F.3d at 56. As the commonality and typicality assessments are often broadly defined, they tend to merge because they focus on similar aspects of an alleged claim. *See Osgood*, 202 F.R.D. at 123.

### a. Substantive Due Process Class

Plaintiffs argue that the proposed due process class satisfies the typicality requirement

10

because the named plaintiffs and the absentee class members allege constitutional violations arising from the same course of defendants' conduct. *See* Pls.' Br. at 14. Plaintiffs claim that agency wide practices such as placements in inappropriate settings and the denial of necessary physical and mental health treatment establish a sufficient course of conduct which is applicable to all class members. *See id.* at 16-17. Plaintiffs assert that all of the class members are "victims of the systemic failures" of DYFS to provide necessary care. *See id.* at 17. Defendants argue that the proposed due process class is still overbroad and fails to identify the specific claims at issue. *See* Defs.' Opp'n. at 12. Defendants also contend that the proposed class fails to identify which named plaintiffs suffered from which claims. *See id.* Finally, defendants argue that "[s]ome reference to the conduct that plaintiffs allege constitutes the violation is essential." *Id.* at 15.

As discussed more fully in section II.A.2.a., *supra*, plaintiffs have delineated the specific conduct which they allege is violative of plaintiffs' due process rights. Thus, plaintiffs' allegations identify the particular claims that are at issue. Plaintiffs allege that the deficiencies in DYFS practices and procedures result in harm to children who are involuntarily in the agency's care. *See* Am. Compl. ¶¶ 199-201. This harm allegedly occurs from *inter alia*, improper foster care placement and a lack of appropriate medical care. *See* II.A.2.a, *supra*. Defendants do not point to any interests of the named plaintiffs that could conflict with the legal theories of the unidentified class members. Therefore, it also appears that typicality is satisfied with respect to the proposed due process class.

### b. MPA Class

Plaintiffs contend that the MPA class satisfies the typicality requirement because the

11

named plaintiffs and the proposed class members "have suffered, or are subject to the risk of suffering, a violation of their rights secured under MEPA." Pls.' Br. at 18. Plaintiffs also argue that there are no conflicts between the individual named plaintiffs and the unidentified class members. *See id.* Defendants respond that none of the named plaintiffs' claims are typical of a MPA violation. *See* Defs.' Opp'n. at 18. Defendants argue that Marco and Juan C do not properly allege a MPA violation and that even if they had, their claims would be atypical of the claims asserted by the class because they only complain about their emergency foster care placement. *See id.* Plaintiffs reply that this Court has already recognized that Marco and Juan C. have asserted a MPA claim. *See* Pls.' Reply at 10. Plaintiffs further argue that their claims are typical of other African-American and Hispanic children whose adoption or foster care placement has been delayed or denied because of race, color or national origin. *See id.*

The Multiethnic Placement Act allows for a private cause of action against an agency when it delays or denies the placement of a child for adoption or into foster care on the basis of race, color or national origin of the child or the prospective care taker. *See Charlie H.*, 83 F. Supp. 2d at 495. The proposed MPA class alleges that DYFS engages in a pattern of racial matching in violation of MPA. Marco and Juan C. specifically allege that they have been subject to racial matching. Their claims are sufficiently typical of the claims asserted by the proposed class to satisfy the typicality requirement of Rule 23(a) at this time.

### 4. Adequacy of Representation

The adequacy of representation requirement tests the qualifications of counsel to represent the class, and serves to uncover conflicts of interest between named parties and the class they seek to represent. *See Barnes*, 161 F.3d at 141. In defining what constitutes "fair and

12

adequate representation," the Third Circuit has stated that "[a]dequate class representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation; and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011 (1975). This requirement serves to "determine that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine v. Jeffes,* 846 F.2d 169, 179 (citing *General Telephone Co.,* 457 U.S. at 157 n.13).

As discussed in the prior Memorandum Opinion of this Court, plaintiffs' counsel appears competent to conduct this litigation on behalf of the proposed classes. *See* 6/28/01 Mem. Op. at 13-14. Therefore the Court will not revisit this issue, and will only consider the adequacy of the proposed named plaintiffs. Defendants do not contest the adequacy of the named plaintiffs for the substantive due process class.[5] Therefore, as the named plaintiffs' claims do not appear to be antagonistic to the unnamed class members, there is no need for the Court to engage in an extended discussion about those class representatives.

However, defendants have raised an objection to the adequacy of the representation of the proposed MPA class. Defendants argue that Sharon K. is an inadequate representative of the MPA class because her claims became moot upon her adoption. *See* Defs.' Opp'n. at 20.

---

[5] In a footnote, defendants once again request that this Court consider the adequacy of the next friends chosen to litigate on behalf of the infant plaintiffs. *See* Defs.' Opp'n. at 10 n.7. However, the Court has already clearly declined to undertake such an examination at this time. If defendants wish to challenge the next friends, they may make an appropriate motion.

13

Defendants contend that Sharon K. does not have standing or incentive to pursue the MPA claim and that by the time plaintiffs' amended motion for class certification was filed, her claims were already moot. *See id.* at 20-21. Plaintiffs respond that Sharon K.'s MPA claims were live when the initial motion for class certification was filed, and that her claims have never changed. *See* Pls.' Reply at 11. Further, plaintiffs argue that her claims should relate back to the filing of the original motion for class certification because the motion has been pending since that time. *See* Pls.' Reply at 11. Plaintiffs also contend that if the Court accepted defendants' argument, any time a class was redefined after it was initially certified, any named plaintiffs with moot claims would have to be dismissed. *See id.* However, plaintiffs' argument misses the mark.

As a general rule, "a named plaintiff whose individual claims have expired may continue in his representative capacity to litigate class certification issues only for two limited purposes: (1) to argue a certification motion that **was filed before his claims expired** ...; and (2) to appeal a denial of a class certification motion presented when his claims were live." *Lusardi v. Xerox Corp.,* 975 F. 2d 964, 975 (3d Cir. 1992) (emphasis supplied). This Court unambiguously denied plaintiffs' last motion for class certification because plaintiffs proposed an inappropriate and overly broad class. *See* 6/28/01 Mem. Op. at 16-17. Contrary to plaintiffs' suggestion, there has not been a continuously pending motion for class certification. Sharon K.'s claims were moot at the time the instant motion for class certification was filed, and she cannot be an adequate representative of the class which she seeks to represent.[6]

However, Marco and Juan C. remain viable representatives of the MPA class. The Court

_____

[6] Plaintiffs cannot claim a continuously pending motion for class certification simply because they captioned the instant motion the "Third Modified Motion for Class Certification."

initially expressed some concern about the adequacy of Marco and Juan C. because they are Hispanic, and the MPA claims have been asserted on the behalf of both African-American and Hispanic children. *See id.* at 15-16. However, plaintiffs contend that it is the defendants' broad policy of racial matching in adoptions and foster care placements which affects both African-American and Hispanic children in DYFS custody. *See* Pls.' Br. at 20-21. Further, plaintiffs argue that the entire class seeks the same relief, and ending the practices of racial matching will not work to the detriment of either party. *See id.* It appears that Marco and Juan C. will be able to adequately represent the interests of the MPA class at this time. However, should the Court determine later that an additional named plaintiff is necessary to protect the interests of absentee class members, the Court will exercise its discretion in that regard. Therefore, at this time, plaintiffs have demonstrated that Marco and Juan C. will adequately represent the interests of the proposed MPA class.

## B. Federal Rule of Civil Procedure 23(b)(2) Requirements

Plaintiffs are seeking class certification under Rule 23(b)(2), which provides for class certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). The party seeking class certification must prove that the party opposing the class acted in a manner that is generally applicable to the class, which would make injunctive or declaratory relief appropriate to the entire class. *See Hassine,* 846 F.2d at 179. Essentially, the question is whether the relief sought will benefit the entire class. *See id.* (citing *Baby Neal,* 43 F.3d at 59).

Plaintiffs argue that the proposed classes satisfy the requirements of 23(b)(2) because

15

they seek relief which would benefit both of the individual classes. *See* Pls.' Br. at 22. The substantive due process class seeks relief from the harm inflicted upon them while involuntarily in the custody of DYFS as a result of conditions such as inadequate training and improper health and psychiatric care. *See id.* at 22-23. Similarly, the MPA class seeks relief based from the alleged practice of delaying or denying adoptions or foster care placement based on the child's race, color or national origin. *See id.* at 23.

Defendants argue that plaintiffs have not adequately alleged a uniform policy applicable to all the members of each class. *See* Defs.' Opp'n. at 24. They contend that there has not been any group injury, and the Court could not issue an injunction if the remedy would be more broad than necessary to address plaintiffs' claims. *See id.* at 25. Plaintiffs reply that they have alleged various "systemic deficiencies" in DYFS operations. *See* Pls.' Reply at 12. Further, they stress that Rule 23(b)(2) only requires that the relief sought be generally applicable to the class, not only related to a group injury. *See id.*

Each of the remaining claims and the desired relief asserted by the plaintiffs appear to be generally applicable to these two smaller classes. The proposed substantive due process class alleges violations of their right to be free from harm while in the custody of the government, and the plaintiffs allege various practices which result in harm to the class members. Class members seek relief to correct these alleged practices. Therefore, it appears that the prospective injunctive relief sought would be generally applicable to the proposed substantive due process class. Similarly, the MPA class alleges that DYFS engages in racial matching which results in the denial and delay of adoptions and foster care placements for African-American and Hispanic children in violation of MPA. These class members are also seeking prospective injunctive relief

16

to end the alleged practice of racial matching. Therefore, it also appears that the relief sought by the MPA plaintiffs is generally applicable to the proposed class.

However, the Court is acutely aware of its responsibility to ensure that this lawsuit is efficiently maintained as a class action. If at any time it appears that continuation of this lawsuit as a class action becomes unduly burdensome, or individual trials on the merits become necessary, the Court will exercise its discretion to decertify or modify the classes certified herein.

17

## III. CONCLUSION

For the above mentioned reasons, plaintiffs' motion for class certification is granted. An appropriate form of Order shall be filed herewith.

GARRETT E. BROWN, JR., U.S.D.J.

18